**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES AND REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (PJW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Brian S. Hermann
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
        December 23, 2005

# TABLE OF CONTENTS

                                                                                                    Page

I. INTRODUCTION ...........................................................................................................5

    A.    Holders of Claims Entitled to Vote ......................................................7
    B.    Voting Procedures ...............................................................................8
    C.    Confirmation Hearing .........................................................................9

II. OVERVIEW OF THE PLAN ....................................................................................10

III. OVERVIEW OF CHAPTER 11 ............................................................................15

IV. COMPANY BACKGROUND ................................................................................16

    A.    General Background ..........................................................................16
    B.    The Debtors ......................................................................................17
    C.    The Businesses..................................................................................17
    D.    Debtors' Prepetition Capital Structure..............................................18

V. EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11
    CASES ........................................................................................................................20

VI. THE CHAPTER 11 CASE ......................................................................................23

    A.    Significant "First Day" Motions........................................................23
    B.    DIP Credit Facilities, Exit Facilities and Supplemental Liquidity
             Facility..............................................................................................24
    C.    Official Committee of Unsecured Creditors.....................................25
    D.    Ad Hoc Committee of Senior Secured Noteholders.........................25
    E.    Claims Process..................................................................................25
    F.    Assumption/Rejection of Leases and Executory Contracts...............26
    G.    Reclamation Claims ..........................................................................27
    H.    KERP ................................................................................................27
    I.    Disclosure Statement/Plan Confirmation Hearings .........................28

VII. SUMMARY OF THE PLAN ..................................................................................29

    A.    Introduction.......................................................................................29
    B.    Classification and Treatment of Administrative Claims, Claims and
             Equity Interests Under the Plan ........................................................29
    C.    Provisions Regarding Corporate Governance and Management of
             the Reorganized Debtors...................................................................37
    D.    Securities to be Issued Pursuant to the Plan .....................................38
    E.    Powers of Officers ............................................................................40
    F.    Dissolution or Merger of Certain Debtors ........................................40
    G.    Substantive Consolidation ................................................................40

      H.      Provisions Regarding Means of Implementation, Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims ................................................................42

      I.       Disputed and Unliquidated Personal Injury Tort and Wrongful Death Claims .......................................................................47

      J.       Estimation .......................................................................47

      K.     Administrative Claims of Indenture Trustees............................48

      L.      Nonconsensual Confirmation ..............................................48

      M.    Effect of Confirmation of the Plan ........................................48

      N.     Retention of Jurisdiction....................................................53

      O.     Miscellaneous Provisions ...................................................53

      P.      Executory Contracts and Unexpired Leases ..............................56

      Q.     Benefit Plans....................................................................57

      R.     Confirmation and Effectiveness of the Plan ..............................58

**VIII. PROJECTIONS AND VALUATION** ................................................60

      A.     Financial Projections .........................................................61

      B.     Valuation Overview...........................................................63

      C.     Valuation Methodologies.....................................................64

      D.     Reorganization Value .........................................................66

**IX. CERTAIN RISK FACTORS TO BE CONSIDERED** ...........................68

      A.     Projected Financial Information ............................................68

      B.     Risks Related to the Debtors' Business and Operations..................68

      C.     Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness.......................................70

      D.     Certain Bankruptcy Law Considerations..................................71

      E.     Certain Risks Relating to the Equity Securities under the Plan................71

**X. CONFIRMATION PROCEDURE** ..................................................72

      A.     Solicitation of Votes .........................................................72

      B.     The Confirmation Hearing ..................................................73

      C.     Confirmation ...................................................................74

**XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...............................................................................77

      A.     Liquidation Under Chapter 7 ...............................................77

      B.     Alternative Plan of Reorganization or Plan of Liquidation ......................77

**XII. SECURITIES LAW MATTERS**....................................................78

      A.     Bankruptcy Code Exemptions from Registration Requirements...............78

**XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ...............................................................................81

      A.     Consequences to Creditors ..................................................82

      B.     Additional Tax Considerations for All Holders of Claims ......................84

2

  C.  Consequences to the Debtors — Cancellation of Debt ............................85

  D.  Section 382 ..................................................................................................86

**XIV. CONCLUSION** ................................................................................................88

**EXHIBITS** ...............................................................................................................91

Doc #:NY7:35140.22

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. **ALL CREDITORS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. <u>SEE</u> ARTICLE IX BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN THE LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY

4

FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

# I.

## INTRODUCTION

On September 19, 2005 (the "Petition Date"), Foamex International Inc. ("Foamex International"), Foamex L.P., Foamex Latin America, Inc. ("Foamex Latin America"), Foamex Asia, Inc. ("Foamex Asia"), FMXI, Inc. ("FMXI"), Foamex Carpet Cushion LLC ("Foamex Carpet Cushion"), Foamex Capital Corporation ("Foamex Capital"), Foamex Mexico, Inc. ("Foamex Mexico") and Foamex Mexico II, Inc. ("Foamex Mexico II") (each a "Debtor," and collectively, the "Debtors" or "Foamex")[1] filed their petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").[2]

On December 23, 2005, the Debtors filed their proposed joint plan of reorganization, dated December 23, 2005 (the "Plan"), which sets forth the manner in which Claims against and Equity Interests in the Debtors will be treated. This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan, the Debtors' business and related matters.

After a careful review of Foamex's business and its prospects as a going concern, Foamex, in consultation with its legal and financial advisors, and the Ad Hoc Committee of Senior Secured Noteholders and its legal and financial advisors, concluded that recoveries to creditors would be maximized by Foamex's continued operation as a

---

[1] In addition to the Debtors, on or about the Petition Date, Foamex Canada Inc., a wholly-owned non-debtor subsidiary of Foamex L.P., sought and obtained an interim, and later a final, order from the Ontario Superior Court of Justice recognizing the Chapter 11 Cases as "foreign proceedings" for purposes of Section 18.6 of the *Companies' Creditors Arrangement Act* (the "Recognition Order"). The Recognition Order provides for, among other things, (a) a limited duration stay of any enforcement action or proceeding with respect to Foamex Canada Inc. and its property on the terms described therein, which has been extended through February 6, 2006, and may be further extended by order of the Ontario Superior Court of Justice, and (b) authorization allowing Foamex Canada Inc. to guarantee the Debtors' obligations arising under the DIP Credit Facilities and to grant liens on its assets as security therefor.

[2] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

going concern under the terms of the Plan. In other words, Foamex is worth more to its creditors as a going concern than upon liquidation.

To achieve that higher value, the Plan contemplates (among other things): (i) payment in full in Cash either on or after the Effective Date to holders of Allowed (a) Administrative Claims, (b) Priority Tax Claims, (c) DIP Financing Claims, (d) Other Priority Claims and (e) Other Secured Claims; (ii) issuance of 100% of the New Common Stock (subject to dilution, as described below) to holders of Allowed Senior Secured Note Claims; (iii) issuance of New Warrants to holders of Allowed Senior Subordinated Note Claims, provided that the Class of Senior Subordinated Note Claims votes to accept the Plan; (iv) distribution of the General Unsecured Claim Distribution Amount to holders of Allowed General Unsecured Claims, provided that the Class of General Unsecured Claims votes to accept the Plan; (v) reinstatement of Intercompany Claims; (vi) no recovery for the holders of Subordinated Claims; (vii) allowing holders of Equity Interests in Surviving Debtor Subsidiaries to retain such interests; and (viii) the cancellation of (a) Old Preferred Stock and (b) Old Common Stock and Other Equity Interests.

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2006, at _____, prevailing Eastern Time.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- An Order of the Court (excluding the exhibits thereto) dated _____, 2006 (the "Disclosure Statement Order"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

- Foamex's Financial Projections (Exhibit C);

- Foamex's Liquidation Analysis (Exhibit D); and

- Foamex's Exit Financing Commitments (Exhibit E).

In addition, Foamex's Annual Report on Form 10-K for the fiscal year ended January 2, 2005, and Foamex's Quarterly Reports on Form 10-Q for the first three quarters of fiscal year 2005 ending on April 3, 2005, July 3, 2005 and October 2, 2005, respectively, are available for inspection online at Foamex's dedicated webpage on Bankruptcy Services, LLC's website at www.bsillc.com.

Finally, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

By order dated _____, 2006, after notice and a hearing, the Court signed the Disclosure Statement Order, determining that the Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT <u>AND</u> THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A.    Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

7

Classes 3 (Senior Secured Note Claims), 4 (Senior Subordinated Note Claims), 5 (General Unsecured Claims), 8 (Old Preferred Stock), 9A (Subordinated Claims) and 9B (Old Common Stock and Other Equity Interests) under the Plan are Impaired. To the extent Claims in Classes 3, 4 and 5 are Allowed Claims, the holders of such Claims are entitled to vote to accept or reject the Plan. Classes 8, 9A and 9B will receive no distributions pursuant to the Plan and, thus, pursuant to section 1126(g) of the Bankruptcy Code, such holders are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 6 (Intercompany Claims) and 7 (Equity Interests in Surviving Debtor Subsidiaries) of the Plan are unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Classes 1, 2, 6 and 7 are conclusively deemed to have accepted the Plan and therefore may not vote to accept or reject the Plan. ACCORDINGLY, A BALLOT TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, AND 5.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article X below.

Because Classes 8, 9A and 9B are deemed to reject the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article X.C below.

For a summary of the treatment of each Class of Claims and Interests, see Article II below.

## B. Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims. Please vote and return your Ballot(s).

If you received a Ballot from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution promptly so that it can be forwarded to the Debtors' voting tabulation agent, Bankruptcy Services, LLC. If you received a Ballot(s) from the Debtors, please vote and return your Ballot(s) directly to the following address:

Bankruptcy Services, LLC
<u>Attn</u>: Foamex Balloting
757 Third Avenue, 3rd Floor
New York, NY 10017
Tel.: (646) 282-2500

DO NOT RETURN YOUR NOTES OR ANY OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON _____, 2006.

