**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES AND REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (PJW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Brian S. Hermann
Justin G. Brass
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
       October 23, 2006

# TABLE OF CONTENTS

Page

**I. INTRODUCTION**.................................................................................................2
    A.    Holders of Interests Entitled to Vote.........................................................5
    B.    Voting Procedures.....................................................................................6
    C.    Confirmation Hearing................................................................................7

**II. OVERVIEW OF THE PLAN**.............................................................................7

**III. OVERVIEW OF CHAPTER 11**.....................................................................16

**IV. COMPANY BACKGROUND**.........................................................................16
    A.    The Debtors.............................................................................................16
    B.    The Debtors' Businesses.........................................................................17
    C.    The Debtors' Prepetition Capital Structure ............................................18

**V. EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11
    CASES**.....................................................................................................20

**VI. THE CHAPTER 11 CASES**............................................................................23
    A.    Significant "First Day" Motions ............................................................23
    B.    DIP Credit Facilities...............................................................................23
    C.    Official Committee of Unsecured Creditors............................................24
    D.    Ad Hoc Committee of Senior Secured Noteholders ...............................24
    E.    Ad Hoc Shareholder Committee .............................................................24
    F.    Changes in the Debtors' Senior Management.........................................25
    G.    The Debtors' Motion to Preserve Net Operating Losses.........................26
    H.    Claims Process .......................................................................................29
    I.    Assumption/Rejection of Leases and Executory Contracts.....................31
    J.    Reclamation Claims................................................................................34
    K.    KERP .....................................................................................................35
    L.    Litigation with PMC, Inc.......................................................................36
    M.    Incentive Plan for the Foamex's Salaried Employees.............................37

**VII. CHAPTER 11 PLAN PROCESS**...................................................................38
    A.    History of the First Amended Plan..........................................................38

**VIII. SUMMARY OF THE PLAN**.......................................................................40
    A.    Introduction.............................................................................................40
    B.    Classification and Treatment of Administrative Claims, Claims and
          Equity Interests Under the Plan...............................................................41
    C.    Voting on Plan........................................................................................50

D.      Distributions. ............................................................................50
E.      Objections to and Resolution of Claims. ...............................51
F.      Estimation. ...............................................................................53
G.      Administrative Claims of Indenture Trustees. ......................53
H.      Cancellation and Surrender of Existing Securities and Agreements.........54
I.      Nonconsensual Confirmation. ................................................54
J.      Provisions Regarding Corporate Governance and Management of the Reorganized Debtors..........................................54
K.      Securities to be Issued Pursuant to the Plan...........................57
L.      Powers of Officers....................................................................59
M.      Corporate Reorganization ........................................................59
N.      Substantive Consolidation .......................................................59
O.      Provisions Regarding Means of Implementation, Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims...................................................................62
P.      Effect of Confirmation of the Plan ..........................................64
Q.      Retention of Jurisdiction...........................................................70
R.      Miscellaneous Provisions .........................................................70
S.      Executory Contracts and Unexpired Leases .............................73
T.      Benefit Plans .............................................................................74
U.      Confirmation and Effectiveness of the Plan ............................75

**IX. FINANCIAL PROJECTIONS**.................................................................78

**X. CERTAIN RISK FACTORS TO BE CONSIDERED**.........................81
A.      Projected Financial Information................................................81
B.      Risks Related to the Debtors' Business and Operations............81
C.      Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness .................................84
D.      Certain Bankruptcy Law Considerations..................................85
E.      Certain Risks Relating to the Post-Effective Date Common Stock .........85
F.      Risks Relating to the Rights Offering .....................................88

**XI. CONFIRMATION PROCEDURE** ......................................................91
A.      Solicitation of Votes .................................................................91
B.      The Confirmation Hearing .......................................................92
C.      Confirmation .............................................................................93

**XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**...............................................................................95
A.      Liquidation Under Chapter 7 ...................................................95
B.      Alternative Plan of Reorganization or Plan of Liquidation ......96

**XIII. SECURITIES LAW MATTERS** .......................................................96
A.      General.......................................................................................96
B.      Rule 144....................................................................................97

Doc #:NY7:283581.7

C.      Subsequent Transfers of Securities -- State Laws ...................................97
D.      Registration Rights ...............................................................................98

**XIV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE**
**PLAN** ...............................................................................................99
A.      Scope of This Summary ........................................................................99
B.      Consequences to the Debtors ...............................................................100
C.      Consequences to Equityholders ..........................................................104
D.      Consequences to Creditors ..................................................................105
E.      Information Reporting; Backup Withholding Tax ...............................106

**XV. CONCLUSION** .............................................................................................108

**EXHIBITS** .........................................................................................................111

Doc #:NY7:283581.7

ALL CREDITORS AND SHAREHOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS FIRST AMENDED DISCLOSURE STATEMENT AND THE FIRST AMENDED PLAN OF REORGANIZATION IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  **THOSE THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  <u>SEE</u> ARTICLE X BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS IN THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN THE LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER OF SALE FOR ANY SECURITIES. A REGISTRATION STATEMENT IN RESPECT OF THE ADDITIONAL COMMON STOCK PROPOSED TO BE OFFERED PURSUANT TO THE RIGHTS OFFERING AND THE CALL OPTION TO BE CREATED PURSUANT TO THE FIRST AMENDED PLAN IS BEING FILED WITH THE SEC.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE

INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

# I.

## INTRODUCTION

On September 19, 2005 (the "Petition Date"), Foamex International Inc. ("Foamex International"), Foamex L.P., Foamex Latin America, Inc. ("Foamex Latin America"), Foamex Asia, Inc. ("Foamex Asia"), FMXI, Inc. ("FMXI"), Foamex Carpet Cushion LLC ("Foamex Carpet Cushion"), Foamex Capital Corporation ("Foamex Capital"), Foamex Mexico, Inc. ("Foamex Mexico") and Foamex Mexico II, Inc. ("Foamex Mexico II") (each a "Debtor," and collectively, the "Debtors" or "Foamex")[1] filed their petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").[2]

On December 23, 2005, the Debtors filed their proposed joint plan of reorganization, dated December 23, 2005 (the "Original Plan"), which set forth the manner in which Claims against and Equity Interests in the Debtors would be treated. Concurrently with the Original Plan, the Debtors filed a disclosure statement (the

---

[1] In addition to the Debtors, on or about the Petition Date, Foamex Canada Inc., a wholly-owned non-debtor subsidiary of Foamex L.P., sought and obtained an interim, and later, a final, order from the Ontario Superior Court of Justice recognizing the Chapter 11 Cases as "foreign proceedings" for purposes of Section 18.6 of the *Companies' Creditors Arrangement Act* (the "Recognition Order"). The Recognition Order provides for, among other things, (a) a limited duration stay of any enforcement action or proceeding with respect to Foamex Canada Inc. and its property on the terms described therein, which has been extended through November 14, 2006, and may be further extended by order of the Ontario Superior Court of Justice, and (b) authorization allowing Foamex Canada Inc. to guarantee the Debtors' obligations arising under the DIP Credit Facilities and to grant liens on its assets as security therefor.

[2] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

"Original Disclosure Statement") describing certain aspects of the Original Plan, the Debtors' business and related matters.

The Debtors' first amended plan (the "Plan") was filed on October 23, 2006, and amends and supercedes in all respects the Original Plan. Similarly, this first amended disclosure statement (the "Disclosure Statement") amends and supercedes in all respects the Original Disclosure Statement. This Disclosure Statement describes certain aspects of the Plan, the Debtors' business and related matters.

After a careful review of Foamex's business and its prospects as a going concern, Foamex, in consultation with its legal and financial advisors, concluded that recoveries to Creditors and Equityholders would be maximized by Foamex's continued operation as a going concern under the terms of the Plan. In other words, Foamex is worth more to its Creditors and Equityholders as a going concern than upon liquidation.

To achieve such higher value, the Plan contemplates (among other things): (i) payment in full in Cash to holders of Allowed (a) Administrative Claims, (b) Priority Tax Claims, (c) DIP Financing Claims, (d) Other Priority Claims and (e) Other Secured Claims (or, at the Debtors' option, the reinstatement of such Allowed Other Secured Claim or the return of collateral securing such Allowed Other Secured Claim); (ii) payment in full in Cash, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, to the Senior Secured Noteholders in an amount equal to their Senior Secured Note Claims (iii) payment in full in Cash to Senior Subordinated Noteholders in an amount equal to their Senior Subordinated Notes Claims plus Post-Petition Interest; (iv) payment in full in Cash to holders of Allowed General Unsecured Claims in an amount equal to their Allowed General Unsecured Claims plus Post-Petition Interest; (v) that all Unliquidated Claims shall be determined and satisfied, to the extent required, in the ordinary course of business by the Reorganized Debtors, without the need for Court approval, including where applicable, through access to available insurance; (vi) allowing holders of Equity Interests in Surviving Debtor Subsidiaries to retain such interests; (vii) converting each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date into 100 shares of Additional Common Stock; and (viii) the continuation (subject to dilution) of the Existing Common Stock and Other Common Equity Interests in Foamex International.

In order to achieve the results contemplated by the Plan, the Debtors need to raise a significant amount of new money. As discussed in more detail below, the Debtors have secured commitments for both debt and equity financing on favorable terms and in amounts sufficient to fund the payments required under the Plan. Such funding includes (i) debt financing in the form of Exit Facilities with combined commitments of up to $790 million and (ii) equity financing of $150 million in the form of a Rights Offering, along with a commitment from certain existing holders of equity interests in Foamex International or their designees that are reasonably acceptable to Foamex International to purchase New Preferred Stock or Additional Common Stock under the Plan should the Rights Offering raise less than $150 million. Continued access to such funding sources up to the Effective Date is critical to the success of the Plan. For a more

-3-

detailed discussion of the Rights Offering and Equity Commitment Agreement <u>see</u> Article VIII.O.

This Disclosure Statement is submitted, pursuant to section 1125 of the Bankruptcy Code, to holders of Interests that are entitled to vote on the Plan in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing</u>") scheduled for _____, 2006, at _____, prevailing Eastern Time.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit <u>A</u>);

- An Order of the Court (excluding the exhibits thereto) dated November __, 2006 (the "<u>Disclosure Statement Order</u>"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit <u>B</u>);

- Foamex's Financial Projections (Exhibit <u>C</u>); and

- A copy of the Exit Facility Commitment Letter and related term sheets (Exhibit <u>D</u>).

In addition, Foamex's Annual Report on Form 10-K for the fiscal year ended January 1, 2006 and Foamex's Quarterly Reports on Form 10-Q for the first two quarters of fiscal year 2006 ended on April 2, 2006 and July 2, 2006, respectively, are available for inspection online at www.foamex.com or Foamex's dedicated webpage on Bankruptcy Services, LLC's website at www.bsillc.com.

A Ballot for, among other things, the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Interests that are entitled to vote to accept or reject the Plan.

By order dated November __, 2006, after notice and a hearing, the Court signed the Disclosure Statement Order, determining that the Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT <u>AND</u> THE INFORMATION ACCOMPANYING THIS

DISCLOSURE STATEMENT.  ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, for making any elections as provided thereon, the record date for voting purposes, and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  Each holder of an Interest that is entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A.    Holders of Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan.  Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 3 (Senior Secured Note Claims), 4 (Senior Subordinated Note Claims), 5 (General Unsecured Claims), 6 (Unliquidated Claims), 7 (Intercompany Claims), 8 (Equity Interests in Surviving Debtor Subsidiaries) and 11 (Other Common Equity Interests in Foamex International) under the Plan are unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Classes 1 through 8 and 11 are conclusively deemed to have accepted the Plan and therefore may not vote to accept or reject the Plan.  Classes 9 (Existing Preferred Stock) and 10 (Existing Common Stock) under the Plan are Impaired.  Holders of such Existing Preferred Stock and Existing Common Stock, as of the Record Date, are entitled to vote to accept or reject the Plan.  ACCORDINGLY, BALLOTS TO ACCEPT OR REJECT THE PLAN ARE BEING PROVIDED TO HOLDERS OF EXISTING PREFERRED STOCK AND EXISTING COMMON STOCK IN CLASSES 9 AND 10, RESPECTIVELY.

The Bankruptcy Code defines "acceptance" of a plan by (i) a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan and (ii) a class of interests as acceptance by holders of such interests in that class that hold at least two-thirds in amount that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article XI below.

In the event that Class 9 or 10 votes to reject the Plan, section 1129(b) permits the Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more Impaired Classes of Claims or Equity Interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article XI.C below.

For a summary of the treatment of each Class of Claims and Interests, see Article II below.

**B.     Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold an Interest in more than one Class, you will receive separate Ballots that must be used for each separate Class. Please vote and return your Ballot(s).

If you received a Ballot from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution promptly so that it can be forwarded to the Debtors' voting tabulation agent, Bankruptcy Services, LLC. If you received a Ballot(s) from the Debtors, please vote and return your Ballot(s) directly to the following address:

>Bankruptcy Services, LLC
>Attn:  Foamex Balloting
>757 Third Avenue, 3rd Floor
>New York, NY 10017
>Tel.:  (646) 282-2500

DO NOT RETURN ANY EQUITY SECURITIES THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED OR TO EXERCISE ANY ELECTIONS PROVIDED ON SUCH BALLOT, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN OR THE EXERCISE OF ANY ELECTIONS MUST BE ACTUALLY RECEIVED NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON _____, 2006.

Doc #:NY7:283581.7

Pursuant to the Disclosure Statement Order, the Court set November __, 2006, the date of the entry of the Disclosure Statement Order, as the record date (the "Voting Record Date") for voting on the Plan. Accordingly, only holders of record as of _____, 2006 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan. **IMPORTANT:** THE VOTING RECORD DATE MAY DIFFER FROM THE SEPARATE RECORD DATE ESTABLISHED FOR PARTICIPATION IN THE RIGHTS OFFERING THAT WILL TAKE PLACE PURSUANT TO, AND IN CONNECTION WITH, THE PLAN. THE RECORD DATE ESTABLISHED FOR THE RIGHTS OFFERING, AND NOT THE VOTING RECORD DATE, WILL DETERMINE THOSE HOLDERS OF THE EXISTING COMMON STOCK AND EXISTING PREFERRED STOCK THAT ARE ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING. For a summary of the Rights Offering, see Article VII.A.4.

If you are a holder of an Interest entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Bankruptcy Services, LLC at (646) 282-2500 from 9 a.m. to 6 p.m., prevailing Eastern Time, Monday through Friday.

## C. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Court has scheduled a hearing to consider confirmation of the Plan for _____, 2006 at _____ prevailing Eastern Time before the Honorable Peter J. Walsh, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the "Confirmation Hearing"). The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before _____, 2006 at 4:00 P.M., prevailing Eastern Time, in the manner described below in Article XI.B. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND EQUITYHOLDERS. THE DEBTORS URGE THOSE ENTITLED TO VOTE TO ACCEPT THE PLAN.

## II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received

by the holders of Allowed Claims[3] and Equity Interests thereunder. This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

**SUMMARY OF CLASSIFICATION AND TREATMENT**
**OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.**

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Claims | Unimpaired; except with respect to Administrative Claims that are Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon, which treatment shall be reasonably acceptable to the Significant Equityholders; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, | $298,790 | 100% |

---

[3] The estimated allowed amount of Allowed Claims excludes Post-Petition Interest unless otherwise noted.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | such transactions. | | |
| -- | Priority Tax Claims | Unimpaired; except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim plus Post-Petition Interest on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, deferred Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim plus Post-Petition Interest, plus interest on such aggregate amount over such period at the same rate as such Post-Petition Interest. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business, without Post-Petition Interest, in accordance with the terms thereof. | $2,110,277 | 100% |

Doc #:NY7:283581.7

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| -- | DIP Financing Claims | Unimpaired; except to the extent that the holders of the DIP Financing Claims and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, the holders of the DIP Financing Claims, or their designees, shall receive payment in full in Cash of all DIP Financing Claims in full and final satisfaction thereof other than the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms survive the termination of the DIP Credit Facilities. | $130,313,400[4] | 100% |
| 1 | Other Priority Claims | Unimpaired; except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim plus Post-Petition Interest on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an | $395,045 | 100% |

---

[4] The amount of the DIP Financing Claims will fluctuate until the Effective Date, particularly with respect to interest and fees as well as the principal amount of the DIP Revolving Credit Facility.

Doc #:NY7:283581.7

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Allowed Other Priority Claim. All Allowed Other Priority Claims which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof. | | |
| 2 | Other Secured Claims | Unimpaired; except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, at the sole option of the Debtors, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured | $1,011,940[5] | 100% |

---

[5]   This amount includes the mechanic's lien claim filed by Commercial Roofing Systems, Inc. ("Commercial Roofing") in the amount of $178,473.95.  Inclusion of such amount herein is without prejudice to any party-in-interest's, including the Debtors' and/or Reorganized Debtors', right to object to Commercial Roofing's claim at any time on any grounds.

-11-

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable. | | |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| 3 | Senior Secured Note Claims | Unimpaired; on the Initial Distribution Date, in full and final satisfaction of the Senior Secured Note Claims, each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Claim. | Deemed allowed in the amount of $312,452,083.33 | 100% |
| 4 | Senior Subordinated Note Claims | Unimpaired; on the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Senior Subordinated Note Claim shall receive Cash in an amount equal to such holders' Allowed Senior Subordinated Note Claim which includes Post-Petition Interest. | $208,150,130.55[6] | 100% |
| 5 | General Unsecured Claims | Unimpaired; on the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an | $13,038,668[7] | 100% |

---

[6]  As per the proof of claim filed by the Senior Subordinated Note Claims Indenture Trustee, the Allowed amount of Senior Subordinated Note Claims includes accrued and unpaid interest through the Petition Date but not Post-Petition Interest.

[7]  Amount does not include 5 Disputed Claims totaling $3,735,616, of which $2,476,897 represents one claim filed by the Debtors' former president and chief executive officer.

Doc #:NY7:283581.7

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Allowed General Unsecured Claim, or as soon as practicable thereafter, in full and final satisfaction of such Claim, each holder of an Allowed General Unsecured Claim will receive Cash in an amount equal to such holder's Allowed General Unsecured Claim plus Post-Petition Interest. To the extent that insurance is available to satisfy an Allowed General Unsecured Claim, such Allowed General Unsecured Claim shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, without the need for Court approval, at such time as such claim becomes liquidated and the insurance proceeds and the insurance therefor becomes available. | | |
| 6 | Unliquidated Claims | Unimpaired; all Unliquidated Claims shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, without the need for Court approval, including, where applicable, through access to available insurance. | N/A | 100% |
| 7 | Intercompany Claims | Unimpaired; all Intercompany Claims will remain outstanding and shall not be discharged by this Plan or the Confirmation Order, but shall instead be | $5,000,000[8] | 100% |

[8] As of October 1, 2005.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | liquidated, determined and satisfied in accordance, and in a manner consistent, with the Debtors' historical practices as if the Chapter 11 Cases had not been commenced. | | |
| 8 | Equity Interests in Surviving Debtor Subsidiaries | Unimpaired; the holders of Equity Interests in Surviving Debtor Subsidiaries shall retain such Equity Interests. | N/A | 100% |
| 9 | Existing Preferred Stock | Impaired; on the Initial Distribution Date, each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date shall be converted into 100 shares of Additional Common Stock. | N/A | 100% |
| 10 | Existing Common Stock | Impaired; Existing Common Stock in Foamex International shall remain outstanding after the Effective Date (and become common stock of Reorganized Foamex International on the Effective Date), subject to dilution as a result of the issuance of any Additional Common Stock. | N/A | 100% |
| 11 | Other Common Equity Interests in Foamex International | Unimpaired; each holder of Other Common Equity Interests in Foamex International shall retain such Equity Interests. | N/A | 100% |

Doc #:NY7:283581.7

# III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equityholders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth, among other things, the treatment of, and means for satisfying, claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor that are impaired by the plan are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to satisfy the requirements of section 1125 of the Bankruptcy Code.

# IV.

## COMPANY BACKGROUND

### A.    The Debtors

Headquartered in Linwood, Pennsylvania, Foamex International is a public holding company that, as of the date hereof, along with its subsidiaries, had annual net sales of approximately $1.3 billion in 2005, employed approximately 4,100 people worldwide and maintained two administrative offices and 32 domestic and 9 international

manufacturing facilities located throughout the United States, Canada and Mexico.[9] Foamex International's domestic operations are conducted through Foamex L.P., a Delaware limited partnership, in which Foamex International owns a 98.284% limited partnership interest. FMXI, a Delaware corporation and a wholly-owned, non-operating subsidiary of Foamex International, is a 1.716% owner and the managing general partner of Foamex L.P.

The other Debtors – Foamex Latin America, Foamex Asia, Foamex Carpet Cushion, Foamex Capital, Foamex Mexico and Foamex Mexico II – are all Delaware companies and subsidiaries of Foamex L.P. Foamex Latin America is a holding company and the parent of Foamex Mexico, itself an intermediate holding company and the ultimate parent of various nondebtor intermediate holding and operating companies and subsidiaries through which the Debtors conduct business in Mexico. Foamex Asia is the 70% owner of Foamex Asia Co., Ltd., which is a joint venture through which Foamex conducts business in China, Malaysia, Singapore and Thailand. Foamex Carpet Cushion is an inactive corporation through which the Debtors previously conducted their carpet underlay business. Foamex Capital is a financing corporation and is the co-issuer and co-obligor of the Senior Secured Notes and the Senior Subordinated Notes. Foamex Mexico II is presently dormant.

### B.    The Debtors' Businesses

The Debtors' operations consist of the following business lines or "strategic business units" ("SBUs"):  foam products, automotive products, technical products and carpet cushion products.

The Debtors' foam products group, their largest SBU based on net sales, serves various comfort, industrial and consumer products markets with a mixture of specialty and commodity products. The Debtors' foam products are used primarily in various bedding and furniture items, including quilting rolls, toppers, cores and border rolls for mattresses, upholstered seating products, mattress overlay pads, leisure furniture, futons and pillows. The Debtors' bedding and furniture products are sold directly to manufacturers as well as through distributors.

The Debtors' automotive products group, their second largest SBU, is one of the largest suppliers of polyurethane foam products to the North American automotive industry. The automotive products group produces, among other things, foam rolls, flame and adhesive laminated composites, thermoformable foams, acoustical foams, basic foam products, energy absorbing foams and molded seat cushions. The Debtors'

---

[9]    Since the Petition Date, the Debtors have closed several carpet cushion and foam warehouses, a fiber operation, a foam pouring operation and five foam fabrication facilities, including three facilities in connection with the discontinuation of certain business lines within their Consumer Products Group within the United States. The products for the remaining business lines will be manufactured at certain of the Debtors' other Foam Products facilities. In addition, the Debtors have closed two manufacturing facilities located in Canada, one of which is a foam pouring operation. The Debtors continue to examine their current manufacturing and warehousing operations and it is possible that additional closures may be implemented in the future.

automotive foam products are sold through a range of tiers in the automotive industry's supply chain. The Debtors primarily supply Tier 1 system integrators that in turn supply original equipment manufacturers, or so-called "OEMs" (e.g., General Motors, Ford and Daimler Chrysler).

The Debtors' technical products group produces innovative specialty foam materials and solutions for use in the automotive, consumer, electronic, industrial and medical fields. Its products are found in various consumer and business products, including sponges, band-aids, cleaning brushes and laser and inkjet printers.

The Debtors' carpet cushion segment is primarily a by-product business utilizing the scrap foam generated by the foam manufacturing operations and outside sources to create carpet underlay. This scrap by-product is re-bonded to form rebond carpet underlay, which accounts for approximately 90% of the revenue of this SBU. The Debtors' carpet cushion products are sold through various wholesalers, "big box" home centers, retail buying groups and chains and independent retailers and contractors.

### C. The Debtors' Prepetition Capital Structure

#### 1. Secured Financing

Prior to the Petition Date, the Debtors had a relatively complex capital structure including three primary layers of secured debt consisting of a bank revolving credit and term loan A facility, a term loan B facility and second-lien bond indebtedness. Specifically, Foamex L.P. was a borrower under a $190 million revolving credit facility (as amended, the "Prepetition Bank Facility") with Bank of America, N.A., as administrative agent and a lender, and certain other lenders party thereto and a term loan A (the "Prepetition Term Loan A") in the approximate principal amount of $33 million with Bank of America, N.A., as administrative agent and a lender, and other lenders party thereto, and an $80 million principal amount term loan B (the "Prepetition Term Loan B," and together with the Prepetition Term Loan A, collectively, the "Prepetition Term Loans") with Silver Point Finance, LLC, as administrative agent and a lender, and the other lenders party thereto. The Debtors' obligations under each facility were guaranteed by each of the Debtors that was not a primary obligor and by Foamex Canada Inc., a Canadian wholly-owned subsidiary of Foamex L.P., and were secured by a first priority lien on, and security interest in, substantially all of the assets of Foamex L.P. and the guarantors.[10]

In addition to the Prepetition Bank Facility and the Prepetition Term Loans, pursuant to an indenture (the "Senior Secured Notes Indenture"), dated as of March 25, 2002, Foamex L.P. and Foamex Capital issued $300 million (original principal

---

[10]  The obligations under the Prepetition Bank Facility and the Prepetition Term Loans ranked pari passu in right of payment; however, pursuant to an intercreditor agreement between the administrative agent for the Prepetition Bank Facility and the Prepetition Term Loan A, on the one hand, and the Prepetition Term Loan B administrative agent, on the other, the lenders under the Prepetition Bank Facility and the Prepetition Term Loan A had prior rights in and to the Debtors' collateral that secured the obligations under the Prepetition Bank Facility and the Prepetition Term Loan A.

amount) of 10 3/4% Senior Secured Notes due April 1, 2009 (the "Senior Secured Notes"). Payment of the Senior Secured Notes was guaranteed by each of the other Debtors except Foamex International and FMXI. The Senior Secured Notes were secured by second liens on substantially the same collateral that secured the obligations under the Prepetition Bank Facility and the Prepetition Term Loans.