Any Claim in Class 3, 4, or 5 to which an objection or request for estimation is pending, or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed, is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing such Claim for the purpose of voting on the Plan. In addition, the Debtors propose that Ballots cast by alleged creditors whose Claims (a) are not listed on the Debtors' Schedules of liabilities or (b) are listed as disputed, contingent and/or unliquidated on the Debtors' Schedules of liabilities, but who have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate Claim amount requirements of that section.

Pursuant to the Disclosure Statement Order, the Court set _____, 2006, the date of the entry of the Disclosure Statement Order, as the record date (the "<u>Voting Record Date</u>") for voting on the Plan. Accordingly, only holders of record as of _____, 2006 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Bankruptcy Services, LLC at (646) 282-2500 from 9 a.m. to 6 p.m., prevailing Eastern Time, Monday through Friday.

C.     **Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Court has scheduled a hearing to consider confirmation of the Plan for _____, 2006 at _____ prevailing Eastern Time before the Honorable Peter J. Walsh, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the "<u>Confirmation Hearing</u>"). The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before _____, 2006 at

4:00 P.M., prevailing Eastern Time, in the manner described below in Article X.B. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

IN ADDITION, THE AD HOC COMMITTEE OF SENIOR SECURED NOTEHOLDERS SUPPORTS THE PLAN AND RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

## II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Interests thereunder.

SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.[3]

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Claims | Unimpaired; except with respect to the Administrative Claims that are Fee Claims, each holder of an Allowed Administrative Claim shall either be paid in full, in Cash on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or (b) receive such other treatment as the Debtors and such holder | $_____ | 100% |

---

[3] This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

Doc #:NY7:35140.22

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | shall have agreed upon; provided that Ordinary Course Administrative Claims will be paid in the ordinary course of the Reorganized Debtors' business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions. | | |
| -- | Priority Tax Claims | Unimpaired; at the option of the Reorganized Debtors, each holder of an Allowed Priority Tax Claim shall either (a) be paid in full, in Cash on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) be paid over a six-year period from the date of assessment as provided in section 1129(a)(9)(c) of the Bankruptcy Code with interest at the statutory rate provided for under applicable federal, state or local law. | $_____ | 100% |
| -- | DIP Financing Claims | Unimpaired; except to the extent that the holders of DIP Financing Claims and the Debtors agree to a different treatment, the holders of DIP Financing Claims shall receive payment in full in Cash of all obligations calculated in accordance with the applicable instruments and agreements. | $243,953,115[4] | 100% |
| 1 | Other Priority | Unimpaired; except to the extent | Nominal | 100% |

---

[4] Amount estimated to be outstanding as of assumed Effective Date.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | Claims | that the holder and the Debtors agree to a different treatment, each holder of an Allowed Other Priority Claim will be paid in full, in Cash, on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. | | |
| 2 | Other Secured Claims | Unimpaired; except to the extent that the holder and the Debtors agree to a different treatment, at the option of the Debtors, each Allowed Other Secured Claim shall either be (a) reinstated by curing all outstanding defaults with all legal, equitable and contractual rights remaining unaltered, (b) paid in full, in Cash, plus any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (c) fully and completely satisfied by delivery or retention of the collateral securing the Other Secured Claim, on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim or as soon thereafter as is practicable. | $_____ | 100% |

12

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| 3 | Senior Secured Note Claims | Impaired; on the Initial Distribution Date, each holder of an Allowed Senior Secured Note Claim (i) shall receive its pro rata share of 15,840,000 shares of New Common Stock (such 15,840,000 shares of New Common Stock representing 100% of the New Common Stock to be issued and outstanding on the Effective Date, subject only to the issuance of shares of New Common Stock pursuant to the Management Incentive Plan, the KERP and the exercise of the New Warrants, if any, distributed to the holders of Allowed Class 4 Senior Subordinated Note Claims) and (ii) shall be deemed to have received its pro rata share of the adequate protection payments made throughout these Chapter 11 Cases pursuant to paragraph 13(d) of the DIP Order. | $312,452,083.33 | 67%[5] |
| 4 | Senior Subordinated Note Claims | Impaired; if Class 4 votes to accept the Plan, then on the Initial Distribution Date, each holder of an Allowed Senior Subordinated Note Claim shall receive its pro rata share of the New Warrants. If Class 4 votes | $208,150,130.55 | Approximately 1%.[6] |

---

[5] The estimated recovery is based on the mid-point valuation and is calculated on a non-diluted basis. The estimated recovery based on the mid-point valuation calculated on a fully diluted basis is 66%. For a discussion of the estimated value range, see Article VIII.D below.

[6] The estimated recovery is based on the mid-point valuation calculated on a fully diluted basis. For a discussion of the value of New Warrants see Article VIII.D below.

13

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|-------|----------------------------------|-----------|-------------------------------------|---------------------|
| | | to reject the Plan, then holders of Allowed Senior Subordinated Note Claims shall not be entitled to receive or retain any property on account of such Claims. | | |
| 5 | General Unsecured Claims | Impaired; if Class 5 votes to accept the Plan, then on the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its pro rata share of the General Unsecured Claim Distribution Amount; provided, however, that in no event shall the holder of an Allowed General Unsecured Claim receive a distribution in excess of 5% of the Allowed amount of such General Unsecured Claim.  If Class 5 votes to reject the Plan, then holders of Allowed General Unsecured Claims shall not be entitled to receive or retain any property on account of such Claims. | $_____ | Up to 5%[7] |

---

[7] Percentage recovery will depend upon aggregate amount of Allowed General Unsecured Claims.

Doc #:NY7:35140.22

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| 6 | Intercompany Claims | Unimpaired. All Intercompany Claims will remain outstanding and will be reinstated on the Effective Date and will be settled in accordance and in a manner consistent with the historical practices of the relevant Debtor(s). | $4.4 million | 100% |
| 7 | Equity Interests in Surviving Debtor Subsidiaries | Unimpaired; holders of Equity Interests in Surviving Debtor Subsidiaries shall retain such Equity Interests. | N/A | 100% |
| 8 | Old Preferred Stock | Impaired; holders of Old Preferred Stock shall not be entitled to receive or retain any property on account of such Old Preferred Stock. | N/A | 0% |
| 9A | Subordinated Claims | Impaired; holders of Subordinated Claims shall not be entitled to receive or retain any property on account of such Claims. | $0 | 0% |
| 9B | Old Common Stock and Other Equity Interests | Impaired; holders of Old Common Stock and Other Equity Interests shall not be entitled to receive or retain any property on account of such Interests. | N/A | 0% |

## III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment

Doc #:NY7:35140.22

for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.

## COMPANY BACKGROUND

### A. General Background

As of July 3, 2005, the date of the last quarterly report on Form 10-Q filed by Foamex International prior to the Petition Date, the Debtors' books and records indicated approximately $620,826,000 in assets and outstanding liabilities of approximately $1,004,534,000 which included approximately $535,000,000 of secured debt. As of December 16, 2005, approximately 1,096 parties asserted claims against the Debtors in the aggregate amount of approximately $3,569,415,779.81, which includes duplicative or otherwise objectionable Claims.[8]

---

[8] As the Bar Date for Claims other than Administrative Claims passed on December 8, 2005, the Debtors are only now beginning to reconcile the recently filed claims against their books and records. The Debtors anticipate that, through objections to duplicate and otherwise objectionable Claims to be filed in coming weeks, they will significantly reduce the number and amount of Claims on file.

Doc #:NY7:35140.22

**B.     The Debtors**

Headquartered in Linwood, Pennsylvania, Foamex International is a public holding company that, as of the Petition Date, along with its subsidiaries and affiliates, employed approximately 5,450 people worldwide and maintained 42 domestic and 9 international manufacturing facilities located throughout the United States, Canada and Mexico.[9] Foamex International believes that it is the largest manufacturer of flexible polyurethane and advanced polymer foam products in North America, with annual net sales of approximately $1.3 billion in 2004 and $972 million for the first three quarters of 2005. Foamex International's domestic operations are conducted through Foamex L.P., a Delaware limited partnership, in which Foamex International owns a 98.284% limited partnership interest. FMXI, a Delaware corporation and a wholly-owned, non-operating subsidiary of Foamex International, is a 1.716% owner and the general partner of Foamex L.P.

The other Debtors – Foamex Latin America, Foamex Asia, Foamex Carpet Cushion, Foamex Capital, Foamex Mexico and Foamex Mexico II – are all Delaware companies and subsidiaries of Foamex L.P. Foamex Latin America is a holding company and the parent of Foamex Mexico, itself an intermediate holding company and the ultimate parent of various nondebtor intermediate holding and operating companies and subsidiaries through which the Debtors conduct business in Mexico. Foamex Asia is the 70% owner of Foamex Asia Co., Ltd., which is a joint venture through which Foamex conducts business in China, Indonesia, Japan, Korea, Malaysia, Philippines, Singapore, Taiwan and Thailand. Foamex Carpet Cushion is an inactive corporation through which the Debtors previously conducted their carpet underlay business. Foamex Capital is a financing corporation and is the co-issuer and co-obligor of the Senior Secured Notes and the Senior Subordinated Notes. Foamex Mexico II is presently dormant.

**C.     The Businesses**

The Debtors' operations consist of the following business lines or "strategic business units" ("SBUs"): foam products, automotive products, technical products and carpet cushion products.

The Debtors' foam products group, their largest SBU based on net sales, serves various comfort, industrial and consumer products markets with a mixture of specialty and commodity products. The Debtors' foam products are used primarily in various bedding and furniture items, including quilting rolls, toppers, cores and border rolls for mattresses, upholstered seating products, mattress overlay pads, leisure furniture,

---

[9]     Since the Petition Date, the Debtors have closed several carpet cushion warehouses. In addition, the Debtors are currently in the process of closing three manufacturing facilities in connection with the discontinuation of certain business lines within their Consumer Products Group. The products for the remaining business lines will be manufactured at certain of the Debtors' other Foam Products facilities. The Debtors continue to examine their current manufacturing and warehousing operations and it is possible that additional closures may be implemented in the future.