In addition to the three primary layers of secured debt described above, as of the Petition Date, the Debtors had approximately $7.0 million of other secured debt, including, inter alia, two industrial revenue bonds ("IRBs") with face amounts of $1.0 million and $6.0 million, respectively. The IRBs were both secured by letters of credit and liens on the facilities constructed with the funds. The issuer of the $1.0 million IRB was the Delaware County (PA) Industrial Development Authority. The proceeds of that bond issuance were originally used to construct an approximately 50,000 square foot foam bun room addition at the Debtors' Eddystone, Pennsylvania facility. The $1.0 million IRB matured on October 1, 2005 and was repaid in full. The issuer of the $6.0 million IRB was the county of Dona Ana, New Mexico. The proceeds of that bond issuance were used to fund the original construction of the Debtors' Santa Teresa, New Mexico facility, consisting of approximately 84,800 square feet of manufacturing and warehousing space and an additional 5,000 square feet of office space, and the equipment initially used at the facility. The $6.0 million IRB matures in November 2013 and, pursuant to the Plan, will be reinstated and paid according to its terms.

## 2. Unsecured Financings

On the Petition Date, the Debtors also had outstanding two tranches of subordinated bonds. Specifically, pursuant to an indenture, dated as of June 12, 1997 (the "2007 Senior Subordinated Notes Indenture"), Foamex L.P. and Foamex Capital issued $150 million (original principal amount) of 9 7/8% Senior Subordinated Notes due June 15, 2007 (the "2007 Senior Subordinated Notes"). Separately, pursuant to an indenture, dated as of December 23, 1997 (the "2005 Senior Subordinated Notes Indenture," and, together with the 2007 Senior Subordinated Notes Indenture, collectively, the "Senior Subordinated Notes Indentures"), Foamex L.P. and Foamex Capital issued $98 million (original principal amount) of 13 1/2% Senior Subordinated Notes that matured on August 15, 2005 (the "2005 Senior Subordinated Notes," and, together with the 2007 Senior Subordinated Notes, collectively, the "Senior Subordinated Notes").[11] The 2007 Senior Subordinated Notes and the 2005 Senior Subordinated Notes are unsecured obligations of Foamex L.P. and Foamex Capital (as well as the Debtors that have guaranteed the obligations thereunder as set forth in the Senior Subordinated Notes Indentures) and are subordinated in right of payment to the Debtors' secured debt, but rank pari passu in right of payment with each other and with the Debtors' other unsecured obligations.

---

[11] As a result of the Debtors' prior repurchases of 2005 Senior Subordinated Notes, the principal amount outstanding at maturity was $51.6 million.

In addition to the foregoing bank and bond indebtedness, the Debtors also had approximately $90,000,000 in ordinary course trade debt that was unpaid as of the Petition Date.

### 3. Equity Interests in Foamex International

On the Petition Date, Foamex International had 50,000,000 shares of Existing Common Stock authorized for issuance of which 24,509,728 shares were outstanding, with an additional 3,489,000 shares issued and held in treasury. In addition, pursuant to various stock option plans, on the Petition Date, there were outstanding options to purchase an additional 3,663,174 shares of Existing Common Stock. As of the Petition Date, there were approximately 129 record holders of the Existing Common Stock. Prior to the Petition Date, the Existing Common Stock was publicly held and traded on the Nasdaq National Market ("NASDAQ") under the ticker symbol "FMXI."[12] In addition, as of the Petition Date, Foamex International had 5,000,000 shares of Existing Preferred Stock authorized for issuance of which 15,000 Series B shares were outstanding.[13]

## V.

## EVENTS LEADING TO COMMENCEMENT
## OF THE CHAPTER 11 CASES

Beginning in the second half of 2002, the Debtors experienced a dramatic decline in their operating performance. Contributing to the deterioration in the Debtors' operating performance was a confluence of events, including a significant increase in the prices of the Debtors' primary raw materials and the severe downturn in the U.S. automotive industry. These factors are discussed in greater detail below.

The Debtors' bank and bond indebtedness – totaling more than $763 million in principal amount – significantly impaired the Debtors' operating performance in several key respects. First and foremost, the Debtors' need to service their heavy debt load limited their ability during the three years preceding the Petition Date to make much needed capital investments and improvements. The lack of capital investment, in turn, hampered the Debtors' ability to remain cost-competitive which, in consequence, resulted in a reduction in unit volume, particularly in the highly competitive bedding and furniture markets where the Debtors manufacture commodity-type products.

---

[12]   Subsequent to the Debtors' Chapter 11 filings, on or about September 28, 2005, NASDAQ delisted the Existing Common Stock. The Existing Common Stock now trades over the counter under the ticker symbol "FMXIQ."

[13]   On the Petition Date, all of Foamex International's issued and outstanding Series B Preferred Stock was held by the Bank of Nova Scotia. According to Bank of Nova Scotia's 13-D filing with the SEC on April 20, 2006, the Bank of Nova Scotia sold all of its Existing Preferred Stock in a block trade to D. E. Shaw Laminar Portfolios, L.L.C. ("D. E. Shaw"). According to D. E. Shaw's separate 13-D filing with the SEC on April 20, 2006, D. E. Shaw is the owner of all of the issued and outstanding shares of the Existing Preferred Stock.

-20-

Additionally, prior to the Petition Date, the Debtors' customers grew concerned about the Debtors' financial condition. Because of their concerns, a few of the Debtors' significant customers took steps to source a portion of their business elsewhere and/or suspend placing new orders with the Debtors.

Compounding the Debtors' decrease in volume was the dramatic increase over the same period in the prices of the chemicals that comprise the vast majority of the Debtors' raw material requirements – specifically, polyol, TDI and MDI. At least four primary factors contributed to these price increases: first, worldwide demand for MDI had increased dramatically which caused it to be in short supply. Second, a reduction in domestic capacity of propylene oxide, a major chemical component of polyol, resulted in a significant decrease in the supply of polyol. Third, given the Debtors' financial distress, many of the Debtors' major chemical suppliers placed strict credit limits on the Debtors' purchases which, in turn, compromised the Debtors' ability to leverage their purchasing scale to obtain more attractive pricing through volume discounts and the like. Lastly, the primary urethane chemicals used to create polyol, MDI and TDI – propylene, toluene and benzene – are each oil-based derivatives. The cost of these raw materials generally tracks the price of oil and energy costs and, consequently, the cost of these chemicals rose dramatically in the year prior to the Petition Date.

Collectively, these factors contributed to chemical price increases of more than 20% from the first to the fourth quarter of 2004, and a further increase of more than 10% in the first quarter of 2005. Although the Debtors were able to pass a portion of these cost increases on to their customers, given the highly competitive environment in which they operate, the Debtors concluded at the time that they could not pass along all such increases, particularly in certain SBUs, and, as a consequence, the Debtors saw their gross margins and operating income erode dramatically.

Finally, the problems facing the North American automotive industry together with certain product-related factors, such as the move away from SUVs in the first half of 2005, negatively impacted the Debtors' automotive business, which is their second largest revenue source. In the months leading up to the Petition Date, several Tier 1 automotive suppliers sought bankruptcy protection and others scaled back their production. In addition, many OEMs were facing their own financial difficulties.

In view of these external factors, and cognizant of the need to restructure their balance sheet, prior to the Petition Date, the Debtors initiated steps to rationalize their business by refocusing on their core competencies. Along those lines, in 2002 and 2003, the Debtors attempted to sell their carpet cushion and automotive businesses. However, based on the results of those sale processes, the Debtors decided not to proceed with either sale because the prices offered would not have allowed the Debtors to deleverage their balance sheet. In April 2005, the Debtors sold their rubber and felt carpet cushion business to Leggett & Platt, Incorporated for approximately $38.7 million. In addition, in May 2005, the Debtors combined the management of their technical and foam products SBUs to increase productivity and efficiency, enhance their market focus and improve integration and communication among their sales, marketing and manufacturing teams. Finally, in the two years prior to the Petition Date, the Debtors

-21-

ceased operating in over ten locations, closed four offices, significantly reduced SG&A spending and implemented various strategies designed to further reduce overhead expenses.

Although the Debtors benefited from these restructuring initiatives prior to the Petition Date, they proved to be insufficient. To assist the Debtors in their restructuring efforts, in May 2005, the Debtors retained Miller Buckfire & Co., LLC ("Miller Buckfire"), as their investment banker and financial advisor, to evaluate strategic alternatives designed to strengthen the Debtors' balance sheet. Almost immediately upon being engaged, Miller Buckfire worked with the Debtors to devise various restructuring alternatives that could be implemented in, or outside of, chapter 11. As part of this process, Miller Buckfire solicited various financing and restructuring proposals from the Debtors' existing stakeholders as well as from third-party financing sources and equity sponsors. The results of this process demonstrated at the time that, to provide the Debtors with sufficient liquidity to operate effectively for the long-term, any restructuring would likely require a significant reduction in Foamex's indebtedness – something that, under the circumstances, could only be achieved by means of a chapter 11 case. In view of all of these factors, on August 15, 2005, Foamex L.P. did not pay the $51.6 million principal payment due upon the maturity of the 2005 Senior Subordinated Notes and the accrued and unpaid interest.

Despite defaulting on their 2005 Senior Subordinated Notes, as part of their overall restructuring efforts, the Debtors announced on August 15, 2005, amendments to both their Prepetition Bank Facility and the Prepetition Term Loans to provide for waivers to September 30, 2005, in respect of the default resulting from the failure to repay the 2005 Senior Subordinated Notes at maturity and the interest due thereon as well as certain other covenant defaults. Such amendments also provided additional liquidity under the Prepetition Bank Facility to allow the Debtors to continue their restructuring efforts. In addition, the Debtors announced at such time that the administrative agents under the Prepetition Bank Facility and Prepetition Term Loans had committed to provide the Debtors with debtor-in-possession and chapter 11 exit financing.

After the Debtors' August 15th announcement, the Debtors and their professionals continued to negotiate with their key creditors, including an informal committee of holders of Senior Secured Notes representing at the time a majority in principal amount of the outstanding Senior Secured Notes (as constituted from time to time, the "Ad Hoc Committee of Senior Secured Noteholders") and their respective professionals concerning the terms of a consensual restructuring. Those negotiations culminated in the Debtors' agreement in principle with members of the Ad Hoc Committee of Senior Secured Noteholders on the key terms of a proposed reorganization plan. That agreement in principle was memorialized in a term sheet that was filed as part of an 8-K filing on September 22, 2005; the term sheet ultimately was embodied in the Original Plan.

As described in detail in Article VII below, significant improvements in the Debtors' business postpetition beginning in the fourth quarter of 2005 have led the Debtors to abandon the Original Plan in favor of the current Plan.

**VI.**

**THE CHAPTER 11 CASES**

### A.    Significant "First Day" Motions

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Court entered several orders authorizing the Debtors to pay various prepetition claims.  These orders were designed to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the chapter 11 filings.  The Court entered orders authorizing the Debtors, among other things, to (i) pay prepetition compensation, benefits and reimbursable employee expenses; (ii) continue certain workers' compensation programs and insurance policies; (iii) continue certain customer practices and programs; (iv) pay certain prepetition freight and customs brokers' claims and amounts due in respect of the Debtors' foreign operations; (v) pay prepetition claims of certain critical vendors,[14] and (vi) obtain postpetition financing, repay certain prepetition secured debt, and grant first priority liens, super-priority administrative expense status and adequate protection to the Debtors' postpetition lenders.

In addition, the Debtors filed several applications seeking orders authorizing the Debtors' retention of professional advisors.  Specifically, the Debtors filed applications to retain (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young, Conaway, Stargatt & Taylor, LLP, as co-counsel, (ii) Miller Buckfire, as financial advisor, (iii) KPMG LLP, as auditors and accountants, and (iv) certain ordinary course professionals.  The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

### B.    DIP Credit Facilities

To provide the Debtors with the cash and liquidity necessary to continue operating and to maintain normal vendor relations postpetition, on September 19, 2005, the Debtors sought Court approval of a $240 million debtor-in-possession revolving credit facility (including a $40 million sub-limit for letters of credit) in the form of a Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified, the "DIP Revolving Credit Facility"), dated as of September 22, 2005, with Bank of America, N.A., as administrative agent (the "DIP Revolving Credit Agent"), and the lenders party thereto (the "DIP Revolving Credit Lenders").  In addition, the Debtors sought Court approval of an $80 million debtor-in-possession term loan (as amended, restated, supplemented or otherwise modified, the "DIP Term Credit Facility,"

---

[14]    During the Chapter 11 Cases, the Debtors have paid approximately $32,477,673 to 24 critical vendors. The primary recipients of these critical vendor payments have been the Debtors' chemical and fabric suppliers.

and together with the DIP Revolving Credit Facility, collectively, the "DIP Credit Facilities"), dated as of September 22, 2005, with Silver Point Finance, LLC, as administrative agent (the "DIP Term Credit Agent," and together with the DIP Revolving Credit Agent, collectively, the "DIP Agents"), and the lenders party thereto (the "DIP Term Loan Lenders," and together with the DIP Revolving Credit Lenders, collectively, the "DIP Lenders"). A portion of the proceeds from the DIP Credit Facilities were used to repay the Debtors' Prepetition Bank Facility and Prepetition Term Loans. The remainder of the proceeds have been able to fund the Debtors' working capital requirements during their Chapter 11 Cases.

On September 21, 2005, the Court approved the DIP Credit Facilities on an interim basis and on October 17, 2005, the Court approved the DIP Credit Facilities on a final basis. On October 18, 2005, the Court entered a final order (the "DIP Financing Order") approving the DIP Credit Facilities.

### C. Official Committee of Unsecured Creditors

On September 29, 2005, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "Creditors' Committee"). The Creditors' Committee is currently comprised of The Bank of New York, the Pension Benefit Guaranty Corporation, Newcastle Partners, LP, Lyondell Chemical Corporation, Shell Chemicals L.P., Steel Partners II, L.P.[15] and Donovan Williams.

The Creditors' Committee has, with Court approval, employed and retained (i) Lowenstein Sandler PC and Greenberg Traurig, LLP, as its co-counsel, and (ii) Jefferies & Company, Inc., as its financial advisor.

### D. Ad Hoc Committee of Senior Secured Noteholders

Prior to the Petition Date, an Ad Hoc Committee of Senior Secured Noteholders was formed by certain large holders of the Debtors' Senior Secured Notes that together represented a majority of the outstanding amount of such securities. Subsequent to the Petition Date, U.S. Bank National Association, as indenture trustee under the Senior Secured Notes Indenture, joined the Ad Hoc Committee of Senior Secured Noteholders. The Ad Hoc Committee of Senior Secured Noteholders has employed and retained (i) Schulte Roth & Zabel LLP and Richards Layton & Finger, P.A., as its co-counsel and (ii) Houlihan Lokey Howard & Zukin Capital, as its financial advisor.

### E. Ad Hoc Shareholder Committee

By letter dated April 25, 2006, D. E. Shaw requested the U.S. Trustee to appoint an official equity committee in the Chapter 11 Cases. The U.S. Trustee denied

---

[15]  On January 9, 2006, the United States Trustee for the District of Delaware filed an Amended Notice of Appointment of Committee of Unsecured Creditors to reflect the resignation of Core Wealth Management from the Creditors' Committee and the appointment of Steel Partners II, L.P.

D. E. Shaw's request on May 3, 2006. On May 9, 2006, D. E. Shaw moved the Court for the appointment of an official equity committee.

Subsequent to D. E. Shaw filing its motion seeking the appointment of an official equity committee, D. E. Shaw and certain other large shareholders of Foamex International formed an ad hoc shareholder committee (the "Ad Hoc Shareholder Committee"). The members of the Ad Hoc Shareholder Committee are D. E. Shaw, Sigma Capital Management, LLC, Par IV Capital Management LLC ("Par IV Capital") and Paloma International L.P. Goldman, Sachs & Co. is an observer to the Ad Hoc Shareholder Committee. The Ad Hoc Shareholder Committee has selected Cleary Gottlieb Steen & Hamilton LLP and Skadden, Arps, Slate, Meagher & Flom LLP, as bankruptcy and special tax counsel, respectively, and Imperial Capital, LLC, as financial advisor.

On August 21, 2006, D.E. Shaw withdrew, without prejudice, its motion seeking the appointment of an official shareholders committee. On October 13, 2006, members of the Ad Hoc Shareholder Committee (or their designees) and Goldman, Sachs & Co. entered into the Equity Commitment Agreement in connection with the proposed Rights Offering. See Article VIII for a more detailed discussion of the Equity Commitment Agreement and Rights Offering.

### F.    Changes in the Debtors' Senior Management

Beginning in April 2006, the Debtors' senior management went through a series of changes. On April 7, 2006, Mr. K. Douglas Ralph, Executive Vice President and Chief Financial Officer ("CFO") of Foamex International, resigned from the Debtors. To date, the Debtors have not hired a replacement CFO.

On June 7, 2006, Mr. Thomas E. Chorman resigned his positions as Foamex International and Foamex L.P.'s President and Chief Executive Officer ("CEO"), and as a board member of Foamex International. In the face of Mr. Chorman's resignation, the board of directors of Foamex International named Mr. Raymond E. Mabus, Jr., Foamex International's Chairman, as Foamex International's President and CEO on at least an interim basis. Mr. Mabus has served in the positions of President and CEO since Mr. Chorman's resignation. Under the Plan, if confirmed, Mr. Mabus will serve as Chairman, President and CEO of Reorganized Foamex International.

Mr. Mabus is a man of great distinction who has served on Foamex International's board of directors since 2000 and as its Chairman since early 2004. Prior to that, Mr. Mabus was the governor of Mississippi from 1988 to 1992 and the U.S. ambassador to the Kingdom of Saudi Arabia from 1994 to 1996. After leaving public service in 1996, Mr. Mabus joined the board of directors of an employee training service called Strategic Partnerships, now operating as the Global Resources Division ("Global Resources Division") of Frontline Group Ltd. Mr. Mabus was president of Global Resources Division from October 1998 through February 2002.

In addition to Mr. Mabus's appointment as Foamex's President and CEO, Mr. Gregory J. Christian was appointed Foamex International's Chief Administrative Officer ("CAO").  In addition to his multiple other roles as Foamex International and Foamex L.P.'s Executive Vice President, General Counsel and Chief Restructuring Officer ("CRO"), as CAO Mr. Christian has assumed responsibility for the Debtors' information technology, procurement and manufacturing technology.  Mr. Christian was also elected to Foamex International's board of directors to fill the vacancy left by Mr. Chorman.

## G.    The Debtors' Motion to Preserve Net Operating Losses

At the time when the voluntary petitions were filed, the Debtors believed that, although they expected to emerge from chapter 11 with substantial net operating losses ("NOLs") for Federal income tax purposes as of January 1, 2006, as a result of the anticipated reorganization to be implemented in the Chapter 11 Cases, the Debtors would recognize an amount of cancellation of indebtedness income ("COD Income") that would exceed the amount of such NOLs.  The application of section 108 of the Internal Revenue Code (the "Tax Code") would reduce the Debtors' NOLs by the amount of such COD Income, with the result that there would not be any NOLs to be carried forward to offset future income.  By the second quarter of 2006, however, the Debtors' financial performance had so improved, that it began to appear as though there may be no COD Income so that the NOLs would not be reduced by COD Income.  The NOLs may therefore constitute a valuable asset of the Debtors' estates that could be used to reduce their future federal income tax liability.  For a more detailed description of the NOLs and federal income tax consequences of the Plan, see Article XIV below.

In light of increased trading activity in the Existing Common Stock from February 2006 through April 2006, Foamex took steps to preserve the utilization of the NOLs after conclusion of the Chapter 11 Cases and to prevent an ownership change within the meaning of section 382(g)(1) of the Tax Code from occurring prior to the consummation of its Chapter 11 plan of reorganization.  Because an ownership change occurring prior to the consummation of the chapter 11 plan would result in the imposition of more onerous annual limitations on the usage of the NOLs to offset future taxable income, on April 20, 2006, Foamex filed a motion in the Bankruptcy Court requesting an order establishing notification and hearing procedures for trading in the Existing Common Stock.  Following negotiations with certain significant equityholders, the Court entered a consensual order establishing the notification and hearing procedures on May 3, 2006 (the "Trading Order").  Specifically, the Trading Order provides that any person or entity that beneficially owns or will own shares of Existing Common Stock representing 4.5% of Foamex International's outstanding shares at the time the Trading Order was entered (a "4.5% Equityholder") must comply with certain procedures in order to provide the Debtors with an opportunity to challenge any transfer of stock that would jeopardize the value of the Debtors' NOLs.  In general, and subject to certain exceptions set forth in the Trading Order, the procedure can be summarized as follows:

(a)     Any person or entity who currently is or becomes a 4.5% Equityholder[16] shall file with the Court, and serve upon the Debtors and counsel to the Debtors, a notice of such status, substantially in the form attached to the Trading Order as Exhibit A, on or before the later of (i) thirty (30) days after the Debtors provide notice of the Trading Order or (ii) ten (10) days after becoming a 4.5% Equityholder.

(b)     Prior to effectuating any transfer of equity securities (including any sale, transfer, assignment, pledge, hypothecation, option to acquire stock[17], or other disposition or encumbrance) that would result in an increase in the amount of equity securities of Foamex International beneficially owned by a 4.5% Equityholder or would result in a person or entity becoming a 4.5% Equityholder, such 4.5% Equityholder shall file with the Court, and serve on the Debtors and counsel to the Debtors, advance written notice, substantially in the form attached to the Trading Order as Exhibit B, of the intended transfer of equity securities.

(c)     Prior to effectuating any transfer of equity securities (including any sale, transfer, assignment, pledge, hypothecation, option to acquire stock, or other disposition or encumbrance) that would result in a decrease in the amount of common stock of Foamex International beneficially owned by a 4.5% Equityholder or would result in a person or entity ceasing to be a 4.5% Equityholder, such 4.5% Equityholder shall file with the Court, and serve on the Debtors and counsel to the Debtors, advance written notice, substantially in the form attached to the Trading Order as Exhibit C, of the intended transfer of equity securities.

(d)     The Debtors shall have twenty (20) days after receipt of a Notice of Proposed Transfer to file with the Court and serve on such 4.5% Equityholder an objection to any proposed transfer of equity securities described in the Notice of Proposed Transfer on the grounds that such transfer may adversely affect the Debtors' ability to utilize their NOLs; provided, however, that, to the extent practicable, the Debtors will use reasonable best efforts to file objections, or confirm to the 4.5% Equityholder that the Debtors have no objection, before the expiration of the twenty (20) day period.  If the Debtors file an objection, the Debtors shall request that such objection be heard by the Court on shortened notice (no more than ten (10) days after the date of such objection), and such transaction will not be effective unless approved by a final and nonappealable order of the Court.  If the Debtors do not object within such twenty (20) day period, such transaction may proceed in an amount not to exceed the amount set forth in the Notice of Proposed Transfer.  Any transaction for which a Notice of Proposed Transfer is filed is void *ab initio* unless either (1) express permission for such transaction is granted by the Debtors; (2) the twenty (20) day period referred to above expires

---

[16]     A "4.5% Equityholder" is any person or entity that beneficially owns at least 1,102,938 shares of Foamex International's common stock, representing 4.5% of the 24,509,728 shares outstanding at the time the Trading Order was entered.

[17]     For purposes of the Trading Order, an "option" to acquire stock includes any contingent purchase, warrant, convertible debt, Series B convertible preferred stock, put, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

without an objection from the Debtors; or (3) such transaction is approved by a final and nonappealable order of the Court.

For a complete description of these notification and hearing procedures, reference should be made to the Trading Order on file with the Court (docket no.1029).