17

futons and pillows. The Debtors' bedding and furniture products are sold directly to manufacturers as well as through distributors.

The Debtors' automotive products group, their second largest SBU, is one of the largest suppliers of polyurethane foam products to the North American automotive industry. The automotive products group produces, among other things, foam rolls, flame and adhesive laminated composites, thermoformable foams, acoustical foams, basic foam products, energy absorbing foams and molded seat cushions. The Debtors' automotive foam products are sold through a range of tiers in the automotive industry's supply chain. The Debtors primarily supply Tier 1 system integrators that in turn supply original equipment manufacturers, or so-called "OEMs" (e.g., General Motors, Ford and Daimler Chrysler).

The Debtors' technical products group produces innovative specialty foam materials and solutions for use in the automotive, consumer, electronic, industrial and medical fields. Its products are found in various consumer and business products, including sponges, band-aids, cleaning brushes and laser and inkjet printers.

The Debtors' carpet cushion segment is primarily a by-product business utilizing the scrap foam generated by the foam manufacturing operations and outside sources to create carpet underlay. This scrap by-product is re-bonded to form rebond carpet underlay, which accounts for approximately 90% of the revenue of this SBU. The Debtors' carpet cushion products are sold through various wholesalers, "big box" home centers (e.g., Home Depot), retail buying groups and chains and independent retailers and contractors.

## D.    Debtors' Prepetition Capital Structure

### 1.    Secured Financing

Prior to the Petition Date, the Debtors had a relatively complex capital structure including three primary layers of secured debt consisting of a bank revolving credit and term loan A facility, a term loan B facility and second-lien bond indebtedness. Specifically, Foamex L.P. was a borrower under a $190 million revolving credit facility (as amended, the "Bank Facility") with Bank of America, N.A., as agent, and certain other lenders party thereto. Foamex L.P. was also the borrower under two separate secured term loans: a term loan A (as amended, the "Term Loan A") in the approximate principal amount of $33 million with Bank of America, N.A., as lender, and other lenders party thereto, and an $80 million principal amount term loan B (as amended, the "Term Loan B," and together with the Term Loan A, collectively, the "Term Loans") with Silver Point Finance, LLC, as agent, and the other lenders party thereto. The Debtors' obligations under each facility were guaranteed by each of the Debtors that was not a primary obligor and by Foamex Canada Inc., a Canadian wholly-owned subsidiary of

Foamex L.P., and were secured by a first priority lien on, and security interest in, substantially all of the assets of Foamex L.P. and the guarantors.[10]

In addition to the Bank Facility and the Term Loans, pursuant to an indenture (the "Senior Secured Notes Indenture"), dated as of March 25, 2002, Foamex L.P. and Foamex Capital issued $300 million (original principal amount) of 10 3/4% Senior Secured Notes due April 1, 2009 (the "Senior Secured Notes"). Payment of the Senior Secured Notes was guaranteed by each of the other Debtors except Foamex International and FMXI. The Senior Secured Notes were secured by second liens on substantially the same collateral that secured the obligations under the Bank Facility and the Term Loans.

In addition to the three primary layers of secured debt referenced above, as of the Petition Date, the Debtors had approximately $7.0 million of other secured debt, including, inter alia, two industrial revenue bonds ("IRBs") with face amounts of $1.0 million and $6.0 million. The IRBs were both secured by letters of credit and liens on the facilities constructed with the funds. The Issuer of the $1.0 million IRB was the Delaware County (PA) Industrial Development Authority. The proceeds of that bond issuance were originally used to construct an approximately 50,000 square foot foam bun room addition at the Debtors' Eddystone, Pennsylvania facility. The $1.0 million IRB matured on October 1, 2005 and was retired. The Issuer of the $6.0 million IRB was the county of Dona Ana, New Mexico. The proceeds of that bond issuance were used to fund the original construction of the Debtors' Santa Teresa, New Mexico facility, consisting of approximately 84,800 square feet of manufacturing and warehousing space and an additional 5,000 square feet of office space, and the equipment initially used at the facility. The $6.0 million IRB matures in November 2013 and, pursuant to the Plan, will be reinstated and paid according to its terms.

## 2.    Unsecured Financings

On the Petition Date, the Debtors also had outstanding two tranches of subordinated bonds. Specifically, pursuant to an indenture, dated as of June 12, 1997 (the "2007 Senior Subordinated Notes Indenture"), Foamex L.P. and Foamex Capital issued $150 million (original principal amount) of 9 7/8% Senior Subordinated Notes due June 15, 2007 (the "2007 Senior Subordinated Notes"). Separately, pursuant to an indenture, dated as of December 23, 1997 (the "2005 Senior Subordinated Notes Indenture," and, together with the 2007 Senior Subordinated Notes Indenture, the "Senior Subordinated Notes Indentures"), Foamex L.P. and Foamex Capital issued $98 million (original principal amount) of 13 1/2% Senior Subordinated Notes, that matured on August 15, 2005 (the "2005 Senior Subordinated Notes," and, together with the 2007 Senior

---

[10] The obligations under the Bank Facility and the Term Loans ranked pari passu in right of payment; however, pursuant to an intercreditor agreement between the agent for the Bank Facility and the Term Loan A, on the one hand, and the Term Loan B agent, on the other, the lenders under the Bank Facility and the Term Loan A had prior rights in and to the Debtors' collateral that secured the obligations under the Bank Facility and the Term Loan A.

Subordinated Notes, collectively, the "Senior Subordinated Notes").[11] The 2007 Senior Subordinated Notes and the 2005 Senior Subordinated Notes are unsecured obligations of Foamex L.P. and Foamex Capital (as well as the Debtors that have guaranteed the obligations thereunder as set forth in the Senior Subordinated Notes Indentures) and are subordinated in right of payment to the secured debt, but rank pari passu in right of payment with each other and with the Debtors' other unsecured obligations.

In addition to the foregoing bank and bond indebtedness, the Debtors also had approximately $90,000,000 in ordinary course trade debt that was unpaid as of the Petition Date.

3.    **Equity Interests in Foamex International**

On the Petition Date, Foamex International had 50,000,000 shares of Old Common Stock authorized for issuance of which 24,509,728 shares were outstanding, with an additional 3,489,000 shares issued and held in treasury. In addition, pursuant to various stock option plans, on the Petition Date, there were outstanding options to purchase an additional 3,663,174 shares of Old Common Stock. As of the Petition Date, there were approximately 129 record holders of the Old Common Stock. Prior to the Petition Date, Foamex International's Old Common Stock was publicly held and traded on the Nasdaq National Market ("NASDAQ") under the ticker symbol "FMXI."[12] In addition, as of the Petition Date, Foamex International had 5,000,000 shares of Old Preferred Stock authorized for issuance of which 15,000 Series B shares were outstanding.[13]

**V.**

**EVENTS LEADING TO COMMENCEMENT
OF THE CHAPTER 11 CASES**

Since 2001, the Debtors have experienced a dramatic decline in their operating performance. Specifically, the Debtors' gross profit margin declined by 3.0% from 14.2% in 2001 to 11.2% in 2004. The Debtors' over-leveraged balance sheet significantly contributed to this decline. Also contributing to the deterioration in the Debtors' operating performance was a confluence of events, including a significant

---

[11]   Through the Debtors' prior repurchases of the 2005 Senior Subordinated Notes, the principal amount outstanding at maturity was $51.6 million.

[12]   Subsequent to the Debtors' Chapter 11 filings, on or about September 28, 2005, NASDAQ delisted Foamex International's Old Common Stock. The Old Common Stock now trades on the OTC Bulletin Board under the ticker symbol "FMXIQ.PK."

[13]   All of Foamex International's issued and outstanding Series B Preferred Stock is held by The Bank of Nova Scotia or its affiliates.

increase in the prices of the Debtors' primary raw materials and the severe downturn in the U.S. automotive industry. These factors are discussed in greater detail below.

The Debtors' bank and bond indebtedness – totaling more than $740 million in principal amount – significantly impaired the Debtors' operating performance in several key respects. First and foremost, the Debtors' need to service their heavy debt load limited their ability during the last three years to make much needed capital investments and improvements. The lack of capital investment, in turn, hampered the Debtors' ability to remain cost-competitive which, in consequence, resulted in a reduction in unit volume, particularly in the highly competitive bedding and furniture markets where the Debtors manufacture commodity-type products.

Additionally, prior to the Petition Date, the Debtors' customers grew concerned about the Debtors' financial condition. In view of their concern, a few of the Debtors' significant customers took steps to source a portion of their business elsewhere and/or suspend placing new orders with the Debtors.

Compounding the Debtors' decrease in volume has been the dramatic increase over the past few years in the prices of the chemicals that comprise the vast majority of the Debtors' raw material requirements – specifically, polyol, TDI and MDI. At least five primary factors have contributed to the price increases: first, worldwide demand for MDI had increased dramatically which has caused it to be in short supply. Second, a reduction in domestic capacity of propylene oxide, a major chemical component of polyol, resulted in a significant decrease in the supply of polyol. Third, given the Debtors' financial distress, many of the Debtors' major chemical suppliers placed strict credit limits on the Debtors' purchases which, in turn, compromised the Debtors' ability to leverage its purchasing scale to obtain more attractive pricing through volume discounts and the like. Fourth, the primary urethane chemicals used to create polyol, MDI and TDI – propylene, toluene and benzene – are each oil-based derivatives. The cost of these raw materials generally tracks the price of oil and energy costs and, consequently, the cost of these chemicals rose dramatically in the year prior to the Petition Date. Lastly, the effect of Hurricane Katrina in the Gulf region further eroded the availability and accessibility of these chemicals.

Collectively, these factors contributed to chemical price increases of more than 20% from the first to the fourth quarter of 2004, and a further increase of more than 10% in the first quarter of 2005. Although the Debtors were able to pass a portion of these cost increases on to their customers, given the highly competitive environment in which they operate, the Debtors were unable to pass along all such increases, particularly in certain SBUs, and, as a consequence, the Debtors saw their gross margins and operating income erode dramatically.