Shortly after entry of the Trading Order, Morgan Stanley & Co. Incorporated ("Morgan Stanley"), through its counsel, advised counsel to Foamex that Morgan Stanley owned 1,400,004 shares of Existing Common Stock, representing at the time approximately 5.7% of the Existing Common Stock. Foamex and its advisers concluded that the acquisition by Morgan Stanley of stock representing 5% or more of the total equity value would likely cause Morgan Stanley to be an additional 5% shareholder and thus constitute an additional owner shift for purposes of section 382 which would result in an ownership change under section 382 of the Tax Code. Accordingly, Foamex took steps, consistent with the Trading Order, to have the Court determine that Morgan Stanley's acquisition of the shares that caused it to become a 5% shareholder was void *ab initio*. With the cooperation and consent of Morgan Stanley, Foamex submitted and obtained the Court's approval of a Stipulation and Order (the "MS Stipulation").

The MS Stipulation provides that each purchase by Morgan Stanley of shares of Existing Common Stock that increased its holdings above 1,270,004 shares of Existing Common Stock (approximately 4.9% of Foamex International's then Existing Common Stock) shall be void *ab initio*. Any shares with respect to which the purchases were void *ab initio* (the "Excess Shares") shall be treated as having been held at all times by Morgan Stanley in trust for the benefit of a qualified charitable organization selected by Foamex International. The MS Stipulation required that Morgan Stanley sell the Excess Shares; Morgan Stanley was permitted to retain the proceeds of such sale only to the extent of its actual cost for such shares, and must pay any additional proceeds to the charitable organization selected by Foamex International. Counsel for Morgan Stanley notified counsel for Foamex International that the Excess Shares were in fact sold on May 15, 2006, for a price in excess of Morgan Stanley's cost; the excess proceeds have been remitted to the charitable organization selected by Foamex International.

Also, subsequent to the entry of the Trading Order, Par IV Capital filed a Schedule 13-G with the SEC for the period ending on May 1, 2006, on which it reported beneficially owning, for SEC reporting purposes, greater than 5 percent of the Existing Common Stock. After discussions between Par IV Capital and Foamex International's counsel revealed that Par IV Capital should not be treated as a 5% shareholder for tax purposes, on May 23, 2006, Par IV Capital, and certain entities affiliated with Par IV Capital (collectively, the "Par IV Entities") and Foamex International entered into a stipulation (the "Par IV Stipulation") that memorialized the earlier discussions between each party's counsel. According to the Par IV Stipulation, shortly after the Trading Order became effective, Par IV Capital notified Foamex that two funds, Par IV Master Fund, Ltd. ("Par IV Fund") and Sunrise Partners Limited Partnership ("Sunrise"), for which Par IV Capital acts as an investment advisor, each separately own 884,750 shares of Existing Common Stock (approximately 3.4% of the Existing Common Stock then outstanding) in

-28-

separate accounts, both of which are managed by Par IV Capital. As part of the Par IV Stipulation, the Par IV Entities represented and warranted that of the 1,769,500 shares of Existing Common Stock referred to in the Schedule 13-G, 884,750 shares are beneficially owned by the Par IV Fund and 884,750 are beneficially owned by Sunrise. The Par IV Entities further represented that: (1) since the filing date of the Schedule 13-G, none of the Par IV Entities has acquired any shares of Existing Common Stock or Existing Preferred Stock, and the ownership reflected on the Schedule 13-G for the period ending on May 1, 2006, represented each Par IV Entity's highest ownership level in the three-year period preceding the filing date of the Schedule 13-G; and (2) to the knowledge of the Par IV Entities, no "person," as that term is defined in the Trading Order, who owns a 5 percent or greater interest in any of the Par IV Entities, owns Foamex common stock or Existing Preferred Stock.

Foamex believes that neither the purchases of its Existing Common Stock by Morgan Stanley nor those reported by Par IV Capital resulted in an ownership change for purposes of section 382 of the Tax Code. However, to avoid any dispute over the effect of Morgan Stanley and/or the Par IV Entities' purchases of Existing Common Stock on reorganized Foamex International's ability to utilize its NOLs, Foamex International has requested a ruling from the IRS confirming that its belief is correct. See Article XIV for a more detailed discussion of the Debtors' NOLs.

### H. Claims Process

#### 1. Last Date to File Proofs of Claim

On October 18, 2005, the Court entered an order (the "Bar Date Order") requiring any person or entity holding or asserting a Claim (other than an Administrative Claim) against the Debtors to file a written proof of claim with Foamex International Inc., et al., Claims Processing, c/o Bankruptcy Services, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, on or before December 8, 2005, and for Governmental Units holding a Claim against the Debtors to file such Claim on or before 4:00 p.m., prevailing Eastern Time on March 20, 2006. The Bar Date Order further provides that, pursuant to Bankruptcy Rule 3003(c)(2), any entity that is required to file a proof of claim in these Chapter 11 Cases pursuant to the Bankruptcy Code, the Bankruptcy Rules or the Bar Date Order with respect to a particular claim against the Debtors, but that fails to do so by the applicable Bar Date, shall not be treated as a creditor with respect to such Claim for the purposes of voting upon, or receiving distributions under, any plan or plans of reorganization filed in these Chapter 11 Cases. Approximately 1,330 claims were filed against the Debtors in the aggregate amount of $4,970,510,219.14, many of which are duplicative or are otherwise objectionable.

Since the Bar Date, the Debtors have engaged in a continuous process of assessing the proofs of claim filed against them and where appropriate, objecting to Claims that the Debtors believe should not be Allowed at all or, at most, not in the amount(s) or classification as filed. Thus far the Debtors have filed nine omnibus objections to proofs of claim:

- On January 13, 2006, the Debtors filed their *First Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "First Omnibus Objection"). On February 13, 2006, the Court entered an order granting the First Omnibus Objection expunging over $1.5 million in Claims against the estates.

- On March 3, 2006, the Debtors filed their *Second Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Second Omnibus Objection"). On April 12, 2006, the Court entered an order granting the Second Omnibus Objection reducing the amount of Claims against the estates by over $2.9 million.

- On March 10, 2006, the Debtors filed their *Third Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Third Omnibus Objection"). On April 12, 2006, the Court entered an order granting the Third Omnibus Objection reducing the amount of Claims against the estates by over $3.5 million.

- On July 7, 2006, the Debtors filed their *Fourth Omnibus Objection to Claims Pursuant to Section 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Fourth Omnibus Objection"). On August 8, 2006, the Court entered an order granting the Fourth Omnibus Objection reducing the amount of Claims against the estates by over $2 million in Claims.

- On July 7, 2006, the Debtors filed their *Fifth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Fifth Omnibus Objection"). On August 8, 2006, the Court entered an order granting the Fifth Omnibus Objection reducing the amount of Claims against the estates by over $2 million.

- On August 23, 2006, the Debtors filed their *Sixth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Sixth Omnibus Objection"). On October 5, 2006, the Court entered an order granting the Sixth Omnibus Objection reducing the amount of Claims against the estates by over $14 million.

- On August 23, 2006, the Debtors filed their *Seventh Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Seventh Omnibus Objection"). On October 5, 2006 the Court entered an

order granting the Seventh Omnibus Objection reducing the amount of Claims against the estates by over $352 million.

- On September 19, 2006, the Debtors filed their *Eighth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Eighth Omnibus Objection").  On October 19, 2006, the Court entered an order granting the Eighth Omnibus Objection reducing the amount of Claims against the estates by over $1 million

- On September 19, 2006, the Debtors filed their *Ninth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Ninth Omnibus Objection").  On October 19, 2006, the Court entered an order granting the Ninth Omnibus Objection reducing the amount of Claims against the estates by over $3 million.

In addition to the foregoing objections, on March 3, 2006, the Debtors filed their initial "Notice of Claims Previously Satisfied" (the "First Notice of Satisfaction") seeking to reduce and allow or expunge approximately 340 filed and scheduled Claims which the Debtors believe were satisfied after the Petition Date by payments authorized pursuant to certain "first day" orders of the Court.  The First Notice of Satisfaction resulted in Claims reductions in excess of $31 million.

On June 20, 2006, the Debtors filed a "Second Notice of Claims Previously Satisfied" (the "Second Notice of Satisfaction") seeking to reduce and allow or expunge approximately 100 filed and scheduled Claims which the Debtors believe were satisfied after the Petition Date by payments authorized pursuant to certain "first day" orders of the Court.  The Second Notice of Satisfaction resulted in Claims reductions in excess of $1.85 million.

The Debtors have substantially completed their Claims reconciliation process and believe, based on the results of such process, that the Claims amount will be further reduced significantly for, among others, the following reasons: (i) certain creditors filed duplicative Claims against each of the Debtors that, under the substantive consolidation provisions in the Plan, will be deemed to be only a single Claim and (ii) the Debtors anticipate that certain significant claims will be withdrawn prior to the effective date of the Plan.  According to the Debtors' estimates, there should remain approximately $13 million[18] of Allowed General Unsecured Claims that will be due and payable on the Effective Date.

## I.  Assumption/Rejection of Leases and Executory Contracts

Pursuant to the Bankruptcy Code, the Debtors have (a) 60 days after the Petition Date to assume or reject unexpired leases of nonresidential real property unless

---

[18]  Amount excludes approximately $3.7 million of General Unsecured Claims that are Disputed Claims.

Doc #:NY7:283581.7

such time period is extended by the Court for cause and (b) until confirmation of the Plan to assume or reject executory contracts and other unexpired leases. The Debtors recently filed a motion to extend their October 16, 2006 deadline to assume or reject unexpired leases of nonresidential real property in the Chapter 11 Cases through February 17, 2007 (the "365 Motion"). Pursuant to local rule, the filing of the 365 Motion automatically extends the Debtors' time to assume or reject executory contracts or unexpired leases of nonresidential real property until the Court acts on such motion. A hearing on the 365 Motion is currently scheduled for November 21, 2006. The Debtors reserve the right to seek one or more further extensions should they determine it is necessary to do so.

As described more fully below, the Debtors have already assumed a number of critical executory contracts and the cure amounts associated with such assumptions either have been paid or will have been paid prior to the Confirmation Hearing. In connection with the assumption of unexpired leases and the Debtors' remaining executory contracts, the Debtors have already reconciled the cure amounts payable in respect of such assumptions with the counterparties to such leases and contracts and shall send the counterparty to such contract or lease a "cure" notice indicating the Debtors' estimate of the "cure" amount required to be paid pursuant to section 365(b) of the Bankruptcy Code upon the assumption of such contract or lease. Counter-parties will be given an opportunity to object to such amounts pursuant to the procedures set forth in such cure notice. All cure amounts shall be paid on the Initial Distribution Date or as otherwise provided for in the Plan. Because the Debtors believe that they have already reconciled such cure amounts with the counterparties to the contracts and leases to be assumed, the Debtors do not anticipate disputes over cure amounts and, as a result of such cure amount reconciliations, the Debtors estimate that the aggregate cure amount to be paid in connection with such assumptions will be approximately $2.8 million.

1.      **Rejected Leases and Executory Contracts**

The Debtors have already obtained Court approval to reject eleven nonresidential real property leases, eight equipment leases, one employment agreement and twenty-three executory contracts. The Debtors expect to reject only a handful of remaining contracts and leases, and anticipate doing so, if at all, at, or prior to, the Confirmation Hearing.

2.      **Assumed Executory Contracts**

The Debtors have already obtained Court approval to assume ten executory contracts, six of which are critical supply contracts that will help ensure that the Debtors and the Reorganized Debtors will have a sufficient supply of raw materials on terms more favorable than those in existence on the Petition Date.

Specifically, on October 17, 2005, the Debtors obtained Court approval to assume (i) that certain sales contract for scrap foam between Maverick, Inc. and Foamex L.P., dated January 1, 2005 (as amended, the "Maverick Contract"), (ii) that certain sales contract for blended and scrap foam between Advanced Foam Recycling, Ltd. and

Foamex L.P., dated July 1, 2005 (as amended, the "Advanced Foam Contract") and (iii) that certain sales contract for various forms of MDI isocyanate between Huntsman International LLC and Foamex L.P., dated September 28, 2004 (as amended, the "Huntsman Contract"). The Maverick Contract, the Advanced Foam Contract and the Huntsman Contract are each important supply contracts, the assumption of which has resulted in, among other things, cost savings and a significant increase in the Debtors' supply of scrap foam and MDI.

In addition, on December 19, 2005, the Court entered an order approving the assumption of that certain sales contract for polyol and TDI between Foamex L.P. and Bayer Material Science LLC, dated August 19, 2005 (as amended, the "Bayer Contract"). The Bayer Contract is an important supply contract, the assumption of which will result in, among other things, a significant increase in the Debtors' availability of polyol and TDI, a return to normal credit terms and an expanded credit limit.

On August 8, 2006, the Debtors obtained Court approval to assume an executory contract with Lyondell Chemical Company ("Lyondell"), as amended by that certain amendment (the "Lyondell Contract Amendment") executed by Foamex L.P. and Lyondell on July 25, 2006 (as amended, the "Lyondell Contract"), pursuant to which Foamex L.P. agrees to buy, and Lyondell agrees to sell, certain quantities of TDI. The Lyondell Contract, similar to the Bayer Contract discussed above, is an important supply contract and its assumption provides the Debtors with additional assurance that their TDI demands will be satisfied.

On October 5, 2006, the Court entered an order approving the assumption of an executory contract for polyol between Foamex L.P. and Shell Chemical LP d/b/a Shell Chemical Company ("Shell"), dated March 30, 2001 (as amended, the "Shell Contract"), pursuant to which Foamex L.P. agrees to buy, and Shell agrees to sell, certain quantities of polyol. Similar to the Bayer Contract and Lyondell Contract described above, the Shell Contract is another important supply contract and its assumption provides the Debtors with further assurance that their polyol demands will be satisfied.

The Debtors have also assumed certain customer agreements. On October 17, 2005, the Debtors obtained Court approval to assume that certain supply contract for polyurethane foam between Anatomic Concepts, Inc. and Foamex L.P., dated September 28, 2001 (as amended, the "Anatomic Contract"). The Anatomic Contract is an important supply contract with one of the Debtors' significant polyurethane foam customers, the assumption of which has resulted in, among other things, an extension of the term of the agreement.

On March 14, 2006, the Court entered an order approving the assumption of an important supply agreement, as amended by the February 21, 2006 amendment, for lamination and foam rolls between Johnson Controls, Inc. ("JCI") and Foamex L.P. (as amended, the "JCI Contract"). JCI is an important customer of the Debtors' automotive SBU and the changes in the contract are expected to benefit both parties.

Finally, on August 8, 2006, the Debtors obtained Court approval to assume all of their pre-petition insurance policies and related agreements (collectively, the "Insurance Agreements") entered into between the Debtors and/or their predecessors Crain Industries, Inc. and its related entities and ACE American Insurance Company and certain of its affiliates (collectively, "ACE") with respect to, among other things, workers' compensation, automobile, employer and general liability.

The Insurance Agreements are critical to the Debtors' operations because, as a matter of state law (at least with respect to the Debtor's workers' compensation insurance), the Debtors are required to obtain and maintain the types of insurance ACE provides. Another important benefit of assumption of the Insurance Agreements is that, after the order approving assumption was entered, ACE released $1,323,068.67 to the Debtors, which represents adjustments to the pledged cash collateral provided by the Debtors to ACE. As a result of the assumption, ACE also agreed to adjust certain premiums paid to ACE by the Debtors and to reduce the amount of required letters of credit posted by the Debtors to collateralize their obligations under the Insurance Agreements.

The Debtors continue to assess their raw material sourcing needs and general business requirements and will make any appropriate motions with respect to their remaining leases and executory contracts within the time period established by the Bankruptcy Code or such other time as may be set by the Court. The Plan provides that except for unexpired leases and executory contracts that are the subject of a motion(s) to reject that is pending on or decided prior to the Confirmation Date, the Debtors will assume all of their executory contracts and unexpired leases effective as of, and subject to the occurrence of, the Effective Date.

**J.     Reclamation Claims**

Section 546(c) of the Bankruptcy Code recognizes the statutory and common law rights of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor received such goods while insolvent and the seller demands in writing reclamation of such goods (i) before ten (10) days after receipt of such goods by the debtor, or (ii) if such ten (10) day period expires after the commencement of the bankruptcy case, before twenty (20) days after receipt of such goods by the debtor. Section 546(c) further permits the bankruptcy court to deny reclamation to a seller with such a right that has made a valid demand if the court (i) grants the claim of such seller priority under section 503(b) of the Bankruptcy Code, or (ii) secures such claim with a lien.

The Debtors have received nineteen (19) reclamation demands seeking the return of at least $20,856,115.20 worth of goods. Six of these reclamation demands failed to specify an exact amount of the alleged reclamation claim. The Debtors have satisfied certain of these alleged reclamation claims through the payment of "cure" amounts associated with contracts that have been assumed or through payments to critical vendors. The Debtors' satisfied their largest reclamation claim – that of Dow Chemical Company in the amount of $16,324,185.79 – through a critical vendor agreement with

-34-

Dow Chemical Company. Certain other reclamation claims may be similarly satisfied prior to or in connection with confirmation of the Plan.

Any reclamation claims that remain unsatisfied prior to the Confirmation Hearing will be treated as Administrative Claims under the Plan.

## K.    KERP

On October 28, 2005, the Debtors filed a motion (the "KERP Motion") with the Court seeking approval of their Key Employee Retention Plan (the "KERP") and the continuation of their Severance Plan, as slightly modified. On November 17, 2005, the Court entered an order approving the KERP and Severance Plan. The KERP and Severance Plan are intended to assist the Debtors in retaining and incentivizing their senior management and other key employees (the "Key Employees") to work through certain key dates and to file, confirm and implement a successful plan of reorganization for the Debtors. Under the KERP, and as set forth in greater detail in the KERP Motion, the Debtors' divided their Key Employees into three groups. Group 1 consisted of 65 non-executive and three executive employees. The retention distributions to the Key Employees in Group 1 are to be made in Cash and are formula driven based upon a percentage of the Key Employee's base salary ranging from 15% to 40%. Group 2 consists of six executives and Group 3 consisted of the Debtors' three senior executives. The amounts of the retention distributions to be made to the Key Employees in Groups 2 and 3 were determined on a discretionary basis and range from 50% to 125% of the particular Key Employee's base salary. The Key Employees in Groups 2 and 3 will receive their KERP distributions in Cash, provided, however, that at the sole option of the board of directors of Reorganized Foamex International (which determination shall be made within forty-five (45) days of the Effective Date), up to 25% (for Group 2) and 50% (for Group 3) of such distributions may be made in the form of Common Stock. For purposes of determining the number of shares of Common Stock, if any, to be distributed to Key Employees in Groups 2 and 3, the Common Stock will be valued at the price per share equal to the price per share at the closing of the over the counter market on the Effective Date.[19]

Payment of the KERP amounts described above are made in installments at intervals during the Chapter 11 Cases and, with respect to Groups 2 and 3, after the Effective Date[20]. Specifically, pursuant to the KERP, the Key Employees in Group 1 shall receive a Cash distribution equal to: (i) 25% of their KERP award on the earlier of

---

[19]    The KERP Motion provides the Board of Directors with the option to pay a portion of the KERP distribution "in the form of common stock in the reorganized Company at a price per share that reflects the value of the equity to be distributed to the Debtors' creditors on the Effective Date of the Debtors' plan." Because the Debtors no longer will be issuing equity to creditors, the Debtors will be seeking, as part of the Confirmation Order, a modification to the KERP that would provide for the issuance of common stock under the KERP at a per share value that reflects the value of Reorganized Foamex International's Common Stock on the Effective Date.

[20]    Two of the three executives in Group 3 are no longer employed by the Debtors. Accordingly, under the KERP, the post-Effective Date distributions to those two executives are forfeited.

the filing of a plan of reorganization and December 15, 2005 (which amount was paid); (ii) 25% of their KERP award on the earlier of the confirmation of a plan of reorganization and March 15, 2006 (which amount was paid); and (iii) 50% of their KERP award on the effective date of a plan of reorganization. Key Employees in Group 2 are entitled to receive a Cash distribution equal to 25% of their KERP award on each of: (i) February 1, 2006 (which amount was paid); (ii) the effective date of a plan of reorganization; and (iii) the 6 month anniversary of the effective date of a plan of reorganization. In addition, on the 1 year anniversary of the effective date of a plan of reorganization, Key Employees in Group 2 are entitled to receive 25% of their KERP award in Cash or, at the sole option of the board of directors of Reorganized Foamex International, in common stock in reorganized Foamex International. Finally, Key Employees in Group 3 are entitled to receive a Cash distribution equal to 25% of their KERP award on each of (i) February 1, 2006 (which amount was paid); and (ii) the effective date of a plan of reorganization. In addition, on each of the 6 month and 1 year anniversaries of the effective date of a plan of reorganization, the Key Employees in Group 3 shall be entitled to receive 25% of their KERP award in Cash or, at the sole option of the board of directors of Reorganized Foamex International, in common stock in reorganized Foamex International. Pursuant to the KERP, the board of directors of Reorganized Foamex International shall have 45 days following the Effective Date to determine whether the 25% payable to Group 2 at the 1 year anniversary of the Effective Date and the 25% payable to Group 3 on each of the 6 month and 1 year anniversaries of the Effective Date shall be payable in Cash or common stock.

### L. Litigation with PMC, Inc.

In July 2001, Foamex L.P. purchased certain assets, but did not assume any liabilities, related to the manufacture and sale of a variety of polyurethane products from a group of sellers, including General Foam Corporation ("GFC"). PMC, Inc. ("PMC"), the parent of GFC, served as guarantor under the asset purchase agreement memorializing the sale. The guarantee, for the benefit of Foamex, covered the performance of all terms, conditions, covenants and indemnities required to be performed by the sellers (including GFC) under the agreement.

Foamex L.P. is a party to certain disputes relating to a fire at a nightclub in Warwick, Rhode Island in February 2003. The fire destroyed the nightclub killing 100 persons and injuring over 100 others. Foamex L.P. and several of its affiliates are named as defendants, along with more than 50 other defendants, in certain litigations concerning the fire. The ensuing litigation comprising numerous cases has been consolidated in a single case, Gray v. Derderian, Case No. 04-312L (the "Rhode Island Litigation"), before the United States District Court for the District of Rhode Island. Plaintiffs have also filed proofs of claim in these Chapter 11 Cases. Such proofs of claim are included in the Class of Unliquidated Claims. Foamex L.P. and certain of its affiliates are named in the Rhode Island Litigation solely as an alleged successor to GFC, itself a defendant in the Rhode Island Litigation. In addition to other foam manufacturing defendants in the Rhode Island Litigation, GFC is alleged to have manufactured and sold polyurethane foam to a foam fabricator in Rhode Island. The foam fabricator is alleged to have then sold the

foam at issue to the nightclub. The foam was among other building materials alleged to have caught fire when pyrotechnics were set off inside the nightclub.

The Rhode Island Litigation is in its early stages and is presently stayed as against Foamex L.P. and its affiliates that are named as defendants due to the automatic stay. Foamex L.P. believes that there are multiple defenses to (i) the plaintiff's claims against GFC, and (ii) the successor liability claim against Foamex L.P. Foamex L.P. also intends, upon the lifting of the automatic stay, to continue vigorously defending itself in the Rhode Island Litigation. Foamex L.P. also believes that, if GFC is held liable for monetary damages in the Rhode Island Litigation, GFC is unable to satisfy that obligation and Foamex L.P. and/or any of its affiliates is found to have liability as a successor to GFC, there is likely to be adequate insurance available to cover such liability. However, there can be no assurance that the defenses available to GFC or to Foamex L.P. and its affiliates as an alleged successor will prevail. In addition, there can be no assurance that, if GFC is held liable for monetary damages in the Rhode Island Litigation, GFC will be able to satisfy that obligation through its insurance or assets or that the liability insurance available to Foamex L.P. will be sufficient to cover potential liability to Foamex L.P. and/or its affiliates, if any one or more of them were to be found to be a successor to GFC.

Foamex L.P. has incurred fees and costs in defense of the Rhode Island Litigation and neither GFC nor PMC had honored Foamex L.P.'s demand for reimbursement of fees and costs, as was agreed to under the asset purchase agreement. Therefore, in November 2005, Foamex L.P. filed an adversary proceeding (the "PMC Litigation") in the bankruptcy case against PMC alleging, among other claims, that PMC breached its obligations under the asset purchase agreement by failing to reimburse Foamex L.P. for its costs related to the defense of the Rhode Island Litigation.

On October 4, 2006, the parties to the PMC Litigation agreed, subject to certain conditions, to a settlement of the PMC Litigation. On October 19, 2006, the Court entered an order approving the settlement of the PMC Litigation. The settlement resolves the PMC Litigation in its entirety and will result in the recovery of the vast majority of Foamex L.P.'s costs and fees expended thus far in defending the Rhode Island Litigation and up to an aggregate of $2.5 million in future costs and fees, but does not settle any disputes as to any PMC obligations under the indemnity for the underlying liability, which is subject to the same $2.5 million indemnity cap.

**M.    Incentive Plan for the Foamex's Salaried Employees**

On October 10, 2006, Foamex filed a motion (the "Incentive Plan Motion") with the Court seeking approval of an incentive plan for their salaried employees (the "Incentive Plan"). In designing the proposed Incentive Plan, the Debtors borrowed heavily from the basic incentive plan structure that had been in place in prior years, with some modifications suggested by the Debtors' compensation consultants, Bright Tree Consulting. The cost of the Incentive Plan if approved, will be approximately $5.9 million if the Debtors achieve 100% of the target performance goal

for 2006 ($151 million of EBITDA) and as much as approximately $11.7 million if the Debtors achieve 110% of their target performance goal.