Finally, the problems facing the North American automotive industry together with certain product-related factors such as the move away from SUVs in the first half of 2005 negatively impacted the Debtors' automotive business, which is their second largest revenue source. In the months leading up to the Petition Date, several Tier

1 automotive suppliers sought bankruptcy protection and others scaled back their production. In addition, many OEMs were facing their own financial difficulties.

In view of these external factors, and cognizant of the need to restructure their balance sheet, prior to the Petition Date, the Debtors initiated steps to rationalize their business by refocusing on their core competencies. Along those lines, in 2002 and 2003, the Debtors attempted to sell their carpet cushion and automotive businesses. However, based on the results of those sale processes, the Debtors decided not to proceed with either sale because the prices offered would not have allowed the Debtors to deleverage their balance sheet. In April 2005, the Debtors sold their rubber and felt carpet cushion business to Leggett & Platt, Incorporated for approximately $38.7 million. In addition, in May 2005, the Debtors combined the management of their technical and foam products SBUs to increase productivity and efficiency, enhance their market focus and improve integration and communication among their sales, marketing and manufacturing teams. Finally, in the two years prior to the Petition Date, the Debtors ceased operating in over ten locations, closed four offices, significantly reduced SG&A spending and implemented various strategies designed to further reduce overhead expenses.

Although the Debtors benefited from these restructuring initiatives prior to the Petition Date, they proved to be insufficient. To assist the Debtors in their restructuring efforts, in May 2005, the Debtors retained Miller Buckfire & Co., LLC ("Miller Buckfire"), as their investment banker and financial advisor, to evaluate strategic alternatives designed to strengthen the Debtors' balance sheet. Almost immediately upon being engaged, Miller Buckfire worked with the Debtors to devise various restructuring alternatives that could be implemented in, or outside of, chapter 11. As part of this process, Miller Buckfire solicited various financing and restructuring proposals from the Debtors' existing stakeholders as well as from third-party financing sources and equity sponsors. The results of this process demonstrated that, to provide the Debtors with sufficient liquidity to operate effectively for the long-term, any restructuring would require a significant conversion of the Debtors' debt into equity – something that, under the circumstances, could only be achieved by means of a chapter 11 case. In view of all of these factors and without sufficient liquidity, on August 15, 2005, Foamex L.P. did not make the $51.6 million payment due upon the maturity of the 2005 Senior Subordinated Notes.

Despite defaulting on their 2005 Senior Subordinated Notes, as part of their overall restructuring efforts, the Debtors announced on August 15, 2005 amendments to both their Bank Facility and the Term Loans to provide for waivers to September 30, 2005, in respect of the default resulting from the failure to repay the 2005 Senior Subordinated Notes at maturity and the interest due thereon as well as certain other covenant defaults. Such amendments also provided additional liquidity under the Bank Facility to allow the Debtors to continue their restructuring efforts. In addition, the Debtors announced at such time that the agents under the Bank Facility and Term Loans had committed to provide the Debtors with debtor-in-possession and chapter 11 exit financing.

After the Debtors' August 15th announcement, the Debtors and their professionals continued to negotiate with their key creditors, including an informal committee of holders of Senior Secured Notes representing a majority in principal amount of the outstanding Senior Secured Notes (the "Ad Hoc Committee of Senior Secured Noteholders") and their respective professionals concerning the terms of a consensual restructuring. Those negotiations culminated in the Debtors' agreement in principle with members of the Ad Hoc Committee of Senior Secured Noteholders on the key terms of the Debtors' Plan. That agreement in principle was memorialized in a term sheet that was filed as part of an 8-K filing on September 22, 2005.

## VI.

## THE CHAPTER 11 CASE

### A.  Significant "First Day" Motions

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Court entered several orders authorizing the Debtors to pay various prepetition claims. These orders were designed to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the filings. The Court entered orders authorizing the Debtors, among other things, to (i) pay prepetition compensation, benefits and employee reimbursement to employees; (ii) continue certain workers' compensation programs and insurance policies; (iii) continue certain customer practices and programs; (iv) pay certain prepetition freight and customs brokers' claims and amounts due in respect to the Debtors' foreign operations; (v) pay prepetition claims of critical vendors,[14] and (vi) obtain postpetition financing, repay certain prepetition secured debt, and grant first priority liens, super-priority administrative expense status and adequate protection to the Debtors' postpetition lenders.

In addition, the Debtors filed several applications seeking orders authorizing the Debtors' retention of professionals. Specifically, the Debtors filed applications to retain (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young, Conaway, Stargatt & Taylor, LLP as co-counsel, (ii) Miller Buckfire, as financial advisor, (iii) KPMG LLP, as auditors and accountants, and (iv) certain ordinary course

---

[14]   As of December 19, 2005, the Debtors paid $7,049,736.71 to 29 critical vendors. The primary recipients of these critical vendor payments have been the Debtors' chemical and fabric suppliers. Also, on December 16, 2005, the Debtors moved the Court [Docket No. 452] for approval of their agreement with their largest critical vendor – The Dow Chemical Company ("Dow Chemical") – regarding Dow Chemical's participation in the Debtors' critical vendor program. If approved by the Bankruptcy Court, the Debtors' agreement with Dow Chemical will allow the Debtors, subject to the conditions and in accordance with the terms specified therein, to pay $21,236,623.84 in eight installments in full and complete satisfaction of Dow Chemical's prepetition claims. In return, Dow Chemical and the others that have received payments under the Debtors' critical vendor program have (or, in the case of Dow Chemical will) restore the Debtors' normal trade terms that existed prepetition and, in the case of Dow Chemical, will increase the Debtors' credit limit for purchases.

professionals. The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

**B.    DIP Credit Facilities, Exit Facilities and Supplemental Liquidity Facility**

To provide the Debtors with the cash and liquidity necessary to continue operating and to maintain normal vendor relations postpetition, on September 19, 2005, the Debtors sought Court approval of a $240 million debtor-in-possession revolving credit facility (including a $40 million sub-limit for letters of credit) in the form of a Debtor-In-Possession Credit Agreement (the "DIP Revolving Credit Facility"), dated as of September 22, 2005, with Bank of America, N.A., as administrative agent (the "DIP Revolving Credit Agent"), and the lenders party thereto (the "DIP Revolving Credit Lenders"). In addition, the Debtors sought Court approval of an $80 million debtor-in-possession term loan (the "DIP Term Credit Facility," and together with the DIP Revolving Credit Facility, the "DIP Credit Facilities"), dated as of September 22, 2005, with Silver Point Finance, LLC, as administrative agent (the "DIP Term Credit Agent," and together with the DIP Revolving Credit Agent, collectively the "DIP Agents"), and the lenders party thereto (the "DIP Term Loan Lenders," and together with the DIP Revolving Credit Lenders, collectively, the "DIP Lenders"). A portion of the proceeds from the DIP Credit Facilities were used to repay the Debtors' prepetition Bank Facility and Term Loans. The remainder of the proceeds are available to fund the Debtors' working capital requirements during their Chapter 11 Cases.

On September 19, 2005, the Court approved the DIP Credit Facilities on an interim basis and on October 17, 2005, the Court approved the DIP Credit Facilities on a final basis. On October 18, 2005, the Court entered a final order (the "DIP Financing Order") approving the DIP Credit Facilities.

As part of the negotiations for the DIP Credit Facilities, both the DIP Revolving Credit Lenders and the DIP Term Loan Lenders have agreed to provide the Reorganized Debtors upon the Effective Date with exit financing sufficient to refinance the amounts outstanding under the DIP Credit Facilities and to provide on-going working capital liquidity (as used herein, and including any substitute exit facilities in the Debtors' reasonable discretion, the "Exit Facilities"). More specifically, the DIP Revolving Credit Lenders have agreed to provide the Reorganized Debtors with a revolving credit facility of up to $275 million (principal amount) (the "Revolving Loan Exit Facility") and the DIP Term Loan Agent has agreed to provide the Reorganized Debtors with a term loan facility of up to $80 million (principal amount) (the "Term Loan Exit Facility"), in each case, on terms substantially similar (but subject to certain conditions specified in the commitment letters) to those provided under the corresponding DIP Credit Facility, including the intercreditor loan priority arrangements, and maturing on the fifth anniversary of the closing of the DIP Credit Facilities. Copies of the commitment letters for these Exit Facilities are attached hereto as Exhibit F.

In addition to the liquidity available to the Debtors upon their emergence from Chapter 11 under the Exit Facilities, certain holders of the Senior Secured Notes

have proposed to provide the Debtors with a $30 million supplemental term loan facility (the "Supplemental Liquidity Facility") on or after the Effective Date, only if the Debtors deem it necessary. The Supplemental Liquidity Facility's terms will be contained in the Plan Supplement.

### C. Official Committee of Unsecured Creditors

On September 29, 2005, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "Creditors' Committee"). The Creditors' Committee is currently comprised of The Bank of New York, the Pension Benefit Guaranty Corporation, Newcastle Partners, LP, Lyondell Chemical Corporation, Shell Chemicals L.P., Core Wealth Management and Donovan Williams.

The Creditors' Committee has, with Court approval, employed and retained (i) Lowenstein Sandler PC and Saul Ewing LLP as its co-counsel and (ii) Jefferies & Company, Inc. as its financial advisor.

### D. Ad Hoc Committee of Senior Secured Noteholders

Prior to the Petition Date, an Ad Hoc Committee of Senior Secured Noteholders was formed by certain large holders of the Debtors' Senior Secured Notes that together represent a majority of the outstanding Senior Secured Notes. The Ad Hoc Committee of Senior Secured Noteholders has employed and retained (i) O'Melveny & Myers LLP and Richards Layton & Finger, PA as its co-counsel and (ii) Houlihan Lokey Howard & Zukin Capital as its financial advisor.