The Creditors Committee and Murray Capital Management, Inc. have objected to the Incentive Plan, among other things, arguing that the Incentive Plan should be tied to the Plan's Effective Date. A hearing on the Incentive Plan Motion is scheduled for October 30, 2006.

## VII.

## CHAPTER 11 PLAN PROCESS

### A. History of the First Amended Plan

#### 1. The Original Plan and Disclosure Statement

On September 22, 2005, just three days after the Petition Date, the Debtors filed an 8-K, which memorialized the Debtors' agreement in principle with members of the Ad Hoc Committee of Senior Secured Noteholders on the key terms of the Debtors' Plan. That term sheet eventually formed the basis of the Debtors' Original Plan, which the Debtors filed along with the Original Disclosure Statement on December 23, 2005.

Under the Original Plan, the Senior Secured Noteholders would receive their pro rata share of 100% of the equity in Reorganized Foamex International, and the Senior Subordinated Noteholders and the Debtors' general unsecured creditors would receive their pro rata share of warrants to purchase 5% of the equity in Reorganized Foamex International and up to $1.5 million of cash (not to exceed 5% of their claims), respectively, so long as their respective Classes voted to accept the Original Plan. The holders of the Debtors' Equity Interests would receive no distributions on account of such Interests. The Original Plan was supported by the Ad Hoc Committee of Senior Secured Noteholders. The Creditors' Committee and The Bank of New York, as indenture trustee for the Senior Subordinated Notes, among others, opposed the Original Plan, arguing principally that the underlying valuation was too low and denied the Debtors' Senior Subordinated Noteholders and General Unsecured Creditors an adequate recovery.

#### 2. Subsequent Plan Negotiations

Following the filing of the Original Plan and Disclosure Statement, the Debtors, the Ad Hoc Committee of Senior Secured Noteholders and the Creditors' Committee participated in negotiations aimed at resolving the Creditors' Committee's objections to the Original Plan. The parties also commenced plan negotiations with Steel Partners, the Debtors' single largest Senior Subordinated Noteholder and unsecured creditor. These negotiations lasted the better part of three months through April 2006, during which time, in an effort to achieve a broader consensus, the Debtors adjourned the hearing on the Original Disclosure Statement.

The negotiations produced an "agreement in principle" on the terms of a consensual plan. Essentially, the "agreement in principle" called for a rights offering to

the Debtors' Senior Subordinated Noteholders, which would have allowed them to purchase all of the shares of common stock in Reorganized Foamex International. The proceeds of such rights offering would have been used to repay the Allowed Senior Secured Note Claims. In addition, the "agreement in principle" would have provided for greater recoveries to the Debtors' other unsecured creditors than those provided under the Original Plan. The Debtors' equity holders would have received no distributions on account of their Interests.

The Debtors ultimately determined that it was not in their best interests nor those of these estates to proceed immediately toward approval of a plan that would embody the "agreement in principle." Fundamentally, the Debtors' significantly improved operating performance over the six months immediately preceding April 2006 suggested that the recoveries negotiated as part of the "agreement in principle" might no longer be supportable. The Debtors' generated EBITDA far in excess of the Debtors' projections for the fourth quarter of 2005 and the first quarter of 2006. In view of the Debtors' improved operating performance, the Debtors thought it prudent to pause to re-evaluate their business plan and projections and to decide, after that re-evaluation, whether the recoveries negotiated as part of the "agreement in principle" continued to be supportable.

3. **Retention of Alvarez & Marsal as the Debtors' Business Operations Consultant**

To assist the Debtors in their development of a revised business plan and projections, the Debtors retained Alvarez & Marsal Business Consulting, LLC ("Alvarez & Marsal"). In addition to assisting in developing a revised business plan, Alvarez & Marsal was tasked with assessing and analyzing the Debtors' business operations, identifying material operational improvement opportunities, and quantifying the benefits that could be generated from implementing those improvement opportunities. Alvarez & Marsal completed its business assessment toward the end of May 2006, and, together with Miller Buckfire and the Debtors' senior management, presented a revised business plan and projections for 2006 and beyond to the Debtors' board of directors in early June 2006.[21] The revised business plan and projections underlie the Plan.

4. **First Amended Plan**

Armed with a revised business plan and projections that for the first time imply recoveries for the Debtors' Equityholders, the Debtors immediately embarked on a process to obtain financing to repay valid claims in full or otherwise leave them unimpaired and to maximize recoveries for their existing Equityholders. With the assistance of Miller Buckfire, the Debtors sent requests for debt financing proposals upon their emergence from chapter 11 to 19 commercial and investment banks and also commenced discussions with the Significant Equityholders about investing additional equity into Foamex through a Rights Offering. The combination of the debt and equity

---

[21] Pursuant to the Court order approving their retention, Alvarez & Marsal's findings were also shared with the Creditors' Committee and the Ad Hoc Committee of Senior Secured Noteholders.

financing would be used to repay Allowed creditor Claims in full or otherwise leave them unimpaired and to fund the Reorganized Debtors' working capital requirements upon their emergence from chapter 11. Ultimately, the Debtors concluded, in the exercise of their business judgment, and in consultation with Miller Buckfire and Paul Weiss, that the Exit Facilities and the Rights Offering provided the Debtors with the best means of maximizing value for their Creditors and Equityholders.

On October 13, 2006, Foamex International entered into the Equity Commitment Agreement to conduct a $150 million Rights Offering to holders of Existing Common Stock and Existing Preferred Stock. Subject to the terms of the Equity Commitment Agreement, several Equityholders – D. E. Shaw, Goldman, Sachs & Co., Sigma Capital Associates, LLC, Par IV Master Fund, Ltd. and Sunrise Partners Limited Partnership (collectively the "Significant Equityholders") – have committed to fund any shortfall between $150 million and the actual proceeds from the Rights Offering through their commitment to purchase, as applicable, New Preferred Stock or Additional Common Stock on the Effective Date pursuant to the Plan.

Separately, on October 13, 2006, Foamex L.P. entered into a commitment with a group of lenders led by Bank of America, N.A. and Banc of America Securities LLC for up to $790 million of exit financing, of which it expects to draw approximately $635 million immediately upon its emergence from chapter 11.[22] Once consummated, the combination of the new equity investment and the exit financing would allow the Debtors to satisfy all Allowed Claims in full and allow holders of Existing Common Stock to retain their ownership interests, subject to any dilution that may occur in connection with the Rights Offering or otherwise.

## VIII.

## SUMMARY OF THE PLAN

### A.    Introduction

The Debtors believe that confirmation of the Plan is critical to their continued survival and that the Plan provides the best opportunity for maximum recoveries for their creditors and shareholders. As a legal matter, the Debtors' creditors cannot receive more than the full recoveries provided for under the Plan and the Debtors believe, and will demonstrate to the Court, that their shareholders will receive at least as much, and likely far more, in value under the Plan than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

---

[22]    The Debtors also filed a motion with the Bankruptcy Court seeking approval of the commitments described above, the commencement of the rights offering, the Company's payment of certain premiums, fees and expenses in connection therewith and modification of the DIP Credit Facilities to permit the foregoing. A hearing to consider the Debtors' request for approval of the commitments and the payment of such amounts is scheduled for October 30, 2006.

Doc #:NY7:283581.7

**THE FOLLOWING IS A SUMMARY OF SOME OF THE
SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT
IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE
DETAILED INFORMATION SET FORTH IN THE PLAN.**

      **B.**      **Classification and Treatment of Administrative Claims, Claims and
Equity Interests Under the Plan**

      Only administrative expenses, claims and equity interests that are
"allowed" may receive distributions under a chapter 11 plan.  An "allowed"
administrative expense, claim or equity interest simply means that the Debtors agree, or
in the event of a dispute, that the Court determines, that the administrative expense, claim
or equity interest, including the amount thereof, is in fact a valid obligation of, or equity
interest in, the Debtors.  Section 502(a) of the Bankruptcy Code provides that a timely
filed administrative expense, claim or equity interest is automatically "allowed" unless
the debtor or another party in interest objects.  However, section 502(b) of the
Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case
even if a proof of claim is filed.  These include, without limitation, claims that are
unenforceable under the governing agreement or applicable non-bankruptcy law, claims
for unmatured interest on unsecured and/or undersecured obligations, property tax claims
in excess of the debtor's equity in the property, claims for certain services that exceed
their reasonable value, nonresidential real property lease and employment contract
rejection damage claims in excess of specified amounts, and late-filed claims.  In
addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity
interest that either is not listed on the debtor's schedules or is listed as disputed,
contingent, or unliquidated if the holder has not filed a proof of claim or equity interest
before the deadline to file proofs of claim and equity interests.

      The Bankruptcy Code also requires that, for purposes of treatment and
voting, a chapter 11 plan divide the different claims against, and equity interests in, the
Debtors into separate classes based upon their legal nature.  Claims of a substantially
similar legal nature are usually classified together, as are equity interests of a
substantially similar legal nature.  Because an entity may hold multiple claims and/or
equity interests which give rise to different legal rights, the holders of such claims and/or
equity interests may find themselves as members of multiple classes of claims and/or
equity interests.

      Under a chapter 11 plan, the separate classes of claims and equity interests
must be designated either as "impaired" (altered by the plan in any way) or "unimpaired"
(unaltered by the plan).  If a class of claims or interests is "impaired," the Bankruptcy
Code affords certain rights to the holders of such claims or interests, such as the right to
vote on the plan (unless the plan provides for no distribution to the holder, in which case,
the holder is deemed to reject the plan), and the right to receive an amount under the
chapter 11 plan that is not less than the value that the holder would receive if the debtor
were liquidated under chapter 7.  Under section 1124 of the Bankruptcy Code, a class of
claims or interests is "impaired" unless, with respect to each claim or interest of such
class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of

such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the same position it would have been in had the debtor's case not been commenced.

Consistent with these requirements the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments described below:

| | | |
|---|---|---|
| Unclassified | Administrative Claims | Paid in full |
| Unclassified | Priority Tax Claims | Paid in full |
| Unclassified | DIP Financing Claims | Paid in full |
| Class 1 | Other Priority Claims | Unimpaired |
| Class 2 | Other Secured Claims | Unimpaired |
| Class 3 | Senior Secured Note Claims | Unimpaired |
| Class 4 | Senior Subordinated Note Claims | Unimpaired |
| Class 5 | General Unsecured Claims | Unimpaired |
| Class 6 | Unliquidated Claims | Unimpaired |
| Class 7 | Intercompany Claims | Unimpaired |
| Class 8 | Equity Interests in Surviving Debtor Subsidiaries | Unimpaired |
| Class 9 | Existing Preferred Stock | Impaired |
| Class 10 | Existing Common Stock | Impaired |
| Class 11 | Other Common Equity Interests in | Unimpaired |

Doc #:NY7:283581.7

Foamex International

For purposes of computing distributions under the Plan, Allowed Claims do not include Post-Petition Interest unless otherwise specified in the Plan.

1.    **Unclassified — Administrative Claims**

Administrative Claims are any rights to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, any Substantial Contribution Claims, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all valid and existing reclamation claims, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code.

Except with respect to Administrative Claims that are Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon, which treatment shall be reasonably acceptable to the Significant Equityholders; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims, Substantial Contribution Claims and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code incurred prior to the Administrative Claims Bar Date, shall submit requests for payment on or before the Administrative Claims Bar Date or forever be barred from doing so and from receiving payment thereof.  Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims, Substantial Contribution Claims and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, incurred after the Administrative Claims Bar Date but on or prior to the Confirmation Date, shall submit requests for payment on or before the date that is thirty (30) days from the Confirmation Date or forever be barred from doing so and from receiving payment thereof.

(a)     Fee Claims.  Fee Claims means an Administrative Claim under sections 330(a), 331 or 503 of the Bankruptcy Code for compensation of a professional or other person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Confirmation Date, including the reasonable non-legal expenses of the individual members of the Creditors' Committee incurred in the discharge of their duties as members of the Creditors' Committee, but excluding any Substantial Contribution Claims and fees and expenses to be paid under the Exit Facility Commitment Letter and the Equity Commitment Agreement, which fees and expenses shall be paid in accordance with the terms of the Exit Facility Commitment Letter and the Equity Commitment Agreement as applicable.  All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Confirmation Date shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Creditors' Committee, counsel to the Significant Equityholders and the Exit Facilities Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Confirmation Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than thirty (30) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

(b)     Substantial Contribution Claims.  All requests for compensation or reimbursement of Substantial Contribution Claims shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Significant Equityholders, counsel to the Exit Facilities Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Effective Date.  Unless such deadline is extended by agreement of the Reorganized Debtors, holders of Substantial Contribution Claims that are required to file and serve applications for final allowance of their Substantial Contribution Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Substantial Contribution Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Substantial Contribution Claims shall be deemed discharged as of the Effective Date.  Objections to any Substantial Contribution Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than twenty (20) days (or such longer period as may be allowed by the Reorganized Debtors or by order of the Court) after the date on which an application for final allowance of such Substantial Contribution Claims was filed and served.

Doc #:NY7:283581.7

### 2. Unclassified — Priority Tax Claims

A Priority Tax Claim consists of any Claim that is entitled to a priority in right of payment under section 502(i) or 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim <u>plus</u> Post-Petition Interest on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, deferred Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim <u>plus</u> Post-Petition Interest, <u>plus</u> interest on such aggregate amount over such period at the same rate as such Post-Petition Interest. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without Post-Petition Interest, in accordance with the terms thereof.

### 3. Unclassified — DIP Financing Claims

DIP Financing Claims means all Claims arising under or relating to the DIP Credit Facilities and all agreements and instruments relating thereto.

On the Effective Date, except to the extent that the holders of the DIP Financing Claims and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, the holders of the DIP Financing Claims, or their designee(s), shall receive payment in full in Cash of all DIP Financing Claims in full and final satisfaction thereof other than the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms survive the termination of the DIP Credit Facilities.

### 4. Class 1 — Other Priority Claims

Other Priority Claims are Claims that are entitled to priority pursuant to section 507(a) of the Bankruptcy Code – other than Administrative Claims and Priority Tax Claims. Such claims may include (i) unsecured Claims for accrued employee compensation earned within 180 days prior to commencement of these Chapter 11 Cases to the extent of $10,000 per employee and (ii) contributions to employee benefit plans arising from services rendered within 180 days prior to the commencement of these Chapter 11 Cases, but only for each such plan to the extent of (a) the number of employees covered by such plan multiplied by $10,000, less (b) the aggregate amount paid to such employees as a priority for wages, salaries or commissions, plus the aggregate amount paid on behalf of such employees to other benefit plans.

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, each holder of an Allowed Other

Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim plus Post-Petition Interest on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. All Allowed Other Priority Claims which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof.

Because the Court entered an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate that the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal, if any.

Class 1 is unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

5.      **Class 2 — Other Secured Claims**

Other Secured Claims means any Secured Claim (including a perfected mechanics lien), other than the DIP Financing Claims and the Senior Secured Note Claims, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, the amount of such Claim that is subject to such setoff.

Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, at the sole option of the Debtors, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

Class 2 is unimpaired under the Plan. The holders of Allowed Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

6.     **Class 3 — Senior Secured Note Claims**

A Senior Secured Note Claims are all Claims arising from the Senior Secured Notes Indenture on account of the Senior Secured Notes.

The Senior Secured Note Claims shall be deemed Allowed in the aggregate amount of $312,452,083.33 <u>plus</u> accrued and unpaid Post-Petition Interest, but excluding any call premiums or any prepayment fees or penalties.

On the Initial Distribution Date, in full and final satisfaction of the Senior Secured Note Claims, each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Claim.

Class 3 is unimpaired under the Plan. The holders of Senior Secured Note Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

7.     **Class 4 — Senior Subordinated Note Claims**

A Senior Subordinated Note Claims means, collectively, the 2005 Senior Subordinated Notes Claim and the 2007 Senior Subordinated Notes Claim.

The Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $208,150,130.55 which includes accrued and unpaid interest (at the applicable contract rate) on such Senior Subordinated Note Claims relating to the period up to but not including the Petition Date. On the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Senior Subordinated Note Claim shall receive Cash in an amount equal to such holders' Senior Subordinated Notes Claim <u>plus</u> Post-Petition Interest.

Class 4 is unimpaired under the Plan. The holders of Allowed Senior Subordinated Note Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

8.     **Class 5 — General Unsecured Claims**

A General Unsecured Claim means an Unsecured Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Senior Subordinated Note Claim or Unliquidated Claim.

On the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, in full and final satisfaction of such Claim, each holder of an Allowed General Unsecured Claim will receive Cash in amount equal to such holder's Allowed General Unsecured Claim <u>plus</u> Post-Petition Interest. To the extent that insurance is available to satisfy an Allowed General Unsecured Claim, such Allowed

General Unsecured Claim shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, without the need for Court approval, at such time as such claim becomes liquidated and the applicable insurance proceeds become available.

Class 5 is unimpaired under the Plan. Each holder of an Allowed General Unsecured Claim is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

9. **Class 6 — Unliquidated Claims**

An Unliquidated Claim is a timely and validly filed proof of claim, disputed by the Debtors, asserting an unliquidated or contingent Claim (which Claim numbers are set forth on Schedule A to the Plan) against one of the Debtors, solely to the extent and on the basis set forth in the proof of claim, and to the extent such Claim has not been disallowed by the Court and remains unliquidated and/or contingent on and as of the Effective Date, unless such claim has been disallowed by the Court. For the avoidance of doubt, (i) no Unliquidated Claim shall be an Allowed Claim or a General Unsecured Claim and (ii) no Claim shall be Unliquidated Claim unless so identified on Schedule A attached to the Plan (which Schedule A may be revised and amended from time to time up to the filing of the Plan Supplement).

All Unliquidated Claims shall be liquidated, determined and satisfied (to the extent required) in the ordinary course of business by the Reorganized Debtors, without the need for Court approval, including, where applicable, through access to available insurance.

On the Effective Date, holders of Unliquidated Claims may commence or continue any action, prosecute such action to judgment or settlement and/or pursue any such Unliquidated Claims, each solely to the extent and on the basis set forth in a timely and validly filed proof of claim, without prejudice to any defense right of offset or other rights, claims or counterclaims available or belonging to the Reorganized Debtors.

Class 6 is unimpaired under the Plan. Each Holder of an Allowed Unliquidated Claim is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

10. **Class 7 — Intercompany Claims**

An Intercompany Claim means any Claim held by one Debtor (or a non-debtor that is a direct or indirect subsidiary of a Debtor) against any other Debtor(s), including, without limitation, (a) any account reflecting intercompany book entries by such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor) with respect to any other Debtor(s), (b) any Claim not reflected in book entries that is held by such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor), and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor) against any other Debtor(s).

-48-

All Intercompany Claims will remain outstanding and shall not be discharged by the Plan or the Confirmation Order, but shall instead be liquidated, determined and satisfied in accordance, and in a manner consistent, with the Debtors' historical practices as if the Chapter 11 Cases had not been commenced.

Class 7 is unimpaired under the Plan. The holders of Intercompany Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

11.     **Class 8 —Equity Interests In Surviving Debtor Subsidiaries**

Equity Interests in Surviving Debtor Subsidiaries means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any right to acquire any such equity security or instrument, including any option, warrant or other right, contractual or otherwise, to acquire, sell or subscribe for any such security or instrument in Debtors that are subsidiaries of Foamex International and are not dissolved pursuant to Section VII.M of the Plan.

The holders of Equity Interests in Surviving Debtor Subsidiaries shall retain such Equity Interests.

Class 8 is unimpaired under the Plan. The holders of Equity Interests in Surviving Debtor Subsidiaries are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

12.     **Class 9 — Existing Preferred Stock**

Existing Preferred Stock means the outstanding Series B preferred stock, par value $1.00 per share, and having a liquidation preference of $100 per share, issued by Foamex International and outstanding immediately prior to the Effective Date.

Each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date shall be converted into 100 shares of Additional Common Stock on the Effective Date and shall receive the treatment accorded to the holders of Existing Common Stock in Class 10.

Class 9 is Impaired under the Plan. The holder(s) of Existing Preferred Stock is entitled to vote to accept or reject the Plan.

13.     **Class 10 – Existing Common Stock**

Existing Common Stock means the common stock, par value $0.01 per share, issued by Foamex International, and outstanding prior to the Effective Date.

Existing Common Stock in Foamex International shall remain outstanding after the Effective Date (and shall become stock in Reorganized Foamex International

after the Effective Date), subject to dilution as a result of the issuance of any Additional Common Stock.

Class 10 is Impaired under the Plan. The holders of Existing Common Stock are entitled to vote to accept or reject the Plan.

14. **Class 11- Other Common Equity Interests in Foamex International**

Other Common Equity Interests in Foamex International means any options, warrants or other rights (other than the Call Option) to acquire Existing Common Stock in existence on and as of the Effective Date.

Each holder of Other Common Equity Interests in Foamex International shall retain such Interests.

Class 11 is unimpaired under the Plan. The holders of Other Common Equity Interests are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

C. **Voting on Plan.**

Each holder of Class 9 Existing Preferred Stock and Class 10 Existing Common Stock shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

D. **Distributions.**

1. Allowed Claims.

(a) *Delivery of Distributions.*

Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Senior Secured Note Claims, Allowed Senior Subordinated Note Claims, Allowed General Unsecured Claims, Allowed Unliquidated Claims at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address). Distributions on account of the Allowed Senior Secured Note Claims and Senior Subordinated Note Claims shall be made initially to their respective Indenture Trustees, or to such other entity(ies) as may be determined by the Debtors, who shall, in turn, make the distributions to the holders of Allowed Senior Secured Note Claims and Allowed Senior Subordinated Note Claims, as the case may be.

(b)     *Distribution of Cash.*

Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(c)     *Fractional Cents.*

Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

(d)     *Unclaimed Distributions.*

Any Distribution of Cash under the Plan to the holder of an Allowed Claim which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the Reorganized Debtors notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the holder of such Claim to such Distribution shall be extinguished and forever barred.

(e)     *Saturdays, Sundays, or Legal Holidays.*

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(f)     *Distributions to Holders of Allowed Claims as of the Voting Record Date.*

As of the close of business on the Voting Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtors and the Reorganized Debtors shall have no obligation to recognize any Claim filed or transfer of any Claims occurring after the Voting Record Date. The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Voting Record Date.

**E.     Objections to and Resolution of Claims.**

**1.     Objections to and Resolution of Administrative Claims and Claims.**

The Reorganized Debtors shall have the exclusive right to make and to file objections to Administrative Claims (other than Fee Claims) and Claims subsequent to

the Effective Date.  Unless otherwise ordered by the Court, objections to Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made as soon as practicable, but in no event later than the Administrative Claims Objection Deadline or the Claims Objection Deadline, as the case may be.  Objections to Fee Claims shall be filed and served on or within thirty (30) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

Objections to Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtor's sole discretion.  The Debtors may settle any such objections without Court approval.  No objections shall be required to be filed with respect to any Unliquidated Claims, which shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtor as provided for in the Plan.

The Debtors shall not establish reserves for the payment of Disputed Claims or Unliquidated Claims.

## 2.  **Procedure for Resolution of Post-Petition Interest Disputes.**

On the later of the Initial Distribution Date or the date on which a General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, the Reorganized Debtors shall pay the Allowed amount of such General Unsecured Claim plus Post-Petition Interest at the Federal Judgment Rate.  To the extent any holder of an Allowed Class 5 General Unsecured Claim believes that it is entitled to Post-Petition Interest at an interest rate other than the Federal Judgment Rate as set forth in subsection (f) of the definition of Post-Petition Interest contained in the Plan, the holder of such Allowed General Unsecured Claim must timely file and serve on the Debtors at the addresses set forth in Article X.J of the Plan a Post-Petition Interest Rate Determination Notice by the later of (i) twenty (20) days after the Effective Date and (ii) ten (10) days after such General Unsecured Claim becomes an Allowed Claim. The Debtors or Reorganized Debtors, as applicable, will have the opportunity to review and dispute the Post-Petition Interest Rate Determination Notice and shall file any objection to the Post-Petition Interest Rate Determination Notice no later than sixty (60) days after the receipt of such notice.  In objecting to the Post-Petition Interest Rate Determination Notice, the Debtors or Reorganized Debtors, as applicable, may assert that the holder of the Claim that filed the Post-Petition Interest Rate Determination Notice is entitled to no Post-Petition Interest under applicable law, and the Court may find that no Post-Petition Interest is required and order that none shall be paid on account of such Allowed General Unsecured Claim.

If the Debtors or Reorganized Debtors, as applicable, determine that the interest rate asserted in the Post-Petition Interest Rate Determination Notice is appropriate, the Debtors may file a certificate of no objection at any time with respect to such notice and pay Post-Petition Interest at the rate requested in the Post-Petition Interest Rate Determination Notice.  No hearing is required by the Court with respect to

-52-

any Post-Petition Interest Rate Determination Notice for which a certificate of no objection is filed or for which the Debtors or Reorganized Debtors, as applicable, do not file a timely objection.