### E. Claims Process

#### 1. Last Date to File Proofs of Claim

On October 18, 2005, the Court entered an order (the "Bar Date Order") requiring any person or entity holding or asserting a Claim (other than an Administrative Claim) against the Debtors to file a written proof of claim with Foamex International Inc., et al., Claims Processing, c/o Bankruptcy Services, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, on or before December 8, 2005, and for Governmental Units holding a Claim against the Debtors on or before 4:00 p.m., prevailing Eastern Time on March 20, 2006. The Bar Date Order further provides that any person or entity (other than, among others, professionals retained in the Chapter 11 Cases and holders of the Debtors' Old Preferred Stock, Old Common Stock or Other Equity Interests) which fails to timely file a proof of claim will be forever barred, estopped and enjoined from voting on, or receiving a distribution under, the Plan and will be forever barred, estopped and enjoined from asserting a Claim against the Debtors, their estates, the Reorganized Debtors, and any of their successors or assigns.

The Debtors are currently assessing all of the proofs of claim filed as of the Bar Date and expect to object to Claims in the coming weeks.

## F. Assumption/Rejection of Leases and Executory Contracts

Pursuant to the Bankruptcy Code, the Debtors have (a) 60 days after the Petition Date to assume or reject unexpired leases of nonresidential real property unless such time period is extended by the Court for cause and (b) until confirmation of the Plan to assume or reject executory contracts. By Court order, the deadline to assume or reject unexpired leases of nonresidential real property in the Chapter 11 Cases has been extended through February 16, 2006. The Debtors reserve the right to seek an extensions of the current February 16th deadline should they need to.

### 1. Rejected Leases and Executory Contracts

The Debtors have already obtained Court approval to reject eight nonresidential real property leases, six equipment leases, one employment agreement and twenty-one executory contracts.

### 2. Assumed Executory Contracts

The Debtors have already obtained Court approval to assume five executory contracts. Specifically, on October 17, 2005, the Debtors obtained Court approval to assume (i) that certain sales contract for scrap foam between Maverick, Inc. and Foamex L.P., dated January 1, 2005 (as amended, the "Maverick Contract"), (ii) that certain sales contract for blended and scrap foam between Advanced Foam Recycling, Ltd. and Foamex L.P., dated July 1, 2005 (as amended, the "Advanced Foam Contract"), (iii) that certain sales contract for various forms of MDI isocyanate between Huntsman International LLC and Foamex L.P., dated September 28, 2004 (as amended, the "Huntsman Contract") and (iv) that certain supply contract for polyurethane foam between Anatomic Concepts, Inc. and Foamex L.P., dated September 28, 2001 (as amended, the "Anatomic Contract"). The Maverick Contract, the Advanced Foam Contract and the Huntsman Contract are each important supply contracts, the assumption of which has resulted in, among other things, cost savings and a significant increase in the Debtors' supply of MDI and scrap foam. The Anatomic Contract is an important supply contract with one of the Debtors' significant polyurethane foam customers, the assumption of which has resulted in, among other things, an extension of the terms of the agreement.

In addition, on December 19, 2005, the Court entered an order approving the assumption of that certain sales contract for polyol and TDI between Foamex L.P. and Bayer Material Science LLC, dated August 19, 2005 (as amended, the "Bayer Contract"). The Bayer Contract is an important supply contract, the assumption of which will result in, among other things, a significant increase in the Debtors' availability of polyol and TDI, a return to normal credit terms and an expanded credit limit.

The Debtors will make any appropriate motions with respect to their remaining leases and executory contracts within the time period established by the Bankruptcy Code or such other time as may be set by the Court. The Plan provides that except for unexpired leases and executory contracts that are the subject of a motion(s) to

reject that is pending on or decided prior to the Confirmation Date or are listed on Schedule XI-R to the Plan, the Debtors will assume all of their executory contracts and unexpired leases effective as of the Effective Date.

### G.    Reclamation Claims

Section 546(c) of the Bankruptcy Code recognizes the statutory and common law rights of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor received such goods while insolvent and the seller demands in writing reclamation of such goods (i) before ten (10) days after receipt of such goods by the debtor, or (ii) if such ten (10) day period expires after the commencement of the bankruptcy case, before twenty (20) days after receipt of such goods by the debtor. Section 546(c) further permits the bankruptcy court to deny reclamation to a seller with such a right that has made a valid demand if the court (i) grants the claim of such seller priority under section 503(b) of the Bankruptcy Code, or (ii) secures such claim with a lien.

To date, the Debtors have received nineteen (19) reclamation demands seeking the return of at least $20,856,115.20[15] worth of goods. The Debtors have satisfied certain of these alleged reclamation claims through the payment of "cure" amounts associated with contracts that have been assumed or through payments to critical vendors.[16] The Debtors expect that certain other reclamation claims will be similarly satisfied prior to or in connection with confirmation of the Plan.

Any reclamation claims that remain unsatisfied will be dealt with through the usual claims resolution process and, unless the Court orders otherwise, shall be treated under the Plan as a Class 5 General Unsecured Claim.

### H.    KERP

On October 28, 2005, the Debtors filed a motion (the "KERP Motion") with the Court seeking approval of their Key Employee Retention Plan (the "KERP") and the continuation of their Severance Plan as slightly modified. On November 17, 2005, the Court entered an order approving the KERP and Severance Plan. The KERP and Severance Plan are intended to assist the Debtors in retaining and incentivizing their senior management and other key employees (the "Key Employees") to work through certain key dates and to file, confirm and implement a successful plan of reorganization for the Debtors. Under the KERP, and as set forth in greater detail in the KERP Motion, the Debtors' divided their Key Employees into three groups. Group 1 consists of 65 non-executive and three executive employees. The retention distributions to be made to the

---

[15]    Six (6) of the letters did not specify an exact amount of the alleged reclamation claim.

[16]    The Debtors anticipate that the largest reclamation claim – that of Dow Chemical, in the amount of $16,324,185.79 – will be satisfied through the Debtors' critical vendor agreement with Dow Chemical, which awaits Court approval.

Doc #:NY7:35140.22

Key Employees in Group 1 are to be made in Cash and are formula driven based upon a percentage of the Key Employee's base salary ranging from 15% to 40%. Group 2 consists of six executives and Group 3 consists of the Debtors' three most senior executives. The amounts of the retention distributions to be made to the Key Employees in Groups 2 and 3 were determined on a discretionary basis and range from 50% to 125% of the particular Key Employee's base salary. The Key Employees in Groups 2 and 3 will receive their KERP distributions in Cash, provided, however, that at the sole option of the board of directors of Reorganized Foamex International (which determination shall be made within forty-five (45) days of the Effective Date), up to 25% (for Group 2) and 50% (for Group 3) of such distributions may be made in the form of New Common Stock. For purposes of determining the number of shares of New Common Stock, if any, to be distributed to Key Employees in Groups 2 and 3, the New Common Stock will be valued at a price per share that is equal to the price per share of the New Common Stock to be issued under the Plan to the holders of Allowed Class 3 Senior Secured Note Claims.

Payment of the KERP amounts described above shall be made in installments at intervals during the Chapter 11 Cases and, with respect to Groups 2 and 3, after the Effective Date. Specifically, pursuant to the KERP, the Key Employees in Group 1 shall receive a Cash distribution equal to: (i) 25% of their KERP award on the earlier of the filing of a plan of reorganization and December 15, 2005; (ii) 25% of their KERP award on the earlier of the confirmation of a plan of reorganization and March 15, 2006; and (iii) 50% of their KERP award on the effective date of a plan of reorganization. Key Employees in Group 2 are entitled to receive a Cash distribution equal to 25% of their KERP award on each of: (i) February 1, 2006; (ii) the effective date of a plan of reorganization; and (iii) the 6 month anniversary of the effective date of a plan of reorganization. In addition, on the 1 year anniversary of the effective date of a plan of reorganization, Key Employees in Group 2 are entitled to receive 25% of their KERP award in Cash or, at the sole option of the board of directors of Reorganized Foamex International, in New Common Stock. Finally, Key Employees in Group 3 are entitled to receive a Cash distribution equal to 25% of their KERP award on each of (i) February 1, 2006; and (ii) the effective date of a plan of reorganization. In addition, on each of the 6 month and 1 year anniversaries of the effective date of a plan of reorganization, the Key Employees in Group 3 shall be entitled to receive 25% of their KERP award in Cash or, at the sole option of the board of directors of Reorganized Foamex International, in New Common Stock. Pursuant to the KERP, the board of directors of Reorganized Foamex International shall have 45 days following the Effective Date to determine whether the 25% payable to Group 2 at the 1 year anniversary of the Effective Date and the 25% payable to Group 3 on each of the 6 month and 1 year anniversaries of the Effective Date shall be payable in Cash or Common Stock.

## I.   Disclosure Statement/Plan Confirmation Hearings

On _____, 2006 the Court entered the Disclosure Statement Order. As provided by the Disclosure Statement Order, the hearing to consider confirmation of the Plan is scheduled for _____, 2006.

# VII.

## SUMMARY OF THE PLAN

### A.    Introduction

The Debtors believe that confirmation of the Plan is critical to their continued survival and that the Plan provides the best opportunity for maximum recoveries for their creditors. The Debtors believe, and will demonstrate to the Court, that their creditors will receive at least as much, and likely more, in value under the Plan than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

### B.    Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the Debtors agree, or in the event of a dispute, that the Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtors. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or

equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designate d either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments described:

| Unclassified | Administrative Claims | Paid in full |
|---|---|---|
| Unclassified | Priority Tax Claims | Paid in full |
| Unclassified | DIP Financing Claims | Paid in full |
| Class 1 | Other Priority Claims | Unimpaired |
| Class 2 | Other Secured Claims | Unimpaired |
| Class 3 | Senior Secured Note Claims | Impaired |
| Class 4 | Senior Subordinated Note Claims | Impaired |

| Class 5 | General Unsecured Claims | Impaired |
| Class 6 | Intercompany Claims | Unimpaired |
| Class 7 | Equity Interests in Surviving Debtor Subsidiaries | Unimpaired |
| Class 8 | Old Preferred Stock | Impaired |
| Class 9A | Subordinated Claims | Impaired |
| Class 9B | Old Common Stock and Other Equity Interests | Impaired |

For purposes of computing distributions under the Plan, Allowed Claims do not include postpetition interest unless otherwise specified in the Plan.