If the Debtors or Reorganized Debtors, as applicable, file an objection to the Post-Petition Interest Rate Determination and no stipulation or agreement is reached with respect to the appropriate rate of Post-Petition Interest for such Allowed General Unsecured Claim, the Debtors or Reorganized Debtors, as applicable, may ask the Court to schedule a hearing on the particular Post-Petition Interest Rate Determination Notice and the related objection at an appropriate time.

The Debtors or Reorganized Debtors, as applicable, and the holder of the Allowed General Unsecured Claim that filed the Post-Petition Interest Rate Determination Notice at any time may enter into a stipulation or agreement as to the appropriate rate of Post-Petition Interest with respect to such Allowed Claim, without further action of the Court.

In no event shall a holder of General Unsecured Claim be entitled to any interest on such Claim from and after the Effective Date, including, without limitation, interest on any amounts payable by the Reorganized Debtors upon the resolution of any Post-Petition Interest Rate Determination Notice.

F.    **Estimation.**

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Debtors in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Court. In the case of Unliquidated Claims arising from personal injury tort or wrongful death actions, the Court may estimate such Claims for the purpose of confirming a plan of reorganization. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

G.    **Administrative Claims of Indenture Trustees.**

In addition to any other Administrative Claim that may be filed by the Indenture Trustees pursuant to the provisions set forth herein, the Senior Secured Notes Indenture Trustee and the Senior Subordinated Notes Indenture Trustee shall have an Allowed Administrative Claim in an amount equal to such Indenture Trustee's Indenture Trustee Expenses. If the Debtors or the Reorganized Debtors dispute the reasonableness

-53-

of any such Indenture Trustee's Indenture Trustee Expenses, the Debtors or the Reorganized Debtors or such affected Indenture Trustee may submit such dispute to the Court for a determination of the reasonableness of such Indenture Trustee Expenses and the disputed portion of such Indenture Trustee's Indenture Trustee Expenses shall not be paid until the dispute is resolved.  The undisputed portion of such Indenture Trustee's Indenture Trustee Expenses shall be paid as provided herein.  An Indenture Trustee shall not be entitled to payment of or the assertion of its Indenture Trustee Charging Lien for any disputed Indenture Trustee expenses to the extent the Court determines that such Indenture Trustee Expenses are unreasonable under the terms of the applicable Prepetition Indenture.  Nothing contained herein shall affect the right of an Indenture Trustee from asserting their respective Indenture Trustee Charging Lien, to the extent applicable under the terms of the respective Prepetition Indenture, provided, however, that upon the full payment of such Indenture Trustee's Indenture Trustee Expenses, such Indenture Trustee's Indenture Trustee Charging Lien shall be deemed released and discharged in full.

### H. Cancellation and Surrender of Existing Securities and Agreements.

Notwithstanding any other provision of the Plan and except for DIP Financing Claims, Intercompany Claims, Existing Common Stock, Other Common Equity Interests in Foamex International and Equity Interests in Surviving Debtor Subsidiaries, on the Effective Date, any promissory note, other instrument or security evidencing a Claim or Equity Interest shall be deemed cancelled, provided, however, that the Senior Secured Notes Indenture and the Senior Subordinated Notes Indentures shall continue to survive and be in full force and effect for the sole purposes of making distributions under the Plan and any Indenture Trustee Charging Lien asserted thereunder.

### I. Nonconsensual Confirmation.

If at least one (1) Class of Interests that is Impaired under the Plan votes to reject the Plan, the Debtors may seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

### J. Provisions Regarding Corporate Governance and Management of the Reorganized Debtors

#### 1. Management

##### (a) The Initial Boards of Directors.

The Significant Equityholders shall have the right, but not the obligation, in their capacities as holders of Post-Effective Date Common Stock, to nominate four (4) members of Reorganized Foamex International's board of directors.  In addition to the Significant Equityholders' four (4) nominees, there shall be one (1) independent director.  Reorganized Foamex International's chief executive officer and its general counsel shall also serve on the board of directors; provided that if the Post-Effective Date Common Stock is listed on a national securities exchange, the number of directors and/or

-54-

composition of the board of directors may be revised as required under the applicable rules of the relevant stock exchange.

Subject to Reorganized Foamex International's Amended and Restated By-laws relating to the filling of vacancies, if any, on the board of directors, the members of the board of directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least twelve (12) months after the Effective Date.

The identities, affiliations and the amount of compensation of the designees shall be disclosed in the Plan Supplement. The members of the initial boards of directors or equivalent governing bodies of the Surviving Debtor Subsidiaries shall be selected by the initial board of directors of Reorganized Foamex International and shall consist, at least in part, of officers and directors of Reorganized Foamex International. The directors of each Debtor on the day immediately preceding the Effective Date that are not otherwise appointed as members of the initial board of directors or the equivalent governing body for the corresponding Reorganized Debtor shall be deemed to have resigned from the board of directors of such Debtor as of the Effective Date.

(b)    <u>Management of Reorganized Debtors</u>.  The officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the date of the Equity Commitment Agreement.  The Reorganized Debtors' officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law, as the case may be.  The Debtors will disclose the terms of such employment agreements in the Plan Supplement.

(c)    <u>Second Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Other Amended and Restated Governing Documents</u>.  The adoption of the Second Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Other Amended and Restated Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or Reorganized Debtors.  The Second Amended and Restated Certificate of Incorporation shall be in form and substance reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent and will, among other things, contain appropriate provisions (i) governing the authorization of (x) the shares of New Preferred Stock, if any, to be issued and outstanding on the Effective Date and (y) the Additional Common Stock, and (ii) prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  Each of the Other Amended and Restated Governing Documents shall be in form and substance reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent.  On or prior to the Effective Date, the Debtors will, if required by applicable state law, file with the Secretary of State of the appropriate jurisdiction the Amended and Restated Certificate of Incorporation and Other Amended and Restated Governing Documents.

In addition, the Second Amended and Restated Certificate of Incorporation of Reorganized Foamex International shall include provisions with respect to any "Business Combination" (as defined in Foamex International's current Restated Certificate of Incorporation) with or into any "Related Person" (as so defined) requiring that the consideration received by the other shareholders in connection with such Business Combination (as so defined) is at "fair value" as determined by the "unrelated director(s)" (who shall have the authority, but not the obligation, to engage independent counsel and independent bankers at Reorganized Foamex International's expense, subject to a budget which shall be reasonably acceptable to Reorganized Foamex International's board of directors, as a whole, for purposes of such determination).

On the Effective Date, the Rights Agreement between Foamex International and Mellon Investor Services LLC, dated as of August 5, 2004, and amended thereafter, shall be terminated.

2.    **Reorganized Debtors' Management Incentive Plan**

On the Effective Date, the Management Incentive Plan shall become effective. Such plan shall be on the terms to be described generally in the Plan Supplement with more specific terms to be approved by the board of directors of Reorganized Foamex International within forty-five (45) days after the Effective Date.

3.    **KERP**

As required by the KERP Order, on the Effective Date, the Reorganized Debtors shall continue to implement the KERP in accordance with the terms of the KERP Motion and KERP Order, including, without limitation, by issuing shares of common stock in Reorganized Foamex International to the employees designated by the board of directors of Reorganized Foamex International to receive such stock in accordance with the KERP.

4.    **Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Amended Governing Documents**

The adoption of the Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Amended and Restated Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or Reorganized Debtors. The Amended and Restated Certificate of Incorporation will, among other things, contain appropriate provisions (i) governing the authorization of up to [_____] shares of Post-Effective Date Common Stock that will be available for issuance and whose terms and conditions may be established by the board of directors of Reorganized Foamex International, and (ii) prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. Each of the Amended and Restated Governing Documents shall, among other things, contain appropriate provisions prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. On

-56-

or prior to the Effective Date, the Debtors will, if required by applicable state law, file with the Secretary of State the Amended and Restated Certificate of Incorporation and Amended and Restated Governing Documents.

### K. Securities to be Issued Pursuant to the Plan

#### 1. Rights

On the Rights Offering Commencement Date, which may occur prior to Confirmation, Foamex International shall issue the Rights to the Equityholders who hold Existing Common Stock and Existing Preferred Stock as of the Rights Offering Record Date.

#### 2. Additional Common Stock

On or before the Effective Date, Reorganized Foamex International shall authorize the issuance of Additional Common Stock to be issued on or after the Effective Date, which shall be sufficient to effectuate the issuance of such Additional Common Stock on the Effective Date pursuant to the Rights Offering, the exercise and settlement of the Call Option (to the extent exercised) on the Effective Date, the conversion of any outstanding Existing Preferred Stock as provided for in the Plan, the Management Incentive Plan, the KERP and the exercise of Other Common Equity Interests in Foamex International outstanding on and as of the Effective Date without further act or action under applicable law, regulation, rule or order.

Reorganized Foamex International shall use its reasonable best efforts to maintain one or more market makers for the Post-Effective Date Common Stock that will facilitate trading of the Post-Effective Date Common Stock over the counter.

#### 3. New Preferred Stock

On or before the Effective Date, in connection with the Put Option, if Foamex International exercises the Put Option and all conditions precedent set forth in the Equity Commitment Agreement are satisfied, including, without limitation, the expiration without exercise of the Call Option, then Reorganized Foamex International shall authorize and, on the Effective Date, issue the New Preferred Stock to the Significant Equityholders in accordance with the terms of the Equity Commitment Agreement without further act or action under applicable law, regulation, rule or order.

#### 4. Filing of Form 15

It is anticipated that after the issuance of the Additional Common Stock there will be fewer than 300 holders of record of the Common Stock. After the Effective Date, Reorganized Foamex International may determine to file a Form 15 with the SEC terminating its registration and periodic filing requirements pursuant to the Securities Exchange Act of 1934, as amended, to the extent legally practicable.

5. **Registration Rights Agreement**

On or prior to the Effective Date, the Reorganized Debtors shall enter into the Registration Rights Agreement with the Registration Rights Participants. The Registration Rights Agreement shall, among other things, provide:

(i)     such Registration Rights Participants with two demand registration rights and unlimited piggy-back registration rights (provided that (a) no demand shall qualify as such unless made by the holders of at least 25% of the aggregate number of outstanding shares of Additional Common Stock issued under the Rights Offering and, if exercised, the Call Option, and unless at least 25% of such aggregate number of outstanding shares shall be included to be sold in each registration statement and (b) no such piggyback registration rights shall be applicable with respect to any filing by Reorganized Foamex International of a registration statement on Forms S-4 or S-8, or any successor forms thereto) with respect to any such Additional Common Stock held by such Registration Rights Participants on customary and reasonable terms; and

(ii)     that (a) at such time as Reorganized Foamex International is eligible to effect a registration on Form S-3 (or any successor form), within sixty (60) days after the request of any Registration Rights Participant or group thereof which holds at least 25% of the aggregate number of outstanding shares of Additional Common Stock issued under the Rights Offering and, if exercised, the Call Option, Reorganized Foamex International shall prepare and file, and shall use its reasonable best efforts to have declared effective as soon as practicable thereafter, a registration statement under the Securities Act for the offering on a continuous basis pursuant to Rule 415 of the Securities Act, of any shares of Additional Common Stock held by the Registration Rights Participants (the "Shelf Registration"); and (b) Reorganized Foamex International shall keep the Shelf Registration effective for a period ending on the earlier of (I) the date that is the two-year anniversary of the date upon which such registration statement is declared effective by the SEC, (II) the date such Additional Common Stock has been disposed of pursuant to an effective registration statement, (III) the date such Additional Common Stock has been disposed of (x) pursuant to and in accordance with SEC Rule 144 (or any similar provision then in force) under the Securities Act or (y) pursuant to another exemption from the registration requirements of the Securities Act pursuant to which such Additional Common Stock is thereafter freely transferable without restriction under the Securities Act, and (IV) the date such Additional Common Stock ceases to be outstanding.

Reorganized Foamex International shall pay all fees and expenses for any demand registration (including, without limitation, the reasonable fees and expenses of one special counsel for the Registration Rights Participants). The managing underwriter of any public offering effected pursuant to a demand registration will be selected by Reorganized Foamex International. The selling stockholders shall pay for their respective internal costs and expenses related to any piggyback registration in which they participate.

### L.    Powers of Officers

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into and to execute any Plan Supplement Document to which the Reorganized Debtors are to be a party and (subject to the approval of the board of directors of Reorganized Foamex International) to take such other or further action as they deem reasonable and appropriate to effectuate the terms of the Plan.

### M.    Corporate Reorganization

On or prior to the Effective Date but immediately prior to the discharge described in Article VIII.E of the Plan of the Debtors and of the Debtors dissolved pursuant thereto, the Reorganized Debtors shall take all necessary steps and make all necessary filings to dissolve each of Foamex Capital and Foamex Mexico II. In addition, Foamex International shall take all necessary steps and make all necessary filings to (i) dissolve the following non-Debtor subsidiaries of Foamex International: Foamex Delaware, Inc., Foamex Aviation, Inc., and JPSGP Inc. and (ii) to convert FMXI, Inc. from a Delaware corporation to a Delaware limited liability company by, among other things, executing the FMXI Conversion Documents. Except as otherwise set forth in the Plan, or as modified by appropriate corporate action after the Effective Date, the corporate structure and equity ownership of the Debtors and their subsidiaries shall be unchanged.

### N.    Substantive Consolidation

Solely in connection with Distributions to be made on the Initial Distribution Date to the holders of Allowed Claims which are Allowed as of such date, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Substantive Consolidation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case for purposes of the Plan and the Distributions thereunder. To the extent a Claim (including any Disputed Claim) becomes an Allowed Claim or an Unliquidated Claim is liquidated in accordance with the provisions of the Plan after the Initial Distribution Date, such Claim shall be satisfied in accordance with the provisions of the Plan by the Debtor against whom such Claim is asserted; provided, however, that the Debtors, at their sole discretion, may satisfy such Claim in any other manner they deem reasonable so long as the treatment of such Claim is otherwise in accordance with the provisions of the Plan.

Doc #:NY7:283581.7

Pursuant to such Substantive Consolidation Order (i) all assets and liabilities of the Substantively Consolidated Debtors will be deemed to be merged solely for purposes of the Plan and Distributions to be made thereunder on the Initial Distribution Date, (ii) the obligations of each Debtor will be deemed to be the obligation of the Substantively Consolidated Debtors solely for purposes of the Plan and Distributions thereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Substantively Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Case in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor thereunder will be deemed to be made by the Substantively Consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Substantively Consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors or (b) other pre- and post-Petition Date guarantees that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or pursuant to the Plan will be, assumed, (ii) pursuant to the express terms of the Plan, or (iii) in connection with the Exit Facilities. The substantive consolidation proposed in the Plan shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until an order is entered closing, dismissing or converting such Debtor's Chapter 11 Case.

The Debtors believe that substantive consolidation is warranted in these cases because, among other reasons, the Debtors historically operated on a consolidated basis. Indeed, given the nominal amount of assets held by the Debtors other than Foamex International and Foamex L.P., the relatively few creditors of each of the Debtors other than Foamex L.P., and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in processing Claims and making Distributions to holders of Allowed Claims. Accordingly, the Debtors believe that substantive consolidation of the Debtors' estates will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors and streamlining the process of making Distributions.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan. See In re Stone & Webster, Inc., 286 B.R. 532 (Bankr. D. Del. 2002). Several courts within the Third Circuit have acknowledged the existence and application of substantive consolidation of separate bankruptcy estates in appropriate circumstances. See In re NII

Holdings, Inc., 288 B.R. 356 (Bankr. D. Del. 2002) (substantively consolidating debtors); In re Molnar Bros., 200 B.R. 555 (Bankr. D.N.J. 1996) (recognizing the application of substantive consolidation of two or more bankruptcy estates); Bracaglia v. Manzo (In re United Stairs Corp.), 176 B.R. 359, 368 (Bankr. D.N.J. 1995) (stating that it is "well established that in the appropriate circumstances the court may substantively consolidate corporate entities"); In re Buckhead American Corp., 1992 Bankr. LEXIS 2506 (Bankr. D. Del. August 13, 1992) (substantively consolidating debtors).

In a relatively recent decision, the Third Circuit Court of Appeals, while specifically recognizing the doctrine of substantive consolidation, nonetheless significantly restricted the circumstances under which a court may order substantive consolidation over the objections of creditors. In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis 18043 (Aug. 23, 2005). In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering consolidation. Instead, the Third Circuit Court of Appeals articulated a number of "principles" to guide the court in its analysis. Owens Corning, at 211. These principles include: (i) absent compelling circumstances courts must respect entity separateness; (ii) recognition that substantive consolidation nearly always addresses harms caused by debtors disregarding separateness; (iii) mere benefit of administration is "hardly a harm calling substantive consolidation into play;" (iv) substantive consolidation should be used rarely and as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may not be used as a "sword." Id.

Using these principles, the Third Circuit Court of Appeals set forth the standard by which courts in this jurisdiction must weigh requests for substantive consolidation where creditor consent is lacking. Specifically, in ordering substantive consolidation (absent consent of the parties) courts must either find, with respect to the entities in question, that (a) prepetition, they disregarded their separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (b) postpetition, "their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. (emphasis added).

For the reasons articulated earlier in this section VII.N, the Debtors believe that substantive consolidation is justified in these Chapter 11 Cases. Absent a timely objection to the Debtors' proposed substantive consolidation, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Court. If an objection is timely filed and served, a hearing with respect to the substantive consolidation of the Debtors' estates may be requested by the Debtors, at which time the Debtors will seek to establish the requisites for substantive consolidation.

**O.      Provisions Regarding Means of Implementation, Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims**

1.      **Exit Facilities**

The Exit Facilities as proposed shall consist of the following three separate facilities:  (i) a $175 million secured asset-based revolving credit facility, (ii) a $425 million first lien term loan facility and (iii) a $190 million second lien term loan facility.  As discussed below, the Exit Lenders' commitment to provide the Exit Facilities to the Debtors is conditioned upon the Court's approval of the various fees and expenses provided for under the Exit Financing Commitment Letter.

Foamex L.P. will be the named borrower under the Exit Facilities, with each of the other surviving Debtors and Foamex Canada Inc., as guarantors.  All of the proceeds of the two term facilities and a portion of the revolving credit facility shall be used by the Debtors to satisfy their obligations under or in connection with the Plan.  The Exit Facilities will be secured by all or substantially all of the borrower's and guarantors' property, but with differing priorities depending upon the nature of the collateral,[23] and shall have maturities ranging from five to seven years.

Pursuant to the Exit Financing Commitment Letter, the Debtors have agreed to pay, subject to the Court's approval, the following fees and expenses: (i) the out of pocket costs and expenses of the Exit Lenders, including the reasonable fees and expenses of legal advisors to the Exit Lenders, which amounts shall be due and payable irrespective of whether the Exit Facilities close, (ii) underwriting fees payable to the Exit Lenders in an amount equal to an agreed upon percentage for each tranche multiplied by the commitment amount of such tranche (the "Underwriting Fees") to be due payable only upon the closing of the Exit Facilities and (iii) other customary fees, including an annual administrative agency fee, letter of credit fees and the like, all of which are subject to the closing of said facilities.  Additionally, the Debtors have agreed in the Exit Financing Commitment Letter to pay the Exit Lenders a fee in the amount of the Underwriting Fees in the event the Debtors consummate an alternative financing transaction (the "Alternate Transaction Fee").  In connection with the foregoing, the Debtors are also finalizing the terms of an agreement with Standard & Poor's ("S&P"), pursuant to which S&P and Moody's for their customary fees (the "Rating Agency Fees") will maintain a corporate credit rating for the borrower and will rate each of the first lien and second lien term loan facilities.

Concurrently with the Effective Date, the Debtors shall have closed on the Exit Facilities, the proceeds of which shall be in an amount necessary to repay the DIP Credit Facilities in full (or as otherwise agreed) in accordance with the Plan, to assist the

---

[23]   For example, the revolving credit facility will have a first lien on accounts receivable, but a junior (third) lien on equipment, inventory and most other assets.

Reorganized Debtors in making all Cash payments required under the Plan[24] and to provide on-going liquidity.

On or prior to the Effective Date, the Debtors shall have closed on the Exit Facilities. The amounts borrowed under the Exit Facilities shall be used to make the required Distributions under the Plan, to satisfy certain plan-related expenses and to fund the Reorganized Debtors' working capital needs.

### 2. Rights Offering

As authorized by the Rights Offering Order, prior to Confirmation, Foamex International shall conduct a Rights Offering to generate gross proceeds of $150 million, subject to the terms and conditions set forth in the Equity Commitment Agreement. Pursuant to the Rights Offering, (i) each holder of Existing Common Stock on the Rights Offering Record Date will be offered the Right to purchase up to 2.56 shares of Additional Common Stock (or such other number based on the shares of Existing Common Stock outstanding on and as of the Rights Offering Commencement Date) for each share of Existing Common Stock held by such holder of Existing Common Stock on the Rights Offering Record Date, in exchange for a Cash payment equal to the Additional Common Stock Purchase Price for each share of Additional Common Stock and (ii) each holder of Existing Preferred Stock on the Rights Offering Record Date will be offered the Right to purchase up to 255.78 shares of Additional Common Stock (or such other number based on the shares of Existing Common Stock outstanding on and as of the Rights Offering Commencement Date) for each share of Existing Preferred Stock held by such holder of Existing Preferred Stock on the Rights Offering Record Date, in exchange for a Cash payment equal to the Additional Common Stock Purchase Price for each share of Additional Common Stock. All Additional Common Stock issued in connection with the exercise of Rights pursuant to the Rights Offering shall be issued on the Effective Date.

### 3. Put Option

To ensure that the Debtors raise sufficient funds to effectuate the Plan in the event that not all of the shares of Additional Common Stock offered through the Rights Offering are subscribed and paid for in full, Foamex International has, subject to Court approval, entered into the Equity Commitment Agreement and, subject to Court approval, the Put Option Agreement with the Significant Equityholders pursuant to which, among other things, the Significant Equityholders have committed to purchase New Preferred Stock under the Put Option, if exercised, for an aggregate purchase price equal to the Rights Offering Amount less the aggregate amount of proceeds to be received by Foamex International as a result of the exercise of Rights. If the Significant Equityholders exercise the Call Option, however, the Put Option will expire unexercised and the Significant Equityholders will not be obligated to purchase the New Preferred Stock. If it does not expire sooner, the Put Option will expire on the earliest of (i) the

---

[24] Such payments will include all "cure amounts" payable by the Debtors on the Effective Date.

Doc #:NY7:283581.7

Effective Date, and (ii) February 28, 2007. Any New Preferred Stock issued in connection with the Put Option shall be issued on the Effective Date.

4. **Call Option**

Pursuant to the Plan, and as more specifically set forth in the Call Option Agreement to be included in the Plan Supplement, Foamex shall sell, and each of the Significant Equityholders shall purchase, on or prior to the Effective Date, the Call Option for an aggregate purchase price equal to $2.0 million, requiring Foamex International to sell, upon the exercise of the Call Option by the Significant Equityholders, shares of Additional Common Stock at a per share price equal to the Additional Common Stock Purchase Price for each Right that is not subscribed and paid for in full by the Equityholders as of the Expiration Time, up to a maximum aggregate purchase price equal to the Rights Offering Amount less the aggregate amount of proceeds to be received by Foamex International as a result of the exercise of Rights. If the Significant Equityholders exercise and fulfill their obligations under the Call Option, the Put Option shall automatically terminate and the Significant Equityholders will not be obligated to purchase the New Preferred Stock. Any Additional Common Stock to be issued under the Plan pursuant to the Call Option shall be issued on the Effective Date.

5. **Use of Rights Offering Proceeds**

Reorganized Foamex International shall utilize the proceeds from the sale of Additional Common Stock and the New Preferred Stock, if any, (a) first, to pay the expenses of the Rights Offering and to pay the balance of the Put Option Premium that becomes due and payable on the Effective Date and (b) second, the net proceeds remaining will be contributed by Reorganized Foamex International to Foamex L.P., its primary operating subsidiary, to fund required payments under the Plan and to fund Foamex L.P.'s working capital requirements on and after the Effective Date.

P. **Effect of Confirmation of the Plan**

1. **Continued Corporate Existence**

Except as otherwise expressly provided for in Article VII.M of the Plan, the Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date with all of the powers of a corporation, partnership or limited liability company, as the case may be, under the laws of the State of Delaware and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith. In addition, the Reorganized Debtors may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including without limitation, the documents and instruments included in the Plan Supplement.

2.     **Dissolution of Creditors' Committee**

The Creditors' Committee shall continue in existence until the Effective Date and shall continue to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all of their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate except that the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) all Fee Claims, (ii) any appeals of the Confirmation Order, (iii) any adversary proceedings pending as of the Effective Date to which it may be a party and (iv) post-Effective Date modifications to the Plan.

3.     **Vesting of Property**

Except as otherwise expressly provided in the Plan, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall be vested with all of the property of the Estates free and clear of all Claims, Liens, encumbrances, charges and other interests of creditors and equity security holders.