1.    **Unclassified — Administrative Claims**

Administrative Claims are Claims for any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors-in-Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code.

Except as provided for below with respect to Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

The Confirmation Order will establish a bar date for filing applications for the allowance of Administrative Claims (except for Fee Claims and Ordinary Course Administrative Claims), which date (the "Administrative Claims Bar Date") will be the

31

first Business Day that is thirty (30) days after the Confirmation Date. Holders of Administrative Claims, except for Fee Claims and Ordinary Course Administrative Claims, not paid prior to the Confirmation Date shall submit requests for payment on or before the Administrative Claims Bar Date or forever be barred from doing so and from receiving payment thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute notice of the Administrative Claims Bar Date. The Reorganized Debtors shall have one hundred-twenty (120) days (or such longer period as may be allowed by order of the Court) following the Administrative Claims Bar Date (the "Administrative Claims Objection Deadline") to review and object to all Administrative Claims.

(a)     Fee Claims. Fee Claims are Administrative Claims under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Confirmation Date (including the reasonable expenses of the members of the Creditors' Committee incurred in the discharge of their duties as members of the Creditors' Committee). All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Confirmation Date shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee for the District of Delaware, counsel to the Creditors' Committee, counsel to the Ad Hoc Committee of Senior Secured Noteholders and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Confirmation Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than thirty (30) days (or such larger period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served. Administrative Claims for Professionals' fees and expenses incurred after the Confirmation Date shall be paid in the ordinary course of business and shall not be subject to Court approval.

## 2.     Unclassified — Priority Tax Claims

A Priority Tax Claim consists of any Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. These Unsecured Claims are given a statutory priority in right of payment.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of

such Allowed Priority Tax Claim, deferred Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest (i) with respect to federal taxes, at a fixed annual rate equal to the federal statutory rate as provided in 26 U.S.C. § 6621; and (ii) with respect to state and local taxes, at the rate applicable under state or local law. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 3. Unclassified — DIP Financing Claims

DIP Financing Claims are all Claims arising under or relating to the DIP Credit Facilities and all agreements and instruments relating thereto.

On the Effective Date, except to the extent that the holders of the DIP Financing Claims agree to a different treatment, the holders of the DIP Financing Claims or their designee(s) shall receive payment in full in Cash of all obligations calculated in accordance with the applicable instruments and agreements in full and final satisfaction of the DIP Financing Claims other than the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms shall survive the termination of the DIP Credit Facilities.

### 4. Class 1 — Other Priority Claims

Other Priority Claims are Claims that are entitled to priority pursuant to section 507(a) of the Bankruptcy Code – other than Administrative Claims and Priority Tax Claims. Such claims may include (i) unsecured Claims for accrued employee compensation earned within 180 days prior to commencement of these Chapter 11 Cases to the extent of $10,000 per employee and (ii) contributions to employee benefit plans arising from services rendered within 180 days prior to the commencement of these Chapter 11 Cases, but only for each such plan to the extent of (a) the number of employees covered by such plan multiplied by $10,000, less (b) the aggregate amount paid to such employees as a priority for wages, salaries or commissions, plus the aggregate amount paid on behalf of such employees to other benefit plans.

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtors shall have agreed to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. All Allowed Other Priority Claims which are not due and payable before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

Because the Court entered an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate that the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal, if any.

Class 1 is unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

5.     **Class 2 — Other Secured Claims**

Other Secured Claims means any Secured Claim, other than the DIP Financing Claims and the Senior Secured Note Claims, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, the amount of such Claim that is subject to such setoff.

Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors shall have agreed to a different treatment, at the sole option of the Debtors, in full and final satisfaction of such claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

Class 2 is unimpaired under the Plan. The holders of Allowed Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to accept or reject the Plan.

6.     **Class 3 — Senior Secured Note Claims**

A Senior Secured Note Claim is a Claim arising from the Senior Secured Notes Indenture on account of the Senior Secured Notes.

The Senior Secured Note Claims shall be deemed Allowed in the aggregate amount of $312,452,083.33, which amount includes accrued and unpaid interest on the Senior Secured Note Claims relating to the period up to but not including the Petition Date.

On the Initial Distribution Date, in full and final satisfaction of such Claims (including any Senior Secured Notes Deficiency Claim), each holder of an Allowed Senior Secured Note Claim (i) shall receive its pro rata share of 15,840,000

Doc #:NY7:35140.22

shares of New Common Stock (such 15,840,000 shares of New Common Stock representing 100% of the New Common Stock to be issued and outstanding on the Effective Date, subject to the subsequent issuance of shares of New Common Stock pursuant to the Management Incentive Plan, the KERP and the exercise of the New Warrants, if any, to be distributed to the holders of Allowed Class 4 Senior Subordinated Note Claims) and (ii) shall be deemed to have received its pro rata share of the adequate protection payments made throughout these Chapter 11 Cases pursuant to paragraph 13(d) of the DIP Order.

Class 3 is Impaired under the Plan. Each holder of an Allowed Senior Secured Note Claim in Class 3 is entitled to vote to accept or reject the Plan.

### 7. Class 4 — Senior Subordinated Note Claims

A Senior Subordinated Note Claim means a Claim arising from the Senior Subordinated Notes Indentures on account of the Senior Subordinated Notes.

The Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $208,150,130.55, which amount includes accrued and unpaid interest on such Senior Subordinated Note Claims relating to the period up to but not including the Petition Date.

If Class 4 votes to accept the Plan, then on the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Senior Subordinated Note Claim will receive its pro rata share of the New Warrants. If Class 4 votes to reject the Plan, then holders of Allowed Senior Subordinated Note Claims shall not be entitled to receive or retain any property on account of such Claims.

Class 4 is Impaired under the Plan. Each holder of an Allowed Senior Subordinated Note Claim is entitled to vote to accept or reject the Plan.

### 8. Class 5 — General Unsecured Claims

A General Unsecured Claim means an Unsecured Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Senior Secured Notes Deficiency Claim, Senior Subordinated Note Claim or Subordinated Claim.

If Class 5 votes to accept the Plan, then on the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, in full and final satisfaction of such Claim, each holder of such Allowed General Unsecured Claim will receive its pro rata share of the General Unsecured Claim Distribution Amount; provided, however, that in no event shall the holder of an Allowed General Unsecured Claim receive a distribution in excess of 5% of the Allowed amount of such General Unsecured Claim. If Class 5 votes to reject the Plan, then holders of Allowed General Unsecured Claims shall not be entitled to receive or retain any property on account of such Claims.

35

Class 5 is Impaired under the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

      9.    **Class 6 — Intercompany Claims**

An Intercompany Claim means any Claim held by one Debtor (or a non-debtor that is a direct or indirect subsidiary of a Debtor) against any other Debtor(s), including, without limitation, (a) any account reflecting intercompany book entries by such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor) with respect to any other Debtor(s), (b) any Claim not reflected in book entries that is held by such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor), and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor) against any other Debtor(s).

All Intercompany Claims will remain outstanding and will be reinstated on the Effective Date and will be settled in accordance and in a manner consistent with the historical practices of the relevant Debtor(s).

Class 6 is unimpaired under the Plan. Holders of Intercompany Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

      10.    **Class 7 — Equity Interests in Surviving Debtor Subsidiaries**

An Equity Interest in Surviving Debtor Subsidiaries means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest that is held by one Debtor in another Debtor(s) that is not to be merged or dissolved as a part of the Plan, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.

The holders of Equity Interests in Surviving Debtor Subsidiaries shall retain such Equity Interests.

Class 7 is unimpaired under the Plan. The holders of Equity Interests in Surviving Debtor Subsidiaries are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

      11.    **Class 8 — Old Preferred Stock**

Old Preferred Stock means the Series B preferred stock, par value $1.00 per share, and having a liquidation preference of $100 per share, issued by Foamex International, and outstanding prior to the Effective Date.

The Old Preferred Stock shall be canceled and the holders of Old Preferred Stock shall not be entitled to receive or retain any property on account of such Old Preferred Stock.

Class 8 is Impaired under the Plan. The holders of Old Preferred Stock are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### 12. Class 9A — Subordinated Claims

Subordinated Claim means a Claim arising from the rescission of a purchase or sale of a security of the Debtors or of an affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, which shall be subordinated to all claims or interests that are senior or equal to the Claim or interest represented by such security, except that if such security is Old Common Stock, such Claim shall have the same priority as the Old Common Stock, as set forth in section 510(b) of the Bankruptcy Code.

Subordinated Claims shall be discharged, and the holders of Subordinated Claims shall not be entitled to receive or retain any property on account of such Claims.

Class 9A is Impaired under the Plan. The holders of Subordinated Claims are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### 13. Class 9B – Old Common Stock and Other Equity Interests

Old Common Stock means the common stock, par value $0.01 per share, issued by Foamex International, and outstanding prior to the Effective Date. Other Equity Interests means any Equity Interests in Foamex International other than Old Common Stock and Old Preferred Stock.

The Old Common Stock and Other Equity Interests shall be canceled and the holders of Old Common Stock and Other Equity Interests shall not be entitled to receive or retain any property on account of such Interests.

Class 9B is Impaired under the Plan. The holders of Old Common Stock and Other Equity Interests are presumed to reject the Plan and are not entitled to accept or reject the Plan.

### C. Provisions Regarding Corporate Governance and Management of the Reorganized Debtors

#### 1. Management

(a) <u>The Initial Boards of Directors</u>. On the Effective Date, the board of directors of Reorganized Foamex International shall consist of the Chief Executive Officer of Reorganized Foamex International and six (6) other members all of whom shall be designated by the Ad Hoc Committee of Senior Secured Noteholders. The identities, affiliations and the amount of compensation of the designees shall be disclosed in the Plan Supplement. The members of the initial boards of directors or equivalent governing bodies of the Surviving Debtor Subsidiaries shall be selected by the initial board of directors of Reorganized Foamex International and shall consist, at least

37

in part, of officers and directors of Reorganized Foamex International. The directors of each Debtor on the day immediately preceding the Effective Date that are not otherwise appointed as members of the initial board of directors or the equivalent governing body for the corresponding Reorganized Debtor shall be deemed to have resigned from the board of directors of such Debtor as of the Effective Date.