4.     **Termination of Subordination Rights**

All Claims of the holders of Senior Secured Notes and Senior Subordinated Notes against the Debtors and all rights and Claims between or among the holders of Senior Secured Notes and Senior Subordinated Notes relating in any manner whatsoever to claimed subordination rights, rights to postpetition and default interest, prepayment fees or premiums, or similar rights, whether legal, contractual or equitable, if any (collectively, "Subordination Related Rights"), shall be deemed satisfied by the Distributions under, described in, contemplated by, and/or implemented by, the Plan to holders of such Claims, and such rights shall be deemed waived, released, discharged, and terminated as of the Effective Date, and all actions related to the enforcement of such Subordination Related Rights shall be permanently enjoined. Distributions under, described in, contemplated by, and/or implemented by, the Plan shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim, including, but not limited to, the holders of Senior Secured Note Claims, by reason of any claimed Subordination Related Rights or otherwise, so that each holder of a Claim shall have and receive the complete benefit of the Distributions in the manner set forth and described in the Plan.

5.     **Discharge of the Debtors**

**Except as otherwise provided in the Plan, the rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims or Interests of any kind or nature whatsoever, including any interest accrued on such**

-65-

Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims against, Liens on, and Equity Interests in the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim or Equity Interest with respect thereto was filed, whether the Claim or Equity Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a Distribution thereunder. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim or Equity Interest shall be precluded from asserting any other or further Claim against, or Interest in, the Debtors, the Reorganized Debtors, or any of their respective assets or properties, based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

6. **Injunction**

Except as otherwise expressly provided in the Plan, the Confirmation Order, the Plan Supplement Documents, or a separate order of the Court, all Persons who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest and (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest. Such injunction shall extend to successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.

7. **Preservation of Causes of Action**

The Reorganized Debtors shall retain all rights and all Causes of Action accruing to them and their estates, including but not limited to, those arising under sections 505, 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including all tax setoff and refund rights arising under section 505, other than as expressly provided below. Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights or

**Causes of Action. Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors have that is not specifically waived or relinquished by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors have as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.**

8.  **Votes Solicited in Good Faith**

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors and the Significant Equityholders (and each of their respective affiliates, agents, directors, officers, members, employees, advisors and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the Distributions contemplated thereunder and therefore have not been, and on account thereof will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the Distributions contemplated thereunder.

9.  **Administrative Claims Incurred After the Confirmation Date**

Administrative Claims incurred by the Reorganized Debtors after the Confirmation Date, including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without the need for Court approval.

10. **Mutual Releases**

**On the Effective Date, (a) the Debtors and the Reorganized Debtors, on behalf of themselves and their estates, (b) all of their respective officers, directors, employees, partners, advisors, attorneys, financial advisors, accountants and other professionals, (c) the members of, and counsel and financial advisors to, the Creditors' Committee, (d) the Significant Equityholders and their collective counsel and financial advisors, (e) the DIP Lenders and DIP Agents and their respective attorneys and advisors, in each case, in their respective capacities as such, (collectively clauses (a) through (e) being the "Released Parties," and each a "Released Party") shall be deemed to and shall unconditionally and irrevocably release each other from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases,**

-67-

or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct, (ii) the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such Persons asserted against the Debtors or the Reorganized Debtors, (iii) the foregoing release shall not apply to any express contractual or financial obligations owed to the Debtors or Reorganized Debtors or any obligation arising under the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan, (iv) the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms shall survive the termination of the DIP Credit Facilities shall continue to exist in accordance with their terms and (v) the obligations of Foamex International and Reorganized Foamex International under the indemnity and other provisions of the Equity Commitment Agreement shall continue to exist in accordance with their terms.

11.    **Releases by non-Debtors**

On and as of the Effective Date, all Persons who (i) do not file timely objections to the releases provided in this paragraph and receive Distributions under the Plan, or (ii) vote to accept the Plan as set forth on the relevant Ballot, and do not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, shall be deemed, by virtue of their treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the other Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any other Released Party on account of any Claim or Interest, including but not limited to any claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way relating to the Debtors or their business and affairs or (z) assert against any of the Reorganized Debtors or any other Released Party any claim, obligation, right, Cause of Action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct, (ii) the foregoing release shall not apply to obligations arising under the Plan or an agreement entered into pursuant to, in connection with, or contemplated by, the Plan and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan or an agreement entered into pursuant to, in connection with, or contemplated by, the Plan.  Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to claims arising against such Released Parties in their capacities as parties in interest in the Chapter 11 Cases.

Doc #:NY7:283581.7

12.     **Exculpation**

(a)     **Exculpation and Limitation of Liability.  The Plan provides that the Debtors, the Reorganized Debtors and the other Released Parties, the Exit Facilities Agent and the other arrangers and lender parties for each of the Exit Facilities (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the negotiation of the Plan, the negotiation of the Plan Supplement Documents, the Equity Commitment Agreement, the Put Option Agreement, the Exit Facility Commitment Agreement, the Rights Offering, the Rights Offering Documents, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting any of the Released Parties, or the Exit Facilities Agent and the other arrangers and lender parties for each of the Exit Facilities from liability.**

(b)     **Limitation of Governmental Releases** **Notwithstanding Articles VIII.J, VIII.K and VIII.L.1 of the Plan, the Plan shall not release, discharge, or exculpate any non-Debtor party from any debt owed to the United States Government and/or its agencies, including the PBGC (the "Government"), or from any liability arising under the Internal Revenue Code, ERISA, as amended, or the environmental laws, securities laws or criminal laws of the United States.  In addition, notwithstanding Articles VIII.J, VIII.K and VIII.L.1 of the Plan, the Plan shall not enjoin or prevent the Government from collecting any such liability from any such non-Debtor party.**

13.     **Term of Bankruptcy Injunction or Stays**

The Plan provides that all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

14.     **Reinstatement and Continuation of Insurance Policies**

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtors' insurance policies in existence on and as of the Confirmation Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Debtors' discharge and release from all Claims and Equity Interests, as provided in the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, their officers and directors) or any other person or entity. Notwithstanding any other provision of the Plan or the Confirmation Order, nothing in the Plan shall (i) impair (w) the right of any insurer to defend against any claim asserted against such insurer, (x) an insurer's status as a secured creditor to the extent applicable under the terms of the Plan, including the right to recover from any Collateral (in accordance with the applicable insurance policy), (y) an insurer's right to draw on third-party letters of credit (in accordance with the terms of the applicable insurance policy and letter of credit) or (z) any insurer's right of setoff pursuant to section 553 of the Bankruptcy Code to the extent applicable and/or (ii) affect an insurer's right to seek arbitration of disputes between the Debtors and such insurer to the extent provided for under the terms of the applicable insurance agreement.

15.     **Officers' and Directors' Indemnification Rights and Insurance**

Notwithstanding any other provisions of the Plan, the obligations of the Debtors to indemnify their present directors, officers, and employees against any obligations, liabilities, costs or expenses pursuant to the articles of incorporation, by-laws, partnership agreements or limited liability company operating agreements of the Debtors, as the case may be, applicable state law, specific agreement, or any combination of the foregoing, shall survive the Effective Date.

Q.     **Retention of Jurisdiction**

The Plan provides that the Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, certain specified purposes as set forth in Article IX of the Plan to which reference should be made for a detailed description of the Court's retention of jurisdiction pursuant to the Plan.

R.     **Miscellaneous Provisions**

1.     **Payment of Statutory Fees**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor as and when such fees become due.

2.     **Modification of the Plan**

Subject to certain limitations specified therein and to section 1127 of the Bankruptcy Code, Article X.B of the Plan permits the Debtors to modify the Plan pre-and post-confirmation. Reference should be made to Article X.B of the Plan for a complete description of the circumstances under which such modifications are permitted.

3. **Governing Law**

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules) or Delaware law, the laws of the State of New York (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

4. **Filing or Execution of Additional Documents**

On or before the Effective Date, the Debtors shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

5. **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions thereunder shall be subject to any such withholding and reporting requirements.

6. **Exemption From Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer and exchange under the Plan of the Call Option, the Put Option, the Additional Common Stock, the Put Option, the New Preferred Stock and the security interests in favor of the lenders under the Exit Facilities, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or other similar tax.

7. **Securities Issues.**

To the extent the Put Option is exercised, the New Preferred Stock issuable to the Significant Equityholders thereunder will be issued in a private placement transaction exempt from registration with the SEC pursuant to Section 4(2) of the Securities Act and may not be sold or otherwise disposed of except pursuant to an effective registration statement or pursuant to an available exemption from such registration requirements. The New Preferred Stock, if issued to the Significant Equityholders, will include a legend on the certificates evidencing such securities indicating their restricted status.

Additional Common Stock issued as part of the Rights Offering and, to the extent the Significant Equityholders exercise the Call Option, the Additional Common Stock Issuable to the Significant Equityholders thereunder, will be issued pursuant to the Registration Statement, provided that such Registration Statement is declared "effective"

by the SEC, but may be subject to resale restrictions if held by an affiliate of the Reorganized Debtors.

8. **Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a)**

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

9. **Exhibits/Schedules**

All exhibits and schedules to the Disclosure Statement and the Plan are incorporated into and constitute a part of the Disclosure Statement and the Plan as if fully set forth therein.

10. **Plan Supplement**

Forms of the documents relating to the Exit Facilities, the Registration Rights Agreement, the Call Option Agreement, the Rights Offering Documents, the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, the Other Amended and Restated Governing Documents, the FMXI Conversion Documents, a notice setting forth the identities, terms and nature of the compensation of the Reorganized Debtors' senior officers and directors and the employment contracts to be entered into with the Reorganized Debtors' senior officers, and such other documents and information as the Debtors determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement, which will be filed with the Clerk of the Court no later than ten (10) days prior to the Confirmation Hearing; provided, however, that the Debtors may amend any of the Plan Supplement Documents through and including the Effective Date in a manner consistent with the Plan and with the prior written consent of each of the Significant Equityholders and the Exit Facilities Agent (which consent shall not be unreasonably withheld) and consent of any other non-Debtor third parties to the relevant document. The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at Bankruptcy Services, LLC's website at Foamex's dedicated web page on www.bsillc.com. Holders of Claims or Equity Interests may also obtain a copy of the Plan Supplement upon written request to the Debtors in accordance with Article X.J of the Plan.

11. **Conflict**

The terms of the Plan shall govern in the event of any inconsistency with the summary of the Plan set forth in this Disclosure Statement. The terms of the Confirmation Order shall govern in the event of any inconsistency with the Plan or the summary of the Plan set forth in this Disclosure Statement.

Doc #:NY7:283581.7

12.     **Setoff by the United States**

The valid setoff rights, if any, of the United States of America will be unaffected by the Plan or confirmation thereof.

S.      **Executory Contracts and Unexpired Leases**

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection.  In the case of the Debtors' rejection of leases of real property and employment agreements, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

1.      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as provided for in Article XI of the Plan, and other than executory contracts or unexpired leases that have expired or terminated pursuant to their own terms during the pendency of the Chapter 11 Cases, or benefit plans, which are specifically dealt with in Article XII of the Plan, all of the executory contracts and unexpired leases that exist between the Debtors and any Person and that were not previously assumed or rejected by the Debtors or were not subject to a motion to assume or reject that is pending on or prior to the Confirmation Date shall be assumed as of and subject to the occurrence of the Effective Date pursuant to the Plan.  To the extent any such executory contracts or unexpired leases have been amended prior to the Confirmation Date, such contracts or leases shall be assumed as so amended.

The following executory contracts and unexpired leases are rejected:

(i)     executory contacts or unexpired leases that have been rejected by the Debtors before the Confirmation Date;

(ii)    executory contracts or unexpired leases that are the subject of a motion to reject pending on the Confirmation Date; and

(iii)   employment agreements that were terminated or rejected prior to the Confirmation Date or in connection with the Plan.

2.      **Cure**

Except as otherwise agreed to by the parties, on the Initial Distribution Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Debtors or the Reorganized Debtors' liability with respect thereto and

(ii) the Initial Distribution Date. All cure payments will be funded by draws on the Exit Facilities or from the Debtors' working capital.

### 3. Rejection Damage Claims

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order authorizing such rejection  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 5 General Unsecured Claims and/or Class 1 Priority Claims to the extent applicable.

### T. Benefit Plans

As, and subject to the occurrence, of the Effective Date, all employee compensation and benefit plans, policies and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, dismemberment insurance plans and workers' compensation programs, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts or plans that have previously been terminated or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts or programs.

The Debtors and the Reorganized Debtors, as the case may be, will continue to be the contributing sponsors of all pension plans which are defined as benefit pension plans by the Pension Benefit Guaranty Corporation (the "PBGC") under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461. The Confirmation Order shall provide that (i) such pension plans are subject to minimum funding requirements of ERISA and section 412 of the Internal Revenue Code, (ii) no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code, shall, or shall be construed to, discharge, release or relieve the Debtors or any other party, in any capacity, from any liability with respect to such pension plans under ERISA or under Internal Revenue Code section 412, and (iii) that neither the PBGC nor such pension plans shall be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

### U.  Confirmation and Effectiveness of the Plan

#### 1.  Conditions Precedent to Confirmation

Pursuant to Article XIII.A of the Plan, the Plan shall not be confirmed by the Court unless and until the following conditions have been satisfied in full or waived pursuant to Article XIII.C of the Plan:

(a)     The Court shall have entered an order finding that the Disclosure Statement, in form and substance reasonably acceptable to the Significant Equityholders, the Exist Facilities Agent and the Debtors, contains adequate information pursuant to section 1125 of the Bankruptcy Code;

(b)     The Plan shall be in form and substance materially consistent with the Equity Commitment Agreement and shall be reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors;

(c)     The Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Significant Equityholders, the DIP Agents, the Exit Facilities Agent and the Debtors;

(d)     All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors;

(e)     The Debtors' existing commitments for the Exit Facilities shall not have expired and shall be in full force and effect; and

(f)     The Equity Commitment Agreement shall not have terminated or expired pursuant to its terms.

#### 2.  Conditions Precedent to Effectiveness

Pursuant to Article XIII.B of the Plan, the Plan will not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XIII.C of the Plan:

(a)     The Confirmation Order, in form and substance reasonably acceptable to the Significant Equityholders, the DIP Agents, the Exit Facilities Agent and the Debtors, shall have been entered, and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by the Plan and such Confirmation Order shall have not been modified or vacated on appeal;

(b)     All undisputed statutory fees then due and payable to the United States Trustee shall have been paid in full;

(c)     All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors and such documents shall be executed, delivered or filed, as the case may be;

(d)     All actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors and shall remain in full force and effect;

(e)     All amounts due under the DIP Revolving Credit Facility shall have been indefeasibly paid in full in Cash and the liens and security interests granted thereunder terminated;

(f)     All amounts due under the DIP Term Loan Credit Facility shall have been indefeasibly paid in full in Cash and the liens and security interests granted thereunder terminated;

(g)     The Exit Facilities shall have been entered into by the Debtors and the other parties thereto and all conditions to the initial borrowings under the Exit Facilities shall have been satisfied or waived in accordance with the terms thereof (but for the occurrence of the Effective Date);

(h)     The Equity Commitment Agreement shall have been executed by the parties thereto, approved by the Court and shall not have expired or terminated by its terms;

(i)     The Rights Offering shall have been consummated in a manner that is reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors;

(j)     The Put Option or the Call Option, as applicable, shall have been exercised, if necessary, as provided in the Plan and the Put Option Agreement; and

(k)     The Put Option Conditions shall have been satisfied or waived in accordance with the terms of the Equity Commitment Agreement.

3.     **Waiver of Conditions**

The Debtors may waive any or all of the conditions set forth in Article XIII.A and B of the Plan (except for the condition set forth in sub-sections B.1 of Article XIII of the Plan) at any time, with the prior written consent of the Significant Equityholders and the Exit Facilities Agent without leave or order of the Court and without any formal action.

4.       **Effect of Failure of Conditions**

In the event that the Effective Date does not occur on or prior to February 28, 2007, or such later date as may be agreed to by the Debtors, Significant Equityholders and the Exit Facilities Agent, upon notification submitted by the Debtors to the Court: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

5.       **Vacatur of Confirmation Order**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

6.       **Revocation, Withdrawal, or Non-Consummation**

(a)       <u>Right to Revoke or Withdraw</u>.  Pursuant to the Plan, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date.

(b)       <u>Effect of Withdrawal, Revocation, or Non-Consummation</u>. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

In the event that the Plan is withdrawn, revoked or is not consummated, to the extent the Debtors have received any Deposits or Subscription Amounts, or portions

thereof, the Debtors shall return such amounts to any Person making such payment and no interest shall be paid thereon.

## IX.

## FINANCIAL PROJECTIONS

The Debtors' with the assistance of their advisors, developed a set of financial projections (as summarized below and in Exhibit C, the "Financial Projections") to generally assess the value of the Reorganized Debtors and the feasibility of the Plan. The Financial Projections set forth below and in Exhibit C are based on a number of significant assumptions, including, among other things, the successful reorganization of the Debtors.

THE PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY.

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, Foamex's management has, through the development of the Financial Projections, analyzed Foamex's ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business subsequent to its emergence from chapter 11. The Financial Projections were also prepared to assist Equityholders entitled to vote on the Plan in determining whether to accept or reject the Plan.

The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein and in Exhibit C, and certain relevant information set forth in Foamex's Annual Report on Form 10-K for the fiscal year ended January 1, 2006 (as amended) and Foamex's Quarterly Reports on Form 10-Q for the first two quarters of fiscal year 2006, all of which are available online at www.foamex.com or Foamex's dedicated web page on Bankruptcy Services, LLC's website at www.bsillc.com. The Financial Projections were prepared in good faith based upon assumptions believed to be reasonable. The Financial Projections, which were last updated in October 2006, were based, in part, on economic, competitive, and general business conditions prevailing at the time. **While as of the date of this Disclosure Statement such conditions have not materially changed, any future changes in these conditions may materially impact Foamex's ability to achieve the Financial Projections.**

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. FOAMEX'S INDEPENDENT PUBLIC

ACCOUNTANT, KPMG LLP, HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

FOAMEX DOES NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, FOAMEX DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF ITS COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE FINANCIAL PROJECTIONS PROVIDED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY FOAMEX'S MANAGEMENT WITH THE ASSISTANCE OF MILLER BUCKFIRE. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY FOAMEX'S MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND FOAMEX'S CONTROL. FOAMEX CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO FOAMEX'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF SUCH EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

FINALLY, THE FINANCIAL PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS, THE FAIR VALUE OF THEIR ASSETS AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. THE REORGANIZED DEBTORS WILL BE REQUIRED TO MAKE SUCH ESTIMATIONS AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING ESTIMATES.

1. **Scope of Financial Projections**

As part of this analysis, the Debtors have prepared projections of their financial performance for the three year period ending January 3, 2010 (the "Projection Period").  These projections and the assumptions upon which they are based are included in the Financial Projections that are annexed hereto as Exhibit C.

The financial information and projections appended to the Disclosure Statement include for the Projection Period:

- Pro forma projected balance sheets for the 2007, 2008 and 2009 fiscal years[25].

- Pro forma projected income statements for the 2007, 2008 and 2009 fiscal years.

- Pro forma projected statements of cash flow for the 2007, 2008 and 2009 fiscal years.

The financial information and projections are based on the assumptions that the Plan will be confirmed by the Court and, for projection purposes, that the Effective Date under the Plan will occur on February 25, 2007.  Although the projections and information are based upon a February 25, 2007 Effective Date, the Debtors believe that an actual Effective Date any time in the first quarter of fiscal year 2007 would not have any material effect on the projections.

2. **Summary of Significant Assumptions**

The Debtors have prepared these Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  Those assumptions considered to be significant are set forth in Exhibit C.  The Financial Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the Projection Period may vary from the projected results and the variations may be material.  All holders of  Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in evaluating the Plan.

---

[25]   The Debtors include two sets of Financial Projections.  One set accounts for the issuance of the New Preferred Stock if the Company exercises the Put Option.  The other set accounts for the issuance of Additional Common Stock if the Significant Equityholders exercise the Call Option.

Doc #:NY7:283581.7

# X.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The factors specified below assume that the Plan is approved by the Court and that the Effective Date occurs on or about February 25, 2007. Although such risk factors are based upon a February 25, 2007 Effective Date, the Debtors believe that an actual Effective Date any time in the first quarter of fiscal year 2007 would not have any material effect on the risk factors.

### A. Projected Financial Information

The Financial Projections included in this Disclosure Statement are dependent upon the successful implementation of the Debtors' business plan and the validity of the assumptions contained therein. These projections reflect numerous assumptions, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, the future performance of the bedding, furniture, carpet and automotive markets, certain assumptions with respect to the Reorganized Debtors' competitors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Reorganized Debtors' actual financial results. Although the Debtors believe that the Financial Projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

### B. Risks Related to the Debtors' Business and Operations

#### 1. Risks Related to Unliquidated Claims

Various Unliquidated Claims have been filed against one or more of the Debtors. A schedule identifying each of the Unliquidated Claims is attached as Schedule A to the Plan. As set forth in the Plan, Unliquidated Claims are Disputed Claims that shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, including, where applicable, through access to available insurance. The Debtors believe the Reorganized Debtors will be able to satisfy (through available insurance or otherwise) all valid Unliquidated Claims in the ordinary course after the Effective Date. However, there can be no such assurance.

-81-

Included in these Unliquidated Claims is the Rhode Island Litigation, which is discussed in detail in Article VI.L above.

2. **Foamex International's ability to utilize its NOLs may be limited.**

As of January 1, 2006, Foamex had approximately $291.6 million of NOL carryforwards with which to offset future taxable income. Section 382 of the Tax Code, however, limits the corporation's utilization of an NOL following a "50-percent ownership change" (a "Section 382 Ownership Change"). While Foamex International believes that it has not undergone any Section 382 Ownership Change since June 7, 2001, and will not undergo a Section 382 Ownership Change prior to implementation of the Plan, such determination is not free from doubt. Foamex International has requested a ruling from the IRS confirming that (i) certain purchases of Existing Common Stock by Morgan Stanley that would likely have caused a Section 382 Ownership Change, are to be disregarded because they were determined to be void *ab initio* by the MS Stipulation and (ii) certain purchases of Existing Common Stock reported on SEC filings on Schedule 13-G by Par IV Capital in its capacity as an investment advisor to, and a manager of, two funds, each of which separately owned approximately 3.4% of Existing Common Stock, did not cause Par IV Capital or the two funds it advised to be treated as a single 5% shareholder for purposes of Section 382 of the Tax Code. If Foamex International were to be treated as having undergone a Section 382 Ownership Change because of the purchases by Morgan Stanley, Par IV Capital or the funds it advised, or for any other reason, the ability to utilize NOLs generated before such ownership change would be severely impaired. Furthermore, because the rules under section 382 of the Tax Code are highly complex, no assurance can be given that another transaction has not triggered, or will not trigger, a Section 382 Ownership Change prior to the implementation of the Plan. Although the issuance of Additional Common Stock may result in a Section 382 Ownership Change, because such ownership change will be pursuant to the Plan, certain more favorable rules will be applicable and the ability to use NOLs will not be significantly affected.

3. **Increase in Raw Material Costs May Have an Adverse Effect on the Reorganized Debtors**

Because the cost of chemicals is the largest single component of Foamex's cost of goods sold, the price and availability of the chemicals Foamex purchases significantly affect Foamex's business. The three principal chemicals used in the manufacture of flexible polyurethane foam are TDI, polyol and MDI. The prices of TDI, polyol and MDI are influenced by demand, manufacturing capacity and oil and natural gas prices. Specifically, since the primary urethane chemicals used to create TDI, polyol and MDI are all oil-based derivatives, fluctuating oil and energy costs, like those experienced in the past few years, could adversely affect the Reorganized Debtors' manufacturing costs. The Reorganized Debtors may not be able to fully offset raw materials price increases through selling price increases and manufacturing process

efficiencies.  To the extent the Reorganized Debtors are unable to so offset any further raw material price increases, their business may be adversely affected.

> 4.  **Foamex Depends on a Limited Number of Suppliers of TDI, polyol and MDI**

A disruption in the Reorganized Debtors' ability to obtain TDI, polyol and/or MDI that continues for a significant period of time could cause the Reorganized Debtors to suspend all or a portion of their manufacturing operations, which could have a material adverse effect on their business results and operations.  Two examples of such disruptions were Hurricanes Rita and Katrina.

> 5.  **Major Customers' Financial Condition and Supply Decisions May Have a Material Effect on the Reorganized Debtors**

The Reorganized Debtors' financial performance is directly tied to the financial condition of their customers and their customers' decisions concerning suppliers.  This is especially so because a small number of customers account for significant percentage of Foamex's net sales.  Sales to Foamex's five largest customers together accounted for approximately 27.1% of Foamex's net sales in 2005.  Sales to Johnson Controls, Foamex's largest customer, accounted for approximately 10.7% of our net sales in 2005.  Thus, the loss of, or a substantial decrease in the amount purchased by, these major customers could have a material adverse effect on the Reorganized Debtors' financial position and results of operations.