(b) <u>Management of Reorganized Debtors</u>. The officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the date immediately preceding the Effective Date. The Reorganized Debtors' officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law, as the case may be. The Debtors will disclose the terms of such officers' compensation in the Plan Supplement.

2. **Reorganized Debtors' Management Incentive Plan**

On the Effective Date, the Management Incentive Plan shall become effective. Such plan shall be on the terms to be described generally in the Plan Supplement with more specific terms to be approved by the board of directors of Reorganized Foamex International within forty-five (45) days after the Effective Date.

3. **Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Amended Governing Documents**

The adoption of the Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Amended Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or Reorganized Debtors. The Amended and Restated Certificate of Incorporation will, among other things, contain appropriate provisions (i) governing the authorization of up to [_____] shares of New Common Stock (of which 15,840,000 shares will be issued on the Effective Date) that will be available for issuance and whose terms and conditions may be established by the board of directors of Reorganized Foamex International, and (ii) prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. Each of the Amended and Restated Governing Documents shall, among other things, contain appropriate provisions prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. On or prior to the Effective Date, the Debtors will, if required by applicable state law, file with the Secretary of State the Amended and Restated Certificate of Incorporation and Amended and Restated Governing Documents.

D. **Securities to be Issued Pursuant to the Plan**

1. **New Common Stock**

On the Effective Date, Reorganized Foamex International will issue 15,840,000 shares of New Common Stock to the holders of Allowed Senior Secured Note

Claims without further act or action under applicable law, regulation, rule or order. The holders of the New Common Stock will have the right to vote and to participate proportionately in any dividends to be distributed by Reorganized Foamex International.

2.    **The New Warrants**

If Class 4 votes to accept the Plan, then on the Effective Date, Reorganized Foamex International shall issue the New Warrants exercisable without further act or action under applicable law, regulation, rule or order.

3.    **Shareholders Agreement**

The Plan provides that Reorganized Foamex International and each holder of an Allowed Senior Secured Note Claim who, after giving effect to the issuance of the New Common Stock pursuant to the Plan, would hold five percent (5%) or more of the New Common Stock, will enter into the Shareholders Agreement as of the Effective Date. All other holders of Allowed Senior Secured Note Claims receiving New Common Stock pursuant to the Plan shall be deemed to be parties to the Shareholders Agreement, to the extent enforceable under applicable law, and shall be intended third party beneficiaries of the Shareholders Agreement to the extent set forth therein. Notwithstanding the foregoing, in order for a holder of New Common Stock to be the beneficiary of any tag along or drag along rights set forth in the Shareholders Agreement, such holder must execute a counterpart signature page and deliver such signature page to Reorganized Foamex. Signature pages may be obtained from Reorganized Foamex at the address for giving notices set forth herein. Among other things, the Shareholders Agreement will impose a restriction on the transfer of the New Common Stock under certain circumstances. It is anticipated that after the issuance of the New Common Stock and New Warrants there will be fewer than 300 holders of record of the New Common Stock and New Warrants. Reorganized Foamex intends to file a Form 15 certifying the number of holders of the New Common Stock and New Warrants with the Securities and Exchange Commission and seeking to terminate their registration and periodic filing requirements pursuant to the Securities Exchange Act of 1934. The Shareholders Agreement will prohibit a holder of New Common Stock from transferring any New Common Stock to any person not already holding New Common Stock at any time the number of record holders of New Common Stock is 450 or more persons. Until the Shareholders Agreement is terminated, the New Common Stock will bear a legend which will provide in form and substance as follows:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND PROVISIONS OF A SHAREHOLDERS AGREEMENT DATED AS OF _____ __, 2006 (AS SUCH AGREEMENT MAY BE SUPPLEMENTED, MODIFIED, AMENDED OR RESTATED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT") AND MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED (A "TRANSFER") UNLESS AND UNTIL SUCH TRANSFER COMPLIES WITH THE SHAREHOLDERS AGREEMENT, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY."

### E. Powers of Officers

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into and to execute any Plan Document to which the Reorganized Debtors are a party and (subject to the approval of the board of directors of Reorganized Foamex International) to take such other or further action as they deem reasonable and appropriate to effectuate the terms of the Plan.

### F. Dissolution or Merger of Certain Debtors

Effective as of the Effective Date but immediately prior to the discharge of the Debtors described in Article VIII.E of the Plan, certain of the Debtors may be dissolved or merged into other Debtors, as more fully described in the Plan Supplement.

### G. Substantive Consolidation

The Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Substantive Consolidation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case for purposes of the Plan and the Distributions thereunder. Pursuant to such Substantive Consolidation Order (i) all assets and liabilities of the Substantively Consolidated Debtors will be merged, (ii) the obligations of each Debtor will be deemed to be the obligation of the Substantively Consolidated Debtors, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Substantively Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Case in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor under the Plan will be deemed to be made by the Substantively Consolidated Debtors, (vi) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors, and (vii) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Substantively Consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Such substantive consolidation shall not (other than for purposes related to the Plan) affect (i) the legal and corporate structure of the Reorganized Debtors or (ii) other pre- and post-Petition Date guarantees that are required to be maintained (a) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or pursuant to the Plan will be assumed, (b) pursuant to the express terms of the Plan, or (c) in connection with any financing to be entered into by the Reorganized Debtors on the Effective Date. The substantive consolidation proposed in the Plan shall not affect each Debtor's obligation to file the necessary operating reports and to pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until an order is entered closing, dismissing or converting such Debtor's Chapter 11 Case.

Doc #:NY7:35140.22

The Debtors believe that substantive consolidation is warranted here because, among other reasons, the Debtors historically operated on a consolidated basis. Indeed, given the nominal amount of assets held by the Debtors other than Foamex International and Foamex L.P., the relatively few creditors of each of the Debtors other than Foamex L.P., and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in processing Claims and making distributions to holders of Allowed Claims. Accordingly, the Debtors believe that substantive consolidation of the Debtors' estates will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors and streamlining the process of making Distributions.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan. See In re Stone & Webster, Inc., 286 B.R. 532 (Bankr. D. Del. 2002). Several courts within the Third Circuit have acknowledged the existence and application of substantive consolidation of separate bankruptcy estates in appropriate circumstances. See In re NII Holdings, Inc., 288 B.R. 356 (Bankr. D. Del. 2002) (substantively consolidating debtors); In re Molnar Bros., 200 B.R. 555 (Bankr. D.N.J. 1996) (recognizing the application of substantive consolidation of two or more bankruptcy estates); Bracaglia v. Manzo (In re United Stairs Corp.), 176 B.R. 359, 368 (Bankr. D.N.J. 1995) (stating that it is "well established that in the appropriate circumstances the court may substantively consolidate corporate entities"); In re Buckhead American Corp., 1992 Bankr. LEXIS 2506 (Bankr. D. Del. August 13, 1992) (substantively consolidating debtors).

In a recent decision, the Third Circuit Court of Appeals while specifically recognizing the doctrine of substantive consolidation, nonetheless significantly restricted the circumstances under which a court may order substantive consolidation over the objections of creditors. In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis 18043 (Aug. 23, 2005). In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering consolidation. Instead, the Third Circuit Court of Appeals articulated a number of "principles" to guide the court in its analysis. Owens Corning, at 211. These principles include: (i) absent compelling circumstances courts must respect entity separateness; (ii) recognition that substantive consolidation nearly always addresses harms caused by debtors disregarding separateness; (iii) mere benefit of administration is "hardly a harm calling substantive consolidation into play;" (iv) substantive consolidation should be used rarely and as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may not be used as a "sword." Id.

Using these principles, the Third Circuit Court of Appeals set forth the standard by which courts in this jurisdiction must weigh requests for substantive consolidation where creditor consent is lacking. Specifically, in ordering substantive

41

consolidation (absent consent of the parties) courts must either find, with respect to the entities in question, that (a) prepetition, they disregarded their separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (b) postpetition, "their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. (emphasis added).

For the reasons articulated earlier in this section VII.G, the Debtors believe that substantive consolidation is justified in these cases. Absent a timely objection to the Debtors' proposed substantive consolidation, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Court. If an objection is timely filed and served, a hearing with respect to the substantive consolidation of the Debtors' estates may be requested by the Debtors, at which time the Debtors will seek to establish the requisites for substantive consolidation.

### H. Provisions Regarding Means of Implementation, Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims

#### 1. Exit Facilities

Concurrently with the Effective Date, the Debtors shall have closed on the Exit Facilities, the proceeds of which shall be in an amount necessary to refinance the DIP Credit Facilities in full (or as otherwise agreed), to assist the Reorganized Debtors in making all Effective Date Cash payments required under the Plan and to provide on-going liquidity.

#### 2. Supplemental Liquidity Facility

To the extent the Debtors deem it necessary, in their sole discretion, on or before the Effective Date, the Debtors shall have entered into the $30 million term loan facility to be provided by certain holders of the Senior Secured Notes. The Supplemental Liquidity Facility shall be on such terms and conditions as may be agreed to by the Debtors and the holders of Senior Secured Notes that are to be parties thereto. The forms of agreements to be entered into between the Reorganized Debtors and the holders of Senior Secured Notes that are providing the Supplemental Liquidity Facility shall be included in the Plan Supplement.

#### 3. Voting of Claims

Each holder of an Allowed Claim in an Impaired Class of Claims shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

Doc #:NY7:35140.22

4.    **Distributions**

(a)    <u>Allowed Claims</u>.

(i)    *Delivery of Distributions*.  Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Senior Secured Note Claims, Allowed Senior Subordinated Note Claims and Allowed General Unsecured Claims at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).  Distributions of New Common Stock and New Warrants, if applicable, shall be made initially to the respective Indenture Trustees, [Transfer Agents, New Warrant Agent,] or to such other entity(ies) as may be determined by the Debtors, who shall make the distributions to the holders of Allowed Senior Secured Note Claims and Allowed Senior Subordinated Note Claims.