> 6.  **Inability to Renew Leases for Certain Manufacturing Facilities**

Foamex leases certain of its foam pouring facilities.  In the event that the Reorganized Debtors are unable to renew leases at these facilities, they could incur significant costs in relocating their manufacturing operations.

> 7.  **Foamex is Subject to Extensive Federal, State, Local and Foreign Environmental Laws and Regulations**

Foamex's past and present business operations and the past and present ownership and operation of its real properties are subject to extensive and changing federal, state, local and foreign environmental laws and regulations, including those relating to the use, handling, storage, discharge and disposal of hazardous substances, the discharge or emission of materials into the environment and the remediation of environmental contamination.  Foamex is currently remediating soil and groundwater contamination at seven of its current and former locations.  It is also designated as a Potentially Responsible Party by the United States Environmental Protection Agency, or by state environmental agencies at eleven sites.  If there are additional sites or the Reorganized Debtors' estimates of their potential environmental liabilities are incorrect, there could be a material adverse effect on their financial condition and results of operations.

8. **The Polyurethane Foam Business has Excess Capacity and is Somewhat Cyclical**

Foamex is subject to excess capacity in the polyurethane foam industry and to the cyclical nature of the automotive, housing, technology, and furniture and bedding industries. A protracted downturn in any of these industries could have a material adverse effect on the Reorganized Debtors' results of operations. In particular, the problems facing the North American automotive industry, which is Foamex's second-largest revenue source, have negatively impacted Foamex's automotive business, and are expected to negatively impact the Reorganized Debtors' financial condition in the future.

9. **Foamex Must Effectively Manage Other Operating Expenses**

In addition to Foamex's ability to effectively increase selling prices in response to raw material cost increases, Foamex must manage and control other operating expenses. If Foamex is unable to achieve reductions in other operating expenses and in selling, general and administrative expenses, there could be a material adverse effect on Foamex's business, financial condition and results of operations.

10. **Foamex's historical financial information will not be indicative of its future financial performance.**

Foamex's financial condition and results of operations following any emergence from chapter 11, if such emergence occurs, will not be comparable to the financial condition or results of operations reflected in its historical financial statements.

**C.     Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness**

As discussed in Article VI.B above, following the Effective Date of the Plan, the Reorganized Debtors' working capital needs and letter of credit requirements are anticipated to be funded by the Exit Facilities. The Exit Facilities will restrict, among other things, the Reorganized Debtors' ability to incur additional indebtedness, consummate certain asset sales, create liens on assets, make investments, loans or advances, consolidate or merge with or into any other person or convey, transfer or lease all or substantially all of their assets or change the business to be conducted by the Reorganized Debtors. In addition, the Exit Facilities will contain financial maintenance covenants and certain other and more restrictive covenants. A breach of any of these covenants could result in a default under the Exit Facilities. It is also anticipated that substantially all of the assets of the Reorganized Debtors will be pledged as security under the Exit Facilities.

In addition, the three facilities that comprise the Exit Facilities will have staggered maturity dates: five years after the Effective Date for the Asset-Based Revolving Credit Facility, six years after the Effective Date for the First Lien Term Loan Facility and seven years after the Effective Date for the Second Lien Term Loan Facility. The First Lien Term Loan will be subject to quarterly amortization of principal equal to

.25% of the original aggregate principal amount for the first 5 ¾ years with the balance payable at final maturity.  The Debtors cannot provide any assurances that they will be able to generate sufficient cash flow from operations to enable them to repay their indebtedness under the Exit Facilities and they may not be able to extend the maturities of, or refinance such indebtedness on commercially reasonable terms, or at all.

## D.     Certain Bankruptcy Law Considerations

### 1.     Risk of Non-Confirmation of the Plan

Although Foamex believes that the Plan satisfies all of the requirements for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion or that interested parties will not object to the Plan, thereby delaying or preventing confirmation.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified.

### 2.     Risk of Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks on Foamex's operations.  Although Foamex believes that the Effective Date will occur on or around February 25, 2007, there can be no assurance as to such timing or that the conditions to the Effective Date contained in the Plan will ever occur.

## E.     Certain Risks Relating to the Post-Effective Date Common Stock

### 1.     Foamex International does not expect to pay dividends on Post-Effective Date Common Stock in the foreseeable future.

Foamex International did not pay any cash dividends on Existing Common Stock during the past two fiscal years and Foamex International will not pay any dividends on our Existing Common Stock during our Chapter 11 Cases.  The payment of any future dividends thereafter will be determined by the Board of Directors of Reorganized Foamex International in light of conditions then existing, including Reorganized Foamex International's earnings, financial condition, cash requirements, restrictions in financing agreements, business conditions and other factors.  Foamex International is a holding company whose assets consist primarily of ownership of Foamex L.P.  Consequently, Reorganized Foamex International's ability to pay dividends will be dependent upon the earnings of Foamex L.P. and any future subsidiaries after the Effective Date and the distribution of the earnings of those subsidiaries to Reorganized Foamex International and loans or advances by Foamex L.P. and any such future subsidiaries after the Effective Date.  Due to these restrictions, Reorganized Foamex International expects to have only limited access to the cash flow generated by Foamex L.P. or any new subsidiaries after the Effective Date and does not expect to pay dividends on Post-Effective Date Common Stock in the foreseeable future.

2.     **The stock price may be volatile and may result in the loss of all or part of an Equityholder's investment.**

The market price of Post-Effective Date Common Stock could fluctuate significantly, in which case an Equityholder may not be able to resell its shares at or above the offering price. The market price of Post-Effective Date Common Stock may fluctuate based on a number of factors, including, but not limited to the following:

- Foamex's obligations that remain outstanding after emergence from these Chapter 11 Cases;

- Foamex's operating performance and the performance of competitors and other similar companies;

- the public's reaction to Foamex's press releases, other public announcements and filings with the SEC;

- changes in earnings estimates or recommendations by research analysts who track the Post-Effective Date Common Stock or the stocks of other companies in the foam industry;

- the extent to which, if at all, broker-dealers choose to make a market on the Post-Effective Date Common Stock;

- changes in general economic conditions;

- Foamex's ability to use NOL carryforwards to offset taxable income in view of the change in capital structure contemplated by the Plan;

- the number of shares to be publicly traded after the Rights Offering;

- Foamex's involvement in legal proceedings;

- actions of current Equityholders;

- the arrival or departure of key personnel;

- acquisitions, strategic alliances or joint ventures involving us or competitors; and

- other developments affecting us, industry or competitors.

In addition, in recent years the stock market has experienced significant price and volume fluctuations. These fluctuations are often unrelated to the operating performance of particular companies. These broad market fluctuations may cause declines in the market price of Post-Effective Date Common Stock. The price of the Post-Effective Date Common Stock could fluctuate based upon factors that have little or nothing to do with Foamex or its performance, and these fluctuations could materially reduce the price of Post-Effective Date Common Stock.

-86-

3.     **Substantial future sales of shares of Post-Effective Date Common Stock in the public market could cause the stock price to fall.**

Based on the number of shares outstanding as of the Record Date, upon consummation of the Rights Offering and assuming that all Rights are exercised by every Equityholder (and the Existing Preferred Stock is converted to Additional Common Stock (as is contemplated by the Plan)), Reorganized Foamex International expects to have outstanding approximately 93 million shares of Post-Effective Date Common Stock, which would result in a greater than two-fold increase in the public float. The Post-Effective Date Common Stock will be freely tradable without restrictions in the public market unless held by an affiliate of Foamex International.

Reorganized Foamex International will grant registration rights to the Significant Equityholders pursuant to the Registration Rights Agreement. In the event that the Significant Equityholders fully exercise the Call Option to be created under the Plan, the Significant Equityholders have the right subject to some conditions to require Foamex to file registration statements covering approximately 66.7 million shares of Post-Effective Date Common Stock, or to include those shares in registration statements that Reorganized Foamex International may file for itself or other stockholders. These registration rights do not cover any shares of New Preferred Stock. Following their registration and sale under the applicable registration statement, those shares of Post-Effective Date Common Stock will become freely tradable, unless held by an affiliate of Reorganized Foamex International. By exercising their registration rights and selling a large number of shares, the Significant Equityholders could cause the price of Post-Effective Date Common Stock to decline. In addition, options to purchase 2.0 million shares of Existing Common Stock were outstanding as of October 1, 2006 Foamex has filed registration statements under the Securities Act registering approximately 6.9 million shares of its common stock reserved for issuance under its employee stock award plans.

4.     **A small number of Equityholders could be able to significantly influence Foamex's business and affairs.**

As of the date hereof, assuming conversion of all Existing Preferred Stock, the Significant Equityholders beneficially owned in the aggregate approximately 53% of the Existing Common Stock. If all of the Rights offered through the Rights Offering are exercised, the Significant Equityholders' beneficial ownership percentage will remain the same. If the Significant Equityholders are the only Equityholders to exercise their Rights in the Rights Offering and the Significant Equityholders elect to exercise the Call Option created under the Plan, the Significant Equityholders' ownership percentage of Post-Effective Date Common Stock would increase to approximately 87%. Accordingly, following the consummation of the Rights Offering and the Effective Date, the Significant Equityholders may continue to exercise significant influence over all matters requiring a shareholders' vote, including the composition of the Board of Directors, the adoption of amendments to Reorganized Foamex International's second amended and restated certificate of incorporation and the approval of mergers or sales of substantially all of Reorganized Foamex International's assets. This concentration of ownership also

-87-

may delay, defer or even prevent a change in control of Reorganized Foamex International and may make some transactions more difficult or impossible without the support of the Significant Equityholders. The interests of the Significant Equityholders may conflict with the interests of other shareholders.

5.      **Foamex International may cease filing reports with the SEC following the Effective Date of the Plan.**

Following the Effective Date of the Plan, if Reorganized Foamex International meets the requirements of the Exchange Act, whereby Reorganized Foamex International has fewer than 300 shareholders of record on such date, Reorganized Foamex International may file a Form 15 with the SEC, which would suspend Reorganized Foamex International's obligation to file public reports with the SEC, such as the annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and proxy statements. In such circumstances, although Foamex International would likely continue to publish press releases and other information on Foamex International's website, Foamex International's suspension of SEC reports would significantly reduce the information about Foamex International that is publicly available, including financial statements, and, as a result, a shareholder's ability to keep informed would likely be impaired.

6.      **An active or liquid trading market for the Post-Effective Date Common Stock may not develop after the Rights Offering.**

Foamex International believes that eight institutions and various insiders hold approximately 80% of the Existing Common Stock and this percentage is expected to increase after consummation of the Rights Offering to the extent the current public float Equityholders do not subscribe to the Rights Offering and allow their Equity Interests to be diluted. Foamex International believes that the public float balance of the current remaining 20% is held by approximately 120 holders of record as of the Record Date. The Existing Common Stock is traded over-the-counter. Over-the-counter trading is dependent on a broker-dealer being willing to make a market in the stock, which Foamex International cannot predict will happen. The small amount of public float and the nature of over-the-counter trading may limit the ability of holders of Post-Effective Date Common Stock to resell their shares if an active trading market does not emerge.

F.      **Risks Relating to the Rights Offering**

1.      **Holders of Existing Common Stock may suffer significant dilution of percentage of ownership of Post-Effective Date Common Stock.**

If all Rights are exercised, or the Significant Equityholders fully exercise the Call Option created under the Plan, the Rights Offering will result in greater than a two-fold increase in Reorganized Foamex International's outstanding common stock. If holders of Existing Common Stock do not exercise their Rights, their proportionate voting and ownership interest will be reduced and the percentage that the original shares represent of Reorganized Foamex International's expanded equity after exercise of the

-88-

Rights will be diluted. The magnitude of the reduction of a Equityholders' ownership percentage will depend upon the extent to which such Equityholder subscribes under the Rights Offering.

  2.  **The commitment of the Significant Equityholders is conditioned upon certain factors.**

  The Significant Equityholders' obligations under the Put Option are subject to the satisfaction of specified conditions, including the approval of the Plan in form and substance reasonably acceptable to the Significant Equityholders, by the Court, the concurrent closing of the Exit Facilities and the absence of any termination events under the Equity Commitment Agreement or any material adverse change in Foamex's business, financial condition or results of operations. Some of these conditions are not within Foamex's control. If Foamex is not able to meet these conditions, the Significant Equityholders may not be willing to waive the conditions and would no longer be obligated to purchase the New Preferred Stock under the Put Option. In such event, the Debtors may not be able to raise the proceeds necessary to fund the Debtors' cash obligations under the Plan, the Plan will not become effective, and the Debtors may need to propose an alternate plan under which the value of the Existing Common Stock could be reduced to as low as zero.

  3.  **If the Significant Equityholders do not fulfill their commitments under the Put Option, the Debtors may not be able to raise proceeds necessary to fund Distributions under the Plan.**

  The funds supporting the Put Option have not been placed into any escrow account and the Put Option is not secured by any collateral. If the Significant Equityholders do not fulfill their commitments under the Put Option, the Debtors may not be able to raise the proceeds necessary to fund the Debtors' cash obligations under the Plan, the Plan will not become effective and the Debtors may need to propose an alternate plan under which the value of the Existing Common Stock could be reduced to as low as zero.

  4.  **The Rights are not transferable and there is no market for the Rights.**

  The Rights may not be sold, given away or otherwise transferred. Because the Rights are non-transferable, there is no market or other means to directly realize any value associated with the Rights other than by a shareholder exercising his rights and putting additional capital at risk.

  5.  **The exercise price was determined after consideration of a number of factors and does not reflect a determination of the value of the Existing Common Stock.**

  Each Right entitles a holder of Existing Common Stock to purchase up to 2.56 shares of Additional Common Stock at an exercise price of $2.25. The exercise

price was determined after consideration of a number of factors and does not necessarily bear any relationship to the book value of assets, past operations, cash flows, losses, financial condition or any other established criteria for value. As a result, the exercise price should not be considered an indication of the actual value of Foamex International or of the Existing Common Stock.

6.      **The price of Existing Common Stock may decline before or after the expiration of the Rights Offering.**

The public trading market price of the Existing Common Stock may decline below the exercise price after Equityholders exercise Rights. If that occurs and the exercise of the Right is not withdrawn prior to the deadline for withdrawal, such exercise will be a commitment to buy shares at a price above the prevailing market price, and an immediate unrealized loss on those shares will result. The exercise price will not be adjusted based on market fluctuations. Moreover, Foamex International cannot assure Equityholders that following an Equityholder's exercise of Rights, such Equityholder will be able to sell Post-Effective Date Common Stock at a price equal to or greater than the exercise price.

7.      **The Rights Offering may be terminated at any time prior to the expiration of the offer period, and neither Foamex International nor the Rights Agent will have any obligation except to return exercise payments.**

Foamex International may, in its sole discretion, decide not to continue with the Rights Offering or terminate the Rights Offering prior to the expiration of the offer period. If the Rights Offering is terminated, the rights agent will return, as soon as practicable, all exercise payments, without interest and Equityholders will not be able to purchase Additional Common Stock at the exercise price.

8.      **Following the deadline for withdrawal, an exercise of Rights may not be revoked.**

Once Rights have been exercised, an exercise may be withdrawn at any time prior to the deadline for withdrawal, but not thereafter, subject to applicable law. The deadline for withdrawal is 5:00 p.m., New York City time, on the business day prior to the expiration of the Rights Offering. Following the deadline for withdrawal, an exercise may not be revoked in whole or in part for any reason, including a decline in the price of Existing Common Stock, even if shares have not already been issued.

9.      **An Equityholder must act promptly and follow instructions carefully if it intends to exercise its rights.**

Eligible participants and, if applicable, brokers, banks or other nominees acting on their behalf, who desire to purchase Additional Common Stock in the Rights Offering must act promptly to ensure that all required certificates and payments are actually received by the rights agent, Mellon Investor Services LLC, on behalf of Mellon Bank N.A., the rights agent, prior to the expiration of the Rights Offering. The time period to exercise rights is limited. If an Equityholder or its broker, bank or other

-90-

nominee fails to complete and sign the required rights certificate, sends an incorrect payment amount or otherwise fails to follow the procedures that apply to the exercise of Rights, Foamex International may, depending on the circumstances, reject the exercise of Rights or accept it only to the extent of the payment received. Neither Foamex International nor the rights agent undertakes to contact a shareholder concerning, or attempt to correct, an incomplete or incorrect rights certificate or payment or contact an Equityholder concerning whether a broker, bank or other nominee holds rights on an Equityholder's behalf. Foamex has the sole discretion to determine whether an exercise properly follows the procedures that apply to the exercise of an Equityholders' rights.

10. **An exercise of rights may be subject to the notification and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976.**

If as a result of an exercise of Rights, or as a result of the Significant Equityholders' exercise of the Call Option, an Equityholder would hold shares of Post-Effective Date Common Stock worth in excess of $56.7 million, such proposed acquisition may trigger notification obligations under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), and all waiting periods under the HSR Act will need to have expired or otherwise been terminated before Foamex can satisfy such exercise of Rights. There can be no guarantee that the Federal Trade Commission and U.S. Department of Justice will allow the waiting periods to expire or terminate. An Equityholder may consider seeking advice of legal counsel to determine the applicability of the HSR Act to its rights.

## XI.

## CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Interests in Classes 9 and 10 of the Plan are Impaired and are entitled to vote to accept or reject the Plan. The Claims and Interests in Classes 1 through 8 and 11 are unimpaired. The holders of Allowed Claims and Interests in each of Classes 1 through 8 and 11 are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Classes therefore is not required under section 1126(f) of the Bankruptcy Code.

As to Classes of Interests entitled to vote on the Plan, the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in amount of the allowed interests of that class that have timely voted to accept or reject a plan.

A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**B.     The Confirmation Hearing**

The Bankruptcy Code requires the Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for _____, 2006 at _____, prevailing Eastern Time, before the Honorable Peter J. Walsh at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or other Interest(s) held by the objector.  Any such objection must be filed with the Court and served so that it is received by the Court and the following parties and the other parties requesting notice in these cases on or before _____ ___, 2006 at 4:00 pm.:

The Debtors:  Foamex International Inc., 1000 Columbia Avenue, Linwood, Pennsylvania 19061, attention: Gregory J. Christian, with a copy to (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, attention:  Alan W. Kornberg, Esq. and Brian S. Hermann, Esq., Tel.: (212) 373-3000, Fax: (212) 757-3990, and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19801, attention: Pauline K. Morgan, Esq. and Joseph M. Barry, Esq., Tel: (302) 571-6600, Fax: (302) 571-1253.

The Ad Hoc Committee of Senior Secured Noteholders: (i) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York, 10022, attention:  Adam Harris, Esq., Tel.: (212) 756-2000, Fax: (212) 593-5955, and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, attention:  John H. Knight, Esq., Tel.: (302) 651-7700, Fax: (302) 651-7701.

The Creditors' Committee:  (i) Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey, 07068-1791, attention:  Kenneth A. Rosen, Esq., Tel.: (973) 597-2500, Fax: (973) 597-2400, and (ii) Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware, 19899, attention: Donald J. Detweiler, Esq., Tel.: (302) 661-7000, Fax: (302) 661-7360.

The Significant Equityholders:  (i) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 1000, attention: James L. Bromley, Esq., Tel: (212) 225-2000, Fax: (212) 225-3999, and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899-1347, attention: William H. Sudell, Jr., Esq., Tel: (302) 658-9200, Fax: (302) 658-3989.

The Agents for the DIP Lenders: (i) Kaye Scholer LLP, 425 Park Avenue, New York, NY 10022-3598, attention: Marc D. Rosenberg, Esq. and Albert M. Fenster, Esq., Tel.: (212) 836-8000, Fax: (212) 836-8689, (ii) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, attention: Fredric L. Ragucci, Esq., Tel.: (212) 756-2000, Fax: (212) 593-5955, (iii) Buchanan Ingersoll PC, The Nemours Building, 1007 North Orange Street, Suite 1110, Wilmington, Delaware 19801-1236, attention: Jami B. Nimeroff, Esq., Tel.: (302) 552-4200, Fax: (302) 552-4295, and (iv) Landis Rath & Cobb, LLP, 919 Market Street, Suite 600, Wilmington, Delaware 19899, attention: Adam C. Landis, Esq., Tel: (302) 467-4400, Fax: (302) 467-4450.

The Agents for the Exit Lenders: (i) Kaye Scholer LLP, 425 Park Avenue, New York, NY 10022-3598, attention: Marc D. Rosenberg, Esq. and Albert M. Fenster, Esq., Tel.: (212) 836-8000, Fax: (212) 836-8689 and (ii) Cahill Gordon & Reindel, LLP, 80 Pine Street, New York, NY 10005, attention: Susanna M. Suh, Esq., Tel.: (212) 701-3686, Fax.: (212) 378-2611.

The Office of the United States Trustee: 844 King Street, Suite 2207, Wilmington, Delaware 19801, attention: David L. Buchbinder, Esq., Tel.: (302) 573-6491, Fax: (302) 573-6497.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Court.

## C. Confirmation

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the Plan.

### 1. Acceptance

All Classes of the Plan are unimpaired except for Classes 9 and 10. Thus, all Classes except for Classes 9 and 10 are conclusively presumed to have voted to accept the Plan.

Because Classes 9 and 10 are impaired, holders of at least two-thirds in amount must vote to accept the Plan. Only those holders of claims who actually vote to accept or reject the Plan count in the tabulation.

### 2. Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, also referred to as a "cram down," it must be demonstrated to the Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code provides that a plan is "fair and equitable" with respect to a particular class as follows:

(a)     Secured Creditors.  Either (i) each Impaired creditor retains its liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments having a present value equal to the amount of its Allowed Secured Claim, (ii) each Impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

(b)     Equity Interests.  Either (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its interest or (ii) the holder of an Interest that is junior to the nonaccepting class will not receive or retain any property under the Plan.

3.     **Feasibility**

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  Based upon the Financial Projections attached as Exhibit C and the assumptions set forth therein, the Debtors believe that they will be able to make all Distributions required pursuant to the Plan and to fund their operations and meet their obligations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

4.     **Best Interests Test**

With respect to each Impaired Class of Equity Interests, Confirmation of the Plan requires that each holder of an Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be reduced by the amount of the costs and

expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distribution, first, to creditors and then, to the holders of Equity Interests.

To determine if the Plan is in the best interests of each Impaired Class of Equity Interests, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Equityholders in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under chapter 7 and (iii) the substantial increases in Claims which would first have to be satisfied, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7.

## XII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization or a plan of liquidation.

### A.    Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtors' assets for distribution in accordance with the priorities established

by chapter 7 of the Bankruptcy Code. For the reasons articulated in Article XI above, the Debtors believe that a liquidation under chapter 7 would not result in greater Distributions to the Debtors' Creditors, all of whom are to be paid in full in cash on the Effective Date or otherwise have their Allowed Claims reinstated under the Plan, and would result in smaller, if any, Distributions being made to and Equityholders than those provided for under the Plan.

### B.    Alternative Plan of Reorganization or Plan of Liquidation

If the Plan is not confirmed, the Court could confirm a different plan. The Plan is, in essence, a reorganization of the Debtors' business; a different plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. The Debtors believe that the Plan, as described herein, enables Creditors and Equityholders to realize the highest and best value. The Debtors believe that any liquidation of the Debtors' assets or alternative form of chapter 11 plan is a much less attractive alternative to Creditors and Equityholders than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtors believe that their Plan provides the best recovery to their Creditors and Equityholders by providing creditors with payment in full in cash on the Effective Date or the reinstatement of their Allowed Claims and allowing Equityholders to retain their Common Stock and to participate in the Rights Offering.

### XIII.

### SECURITIES LAW MATTERS

### A.    General

Foamex International's Common Stock trades over-the-counter under the trading symbol "FMXIQ" Except for shares of Foamex International's Common Stock held by "affiliates" (as defined in Rule 144 promulgated under the Securities Act) of Foamex International, and except as otherwise restricted by the Trading Order, shares of Foamex International's Common Stock are freely tradable. Foamex International is filing a registration statement for the Additional Common Stock offered in the Rights Offering and underlying the Call Option to be issued under the Plan. Foamex International has granted the Significant Equityholders certain registration rights with regard to the Significant Equityholders' future resale of shares of Common Stock.

On or about October 24, 2006, Foamex International will file a registration statement on Form S-1 with the SEC in connection with the Rights Offering and the sale of Additional Common Stock pursuant thereto.[26] Upon the issuance of the Additional Common Stock, the registration statement, the Additional Common Stock with the exception of any rights of Additional Common Stock held by any of Reorganized

---

[26]    A copy of the S-1 can be viewed on the SEC's website at www.sec.gov.

Foamex International "affiliates," including shares held by the Significant Equityholders, will be freely tradable.

B.    **Rule 144**

Rule 144 provides a method for resales of the Common Stock purchased from Reorganized Foamex International and its affiliates in a nonpublic transaction and securities held by affiliates of Reorganized Foamex International, however acquired. In general, under Rule 144, a person who has beneficially owned shares of the Common Stock for at least one year would be entitled to sell within any three-month period a number of shares that does not exceed the greater of the following:

- One percent of the number of shares of the Common Stock; and

- The average weekly trading volume of the Common Stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to such sale.