(ii)    *Distribution of Cash*.  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (a) a check drawn on, or (b) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(iii)    *Initial Distributions*.  On the Initial Distribution Date, the Reorganized Debtors shall distribute, as provided in the Plan (a) the New Common Stock to the holders of Allowed Senior Secured Note Claims, (b) the New Warrants to holders of Allowed Senior Subordinated Note Claims (provided that Class 4 votes to accept the Plan) and (c) that portion of the General Unsecured Claim Distribution Amount equal to the aggregate dollar amount of Distributions to be made to holders of General Unsecured Claims that are Allowed as of the Initial Distribution Date (provided that Class 5 votes to accept the Plan).

(iv)    *Unclaimed Distributions*.  Any Distribution of Cash under the Plan which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan and any supplemental distribution to which such holder may be entitled under the Plan shall be transferred to and become property of the Reorganized Debtors notwithstanding state or other escheat or similar laws to the contrary.  Any distribution of New Common Stock and/or New Warrants under the Plan which remains unclaimed for a period of ninety (90) days shall be cancelled and any dividends which have been paid with respect to such securities shall be transferred to and become property of the Reorganized Debtors and any and all entitlement by the holder of such Claim to such distribution shall be extinguished and forever barred.

(v)    *Distributions as of the Distribution Record Date*. As of the close of business on the Distribution Record Date, the claims register shall be

closed, and there shall be no further changes in the record holders of any Claims. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the Distribution Record Date. The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Distribution Record Date.

(vi) *Interest on Claims*. Unless specifically provided for in the Plan with respect to Priority Tax Claims, Other Secured Claims and DIP Financing Claims, no holders of Claims (including Administrative Claims), Allowed or otherwise, shall be entitled to receive any interest thereon.

(vii) *Indenture Trustees' Fees and Expenses*. The Senior Secured Indenture Trustee and, provided that Class 4 votes to accept the Plan, the Senior Subordinated Notes Indenture Trustee, shall be entitled to payment from the Reorganized Debtors of the reasonable fees and out-of-pocket expenses incurred by such Indenture Trustees in making distributions under the Plan without further Court approval. If Class 4 votes to reject the Plan, then the Senior Subordinated Notes Indenture Trustee shall not be entitled to payment of its fees as described in the preceding sentence. Any such payments will be made on terms agreed to with Reorganized Debtors and will not be deducted from distributions to be made pursuant to the Plan, provided, that, if the Debtors and such Indenture Trustee do not agree on the amount of such payments, such dispute shall be submitted to the Court for final resolution.

(b) Objections to and Resolution of Claims.

(i) *Objections to and Resolution of Administrative Claims and Claims*. The Reorganized Debtors shall have the exclusive right to make and to file objections to Administrative Claims (other than Fee Claims) and Claims subsequent to the Effective Date. Unless otherwise ordered by the Court, objections to Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made as soon as practicable, but in no event later than the Administrative Claims Objection Deadline or the Claims Objection Deadline, as the case may be. Objections to Fee Claims shall be filed and served on or within thirty (30) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

(ii) *Priority Claims*.

(a) Establishment of Priority Claims Reserve. On the Effective Date, the Reorganized Debtors shall place into a reserve an amount of Cash equal to the sum of (a) the aggregate amount of all Disputed Other Priority Claims, plus (b) an amount to be determined by the Court to be reserved for any Disputed Other Priority Claims that are unliquidated (the "Priority Claims Reserve").

(b)     Cash Held in Priority Claims Reserve. Cash held in the Priority Claims Reserve shall be deposited in a bank account or accounts in the name of the Reorganized Debtors and designated as held in trust for the benefit of holders of Disputed Other Priority Claims that become Allowed. Cash held in the Priority Claims Reserve shall not constitute property of the Reorganized Debtors. The Reorganized Debtors shall pay, or cause to be paid, out of the funds held in the Priority Claims Reserve, any tax imposed on the Priority Claims Reserve by any governmental unit with respect to income generated by Cash held in the Priority Claims Reserve. Any Cash held in the Priority Claims Reserve after all Other Priority Claims have been Allowed or disallowed shall be transferred to and become the property of the Reorganized Debtors.

(c)     Allowance of Disputed Priority Claims. If, on or after the Effective Date, any Disputed Other Priority Claim becomes an Allowed Claim, the Reorganized Debtors shall, not later than thirty (30) days after the date on which such Claim becomes an Allowed Claim, or as soon thereafter as is practicable, distribute from the Priority Claims Reserve to the holder of such Allowed Other Priority Claim Cash equal to the amount that such holder would have been entitled to had such Claim been Allowed on the Effective Date.

(iii)     *General Unsecured Claims*.

(a)     Establishment of Disputed General Unsecured Claims Reserve. If Class 5 votes to accept the Plan, then on the Initial Distribution Date, the Reorganized Debtors shall establish the Disputed General Unsecured Claims Reserve and fund such reserve with the General Unsecured Claim Distribution Amount less any amounts distributed to holders of Allowed General Unsecured Claims on the Initial Distribution Date. The amount to be funded into the Disputed General Unsecured Claims Reserve shall reflect the aggregate Distributions that holders of Disputed General Unsecured Claims would have been entitled to receive under the Plan if such holders' General Unsecured Claims had been Allowed in an amount equal to such Claims' aggregate Disputed Claims Amount on the Initial Distribution Date.

(b)     Cash Held in Disputed General Unsecured Claims Reserve. Cash held in the Disputed General Unsecured Claims Reserve shall be deposited in a bank account or accounts in the name of the Reorganized Debtors and designated as held in trust for the benefit of holders of Disputed General Unsecured Claims whose claims have become Allowed. Cash held in the

45

Disputed General Unsecured Claims Reserve shall not constitute property of the Reorganized Debtors. The Reorganized Debtors shall pay, or cause to be paid, out of the funds held in the Disputed General Unsecured Claims Reserve, any tax imposed on the Disputed General Unsecured Claims Reserve by any governmental unit with respect to income generated by Cash held in the Disputed General Unsecured Claims Reserve. Any Cash held in the Disputed General Unsecured Claims Reserve after all General Unsecured Claims have been Allowed or disallowed and holders of Allowed Claims have received the full amount of distributions to which they are entitled under the Plan, including supplemental Distributions, if any, to be made on the Supplemental Distribution Date, shall be transferred to and become the property of the Reorganized Debtors.

(c)     Allowance of Disputed General Unsecured Claims. The holder of a Disputed General Unsecured Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive a distribution of Cash from the Disputed General Unsecured Claims Reserve as soon thereafter as is practicable. Such Distributions shall be made in accordance with the Plan based on the Distributions that would have been made to such holder under the Plan if such Disputed Claim had been an Allowed Claim on or prior to the Effective Date.

(d)     Distributions on Supplemental Distribution Date. Unless otherwise provided in the Plan, to the extent there remains any Cash in the Disputed General Unsecured Claims Reserve after all Distributions are made to holders of Allowed General Unsecured Claims (including Disputed Claims that have become Allowed Claims) and provided that holders of such Allowed Claims had up to that point received Distributions of less than 5% of the Allowed amount of such Claims on account of such Claims, the Reorganized Debtors shall, on the Supplemental Distribution Date, distribute to the holders of Allowed General Unsecured Claims their pro rata share of such excess Cash, provided, however, that the total Distributions to be made to the holders of Allowed General Unsecured Claims on account of such Claims shall not exceed 5% of the Allowed amount of such Claims. The Reorganized Debtors shall in no event be obligated to make any such supplemental Distribution if, in the discretion of Reorganized Debtors, there is not sufficient excess Cash to make a cost-efficient Distribution, taking into account the size of the Distribution to be made and the number of recipients of such Distribution.

Doc #:NY7:35140.22

(e)     Cancellation and Surrender of Existing
Securities and Agreements.  Notwithstanding any other provision
of the Plan, except for the Intercompany Claims and Equity
Interests in Surviving Debtor Subsidiaries, on the Effective Date,
any promissory note, other instrument or security evidencing a
Claim (other than DIP Financing Claims) or Equity Interest shall
be deemed cancelled.

I.      **Disputed and Unliquidated Personal Injury Tort and Wrongful Death
Claims**

Pursuant to the Plan, the Debtors dispute all Claims based on personal
injury tort or wrongful death.  Provided that the holder of any Disputed and/or
Unliquidated Claim based on personal injury tort or wrongful death has timely filed a
proof of claim, the allowance of such Claim for purposes of seeking payment from the
proceeds of any insurance policy covering such Claim, shall be determined by the state or
federal court (other than the Court) in which such Claim was pending as of the Petition
Date unless the holder of such Claim agrees to fix the Allowed amount of such Claim
pursuant to a written stipulation filed with the Court.  If a holder of any Disputed and/or
Unliquidated Claim based on personal injury tort or wrongful death did not commence an
action in a state or federal court prior to the Petition Date, such holder may commence,
upon the Effective Date of the Plan, such an action in a forum having jurisdiction and
venue over such Claim (other than the Court) only if:  (i) the applicable statute of
limitations to commence such an action has not expired and (ii) such holder has timely
filed a proof of claim.  The court in which the holder of the Claim commences such an
action shall determine the allowance of such Claim solely for purposes of determining the

Plan shall not be subject to levy, garnishment, attachment, or like legal process by any
holder of a Claim, including, but not limited to, the holders of Senior Secured Note
Claims, by reason of any claimed Subordination Related Rights or otherwise, so that each
holder of a Claim shall have and receive the complete benefit of the distributions in the
manner set forth and described in the Plan.  If Class 4 votes to reject the Plan, then the
preceding two sentences shall be disregarded and all Subordination Related Rights shall
continue to exist and any and all Distributions to holders of Allowed Senior Subordinated
Note Claims on account of such Claims shall remain subject to levy, garnishment,