Sales under Rule 144 are also subject to various manner of sale provisions and notice requirements and to the availability of current public information about Reorganized Foamex International, including the filing of all required Exchange Act reports by Reorganized Foamex International.

Under Rule 144(k), a person who is not deemed to have been an "affiliate" of Reorganized Foamex International at any time during the three months preceding a sale and who has beneficially owned the shares proposed to be sold for at least two years, which two-year period includes the holding period of any prior owner other than an "affiliate," is entitled to sell its shares without complying with the manner of sale, public, volume limitation or notice provisions of Rule 144.

Rule 144 defines "affiliate" as a person that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with another party.

Neither the Debtors' filing of these Chapter 11 Cases nor the approval of the Plan has affected or will affect the holding period, for purposes of Rule 144, of Common Stock purchased prior to the approval of the Plan. However, persons needing to rely on the notice, manner of sale and volume restrictions of Rule 144 to effect a sale may not do so if, as it is contemplating doing, Reorganized Foamex International files a Form 15 suspending its requirement to file Exchange Act reports and therefore must sell pursuant to Rule 144(k), another available exemption from registration or an effective registration statement.

C.    **Subsequent Transfers of Securities -- State Laws**

State securities laws generally provide registration exemptions for subsequent transfers by a bona-fide owner for its own account and subsequent transfers to

institutional or accredited investors. Such exemptions are generally expected to be available for subsequent transfers of Additional Common Stock.

### D. Registration Rights

Reorganized Foamex International and the Significant Equityholders shall enter into the Registration Rights Agreement whereby each of the Significant Equityholders will receive demand and piggyback registration rights with respect to the resale of shares of Additional Common Stock issued to the Significant Equityholders under the exercise of rights by the Significant Equityholders in the Rights Offering and the purchase of Additional Common Stock under the Call Option, if exercised. The Registration Rights Agreement would entitle the Significant Equityholders to make two demands for registration of all or part of the holders' common stock that is subject to the Registration Rights Agreement, subject to certain conditions and exceptions. In addition, the piggyback registration rights will provide that, subject to certain conditions and exceptions, if Reorganized Foamex International proposes to file a registration statement under the Securities Act with respect to an offering of equity securities on a form that would permit registration of shares of the common stock that is subject to the Registration Rights Agreement, then Reorganized Foamex International will offer the Significant Equityholders the opportunity to register all or part of such shares on the terms and conditions set forth in the Registration Rights Agreement. The Significant Equityholders will also have unlimited rights to register the common stock that is subject to the Registration Rights Agreement on Form S-3, if and when Reorganized Foamex International qualifies to use such Form. Under the Registration Rights Agreement, Reorganized Foamex International will pay all fees and expenses for any demand registration, including the reasonable fees and expenses of counsel for the Significant Equityholders and the Significant Equityholders will pay for their respective internal costs and expenses related to any piggyback registration in which they participate.

FOAMEX INTERNATIONAL DOES NOT PRESENTLY INTEND TO SUBMIT ANY NO-ACTION OR INTERPRETATIVE REQUESTS TO THE SEC WITH RESPECT TO ANY SECURITIES LAWS MATTERS DISCUSSED HEREIN.

Following the Effective Date, the Common Stock will not be traded on any stock exchange or other national quotation system and the Debtors may take steps to deregister their securities under the Exchange Act. If such deregistration takes place, the Debtors will no longer be obligated to file annual, quarterly or current reports under the Exchange Act.

# XIV.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

> **IRS Circular 230 disclosure**: **To ensure compliance with requirements imposed by the IRS, you are hereby notified that: (a) any discussion of U.S. federal tax issues in this document is not intended or written by us to be relied upon, and cannot be relied upon by holders of Claims or Equity Interests ("Holders"), for the purpose of avoiding penalties that may be imposed on such Holders under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) each Holder should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of the anticipated material federal income tax consequences of the implementation of the Plan to the Debtors, Creditors and Equityholders.

### A.    Scope of This Summary

This summary is based on the Tax Code, final and temporary Treasury Regulations promulgated thereunder, administrative pronouncements or practices, and judicial decisions, all as of the date hereof. Future legislative, judicial, or administrative modifications, revocations, or interpretations, which may or may not be retroactive, may result in federal income tax consequences significantly different from those discussed herein. This summary is not binding on the IRS or the U.S. courts, and no assurance can be given that the conclusions reached in this summary will not be challenged by the IRS or will be sustained by a U.S. court if so challenged. In addition, the Debtors have not requested, and do not intend to request, a ruling from the IRS regarding any of the federal income tax consequences of the implementation of the Plan to the Debtors, Creditors or Equityholders. The Debtors have, however, requested rulings from the IRS regarding certain purchases of stock of Foamex International by Morgan Stanley and Par IV Capital because the federal income tax treatment of these purchases will affect the availability of NOLs to the Reorganized Debtors as deductions after the Effective Date.

This summary does not address the federal income tax consequences to certain Creditors, including holders of (a) Administrative Expense Claims, (b) Professional Fees Claims, (c) Priority Tax Claims, and (d) Unliquidated Claims. In addition, this summary does not address the federal income tax consequences to certain categories of Creditors and Equityholders subject to special rules, including Creditors and Equityholders that are (a) banks, financial institutions, or insurance companies, (b) real estate investment trusts, cooperatives, regulated investment companies, mutual funds, or small business investment companies, (c) brokers or dealers in securities, (d) tax-exempt organizations, (e) investors in pass-through entities and such entities themselves, and (f) foreign taxpayers. Furthermore, this summary is limited to U.S. federal income tax consequences and does not discuss state, local or foreign tax consequences.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential federal income tax

-99-

consequences that may apply to the Debtors, Creditors, and Equityholders as a result of the implementation of the Plan. In addition, this summary does not take into account the individual facts and circumstances of any particular Creditor or Equityholders that may affect the federal income tax consequences to such Creditor or Equityholder of the implementation of the Plan. Accordingly, this summary is not intended to be, and should not be construed as, legal or federal income tax advice with respect to any Creditor or Equityholder. Each Creditor or Equityholder should consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

### B. Consequences to the Debtors

It is not expected that the implementation of the Plan will create a federal tax liability or a tax refund for the Debtors. However, as discussed below, uncertainty exists as to the extent to which the NOL carryforward generated by the Debtors prior to the Effective Date will be available to the Reorganized Debtors as deductions after the Effective Date.

### 1. Distributions of Cash in Satisfaction of Claims.

The payment in full of Allowed Claims in cash pursuant to the Plan should not create tax consequences that differ materially from those that would have been obtained had those claims been repaid, absent the Plan, in the ordinary course of the Debtors' business. If, however, a holder of an Allowed Claim were to accept less than full payment in satisfaction of a debt, the Debtors would, for federal income tax purposes, realize COD Income. A debtor in a bankruptcy case generally does not include COD Income in its gross income, but rather must reduce certain tax attributes, such as NOLs, to the extent it has such attributes to reduce, by the amount of COD Income that otherwise would have been recognized. It is not anticipated, however, that the Debtors will realize COD Income from the implementation of the Plan.

### 2. Issuance of Rights and Additional Common Stock.

In general, for federal income tax purposes, a corporation does not recognize gain or loss on the receipt of cash or other property in exchange for its own stock. Therefore, the issuance of Rights and shares of Additional Common Stock in a public or private offering, pursuant to the Plan, should not be a taxable event for Foamex International. Similarly, the receipt of borrowed funds by a debt issuer is not income for federal income tax purposes, so that the Reorganized Debtors' receipt of funds under the Exit Facilities pursuant to the Plan should not be a taxable event for the Reorganized Debtors.

### 3. NOL Carryforward.

The Debtors have reported substantial losses for federal income tax purposes, and in the case of the affiliated group of which Foamex International is the common parent, there are substantial NOLs that are available to be carried forward to future taxable years. Section 382 of the Tax Code, however, limits a corporation's utilization of an NOL following a Section 382 Ownership Change. While the Debtors

believe that Foamex International has not undergone any Section 382 Ownership Change since June 7, 2001 and will not undergo a Section 382 Ownership Change prior to the implementation of the Plan, such determination is not free from doubt. The Debtors have requested rulings from the IRS confirming that (1) certain purchases of the stock of Foamex International by Morgan Stanley on or about May 3, 2006, that would likely have caused a Section 382 Ownership Change, are to be disregarded because they were determined to be void *ab initio* by the MS Stipulation approved and ordered by the Bankruptcy Court and (2) certain purchases of the stock of Foamex International reported in SEC filings on Schedule 13G by Par IV Capital, in its capacity as an investment advisor to, and a manager of, two funds, each of which separately owned approximately 3.4 percent of Foamex common stock, did not cause Par IV Capital or the two funds it advised to be treated as a single 5-percent shareholder for purposes of section 382.  If Foamex International were to be treated as having undergone a Section 382 Ownership Change because of the purchases by Morgan Stanley or Par IV Capital, however, the Debtors' ability to utilize their NOLs generated before such ownership change would be severely impaired.  Furthermore, because the rules under section 382 are highly complex, the Debtors cannot give assurance that another transaction will not trigger a Section 382 Ownership Change prior to the implementation of the Plan.  While the Debtors expect that consummation of the Rights Offering will result in a Section 382 Ownership Change, because such ownership change will be pursuant to the Plan, certain more favorable rules will be applicable and the Debtors' ability to use their NOLs will not be significantly affected.

       *Section 382 Limitation on NOLs.*  In general, if a taxpayer's deductions in a given year exceed taxable income for the year, the taxpayer may carry the excess (an NOL) back to the two previous taxable years and forward to the next 20 taxable years.  If the taxpayer paid income taxes in a carryback year, it may be entitled to a refund of those taxes.  An NOL carryforward, on the other hand, will generally reduce or eliminate the taxes payable in one or more carryforward years.  Section 382 of the Tax Code, however, limits a corporate taxpayer's utilization of an NOL following a Section 382 Ownership Change.  A Section 382 Ownership Change occurs when the percentage of stock (determined on the basis of value) owned by one or more holders of at least 5 percent of such stock increases by more than 50 percentage points (in relationship to the corporation's total stock considered to be outstanding for this purpose) from the lowest percentage of stock that was owned by such 5-percent shareholders at any time during the applicable "testing period."  The testing period is ordinarily the shorter of (i) the three-year period preceding the date of testing or (ii) the period of time since the most recent ownership change of the corporation.  In general, for purposes of determining stock ownership under section 382 of the Tax Code, stock owned by an entity is deemed owned proportionately by its owners and, with certain exceptions, all persons holding less than 5 percent of the value of the corporation's stock are treated as a single 5-percent shareholder.  When the limitation under section 382 (the "Section 382 Limitation") applies, the corporate taxpayer can only offset taxable income in taxable years following the Section 382 Ownership Change with pre-change NOLs by an amount generally equal to the product of (i) the applicable federal long-term exempt rate in effect on the date of the ownership change and (ii) the value of the taxpayer's equity immediately prior to the

change (the "annual limitation").  Any unused annual limitation may be carried forward to increase the amount of income that may be offset by the NOL in subsequent years.

     *Effects of the Implementation of the Plan on the Debtors' NOLs.*  As discussed above, the Debtors are not expected to realize COD Income from the implementation of the Plan, and therefore, substantially all of the NOLs should remain intact after the implementation of the Plan.  Section 382(l)(5) of the Tax Code provides that the Section 382 Limitation does not apply to a corporation if (a) the corporation is under court's jurisdiction in bankruptcy immediately before the ownership change and (2) shareholders and certain creditors, who will receive stock of the corporation in full or partial satisfaction of certain qualified indebtedness, as a result of being shareholders or creditors immediately before the ownership change, will own at least 50 percent of the stock of the corporation after the ownership change. The Debtors, however, do not expect to qualify for the bankruptcy exception under section 382(l)(5) of the Tax Code and, consequently, expect to undergo a Section 382 Ownership Change as a result of the implementation of the Plan.  The NOL carryforward of the Debtors will therefore be subject to the Section 382 Limitation.  Section 382(l)(6) of the Tax Code and the Treasury Regulations promulgated thereunder, however, provide that, in the case of a Section 382 Ownership Change occurring pursuant to a chapter 11 plan of reorganization to which section 382(l)(5) does not apply, the value of the debtor's stock for the purpose of computing the Section 382 Limitation is generally equal to the lesser of (i) the aggregate value of the debtor's stock immediately after the ownership change and (ii) the value of the debtor's assets immediately before the ownership change (determined without regard to the debtor's liabilities).  Accordingly, a debtor's Section 382 Limitation under section 382(l)(6) of the Tax Code generally will reflect the increase in the value of the debtor's stock resulting from the infusion of new equity capital or the exchange of debt for equity pursuant to the chapter 11 plan of reorganization.  In the case of Foamex International, the application of section 382(l)(6) will permit the equity amount that will be invested in Foamex International stock pursuant to the Rights Offering and the Put and/or Call Options to be taken into account in calculating the Section 382 Limitation. Foamex International therefore expects that the Section 382 Limitation resulting from the Section 382 Ownership Change occurring pursuant to the Plan will not have a significant impact on its ability to utilize its NOLs.

     *The Morgan Stanley Purchases and the Debtors' NOLs.* Although the implementation of the Plan is not expected to reduce, or significantly limit the utilization of, the NOLs, the NOL carryforward available to the Reorganized Debtors may be severely limited under section 382 of the Tax Code if certain purchases of the stock of Foamex International by Morgan Stanley on or about May 3, 2006 were to be treated as having triggered a Section 382 Ownership Change in spite of the MS Stipulation (discussed above in Article VI.F), providing that such purchases are void *ab initio* under the automatic stay provision of section 362(a)(3) of the Bankruptcy Code.  A Section 382 Ownership Change on that date would not qualify for the benefits of section 382(l)(6) described above and would thus result in a significantly lower annual limitation on Foamex International's use of its NOLs.

As described in Article VI.G, the Debtors' financial performance significantly improved in late 2005 and early 2006, and the Debtors determined in or around April 2006 that the amount of COD Income might not exhaust their NOL carryforward and thus their NOLs were valuable assets of their bankruptcy estate that should be protected. Accordingly, on April 20, 2006, the Debtors filed the Trading Motion, requesting an order that would establish notification and hearing procedures for trading in the equity securities of Foamex International, and on May 3, 2006, the Bankruptcy Court entered the Trading Order.

On May 4, 2006, the day after the Trading Order was entered, Morgan Stanley notified the Debtors that, as a result of its acquisition of Foamex International common shares in open-market purchases between April 20, 2006 and May 3, 2006, it allegedly had become an owner of more than 5 percent of Foamex International's outstanding common shares. Because other owner shifts that amounted to more than 45 percent had occurred by May 3, 2006, taking into account this 5-percent owner shift along with the previous owner shifts during the applicable Section 382 three-year testing period, the Debtors determined that Foamex International would likely have experienced a Section 382 Ownership Change if Morgan Stanley was treated as a 5-percent shareholder.

Following receipt of Morgan Stanley's notification, the Debtors immediately took action to void Morgan Stanley's acquisition of the Foamex International stock that caused Morgan Stanley to become a 5 percent owner. As a result, on May 11, 2006, the Debtors and Morgan Stanley entered into the MS Stipulation, which was approved and ordered by the Bankruptcy Court the next day. The MS Stipulation provided that each purchase of the Excess Shares by Morgan Stanley that increased its Common Stock holdings above approximately 4.9 percent of the Foamex International Common Stock outstanding, was void *ab initio*. On May 15, 2006, as required by the MS Stipulation, Morgan Stanley sold the Excess Shares for an amount in excess of Morgan Stanley's cost to originally acquire the shares, and Morgan Stanley contributed the excess proceeds associated with the sale to a qualified charitable organization selected by Foamex International.

If the MS Stipulation is deemed effective for federal income tax purposes, Morgan Stanley would not be treated as having ever been a 5-percent shareholder during the applicable "testing period", and the Debtors believe that no Section 382 Ownership Change will have occurred before the Effective Date. The Debtors intend to take the position that the MS Stipulation was effective, the purchase of the Excess Shares by Morgan Stanley was void *ab initio*, and no Section 382 Ownership took place on or about May 3, 2006 as a result of the purchases by Morgan Stanley. Foamex International has requested a ruling from the National Office of the IRS confirming that this position is correct.

*Other Risks of a Section 382 Ownership Change.* As described above in Article VI.G, Par IV Capital filed a Schedule 13-G for the period ending on May 1, 2006, on which it reported beneficially owning, for SEC reporting purposes, greater than 5 percent of the Foamex International common stock. Par IV Capital reported its purchase

of Foamex International common stock in its capacity as an investment advisor to, and a manager of, two funds, Par IV Fund and Sunrise, each of which, in a separate account, owns the approximately 3.4 percent of the common stock of Foamex International outstanding at the time the Trading Order was entered.. Because none of Par IV Entities is an economic owner of Foamex International common stock and Foamex International believes that Par IV Fund and Sunrise should not be treated together as a single entity for federal income tax purposes, Foamex believes that the purchases of Foamex International common stock by Par IV Capital did not result in a Section 382 Ownership Change. Foamex International has also requested a ruling from the National Office of the IRS confirming that this position is correct.

However, because the rules under section 382 are highly complex, Foamex cannot give assurance that another transaction will not trigger a Section 382 Ownership Change prior to the implementation of the Plan.

4.    **Alternative Minimum Tax**

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20-percent rate to the extent that AMT exceeds the corporation's regular federal income tax for the taxable year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, a corporation generally is entitled to offset no more than 90 percent of its AMTI with NOL carrybacks and carryforwards (as recomputed for AMT purposes). Accordingly, the Debtors' use of their NOLs in both carryback and carryforward years may be subject to limitations for AMT purposes in addition to any other limitations that may apply. Any AMT that the Debtors pay generally will be allowed as a nonrefundable credit against their regular federal income tax liability in future taxable years when they are no longer subject to AMT.

C.    **Consequences to Equityholders**

1.    **Holders of the Preferred Equity Interests.**

The Preferred Equity Interests in Foamex International to the extent outstanding will be deemed converted into Existing Common Stock and holders of the Preferred Equity Interests will be treated as holders of Existing Common Stock under the Plan. The conversion of Preferred Equity Interests into Existing Common Stock will not be a taxable transaction.

2.    **Holders of the Existing Common Stock.**

(a)    Receipt of Subscription Rights

A holder of Existing Common Stock will generally not recognize income on the receipt of subscription rights in the Rights Offering. Assuming that the receipt of subscription rights in the Rights Offering is not taxable, the holder's tax basis in the rights will depend on the relative fair market value of the rights and the Existing

Common Stock at the time the rights are distributed.  If the rights have a fair market value equal to at least 15 percent of the fair market value of the Existing Common Stock, each holder must allocate its tax basis in its Existing Common Stock between the Existing Common Stock and the rights in proportion to their fair market values.  If the subscription rights have a fair market value that is less than 15 percent of the fair market value of the Existing Common Stock, each holder's tax basis in the rights will be zero unless the holder elects to allocate its tax basis in its Existing Common Stock in the manner described in the previous sentence.  A holder makes this election by attaching a statement in its tax return for the year in which the subscription rights are received.  The election, once made, is irrevocable.  A holder making this election must retain a copy of the election and the tax return with which it was filed to substantiate the gain or loss recognized on any later sale of Additional Common Stock received on exercise of a subscription rights.  The holding period for the subscription rights received in the Rights Offering will include the holder's holding period for the Existing Common Stock with respect to which the subscription rights are received.

(b)     Exercise of Subscription Rights

A holder of Existing Common Stock will not recognize gain or loss on exercise of a subscription right received in the Rights Offering.  The holder's tax basis in the Additional Common Stock acquired through exercise of a right will equal the sum of the exercise price for the Right, and the holder's tax basis, if any, in the right determined as described under "Receipt of Subscription Rights" above.  The holding period for the Additional Common Stock acquired through exercise of a right will begin on the exercise date.

(c)     Expiration of Subscription Rights

A holder that allows a subscription right to expire will not recognize gain or loss, and any tax basis allocated to the subscription right will be re-allocated to the holder's Existing Common Stock.

**D.     Consequences to Creditors**

Pursuant to the Plan, holders of Allowed Claims will receive Cash in full satisfaction and discharge of their Allowed Claims or otherwise have their Allowed Claims Distributed.  Any creditor whose claim is reinstated will be subject to the same tax treatment in the year in which payment is received.

1.     **Distributions of Cash in Satisfaction of Claims.**

In general, each Creditor will recognize gain or loss in an amount equal to the difference between (a) the amount of any cash received by such Creditor in satisfaction of such Claim (other than any Claim for accrued but unpaid interest, inclusive of Post-Petition Interest) and (b) the Creditor's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest).  Where gain or loss is recognized by a Creditor, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax

status of the Creditor, whether the Claim constitutes a capital asset in the hands of the Creditor and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the Creditor had previously claimed a bad debt deduction.

To the extent that any amount received by a Creditor is received in satisfaction of accrued interest or accrued original issue discount ("OID") during its holding period (including Post-Petition Interest), such amount will be taxable to the Creditor as interest income (to the extent not previously included in the Creditor's gross income) regardless of whether the creditor otherwise recognizes a loss as a result of the overall transaction.

## 2. Market Discount

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the satisfaction of its Claim (subject to *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of payment.

## E. Information Reporting; Backup Withholding Tax

Distributions made pursuant to the Plan will generally be subject to applicable federal income tax information reporting and withholding. The Tax Code imposes backup withholding tax, currently at the rate of 28 percent, on certain payments, including payments of interest, if a taxpayer (a) fails to furnish its correct taxpayer identification number (generally on Form W-9), (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has previously failed to report properly items subject to backup withholding tax, or (d) fails to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such taxpayer that it is subject to backup withholding tax. However, taxpayers that are corporations generally are excluded from these information reporting and backup withholding tax rules. Backup withholding is not an additional federal income tax. Any amounts withheld under the backup withholding tax rules will be allowed as a credit against a taxpayer's federal income tax liability, if any, or will be refunded to the extent it exceeds such liability, if such taxpayer furnishes required information to the IRS. A taxpayer that does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS. Each taxpayer should consult its own tax advisor regarding the information reporting and backup withholding tax rules.

The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax advisor. The above discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on individual circumstances of a particular Creditor or Equityholder.

-106-

Accordingly, each Creditor or Equityholder is urged to consult with its own tax advisor about federal, state, local and foreign tax consequences of the plan.

Doc #:NY7:283581.7

# XV.

## CONCLUSION

The Debtors believe the Plan is in the best interests of all Creditors and Equityholders and urge those entitled to vote to accept the Plan.

Dated: October 23, 2006

**FOAMEX INTERNATIONAL INC.**

By:     /s/ Gregory J. Christian
Name: Gregory J. Christian
Title:  Executive Vice President, Chief
        Administrative Officer, Chief
        Restructuring Officer and General
        Counsel

**FMXI, INC.**

By:     /s/ Gregory J. Christian
Name: Gregory J. Christian
Title:  Vice President, Chief Restructuring
        Officer and Secretary

**FOAMEX L.P.**

**By:  FMXI, INC.**
**Foamex L.P.'s Managing General Partner**
By:     /s/ Gregory J. Christian
Name:  Gregory J. Christian
Title:   Vice President, Chief Restructuring
         Officer and Secretary

Doc #:NY7:283581.7

**FOAMEX CAPITAL CORPORATION**

By: \_\_\_\_/s/ Gregory J. Christian_____
Name: Gregory J. Christian
Title   Vice President, Chief Restructuring
        Officer and Secretary


**FOAMEX CARPET CUSHION LLC**

By: \_\_\_\_/s/ Gregory J. Christian_____
Name: Gregory J. Christian
Title:   Vice President, Chief Restructuring
        Officer and Secretary


**FOAMEX ASIA, INC.**

By: \_\_\_\_/s/ Gregory J. Christian_____
Name: Gregory J. Christian
Title:   Vice President, Chief Restructuring
        Officer and Secretary


**FOAMEX LATIN AMERICA, INC.**

By: \_\_\_\_/s/ Gregory J. Christian_____
Name: Gregory J. Christian
Title:   Vice President, Chief Restructuring
        Officer and Secretary


**FOAMEX MEXICO, INC.**

By: \_\_\_\_/s/ Gregory J. Christian_____
Name: Gregory J. Christian
Title:   Vice President, Chief Restructuring
        Officer and Secretary

Doc #:NY7:283581.7

**FOAMEX MEXICO II, INC.**

By:     /s/ Gregory J. Christian
Name:  Gregory J. Christian
Title:    Vice President, Chief Restructuring
           Officer and Secretary

Doc #:NY7:283581.7

# EXHIBITS

- **Exhibit A** - The Plan

- **Exhibit B** – The Disclosure Statement Order

- **Exhibit C** - Foamex's Projected Financial Information

- **Exhibit D** - Exit Facility Commitment Letter and related term sheets

Doc #:NY7:283581.7

Doc #:NY7:283581.7