# Exhibit A

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.,* | ) | Case No. 05-12685 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Brian S. Hermann
Justin G. Brass
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
        October 23, 2006

**TABLE OF CONTENTS**

Page

I. DEFINITIONS AND CONSTRUCTION OF TERMS ................................................1
    A.      Definitions. .............................................................................1
    B.      Interpretation, Application of Definitions and Rules of
            Construction. .........................................................................21

II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .............................21
    A.      Introduction. ..........................................................................21

III. TREATMENT OF ADMINISTRATIVE CLAIMS  AND PRIORITY TAX
       CLAIMS ...............................................................................................23
    A.      Administrative Claims. ...........................................................23
    B.      Bar Date for Administrative Claims. ........................................23
    C.      Fee Claims. ...........................................................................24
    D.      Substantial Contribution Claims. .............................................24
    E.      Priority Tax Claims. ...............................................................24
    F.      DIP Financing Claims. ...........................................................25

IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS ...................................25
    A.      Class 1 — Other Priority Claims. .............................................25
    B.      Class 2 — Other Secured Claims. ............................................26
    C.      Class 3 — Senior Secured Note Claims. ....................................26
    D.      Class 4 — Senior Subordinated Note Claims. ............................27
    E.      Class 5 — General Unsecured Claims. ......................................27
    F.      Class 6 — Unliquidated Claims. ..............................................28
    G.      Class 7 —Intercompany Claims. ..............................................28
    H.      Class 8 — Equity Interests in Surviving Debtor Subsidiaries. .................28
    I.      Class 9 —Existing Preferred Stock. .........................................29
    J.      Class 10 — Existing Common Stock. .......................................29
    K.      Class 11 — Other Common Equity Interests In Foamex
            International. .........................................................................29

V. PROVISIONS REGARDING VOTING, DISTRIBUTIONS, AND
       TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED
       ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY
       INTERESTS ..........................................................................................30
    A.      Voting on Plan. ......................................................................30
    B.      Distributions. .........................................................................30
    C.      Objections to and Resolution of Claims. ..................................31
    D.      Procedure for Resolution of Post-Petition Interest Disputes. ...................32
    E.      Estimation. ............................................................................33
    F.      Administrative Claims of Indenture Trustees. ...........................33
    G.      Cancellation and Surrender of Existing Securities and Agreements. .........34
    H.      Nonconsensual Confirmation. .................................................34

Doc #:NY7:279598.8

VI. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS ....................................34

VII. PROVISIONS REGARDING IMPLEMENTATION OF PLAN ...........................35
    A.    Exit Facilities. ....................................................................................35
    B.    Rights Offering.....................................................................................35
    C.    Put Option............................................................................................36
    D.    Call Option...........................................................................................36
    E.    Use of Rights Offering Proceeds.........................................................36
    F.    Securities to be Issued Pursuant to the Plan........................................37
    G.    Filing of Form 15. ...............................................................................37
    H.    Registration Rights Agreement. ..........................................................38
    I.    Corporate Governance and Management of the Reorganized
        Debtors.................................................................................................39
    J.    Reorganized Debtors' Management Incentive Plan..............................40
    K.    KERP. ..................................................................................................41
    L.    Powers of Officers...............................................................................41
    M.    Corporate Reorganization. ..................................................................41

VIII. EFFECT OF CONFIRMATION OF THE PLAN...........................................41
    A.    Continued Corporate Existence............................................................41
    B.    Dissolution of Creditors' Committee ...................................................42
    C.    Vesting of Property...............................................................................42
    D.    Termination of Subordination Rights...................................................42
    E.    Discharge of the Debtors. ....................................................................43
    F.    Injunction. ...........................................................................................43
    G.    Preservation of Causes of Action. .......................................................43
    H.    Votes Solicited in Good Faith..............................................................44
    I.    Administrative Claims Incurred After the Confirmation Date. ................44
    J.    Mutual Releases. ..................................................................................44
    K.    Releases by non-Debtors. ....................................................................45
    L.    Exculpation. .........................................................................................46
    M.    Term of Bankruptcy Injunction or Stays. ............................................46
    N.    Reinstatement and Continuation of Insurance Policies. ...........................47
    O.    Officers' and Directors' Indemnification Rights and Insurance. ..............47

IX. RETENTION OF JURISDICTION .......................................................................47

X. MISCELLANEOUS PROVISIONS...........................................................................48
    A.    Payment of Statutory Fees. ..................................................................48
    B.    Modification of the Plan. .....................................................................48
    C.    Governing Law.....................................................................................49
    D.    Filing or Execution of Additional Documents......................................49
    E.    Withholding and Reporting Requirements. ...........................................49
    F.    Exemption From Transfer Taxes...........................................................49
    G.    Securities Issues. ..................................................................................50
    H.    Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil
        Procedure 62(a). ..................................................................................50

I.      Exhibits/Schedules. ...........................................................................50
J.      Notices. ...............................................................................................50
K.     Plan Supplement..................................................................................51
L.      Conflict. ...............................................................................................52
M.    Setoff by the United States. ................................................................52

XI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................52
A.     Assumption and Rejection of Executory Contracts and Unexpired
Leases. ................................................................................................52
B.     Cure. ....................................................................................................53
C.     Rejection Damage Claims....................................................................53

XII. BENEFIT PLANS.............................................................................................53

XIII. CONFIRMATION AND EFFECTIVENESS OF THE PLAN..............................54
A.     Conditions Precedent to Confirmation. ................................................54
B.     Conditions Precedent to Effectiveness. ...............................................55
C.     Waiver of Conditions...........................................................................56
D.     Effect of Failure of Conditions. ...........................................................56
E.     Vacatur of Confirmation Order. ...........................................................56
F.     Revocation, Withdrawal, or Non-Consummation...................................57

Foamex International Inc. ("Foamex International" or the "Company"), Foamex L.P., Foamex Latin America, Inc., Foamex Asia, Inc., FMXI, Inc., Foamex Carpet Cushion LLC, Foamex Capital Corporation, Foamex Mexico, Inc. and Foamex Mexico II, Inc., the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby propose the following first amended joint plan of reorganization under section 1121(a) of the Bankruptcy Code.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, results of operations, and projections for future operations and risk factors, together with a summary and analysis of this Plan. All Interest holders entitled to vote on this Plan are encouraged to consult the Disclosure Statement and to read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

## I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.  Definitions.

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

| | |
|---|---|
| ***2005 Indenture Trustee*** | means The Bank of New York and any successor thereto. |
| ***2005 Senior Subordinated Notes*** | means the 13½% Senior Subordinated Notes due 2005 issued pursuant to the 2005 Senior Subordinated Notes Indenture. |
| ***2005 Senior Subordinated Notes Claims*** | means all Claims arising from the 2005 Senior Subordinated Notes Indenture on account of the 2005 Senior Subordinated Notes. |
| ***2005 Senior Subordinated Notes Indenture*** | means the Indenture (as amended, supplemented, restated or otherwise modified), dated as of December 23, 1997, by and among Foamex L.P., Foamex Capital Corporation, General Felt Industries, Inc., Foamex Fibers, Inc., Foamex LLC, Crain Holdings Corp. and The Bank of New York, as Trustee. |
| ***2007 Indenture Trustee*** | means The Bank of New York and any successor thereto. |

| | |
|---|---|
| ***2007 Senior Subordinated Notes*** | means the 9⅞% Senior Subordinated Notes due 2007 issued pursuant to the 2007 Senior Subordinated Notes Indenture. |
| ***2007 Senior Subordinated Notes Claims*** | means all Claims arising from the 2007 Senior Subordinated Notes Indenture on account of the 2007 Senior Subordinated Notes. |
| ***2007 Senior Subordinated Notes Indenture*** | means the Indenture (as amended, supplemented, restated or otherwise modified), dated as of June 12, 1997, by and among Foamex L.P., Foamex Capital Corporation, General Felt Industries, Inc., Foamex Fibers, Inc. and The Bank of New York, as Trustee. |
| ***Additional Common Stock*** | means the common stock in Reorganized Foamex International to be issued on or after the Effective Date as provided for in Article VII.F.2 of the Plan, it being understood that any Additional Common Stock to be issued to Equityholders under the Rights Offering or to the Significant Equityholders pursuant to the Call Option, if exercised, shall be issued on the Effective Date. |
| ***Additional Common Stock Purchase Price*** | means $2.25 per share. |
| ***Ad Hoc Committee of Senior Secured Noteholders*** | means the informal committee comprised of one or more holders of Senior Secured Notes and the Senior Secured Indenture Trustee, as constituted from time to time. |
| ***Administrative Claim*** | means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, any Substantial Contribution Claims, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all valid and existing reclamation claims, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates under section 1930 of |

2

title 28 of the United States Code.

***Administrative Claims Bar Date***   means [December] __, 2006.

***Allowed***   means, with reference to any Claim, (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under this Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any Unliquidated Claim or (y) interest, penalties or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in this Plan.

***Amended and Restated By-Laws***   means the Amended and Restated By-Laws of Reorganized Foamex International, which shall be in substantially the form contained in the Plan Supplement.

***Amended and Restated Certificate of Incorporation***   means the Second Amended and Restated Certificate of Incorporation of Reorganized Foamex International, which shall be in substantially the form contained in the Plan Supplement.

***Ballots***   means the ballots distributed with the Disclosure Statement to those that are entitled to vote on the Plan upon which is to be indicated, among other things, acceptance or rejection of the Plan.

***Bankruptcy Code***   means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date or as otherwise applicable to these Chapter 11 Cases.

***Bankruptcy Rules***   means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require, as in effect on the Petition Date or as otherwise applicable to

these Chapter 11 Cases.

| | |
|---|---|
| **Bar Date** | means (i) with respect to all Claims other than Administrative Claims, the applicable deadline established pursuant to the Bar Date Order or such other deadline as has been granted by order of the Court with respect to one or more holders of Claims, by which proofs of Claim of the type described in such order must be filed in the Chapter 11 Cases and (ii) with respect to Administrative Claims, the Administrative Claims Bar Date. |
| **Bar Date Order** | means that certain order, entered by the Court on October 18, 2005 [Docket No. 199], establishing the Bar Date with respect to the Claims described therein, which do not include Administrative Claims. |
| **Business Day** | means any day not designated as a legal holiday by Bankruptcy Rule 9006(a) and any day on which commercial banks are open for business, and not authorized, by law or executive order, to close, in the City of New York, New York. |
| **Call Option** | means a call option to be issued by the Company to the Significant Equityholders pursuant to this Plan which, subject to the terms and conditions of the Call Option Agreement and the payment by the Significant Equityholders to the Company of the Call Option Premium, will permit the Significant Equityholders to purchase on the Effective Date at a per share price equal to the Additional Common Stock Purchase Price, all remaining shares of Additional Common Stock not otherwise subscribed and paid for by the Equityholders pursuant to the Rights Offering as of the Expiration Time, up to a maximum aggregate purchase price equal to the Rights Offering Amount less the aggregate amount of proceeds received by Foamex International as a result of the exercise of Rights, which Additional Common Stock shall be issued to the Significant Equityholders on the Effective Date. |
| **Call Option Agreement** | means the call option agreement among the Company and each of the Significant Equityholders which shall be in substantially the form contained in the Plan Supplement and shall be executed on or before the Confirmation Date. |
| **Call Option Premium** | means $2,000,000.00 in Cash. |

Doc #:NY7:279598.8

| | |
|---|---|
| ***Cash*** | means cash and cash equivalents denominated in legal tender of the United States of America. |
| ***Causes of Action*** | means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, now owned or hereafter acquired by the Debtors, and the Cash and non-Cash proceeds thereof, whether arising under the Bankruptcy Code or other federal, state or foreign law, equity or otherwise, including, without limitation, any causes of action arising under sections 510, 544, 547, 548, 549, 550, 551 or any other section of the Bankruptcy Code. |
| ***Chapter 11 Cases*** | means the chapter 11 cases commenced by the Debtors. |
| ***Claim*** | means any claim, as such term is defined in section 101(5) of the Bankruptcy Code. |
| ***Claims Objection Deadline*** | means, except with respect to Fee Claims and Substantial Contribution Claims, the last day for filing objections to Claims and Administrative Claims, which day shall be one hundred-twenty (120) days after the Effective Date or such later date as the Court may order. |
| ***Class*** | means each category or group of Claims or Equity Interests as classified or designated in Article II of this Plan. |
| ***Collateral*** | means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law. |
| ***Confirmation*** | means "confirmation" as used in section 1129 of the Bankruptcy Code. |
| ***Confirmation Date*** | means the date on which the Confirmation Order is entered on the Court's docket. |
| ***Confirmation Hearing*** | means the hearing to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, as it |

Doc #:NY7:279598.8

may be adjourned or continued from time to time.

**Confirmation Order**     means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**Court**     means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, or any other court having jurisdiction over the Chapter 11 Cases.

**Creditor**     means "creditor" as defined in section 101(10) of the Bankruptcy Code.

**Creditors' Committee**     means the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 Cases on September 29, 2005, by the United States Trustee for the District of Delaware, pursuant to section 1102(a) of the Bankruptcy Code, as constituted from time to time.

**Debtors**     has the meaning set forth in the introductory paragraph of the Plan.

**Debtors in Possession**     means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**DIP Agents**     means the DIP Revolving Credit Agent and the DIP Term Loan Agent.

**DIP Credit Facilities**     means the DIP Revolving Credit Facility and the DIP Term Loan Credit Facility.

**DIP Financing Claims**     means all Claims arising under or relating to the DIP Credit Facilities and all agreements and instruments relating thereto.

**DIP Lenders**     means the Lenders that are parties to the DIP Credit Facilities.

**DIP Motion**     means the Debtors' Motion for an Order Pursuant to Sections 361, 363, 364 of the Bankruptcy Code (1) Authorizing the Debtors to Obtain Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Authorizing Repayment of Certain Prepetition Secured Debt, (4) Granting Liens and Super-Priority Administrative Expense Status, (5) Providing Adequate Protection and (6) Scheduling and Approving the Form and Method of Notice of Final Hearing [Docket No. 15],

dated September 19, 2005.

| | |
|---|---|
| ***DIP Order*** | means the Final Order entered by the Court on October 18, 2005 [Docket No. 197], granting final approval of the DIP Motion, as amended or otherwise modified. |
| ***DIP Revolving Credit Agent*** | means Bank of America, N.A., in its capacity as administrative agent under the DIP Revolving Credit Facility. |
| ***DIP Revolving Credit Facility*** | means that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified), dated as of September 22, 2005, by and among Foamex L.P., the Guarantors (as defined therein), the Lenders, the DIP Revolving Credit Agent, Banc of America Securities LLC, as Sole Lead Arranger, and Banc of America Securities LLC, as Sole Book Manager. |
| ***DIP Term Loan Agent*** | means Silver Point Finance, LLC, in its capacity as administrative agent under the DIP Term Loan Credit Facility. |
| ***DIP Term Loan Credit Facility*** | means that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified), dated as of September 22, 2005, by and among Foamex L.P., the Guarantors (as defined therein), the Lenders and the DIP Term Loan Agent. |
| ***Disclosure Statement*** | means the First Amended Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code and all Schedules and Exhibits attached thereto that relate to this Plan, as approved by the Court on November [__], 2006, pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such Disclosure Statement may be amended, modified or supplemented from time to time. |
| ***Disputed Claim*** | means in reference to any Claim or Administrative Claim, any portion of a Claim or Administrative Claim, that is not an Allowed Claim. Without limiting the foregoing, for purposes of this Plan, a Claim shall be a Disputed Claim: |

(i)     if no proof of Claim or request for payment of an Administrative Claim has been filed by the applicable Bar Date: (a) a Claim that has been or

hereafter is listed on the Schedules as disputed, contingent or unliquidated; (b) a Claim that is an Unliquidated Claim or otherwise asserts an unliquidated amount; or (c) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with this Plan, the Bankruptcy Code and the Bankruptcy Rules by the Claims Objection Deadline or, which objection or request for estimation has not been withdrawn or determined by a Final Order; or

(ii)  if a proof of Claim or request for payment of an Administrative Claim has been filed by the applicable Bar Date, (x) a Claim or request for payment of an Administrative Claim for which a timely objection or request for estimation is interposed by the Debtors or any other party in interest in accordance with this Plan, the Bankruptcy Code and the Bankruptcy Rules by the Claims Objection Deadline which objection or request for estimation has not been withdrawn or determined by a Final Order; (y) a Claim that is an Unliquidated Claim or otherwise asserts an unliquidated amount; or (z) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated.

***Distributions***  means the Cash or other distributions to be made pursuant to, and in accordance with, this Plan.

***Effective Date***  means the first Business Day on which all of the conditions specified in Article XIII.B of the Plan have been satisfied or waived in accordance with Article XIII.C of the Plan; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

***Equity Commitment Agreement***  means the agreement, dated as of October 13, 2006, and attached hereto as Exhibit A, among Foamex International and each of the Significant Equityholders.

***Equityholder***  Means a holder, as of the Rights Offering Record Date, of

Existing Common Stock or Existing Preferred Stock.

| | |
|---|---|
| ***Equity Interest or Interest*** | means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any right to acquire any such equity security or instrument, including any option, warrant or other right, contractual or otherwise, to acquire, sell or subscribe for any such security or instrument. |
| ***ERISA*** | has the meaning set forth in Article XII of the Plan. |
| ***Estates*** | means the estates of the Debtors, individually or collectively, as is appropriate in the context, created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code. |
| ***Existing Common Stock*** | means the common stock, par value $0.01 per share, issued by Foamex International Inc. and outstanding immediately prior to the Effective Date. |
| ***Existing Preferred Stock*** | means the outstanding Series B preferred stock, par value $1.00 per share, and having a liquidation preference of $100 per share, issued by Foamex International and outstanding immediately prior to the Effective Date. |
| ***Exit Facilities*** | means the Revolving Credit Exit Facility, the First Lien Term Loan Exit Facility and the Second Lien Term Loan Exit Facility. |
| ***Exit Facilities Agent*** | means the administrative agent for each of the Exit Facilities. |
| ***Exit Facility Commitment Letter*** | means the commitment letter, dated as of October 13, 2006, among the Company, Foamex L.P., Bank of America, N.A., Banc of America Securities LLC, Morgan Stanley Senior Funding, Inc. and Barclays Capital, the investment banking division of Barclays Bank PLC setting forth the terms and conditions of the Exit Facilities. |
| ***Expiration Time*** | Means 5:00 p.m. (prevailing Eastern Time) on the date that the Rights Offering expires. |
| ***Federal Judgment Rate*** | means the rate of interest provided for in 28 U.S.C. § 1961, as in effect on the Petition Date. |

| | |
|---|---|
| ***Fee Claims*** | means an Administrative Claim under sections 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Confirmation Date, including the reasonable non-legal expenses of the individual members of the Creditors' Committee incurred in the discharge of their duties as members of the Creditors' Committee, but excluding any Substantial Contribution Claims and fees and expenses to be paid under the Exit Facility Commitment Letter and the Equity Commitment Agreement, which fees and expenses shall be paid in accordance with the terms of the Exit Facility Commitment Letter and the Equity Commitment Agreement, as applicable. |
| ***Final Order*** | means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending; provided, however, that the possibility that a motion may be filed pursuant to Rules 9023 or 9024 of the Bankruptcy Rules or Rules 59 or 60(b) of the Federal Rules of Civil Procedure shall not mean that an order or judgment is not a Final Order. |
| ***First Lien Term Loan Exit Facility*** | means that certain senior secured first lien term loan exit facility to be entered into with the lender parties thereto, Bank of America, N.A., acting as administrative agent thereof, and Morgan Stanley Senior Funding, Inc. and Barclays Capital, the investment banking division of Barclays Bank PLC, acting as co-syndication agents, for $425 million, and all ancillary agreements, substantially in the forms contained in the Plan Supplement. |
| ***FMXI Conversion Documents*** | means the documents necessary to convert FMXI, Inc. from a Delaware corporation to a Delaware limited liability company, including, without limitation, a limited liability company operating agreement, in substantially the forms contained in the Plan Supplement. |
| ***General Unsecured Claim*** | means an Unsecured Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other |

Doc #:NY7:279598.8

Priority Claim, Senior Subordinated Note Claim, or Unliquidated Claim.

**Government**

has the meaning set forth in Article VIII.L.2 of the Plan.

**Impaired**

has the meaning in section 1124 of the Bankruptcy Code.

**Indenture Trustee Charging Lien**

means a lien that secures repayment of the Indenture Trustees' fees and expenses, to the extent provided for in the Prepetition Indentures.

**Indenture Trustee Expenses**

means any reasonable fees and documented out-of-pocket costs and expenses incurred after the Petition Date and through and including the Initial Distribution Date by the Indenture Trustees under the Prepetition Indentures, the reasonableness of which shall, if disputed by the Debtors, be determined by the Court. Such amounts may include, without limitation, the reasonable, documented, out-of-pocket costs and expenses of, and reasonable, documented unpaid legal fees actually incurred by, counsel to the Indenture Trustees.

**Indenture Trustees**

means, collectively, the Senior Secured Notes Indenture Trustee and the Senior Subordinated Notes Indenture Trustee.

**Initial Distribution Date**

means the Effective Date or as soon thereafter as is practicable.

**Intercompany Claims**

means any Claim held by one Debtor (or a non-debtor that is a direct or indirect subsidiary of a Debtor) against any other Debtor(s), including, without limitation, (a) any account reflecting intercompany book entries by such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor) with respect to any other Debtor(s), (b) any Claim not reflected in book entries that is held by such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor), and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor (or non-debtor that is a direct or indirect subsidiary of such Debtor) against any other Debtor(s).

**KERP**

means the Debtors' Key Employee Retention Program, as described in the KERP Motion and approved pursuant to the KERP Order.

**KERP Motion**

means the Debtors' Motion Pursuant to Sections 363(b)(1) and 105(a) of the Bankruptcy Code for an Order

Approving the Debtors' Key Employee Retention Program and Severance Plan [Docket No. 255], dated October 28, 2005.

**KERP Order**    means the Final Order, entered by the Court on November 17, 2005 [Docket No. 336], approving the KERP Motion.

**Lien**    has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Management Incentive Plan**    means an incentive plan pursuant to which, among other things, the board of directors of Reorganized Foamex International may award to certain members of Reorganized Foamex International's senior management and board of directors after the Effective Date, on such date(s) and in such manner to be determined by the board of directors of Reorganized Foamex International, shares of common stock in Reorganized Foamex International (or options to acquire shares of common stock in Reorganized Foamex International) not to exceed (in the aggregate) 10% of the aggregate number of outstanding shares of Post-Effective Date Common Stock and those shares of common stock, if any, to be issued pursuant to the KERP.

**New Preferred Stock**    means the Series C preferred stock of Reorganized Foamex International, the terms of which are set forth on Annex A to the Put Option Agreement, to be authorized and, on the Effective Date, issued by Reorganized Foamex International, if at all, only upon Foamex International's exercise of the Put Option in accordance with the Equity Commitment Agreement and this Plan in the event the Significant Equityholders do not exercise the Call Option.

**Ordinary Course Administrative Claims**    means Administrative Claims against the Debtors that represent liabilities (a) to a seller of goods or services on account of such seller's post-petition provision of goods and/or services and (b) that were otherwise incurred in the ordinary course of business by the Debtors.

**Other Amended and Restated Governing Documents**    means (i) with respect to each of the Reorganized Debtors (other than Reorganized Foamex International and FMXI, Inc.) such entity's amended and restated certificate of incorporation, operating agreement or limited partnership agreement, as the case may be, and (ii) with respect to FMXI, Inc., the FMXI Conversion Documents, each of

12

which will be in effect on the Effective Date, and shall be in substantially the form contained in the Plan Supplement.

**Other Common Equity Interests in Foamex International**  means any options, warrants or other rights (other than the Call Option) to acquire Existing Common Stock in existence on and as of the Effective Date.

**Other Priority Claim**  means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims).

**Other Secured Claim**  means any Secured Claim, other than the DIP Financing Claims and the Senior Secured Note Claims, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, the amount of such Claim that is subject to such setoff.

**PBGC**  has the meaning set forth in Article XII of the Plan.

**Person**  means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity.

**Petition Date**  means September 19, 2005, the date on which the Debtors filed their voluntary petitions for relief commencing the Chapter 11 Cases.

**Plan**  means this First Amended Plan, as it may be further amended or modified from time to time, together with all addenda, exhibits, schedules or other attachments, if any.

**Plan Supplement Documents**  means the documents to be included in the Plan Supplement, including those identified in Article X.K of the Plan.

**Plan Supplement**  means the supplement to the Plan containing the Plan Supplement Documents.

**Post-Effective Date Common Stock**  means, collectively, the Existing Common Stock and the Additional Common Stock on and as of the Effective Date.

**Post-Petition Interest**  means with respect to:

(a)       the Senior Secured Note Claims, accrued and

Doc #:NY7:279598.8

unpaid interest (including interest on interest that is due and owing and unpaid, compounded semi-annually on the semi-annual interest payment dates) pursuant to the Senior Secured Notes Indenture calculated as per the proofs of claim filed by the Senior Secured Notes Indenture Trustee (claim nos. 865-873) from the Petition Date through the Bar Date and the applicable contractual rate thereafter through the Effective Date;

(b)     the 2005 Senior Subordinated Note Claims, accrued and unpaid interest pursuant to the 2005 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the applicable contractual rate;

(c)     the 2007 Senior Subordinated Note Claims, accrued and unpaid interest (including interest on interest that is due and owing and unpaid, compounded semi-annually on the semi-annual interest payment dates) pursuant to the 2007 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the applicable contractual rate;

(d)     Other Secured Claims, interest accruing on such claims from the Petition Date through the Effective Date at the rate set forth in the contract or other applicable document giving rise to such claims (to the extent lawful) or, if the applicable instrument does not specify a rate of interest, at the Federal Judgment Rate;

(e)     Priority Tax Claims, interest accruing from the Petition Date through the Effective Date (i) with respect to federal taxes, at a fixed annual rate equal to the federal statutory rate as provided in 26 U.S.C. § 6621, and (ii) with respect to state and local taxes, at the Prime Rate of interest as in effect for the period to which the Priority Tax Claim pertains or (iii) in either case, as otherwise agreed to by the holder of such Priority Tax Claim and the Debtor and which shall be reasonably acceptable to the Significant Equityholders; and

(f)     General Unsecured Claims, interest, accruing from

the Petition Date through the Effective Date at the Federal Judgment Rate; <u>provided</u>, <u>however</u>, that a holder of an Allowed General Unsecured Claim may seek payment of Post-Petition Interest at an otherwise legally required rate in accordance with the procedures set forth in Article V.D herein.

For the avoidance of doubt, except as required under applicable non-bankruptcy law, Post-Petition Interest will not be paid on the following Allowed Claims: Administrative Expense Claims, Fee Claims, Substantial Contribution Claims or Unliquidated Claims.

***Post-Petition Interest Rate Determination Notice***   means a notice to be filed by the holder of an Allowed General Unsecured Claim with the Court and served on the Debtors at the addresses set forth in Article X.J on the later of (i) twenty (20) days after the Effective Date and (ii) ten (10) days after such General Unsecured Claim becomes an Allowed Claim requesting that the Court establish the applicable rate of Post-Petition Interest for such Claim as provided for in subsection (f) of the definition of Post-Petition Interest. The Post-Petition Interest Rate Determination Notice shall (a) identify the Claim and the requested rate of interest applicable to such Claim and (b) attach documentation supporting the payment of such rate of interest for each Claim.

***Prepetition Indentures***   means, collectively, the Senior Secured Notes Indenture and the Senior Subordinated Notes Indentures.

***Prime Rate***   means the rate of interest published from time to time in The Wall Street Journal, Eastern Edition, and designated as the prime rate.

***Priority Tax Claim***   means any Claim that is entitled to a priority in right of payment under section 502(i) or 507(a)(8) of the Bankruptcy Code.

***pro rata***   means, with respect to any Claim, at any time, the proportion that the amount of a Claim in a particular Class bears to the aggregate amount of all Claims (including Disputed Claims) in such Class, unless in each case the Plan provides otherwise.

***Professional***   means (i) any professional employed in the Chapter 11 Cases pursuant to section 327 or 328 of the Bankruptcy Code or otherwise and (ii) any professional or other entity

seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**Put Option**

means the put option issued by the Significant Equityholders to the Company in exchange for the Put Option Premium pursuant to and subject to the terms and conditions set forth in the Equity Commitment Agreement, which requires the Significant Equityholders to purchase, upon the Company's exercise of the Put Option, shares of New Preferred Stock (to be issued on the Effective Date) for an aggregate purchase price equal to the Rights Offering Amount less the aggregate amount of proceeds actually received by the Company as a result of the exercise, if any, of Rights by the Equityholders (including the Significant Equityholders).

**Put Option Agreement**

means the Put Option Agreement among the Company and each of the Significant Equityholders, dated as of November [__], 2006, substantially in the form attached as Exhibit C to the Equity Commitment Agreement.

**Put Option Conditions**

has the meaning ascribed to such term in the Equity Commitment Agreement.

**Put Option Premium**

means the cost of the Put Option, which amount shall not exceed $9.5 million and shall be payable by Foamex International to the Significant Equityholders in accordance with the Equity Commitment Agreement and the Rights Offering Order.

**reasonably acceptable to the Significant Equityholders**

means reasonably acceptable to each of the Significant Equityholders in their individual reasonable discretion.

**Registration Rights Agreement**

means the Registration Rights Agreement to be entered into as of the Effective Date between Reorganized Foamex International and the Significant Equityholders, substantially in the form contained in the Plan Supplement.

**Registration Rights Participants**

means the Significant Equityholders that are parties to the Registration Rights Agreement.

**Registration Statement**

means the registration statement, filed by Foamex International with the SEC on Form S-1 and under the Securities Act relating to the issuance of the Additional Common Stock to be issued in connection with the Rights

Offering and the Call Option, as the same may be
amended, modified or supplemented from time to time.

***Released Parties***            has the meaning set forth in Article VIII.J of the Plan.

***Reorganized Debtors***         means the Debtors, or any successors thereto by merger,
                                  consolidation, or otherwise, on and after the Effective
                                  Date.

***Reorganized Foamex***          means Foamex International Inc., a Delaware corporation,
***International***               or any successor thereto by merger, consolidation, or
                                  otherwise, on and after the Effective Date.

***Revolving Credit Exit***       means that certain revolving credit exit facility to be
***Facility***                    entered into with the lender parties thereto and Bank of
                                  America, N.A., as administrative agent, for up to $175
                                  million, and all ancillary agreements, substantially in the
                                  forms contained in the Plan Supplement.

***Rights***                      means the rights issued pursuant to the Rights Offering.

***Rights Agent***                means Mellon Bank, N.A. c/o Mellon Investor Services
                                  LLC, as the agent retained by Foamex International to
                                  assist in the Rights Offering.

***Rights Offering***             means the offer and sale by Foamex International of
                                  Additional Common Stock pursuant to an SEC-registered
                                  rights offering whereby (i) each holder of Existing
                                  Common Stock as of the Rights Offering Record Date
                                  shall be offered the Right to purchase up to 2.56 shares of
                                  Additional Common Stock for each share of Existing
                                  Common Stock held on such record date, in exchange for
                                  a cash payment equal to the Additional Common Stock
                                  Purchase Price and (ii) each holder of Existing Preferred
                                  Stock as of the Rights Offering Record Date shall be
                                  offered the Right to purchase up to 255.78 shares of
                                  Additional Common Stock for each share of Existing
                                  Preferred Stock held on such record date, in exchange for
                                  a Cash payment equal to the Additional Common Stock
                                  Purchase Price, each as described more fully in the Equity
                                  Commitment Agreement and the Registration Statement.

***Rights Offering Amount***      means the gross proceeds to be raised through the Rights
                                  Offering, which amount shall equal $150.0 million;
                                  <u>provided</u>, <u>however</u>, that in no event shall Reorganized
                                  Foamex International's Cash on its consolidated balance
                                  sheet (after giving effect to the payments and other
                                  transactions contemplated by the Plan) exceed $7.5

million on and as of the second Business Day after the Effective Date.

| | |
|---|---|
| ***Rights Offering Commencement Date*** | means a date after the SEC declares the Registration Statement effective on which the Rights Offering shall commence and the Rights shall become exercisable, which date shall be selected by Foamex International and shall be reasonably acceptable to the Significant Equityholders. |
| ***Rights Offering Documents*** | means, collectively, the documents necessary for effectuating the Rights Offering, including, without limitation, the Registration Statement and any notices, subscription forms and other ancillary documents to be sent to Equityholders entitled to participate in the Rights Offering. |
| ***Rights Offering Order*** | means that certain order, entered by the Court on [DATE] [Docket No. [___], which order, among other things, approved Foamex International's entry into the Equity Commitment Agreement and the commencement of the Rights Offering as contemplated by the Equity Commitment Agreement. |
| ***Rights Offering Record Date*** | means a date that is three (3) business days prior to the Rights Offering Commencement Date. |
| ***Scheduled*** | means, with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules. |
| ***Schedules*** | means the schedules of assets and liabilities, statements of financial affairs, and lists of holders of Claims and Equity Interests filed with the Court by the Debtors, including any amendments, modifications or supplements thereto. |
| ***SEC*** | means the United States Securities and Exchange Commission. |
| ***Second Lien Term Loan Facility*** | means that certain senior secured second lien term loan exit facility to be entered into with the lender parties thereto, Bank of America, N.A., as administrative agent, and Morgan Stanley Senior Funding, Inc. and Barclays Bank PLC, as co-syndication agents, for $190 million, and all ancillary agreements, substantially in the forms contained in the Plan Supplement. |

18

| | |
|---|---|
| ***Secured Claim*** | means a Claim that is secured by a Lien on Collateral, to the extent of the value (as of the Effective Date or such other date as may be established by the Court) of such Collateral determined by a Final Order of the Court pursuant to section 506 of the Bankruptcy Code or as otherwise agreed upon in writing by the Debtors and the holder of such Claim. |
| ***Securities Act*** | means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder. |
| ***Senior Secured Note Claims*** | means all Claims arising from the Senior Secured Notes Indenture on account of the Senior Secured Notes. |
| ***Senior Secured Noteholder(s)*** | means a holder(s) of Senior Secured Notes. |
| ***Senior Secured Notes*** | means the 10¾% Senior Secured Notes due 2009 issued pursuant to the Senior Secured Notes Indenture. |
| ***Senior Secured Notes Adequate Protection Professional Payments*** | means the payments made by the Debtors to the professionals engaged by the Ad Hoc Committee of Senior Secured Noteholders pursuant to paragraph 13(d) of the DIP Order. |
| ***Senior Secured Notes Indenture*** | means the Indenture (as amended, supplemented, restated or otherwise modified) dated as of March 25, 2002, by and among Foamex L.P., Foamex Capital Corporation, the Guarantors (as defined therein) and U.S. Bank National Association, as indenture trustee. |
| ***Senior Secured Notes Indenture Trustee*** | means U.S. Bank National Association or any successor thereto, in its capacity as the indenture trustee under the Senior Secured Notes Indenture. |
| ***Senior Subordinated Note Claims*** | means, collectively, the 2005 Senior Subordinated Notes Claim and the 2007 Senior Subordinated Notes Claim. |
| ***Senior Subordinated Noteholder(s)*** | means a holder(s) of Senior Subordinated Notes. |
| ***Senior Subordinated Notes*** | means, collectively, (i) the 2005 Senior Subordinated Notes and (ii) the 2007 Senior Subordinated Notes. |
| ***Senior Subordinated Notes Indenture Trustee*** | means, collectively, the 2005 Indenture Trustee and the 2007 Indenture Trustee. |
| ***Senior Subordinated Notes*** | means, collectively, the 2005 Senior Subordinated Notes |

| | |
|---|---|
| ***Indentures*** | Indenture and the 2007 Senior Subordinated Notes Indenture. |
| ***Shelf Registration*** | has the meaning set forth in Article VII.H of the Plan. |
| ***Significant Equityholders*** | means D. E. Shaw Laminar Portfolios, L.L.C., Sigma Capital Associates, LLC, Par IV Master Fund, Ltd., Sunrise Partners Limited Partnership and Goldman, Sachs & Co., or their respective designees that are reasonably acceptable to Foamex International. |
| ***Subordination Related Rights*** | has the meaning set forth in Article VIII.D of the Plan. |
| ***Substantial Contribution Claim*** | means a claim by any Professional, Creditor or party in interest for reasonable compensation for services or reasonable expenses incurred in connection with the Chapter 11 Cases pursuant to sections 503(b)(3)(D) or (b)(4) of the Bankruptcy Code. |
| ***Substantive Consolidation Order*** | means the Confirmation Order or such other order of the Court providing for the substantive consolidation of the Debtors. |
| ***Substantively Consolidated Debtors*** | means the Debtors, as substantively consolidated pursuant to the Substantive Consolidation Order. |
| ***Surviving Debtor Subsidiaries*** | means the Debtors that are subsidiaries of Foamex International and that are not to be dissolved pursuant to Article VII.M of this Plan. |
| ***Unliquidated Claim*** | means a timely and validly filed proof of claim, disputed by the Debtors, asserting an unliquidated or contingent claim (which claim numbers are set forth on Schedule <u>A</u> attached hereto) against one of the Debtors, solely to the extent and on the basis set forth in the proof of claim, and to the extent such claim has not been disallowed by the Court and remains unliquidated and/or contingent on and as of the Effective Date, unless such claim has been disallowed by the Court. For the avoidance of doubt, (i) no Unliquidated Claim shall be an Allowed Claim or a General Unsecured Claim and (ii) no Claim shall be an Unliquidated Claim unless so identified on Schedule A attached hereto (which Schedule <u>A</u> may be revised and amended from time to time up to the filing of the Plan Supplement). |

Doc #:NY7:279598.8

| | |
|---|---|
| ***Unsecured Claim*** | means any Claim that is not a Secured Claim, Other Secured Claim, Administrative Claim, Priority Tax Claim or Other Priority Claim. |
| ***Voting Deadline*** | means the date established by the Court by which holders of Interests entitled to vote on this Plan must submit their Ballots. |
| ***Voting Record Date*** | means the date fixed by the Court in its order approving the Disclosure Statement as the record date for determining the holders of Interests entitled to vote to accept or reject this Plan. |

### B.    Interpretation, Application of Definitions and Rules of Construction.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in the Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section or subsection in the Plan unless expressly provided otherwise. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### A.    Introduction.

All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, and DIP Financing Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified

Doc #:NY7:279598.8

in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim or Equity Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    **Unclassified Claims (not entitled to vote on the Plan).**

(a)    *Administrative Claims.*

(b)    *Priority Tax Claims.*

(c)    *DIP Financing Claims.*

2.    **Unimpaired Classes of Claims and Interests (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).**

(a)    *Class 1:  Other Priority Claims.*

Class 1 consists of all Other Priority Claims.

(b)    *Class 2:  Other Secured Claims.*

Class 2 consists of all Other Secured Claims.

(c)    *Class 3:  Senior Secured Note Claims.*

Class 3 consists of all Senior Secured Note Claims.

(d)    *Class 4:  Senior Subordinated Note Claims.*

Class 4 consists of all Senior Subordinated Note Claims.

(e)    *Class 5:  General Unsecured Claims.*

Class 5 consists of all General Unsecured Claims.

(f)    *Class 6:  Unliquidated Claims.*

Class 6 consists of all Unliquidated Claims.

(g)    *Class 7:  Intercompany Claims.*

Class 7 consists of all Intercompany Claims.

(h)    *Class 8:  Equity Interests in Surviving Debtor Subsidiaries.*

Doc #:NY7:279598.8

Class 8 consists of all Equity Interests in Surviving Debtor Subsidiaries.

        (i)     *Class 11: Other Common Equity Interests in Foamex International.*

Class 11 consists of all Other Common Equity Interests in Foamex International.

**3.    Impaired Classes of Equity Interests (entitled to vote on the Plan).**

        (a)     *Class 9:  Existing Preferred Stock.*

Class 9 consists of all of the Existing Preferred Stock.

        (b)     *Class 10:  Existing Common Stock.*

Class 10 consists of all of the Existing Common Stock.

**III.**

**TREATMENT OF ADMINISTRATIVE CLAIMS
AND PRIORITY TAX CLAIMS**

**A.    Administrative Claims.**

Except with respect to Administrative Claims that are Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon, which treatment shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

**B.    Bar Date for Administrative Claims.**

Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims, Substantial Contribution Claims and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code incurred prior to the Administrative Claims Bar Date, shall submit requests for payment on or before the Administrative Claims Bar Date or forever be barred from doing so and from receiving payment thereof.  Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims, Substantial Contribution Claims and any fees or charges assessed against the Estates under section 1930 of title 28 of the

Doc #:NY7:279598.8

United States Code, incurred after the Administrative Claims Bar Date but on or prior to the Confirmation Date, shall submit requests for payment on or before the date that is thirty (30) days from the Confirmation Date or forever be barred from doing so and from receiving payment thereof.

### C.    <u>Fee Claims</u>.

All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Confirmation Date shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Creditors' Committee, counsel to the Significant Equityholders and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Confirmation Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than thirty (30) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

### D.    <u>Substantial Contribution Claims</u>.

All requests for compensation or reimbursement of Substantial Contribution Claims shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Significant Equityholders, counsel to the Exit Facilities Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Effective Date. Unless such deadline is extended by agreement of the Reorganized Debtors, holders of Substantial Contribution Claims that are required to file and serve applications for final allowance of their Substantial Contribution Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Substantial Contribution Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Substantial Contribution Claims shall be deemed discharged as of the Effective Date. Objections to any Substantial Contribution Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than twenty (20) days (or such longer period as may be allowed by the Reorganized Debtors or by order of the Court) after the date on which an application for final allowance of such Substantial Contribution Claims was filed and served.

### E.    <u>Priority Tax Claims</u>.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, which shall be reasonably acceptable to the Significant

Doc #:NY7:279598.8

Equityholders and the Exit Facilities Agent, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors (a) Cash in an amount equal to such Allowed Priority Tax Claim <u>plus</u> Post-Petition Interest on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, deferred Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim <u>plus</u> Post-Petition Interest, <u>plus</u> interest on such aggregate amount over such period at the same rate as such Post-Petition Interest. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without Post-Petition Interest, in accordance with the terms thereof.

**F.**     <u>**DIP Financing Claims**</u>**.**

On the Effective Date, except to the extent that the holders of the DIP Financing Claims and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, the holders of the DIP Financing Claims, or their designees, shall receive payment in full in Cash of all DIP Financing Claims in full and final satisfaction thereof other than the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms survive the termination of the DIP Credit Facilities.

## IV.

## TREATMENT OF CLAIMS AND
## EQUITY INTERESTS

**A.**     <u>**Class 1 — Other Priority Claims**</u>**.**

**1.**     <u>**Distributions**</u>**.**

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim <u>plus</u> Post-Petition Interest on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. All Allowed Other Priority Claims which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof.

**2.**     <u>**Impairment and Voting**</u>**.**

Class 1 is unimpaired under the Plan. Holders of Allowed Other Priority Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

Doc #:NY7:279598.8

### B.    Class 2 — Other Secured Claims.

#### 1.    Distributions.

Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, at the sole option of the Debtors, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

#### 2.    Impairment and Voting.

Class 2 is unimpaired under the Plan.  The holders of Allowed Other Secured Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### C.    Class 3 — Senior Secured Note Claims.

#### 1.    Allowance of Senior Secured Note Claims and Distribution.

The Senior Secured Note Claims shall be deemed Allowed in the aggregate amount of $312,452,083.33 plus accrued and unpaid Post-Petition Interest, but excluding any call premiums or any prepayment fees or penalties.

On the Initial Distribution Date, in full and final satisfaction of the Senior Secured Note Claims, each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Claim.

Doc #:NY7:279598.8

## 2. **Impairment and Voting.**

Class 3 is unimpaired under the Plan. The holders of Senior Secured Note Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### D. **Class 4 — Senior Subordinated Note Claims.**

#### 1. **Allowance of Senior Subordinated Note Claims and Distributions.**

The Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $208,150,130.55 which includes accrued and unpaid interest (at the applicable contract rate) on such Senior Subordinated Note Claims relating to the period up to but not including the Petition Date.

On the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Senior Subordinated Notes Claim shall receive Cash in an amount equal to such holders' Allowed Senior Subordinated Notes Claim plus Post-Petition Interest.

#### 2. **Impairment and Voting.**

Class 4 is unimpaired under the Plan. The holders of Allowed Senior Subordinated Note Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### E. **Class 5 — General Unsecured Claims.**

#### 1. **Distributions.**

On the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, in full and final satisfaction of such Claim, each holder of an Allowed General Unsecured Claim will receive Cash in amount equal to such holder's Allowed General Unsecured Claim plus Post-Petition Interest. To the extent that insurance is available to satisfy an Allowed General Unsecured Claim, such Allowed General Unsecured Claim shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, without the need for Court approval, at such time as such claim becomes liquidated and the insurance proceeds of the insurance therefor become available.

#### 2. **Impairment and Voting.**

Class 5 is unimpaired under the Plan. Each holder of an Allowed General Unsecured Claim is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

Doc #:NY7:279598.8

F.    **Class 6 — Unliquidated Claims.**

1.    **Distributions.**

All Unliquidated Claims shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, without need for Court approval, including, where applicable, through access to available insurance.

2.    **Impairment and Voting.**

Class 6 is unimpaired under the Plan. Each holder of an Allowed Unliquidated Claim is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, holders of Unliquidated Claims may commence or continue any action, prosecute such action to judgment or settlement and/or pursue any such Unliquidated Claims, each solely to the extent and on the basis set forth in a timely and validly filed proof of claim, without prejudice to any defense, right of offset or other rights, claims or counterclaims available or belonging to the Reorganized Debtors.

G.    **Class 7 —Intercompany Claims.**

1.    **Distributions.**

All Intercompany Claims will remain outstanding and shall not be discharged by this Plan or the Confirmation Order, but shall instead be liquidated, determined and satisfied in accordance, and in a manner consistent, with the Debtors' historical practices as if the Chapter 11 Cases had not been commenced.

2.    **Impairment and Voting.**

Class 7 is unimpaired under the Plan. Holders of Intercompany Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

H.    **Class 8 — Equity Interests in Surviving Debtor Subsidiaries.**

1.    **Distribution.**

The holders of Equity Interests in Surviving Debtor Subsidiaries shall retain such Equity Interests.

2.    **Impairment and Voting.**

Class 8 is unimpaired under the Plan. The holders of Equity Interests in Surviving Debtor Subsidiaries are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

Doc #:NY7:279598.8

I.     **Class 9 —Existing Preferred Stock.**

1.     **Distributions.**

Each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date shall be converted into 100 shares of Additional Common Stock on the Effective Date and shall receive the treatment accorded to the holders of Existing Common Stock in Class 10.

2.     **Impairment and Voting**.

Class 9 is Impaired under the Plan.  The holder(s) of Existing Preferred Stock is entitled to vote to accept or reject the Plan.

J.     **Class 10 — Existing Common Stock.**

1.     **Distributions.**

Existing Common Stock in Foamex International shall remain outstanding after the Effective Date (and become common stock of Reorganized Foamex International on the Effective Date), subject to dilution as a result of the issuance, of any Additional Common Stock.

2.     **Impairment and Voting.**

Class 10 is Impaired.  The holders of Existing Common Stock are entitled to vote to accept or reject the Plan.

K.     **Class 11 — Other Common Equity Interests In Foamex International.**

1.     **Distributions.**

The holders of Other Common Equity Interests in Foamex International shall retain such Interests.

2.     **Impairment and Voting.**

Class 11 is unimpaired under the Plan.  The holders of Other Common Equity Interests in Foamex International are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

Doc #:NY7:279598.8

# V.

## PROVISIONS REGARDING VOTING, DISTRIBUTIONS, AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY INTERESTS

### A.    <u>Voting on Plan</u>.

Each holder of Class 9 Existing Preferred Stock and Class 10 Existing Common Stock shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Court.

### B.    <u>Distributions</u>.

#### 1.    <u>Allowed Claims</u>.

##### (a)    *Delivery of Distributions*.

Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Senior Secured Note Claims, Allowed Senior Subordinated Note Claims, Allowed General Unsecured Claims, Allowed Unliquidated Claims at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).  Distributions on account of the Allowed Senior Secured Note Claims and Senior Subordinated Note Claims shall be made initially to their respective Indenture Trustees, or to such other entity(ies) as may be determined by the Debtors, who shall, in turn, make the distributions to the holders of Allowed Senior Secured Note Claims and Allowed Senior Subordinated Note Claims, as the case may be.

##### (b)    *Distribution of Cash*.

Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

##### (c)    *Fractional Cents*.

Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

Doc #:NY7:279598.8

(d)     _Unclaimed Distributions._

Any Distribution of Cash under the Plan to the holder of an Allowed Claim which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the Reorganized Debtors notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the holder of such Claim to such Distribution shall be extinguished and forever barred.

(e)     _Saturdays, Sundays, or Legal Holidays._

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(f)     _Distributions to Holders of Allowed Claims as of the Voting Record Date._

As of the close of business on the Voting Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtors and the Reorganized Debtors shall have no obligation to recognize any Claim filed or transfer of any Claims occurring after the Voting Record Date. The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Voting Record Date.

## C.     Objections to and Resolution of Claims.

### 1.     Objections to and Resolution of Administrative Claims and Claims.

The Reorganized Debtors shall have the exclusive right to make and to file objections to Administrative Claims (other than Fee Claims) and Claims subsequent to the Effective Date. Unless otherwise ordered by the Court, objections to Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made as soon as practicable, but in no event later than the Claims Objection Deadline. Objections to Fee Claims shall be filed and served within thirty (30) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

Objections to Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion. The Debtors may settle any such objections without Court approval. No objections shall be required to be filed with respect to any Unliquidated Claims, which shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors as provided for herein.

Doc #:NY7:279598.8

The Debtors shall not establish reserves for the payment of Disputed Claims or Unliquidated Claims.

**D.     Procedure for Resolution of Post-Petition Interest Disputes.**

On the later of the Initial Distribution Date or the date on which a General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, the Reorganized Debtors shall pay the Allowed amount of such General Unsecured Claim plus Post-Petition Interest at the Federal Judgment Rate.  To the extent any holder of an Allowed Class 5 General Unsecured Claim believes that it is entitled to Post-Petition Interest at an interest rate other than the Federal Judgment Rate, the holder of such Allowed General Unsecured Claim must timely file and serve on the Debtors at the addresses set forth in Article X.J below a Post-Petition Interest Rate Determination Notice by the later of (i) twenty (20) days after the Effective Date and (ii) ten (10) days after such General Unsecured Claim becomes an Allowed Claim.  The Debtors or Reorganized Debtors, as applicable, will have the opportunity to review and dispute the Post-Petition Interest Rate Determination Notice and shall file any objection to the Post-Petition Interest Rate Determination Notice no later than sixty (60) days after the receipt of such notice.  In objecting to the Post-Petition Interest Rate Determination Notice, the Debtors or Reorganized Debtors, as applicable, may assert that the holder of the Claim that filed the Post-Petition Interest Rate Determination Notice is entitled to no Post-Petition Interest under applicable law, and the Court may find that no Post-Petition Interest is required and order that none shall be paid on account of such Allowed General Unsecured Claim.

If the Debtors or Reorganized Debtors, as applicable, determine that the interest rate asserted in the Post-Petition Interest Rate Determination Notice is appropriate, the Debtors may file a certificate of no objection at any time with respect to such notice and pay Post-Petition Interest at the rate requested in the Post-Petition Interest Rate Determination Notice.  No hearing is required by the Court with respect to any Post-Petition Interest Rate Determination Notice for which a certificate of no objection is filed or for which the Debtors or Reorganized Debtors, as applicable, do not file a timely objection.

If the Debtors or Reorganized Debtors, as applicable, file an objection to the Post-Petition Interest Rate Determination and no stipulation or agreement is reached with respect to the appropriate rate of Post-Petition Interest for such Allowed General Unsecured Claim, the Debtors or Reorganized Debtors, as applicable, may ask the Court to schedule a hearing on the particular Post-Petition Interest Rate Determination Notice and the related objection at an appropriate time.

The Debtors or Reorganized Debtors, as applicable, and the holder of the Allowed General Unsecured Claim that filed the Post-Petition Interest Rate Determination Notice at any time may enter into a stipulation or agreement as to the appropriate rate of Post-Petition Interest with respect to such Allowed Claim, without further action of the Court.

Doc #:NY7:279598.8

In no event shall a holder of a General Unsecured Claim be entitled to any interest on such Claim from and after the Effective Date, including, without limitation, interest on any amounts payable by the Reorganized Debtors upon the resolution of any Post-Petition Interest Rate Determination Notice.

### E.   Estimation.

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Debtors in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Court. In the case of Unliquidated Claims arising from personal injury tort or wrongful death actions, the Court may estimate such Claims for the purpose of confirming a plan of reorganization. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### F.   Administrative Claims of Indenture Trustees.

In addition to any other Administrative Claim that may be filed by the Indenture Trustees pursuant to the provisions set forth herein, the Senior Secured Notes Indenture Trustee and the Senior Subordinated Notes Indenture Trustee shall have an Allowed Administrative Claim in an amount equal to such Indenture Trustee's Indenture Trustee Expenses. If the Debtors or the Reorganized Debtors dispute the reasonableness of any such Indenture Trustee's Indenture Trustee Expenses, the Debtors or the Reorganized Debtors or such affected Indenture Trustee may submit such dispute to the Court for a determination of the reasonableness of such Indenture Trustee Expenses and the disputed portion of such Indenture Trustee's Indenture Trustee Expenses shall not be paid until the dispute is resolved. The undisputed portion of such Indenture Trustee's Indenture Trustee Expenses shall be paid as provided herein. An Indenture Trustee shall not be entitled to payment of or the assertion of its Indenture Trustee Charging Lien for any disputed Indenture Trustee Expenses to the extent the Court determines that such Indenture Trustee Expenses are unreasonable under the terms of the applicable Prepetition Indenture. Nothing contained herein shall affect the right of an Indenture Trustee from asserting their respective Indenture Trustee Charging Lien, to the extent applicable under the terms of the respective Prepetition Indenture, provided, however, that upon the full payment of such Indenture Trustee's Indenture Trustee Expenses, such Indenture Trustee's Indenture Trustee Charging Lien shall be deemed released and discharged in full.

Doc #:NY7:279598.8

## G. Cancellation and Surrender of Existing Securities and Agreements.

Notwithstanding any other provision of the Plan and except for DIP Financing Claims, Intercompany Claims, Existing Common Stock, Other Common Equity Interests in Foamex International and Equity Interests in Surviving Debtor Subsidiaries, on the Effective Date, any promissory note, other instrument or security evidencing a Claim or Equity Interest shall be deemed cancelled, provided, however, that the Senior Secured Notes Indenture and the Senior Subordinated Notes Indentures shall continue to survive and be in full force and effect for the sole purposes of making distributions under the Plan and any Indenture Trustee Charging Lien asserted thereunder.

## H. Nonconsensual Confirmation.

If at least one (1) Class of Interests that is Impaired under the Plan votes to reject the Plan, the Debtors may seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

# VI.

## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Solely in connection with Distributions to be made on the Initial Distribution Date to the holders of Allowed Claims which are Allowed as of such date, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Substantive Consolidation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case for purposes of this Plan and the Distributions hereunder. To the extent a Claim (including any Disputed Claim) becomes an Allowed Claim or an Unliquidated Claim is liquidated in accordance with the provisions of the Plan after the Initial Distribution Date, such Claim shall be satisfied in accordance with the provisions of the Plan by the Debtor against whom such Claim is asserted; provided, however, that the Debtors, at their sole discretion, may satisfy such Claim in any other manner they deem reasonable so long as the treatment of such Claim is otherwise in accordance with the provisions of the Plan.

Pursuant to such Substantive Consolidation Order (i) all assets and liabilities of the Substantively Consolidated Debtors will be deemed to be merged solely for purposes of this Plan and Distributions to be made hereunder on the Initial Distribution Date, (ii) the obligations of each Debtor will be deemed to be the obligation of the Substantively Consolidated Debtors solely for purposes of this Plan and Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Substantively Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Case in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor hereunder will be deemed to be made by the

Substantively Consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Substantively Consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors or (b) other pre- and post-Petition Date guarantees that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (ii) pursuant to the express terms of the Plan, or (iii) in connection with the Exit Facilities. The substantive consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until an order is entered closing, dismissing or converting such Debtor's Chapter 11 Case.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates. If no objection to substantive consolidation is timely filed and served, then the Substantive Consolidation Order may be entered by the Court. If any such objection(s) is timely filed and served, a hearing with respect to the substantive consolidation of the Estates and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

## VII.

## PROVISIONS REGARDING IMPLEMENTATION OF PLAN

### A.    Exit Facilities.

On or prior to the Effective Date, the Debtors shall have closed on the Exit Facilities. The amounts borrowed under the Exit Facilities shall be used to make the required Distributions under the Plan, to satisfy certain plan-related expenses and to fund the Reorganized Debtors' working capital needs.

### B.    Rights Offering.

As authorized by the Rights Offering Order, prior to Confirmation, Foamex International shall conduct a Rights Offering to generate gross proceeds of $150 million, subject to the terms and conditions set forth in the Equity Commitment Agreement. Pursuant to the Rights Offering, (i) each holder of Existing Common Stock on the Rights Offering Record Date will be offered the Right to purchase up to 2.56 shares of Additional Common Stock for each share of Existing Common Stock held by such holder of Existing Common Stock on the Rights Offering Record Date, in exchange for a Cash payment equal to the Additional Common Stock Purchase Price for each share of Additional Common Stock and (ii) each holder of Existing Preferred Stock on the

Rights Offering Record Date will be offered the Right to purchase up to 255.78 shares of Additional Common Stock for each share of Existing Preferred Stock held by such holder of Existing Preferred Stock on the Rights Offering Record Date, in exchange for a Cash payment equal to the Additional Common Stock Purchase Price for each share of Additional Common Stock. All Additional Common Stock issued in connection with the exercise of Rights pursuant to the Rights Offering shall be issued on the Effective Date.

### C.   Put Option.

To ensure that the Debtors raise sufficient funds to effectuate the Plan, in the event that not all of the shares of Additional Common Stock offered through the Rights Offering are subscribed and paid for in full, Foamex International has entered into the Equity Commitment Agreement and the Put Option Agreement with the Significant Equityholders pursuant to which, among other things, the Significant Equityholders have committed to purchase New Preferred Stock under the Put Option, if exercised, for an aggregate purchase price equal to the Rights Offering Amount less the aggregate amount of proceeds to be received by Foamex International as a result of the exercise of Rights. If the Significant Equityholders exercise the Call Option, however, the Put Option will expire unexercised and the Significant Equityholders will not be obligated to purchase the New Preferred Stock. If it does not expire sooner, the Put Option will expire on the earliest of (i) the Effective Date, and (ii) February 28, 2007. Any New Preferred Stock issued in connection with the Put Option shall be issued on the Effective Date.

### D.   Call Option.

Pursuant to the Plan, and as more specifically set forth in the Call Option Agreement included in the Plan Supplement, the Company shall sell, and each of the Significant Equityholders shall purchase, on or prior to the Effective Date, the Call Option for an aggregate purchase price equal to $2.0 million, requiring Foamex International to sell, upon the exercise of the Call Option by the Significant Equityholders, shares of the Additional Common Stock at a per share price equal to the Additional Common Stock Purchase Price for each Right that is not subscribed and paid for in full by the Equityholders as of the Expiration Time, up to a maximum aggregate purchase price equal to the Rights Offering Amount less the aggregate amount of proceeds to be received by Foamex International as a result of the exercise of Rights. If the Significant Equityholders exercise and fulfill their obligations under the Call Option, the Put Option shall automatically terminate and the Significant Equityholders will not be obligated to purchase the New Preferred Stock. Any Additional Common Stock to be issued under the Plan pursuant to the Call Option shall be issued on the Effective Date.

### E.   Use of Rights Offering Proceeds.

Reorganized Foamex International shall utilize the proceeds from the sale of Additional Common Stock and the New Preferred Stock, if any, (a) first, to pay the expenses of the Rights Offering and to pay the balance of the Put Option Premium that becomes due and payable on the Effective Date and (b) second, the net proceeds remaining will be contributed by Reorganized Foamex International to Foamex L.P., its

primary operating subsidiary, to fund required payments under the Plan and to fund Foamex L.P.'s working capital requirements on and after the Effective Date.

F.    **Securities to be Issued Pursuant to the Plan**.

1.    **Rights**.

On the Rights Offering Commencement Date, which may occur prior to Confirmation, Foamex International shall issue the Rights to the Equityholders who hold Existing Common Stock and Existing Preferred Stock as of the Rights Offering Record Date.

2.    **Additional Common Stock**.

On or before the Effective Date, Reorganized Foamex International shall authorize the issuance of Additional Common Stock to be issued on or after the Effective Date, which shall be sufficient to effectuate the issuance of such Additional Common Stock pursuant to the Rights Offering on the Effective Date, the exercise and settlement of the Call Option (to the extent exercised) on the Effective Date, the conversion of any outstanding Existing Preferred Stock as provided for in the Plan, the Management Incentive Plan, the KERP and the exercise of Other Common Equity Interests in Foamex International outstanding on and as of the Effective Date without further act or action under applicable law, regulation, rule or order.

Reorganized Foamex International shall use its reasonable best efforts to maintain one or more market makers for the Post-Effective Date Common Stock that will facilitate trading of the Post-Effective Date Common Stock over the counter.

3.    **New Preferred Stock**.

On or prior to the Effective Date, in connection with the Put Option, if Foamex International exercises the Put Option and all conditions precedent set forth in the Equity Commitment Agreement are satisfied, including, without limitation, the expiration without exercise of the Call Option, then Reorganized Foamex International shall authorize and, on the Effective Date, issue the New Preferred Stock to the Significant Equityholders in accordance with the terms of the Equity Commitment Agreement without further act or action under applicable law, regulation, rule or order.

G.    **Filing of Form 15**.

It is anticipated that after the issuance of the Additional Common Stock there will be fewer than 300 holders of record of the Common Stock.  After the Effective Date, Reorganized Foamex International may determine to file a Form 15 with the SEC terminating its periodic filing requirements pursuant to the Securities Exchange Act of 1934, as amended, to the extent legally practicable.

Doc #:NY7:279598.8

**H.**     **Registration Rights Agreement.**

On or prior to the Effective Date, the Reorganized Debtors shall enter into the Registration Rights Agreement with the Registration Rights Participants. The Registration Rights Agreement shall, among other things, provide:

(i)     such Registration Rights Participants with two demand registration rights and unlimited piggy-back registration rights (provided that (a) no demand shall qualify as such unless made by the holders of at least 25% of the aggregate number of outstanding shares of Additional Common Stock issued under the Rights Offering and, if exercised, the Call Option, and unless at least 25% of such aggregate number of outstanding shares shall be included to be sold in each registration statement and (b) no such piggyback registration rights shall be applicable with respect to any filing by Reorganized Foamex International of a registration statement on Forms S-4 or S-8, or any successor forms thereto) with respect to any such Additional Common Stock held by such Registration Rights Participants on customary and reasonable terms; and

(ii)     that (a) at such time as Reorganized Foamex International is eligible to effect a registration on Form S-3 (or any successor form), within sixty (60) days after the request of any Registration Rights Participant or group thereof which holds at least 25% of the aggregate number of outstanding shares of Additional Common Stock issued under the Rights Offering and, if exercised, the Call Option, Reorganized Foamex International shall prepare and file, and shall use its reasonable best efforts to have declared effective as soon as practicable thereafter, a registration statement under the Securities Act for the offering on a continuous basis pursuant to Rule 415 of the Securities Act, of any such shares of Additional Common Stock held by the Registration Rights Participants (the "Shelf Registration"); and (b) Reorganized Foamex International shall keep the Shelf Registration effective for a period ending on the earlier of (I) the date that is the two-year anniversary of the date upon which such registration statement is declared effective by the SEC, (II) the date such Additional Common Stock has been disposed of pursuant to an effective registration statement, (III) the date such Additional Common Stock has been disposed of (x) pursuant to and in accordance with SEC Rule 144 (or any similar provision then in force) under the Securities Act or (y) pursuant to another exemption from the registration requirements of the Securities Act pursuant to which such Additional Common Stock is thereafter freely transferable without restriction under the Securities Act, and (IV) the date such Additional Common Stock ceases to be outstanding.

Doc #:NY7:279598.8

Reorganized Foamex International shall pay all fees and expenses for any demand registration (including, without limitation, the reasonable fees and expenses of one special counsel for the Registration Rights Participants). The managing underwriter of any public offering effected pursuant to a demand registration will be selected by Reorganized Foamex International. The selling stockholders shall pay for their respective internal costs and expenses related to any piggyback registration in which they participate.

## I.      Corporate Governance and Management of the Reorganized Debtors

### 1.      The Initial Boards of Directors.

The Significant Equityholders shall have the right, but not the obligation in their capacities as holders of Post-Effective Date Common Stock, to nominate four (4) members of Reorganized Foamex International's board of directors. In addition to the Significant Equityholders' four (4) nominees, there shall be one (1) independent director. Reorganized Foamex International's chief executive officer and its general counsel shall also serve on the board of directors; provided that if the Post-Effective Date Common Stock is listed on a national securities exchange, the number of directors and/or composition of the board of directors may be revised as required under the applicable rules of the relevant stock exchange.

Subject to Reorganized Foamex International's Amended and Restated By-laws relating to the filling of vacancies, if any, on the board of directors, the members of the board of directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least twelve (12) months after the Effective Date.

The identities, affiliations and the amount of compensation of the designees shall be disclosed in the Plan Supplement. The members of the initial boards of directors or equivalent governing bodies of the Surviving Debtor Subsidiaries shall be selected by the initial board of directors of Reorganized Foamex International and shall consist, at least in part, of officers and directors of Reorganized Foamex International. The directors of each Debtor on the day immediately preceding the Effective Date that are not otherwise appointed as members of the initial board of directors or the equivalent governing body for the corresponding Reorganized Debtor shall be deemed to have resigned from the board of directors of such Debtor as of the Effective Date.

### 2.      Management of Reorganized Debtors.

The officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the date of the Equity Commitment Agreement. The Reorganized Debtors' officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law, as the case may be. The Debtors will disclose the terms of such employment agreements in the Plan Supplement.

Doc #:NY7:279598.8

3.    **Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Other Amended and Restated Governing Documents.**

The adoption of the Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Other Amended and Restated Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or Reorganized Debtors.  The Amended and Restated Certificate of Incorporation shall be in form and substance reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent and will, among other things, contain appropriate provisions (i) governing the authorization of (x) the shares of New Preferred Stock, if any, to be issued and outstanding on the Effective Date and (y) the Additional Common Stock, and (ii) prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  Each of the Other Amended and Restated Governing Documents shall be in form and substance reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent and shall, among other things, contain appropriate provisions prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  On or prior to the Effective Date, the Debtors will, if required by applicable state law, file with the Secretary of State of the appropriate jurisdiction the Amended and Restated Certificate of Incorporation and Other Amended and Restated Governing Documents.

In addition, the Amended and Restated Certificate of Incorporation of Reorganized Foamex International shall include provisions with respect to any "Business Combination" (as defined in Foamex International's current Restated Certificate of Incorporation) with or into any "Related Person" (as so defined) requiring that the consideration received by the other shareholders in connection with such Business Combination (as so defined) is at "fair value" as determined by the "unrelated director(s)" (who shall have authority, but not the obligation, to engage independent counsel and independent bankers at Reorganized Foamex International's expense, subject to a budget which shall be reasonably acceptable to Reorganized Foamex's board of directors, as a whole, for purposes of such determination).

On the Effective Date, the Rights Agreement between Foamex International and Mellon Investor Services LLC, dated as of August 5, 2004, and amended thereafter, shall be terminated.

J.    **Reorganized Debtors' Management Incentive Plan.**

On the Effective Date, the Management Incentive Plan shall become effective.  Such plan shall be on the terms to be described generally in the Plan Supplement with more specific terms to be approved by the board of directors of Reorganized Foamex International within forty-five (45) days after the Effective Date.

40

### K.     KERP.

As required by the KERP Order, on the Effective Date, the Reorganized Debtors shall continue to implement the KERP in accordance with the terms of the KERP Motion and KERP Order, including, without limitation, by issuing shares of common stock in Reorganized Foamex International to the employees designated by the board of directors of Reorganized Foamex International to receive such stock in accordance with the KERP.

### L.     Powers of Officers.

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into and to execute any Plan Supplement Document to which the Reorganized Debtors are to be a party and (subject to the approval of the board of directors of Reorganized Foamex International) to take such other or further action as they deem reasonable and appropriate to effectuate the terms of the Plan.

### M.     Corporate Reorganization.

On or prior to the Effective Date but immediately prior to the discharge described in Article VIII.E of this Plan of the Debtors and of the Debtors dissolved pursuant hereto, the Reorganized Debtors shall take all necessary steps and make all necessary filings to dissolve each of Foamex Capital Corporation and Foamex Mexico II, Inc.  In addition, Foamex International shall take all necessary steps and make all necessary filings to (i) dissolve Foamex Delaware, Inc., Foamex Aviation, Inc., and JPSGP Inc., each a non-Debtor Subsidiary of Foamex International, and (ii) to convert FMXI, Inc. from a Delaware corporation to a Delaware limited liability company by, among other things, executing the FMXI Conversion Documents.  Except as otherwise set forth herein, or as modified by appropriate corporate action after the Effective Date, the corporate structure and equity ownership of the Debtors and their subsidiaries shall be unchanged.

## VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.     Continued Corporate Existence.

Except as otherwise expressly provided for in Article VII.M above, the Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date with all of the powers of a corporation, partnership or limited liability company, as the case may be, under the laws of the State of Delaware and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection herewith.  In addition, the Reorganized Debtors may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and

conditions of the Plan as well as the documents and instruments executed and delivered in connection herewith, including without limitation, the documents and instruments included in the Plan Supplement.

### B.    Dissolution of Creditors' Committee

The Creditors' Committee shall continue in existence until the Effective Date and shall continue to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date.  On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all of their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate except that the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) all Fee Claims, (ii) any appeals of the Confirmation Order, (iii) any adversary proceedings pending as of the Effective Date to which it may be a party and (iv) post-Effective Date modifications to the Plan.

### C.    Vesting of Property.

Except as otherwise expressly provided in the Plan, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall be vested with all of the property of the Estates free and clear of all Claims, Liens, encumbrances, charges and other interests of creditors and equity security holders.

### D.    Termination of Subordination Rights.

All Claims of the holders of Senior Secured Notes and Senior Subordinated Notes against the Debtors and all rights and Claims between or among the holders of Senior Secured Notes and Senior Subordinated Notes relating in any manner whatsoever to claimed subordination rights, rights to postpetition and default interest, prepayment fees or premiums, or similar rights, whether legal, contractual or equitable, if any (collectively, "Subordination Related Rights"), shall be deemed satisfied by the Distributions under, described in, contemplated by, and/or implemented by, this Plan to holders of such Claims, and such rights shall be deemed waived, released, discharged, and terminated as of the Effective Date, and all actions related to the enforcement of such Subordination Related Rights shall be permanently enjoined.  Distributions under, described in, contemplated by, and/or implemented by, this Plan shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim, including, but not limited to, the holders of Senior Secured Note Claims, by reason of any claimed Subordination Related Rights or otherwise, so that each holder of a Claim shall have and receive the complete benefit of the Distributions in the manner set forth and described in this Plan.

### E. Discharge of the Debtors.

Except as otherwise provided herein, the rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims or Interests of any kind or nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims against, Liens on, and Equity Interests in the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim or Equity Interest with respect thereto was filed, whether the Claim or Equity Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a Distribution hereunder. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim or Equity Interest shall be precluded from asserting any other or further Claim against, or Interest in, the Debtors, the Reorganized Debtors, or any of their respective assets or properties, based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

### F. Injunction.

Except as otherwise expressly provided in the Plan, the Confirmation Order, the Plan Supplement Documents, or a separate order of the Court, all Persons who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest and (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest. Such injunction shall extend to successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.

### G. Preservation of Causes of Action.

The Reorganized Debtors shall retain all rights and all Causes of Action accruing to them and their estates, including but not limited to, those arising under

Doc #:NY7:279598.8

sections 505, 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including all tax setoff and refund rights arising under section 505, other than as expressly provided below. Except as expressly provided in this Plan or the Confirmation Order, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights or Causes of Action. Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors have that is not specifically waived or relinquished by this Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors have as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### H.    Votes Solicited in Good Faith.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors and the Significant Equityholders (and each of their respective affiliates, agents, directors, officers, members, employees, advisors and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the Distributions contemplated hereunder and therefore have not been, and on account thereof will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the Distributions contemplated hereunder.

### I.    Administrative Claims Incurred After the Confirmation Date.

Administrative Claims incurred by the Reorganized Debtors after the Confirmation Date, including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without the need for Court approval.

### J.    Mutual Releases.

**On the Effective Date, (a) the Debtors and the Reorganized Debtors, on behalf of themselves and their estates, (b) all of their respective officers, directors, employees, partners, advisors, attorneys, financial advisors, accountants and other professionals, (c) the members of, and counsel and financial advisors to, the Creditors' Committee, (d) the Significant Equityholders and their counsel and financial advisors, (e) the DIP Lenders and DIP Agents and their respective attorneys and advisors, in each case, in their respective capacities as such, (collectively clauses (a) through (e) being the "Released Parties," and each a "Released Party") shall be deemed to and hereby unconditionally and irrevocably release each other from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown,**

44

foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, <u>except</u> that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct, (ii) the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such Persons asserted against the Debtors or the Reorganized Debtors, (iii) the foregoing release shall not apply to any express contractual or financial obligations owed to the Debtors or Reorganized Debtors or any obligation arising under the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan, (iv) the obligations under the indemnity and other provisions of the DIP Credit Facilities by their terms shall survive the termination of the DIP Credit Facilities shall continue to exist in accordance with their terms, and (v) the obligations of Foamex International and Reorganized Foamex International under the indemnity and other provisions of the Equity Commitment Agreement shall continue to exist in accordance with their terms.

K.    <u>Releases by non-Debtors</u>.

On and as of the Effective Date, all Persons who (i) do not file timely objections to the releases provided in this paragraph and receive Distributions under the Plan, or (ii) vote to accept the Plan as set forth on the relevant Ballot, and do not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, shall be deemed, by virtue of their treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the other Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any other Released Party on account of any Claim or Interest, including but not limited to any claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way relating to the Debtors or their business and affairs or (z) assert against any of the Reorganized Debtors or any other Released Party any claim, obligation, right, Cause of Action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; <u>provided</u>, <u>however</u>, that (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct, (ii) the foregoing release shall not apply to obligations arising under the Plan or an agreement entered into pursuant to, in connection with, or contemplated by, the Plan and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan or an agreement entered into pursuant to, in connection with, or contemplated by, the Plan. Notwithstanding anything to the contrary in this Plan, the releases of the Released Parties shall extend only to claims

**arising against such Released Parties in their capacities as parties in interest in the Chapter 11 Cases.**

      **L.**      **Exculpation.**

      **1.**      **Exculpation and Limitation of Liability.**

**The Debtors, the Reorganized Debtors, the other Released Parties, the Exit Facilities Agent and the other arrangers and lender parties for each of the Exit Facilities (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the negotiation of the Plan, the negotiation of the Plan Supplement Documents, the Equity Commitment Agreement, the Put Option Agreement, the Exit Facility Commitment Agreement, the Rights Offering, the Rights Offering Documents, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting any of the Released Parties, the Exit Facilities Agent or the other arranger and lender parties for each of the Exit Facilities from liability.**

      **2.**      **Limitation of Governmental Releases.**

**Notwithstanding Articles VIII.J, VIII.K and VIII.L.1 of the Plan, the Plan shall not release, discharge, or exculpate any non-Debtor party from any debt owed to the United States Government and/or its agencies, including the PBGC (the "Government"), or from any liability arising under the Internal Revenue Code, ERISA, as amended, or the environmental laws, securities laws or criminal laws of the United States. In addition, notwithstanding Articles VIII.J, VIII.K and VIII.L.1 of the Plan, the Plan shall not enjoin or prevent the Government from collecting any such liability from any such non-Debtor party.**

      **M.**      **Term of Bankruptcy Injunction or Stays.**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Doc #:NY7:279598.8

## N.     Reinstatement and Continuation of Insurance Policies.

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtors' insurance policies in existence on and as of the Confirmation Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Debtors' discharge and release from all Claims and Equity Interests, as provided herein, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and directors) or any other person or entity.  Notwithstanding any other provision of the Plan or the Confirmation Order, nothing in this Plan shall (i) impair (w) the right of any insurer to defend against any claim asserted against such insurer, (x) an insurer's status as a secured creditor to the extent applicable under the terms of the Plan, including the right to recover from any Collateral (in accordance with the applicable insurance policy, (y) an insurer's right to draw on third-party letters of credit (in accordance with the terms of the applicable insurance policy and letter of credit) or (z) any insurer's right of setoff pursuant to section 553 of the Bankruptcy Code to the extent applicable and/or (ii) affect an insurer's right to seek arbitration of disputes between the Debtors and such insurer to the extent provided for under the terms of the applicable insurance agreement.

## O.     Officers' and Directors' Indemnification Rights and Insurance.

Notwithstanding any other provisions of the Plan, the obligations of the Debtors to indemnify their present directors, officers, and employees against any obligations, liabilities, costs or expenses pursuant to the articles of incorporation, by-laws, partnership agreements or limited liability company operating agreements of the Debtors, as the case may be, applicable state law, specific agreement, or any combination of the foregoing, shall survive the Effective Date.

# IX.

# RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:  (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that Distributions to holders of Allowed Claims and Interests are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Interest; (5) to hear and determine timely objections to Administrative Claims and Claims; (6) to hear and determine, to the extent provided in Article V.D. herein, any disputes arising by

the filing of a Post-Petition Interest Rate Determination Notice by a holder of an Allowed Class 5 General Unsecured Claim; (7) to hear and determine any disputes arising as to the reasonableness of an Indenture Trustee's Indenture Trustee Expenses; (8) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (9) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (10) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (11) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (12) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (13) to hear and determine any issue for which the Plan requires a Final Order of the Court; (14) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (15) to hear and determine any Causes of Action preserved under the Plan under sections 544, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code; (16) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (17) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article VIII of the Plan; and (18) to enter a final decree closing the Chapter 11 Cases. The Court shall not retain any jurisdiction over the Exit Facilities or over matters relating to the interpretation or enforcement of the Exit Facilities or any disputes arising therefrom from and after the Effective Date.

# X.

## MISCELLANEOUS PROVISIONS

### A.      Payment of Statutory Fees.

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor as and when such fees become due.

### B.      Modification of the Plan.

#### 1.      Pre-Confirmation Modifications.

The Debtors may alter, amend, or modify the Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code, provided, however, without the prior written consent of each of the Significant Equityholders and the Exit Facilities Agent, which consent cannot be unreasonably withheld, there shall be no alteration, amendment or modification of the Plan prior to Confirmation.

Doc #:NY7:279598.8

## 2. Post-Confirmation Immaterial Modifications.

After the Confirmation Date, the Debtors may, with the approval of the Court and prior written consent of the Significant Equityholders and the Exit Facilities Agent (which consent shall not be unreasonably withheld), without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect the holders of Claims or Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

## 3. Post-Confirmation Material Modifications.

After the Confirmation Date, the Debtors may, with the prior written consent of the Significant Equityholders and the Exit Facilities Agent (which consent shall not be unreasonably withheld), alter or amend the Plan in a manner which, as determined by the Court, materially and adversely affects holders of Claims or Interests, provided that such alteration or modification is made after a hearing as provided in section 1127 of the Bankruptcy Code.

## C. Governing Law.

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules) or Delaware law, the laws of the State of New York (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

## D. Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## E. Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection herewith and Distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.

## F. Exemption From Transfer Taxes.

Pursuant to section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer and exchange under the Plan of the Call Option, the Additional Common Stock, the Put Option, the New Preferred Stock and the security interests in favor of the lenders under the Exit Facilities, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or other similar tax.

### G.      Securities Issues.

To the extent the Call Option is not exercised and the Company exercises the Put Option, the New Preferred Stock issuable to the Significant Equityholders thereunder will be issued in private placement transactions exempt from registration with the SEC pursuant to Section 4(2) of the Securities Act and may not be sold or otherwise disposed of except pursuant to an effective registration statement or pursuant to an available exemption from such registration requirements.  The New Preferred Stock, if issued to the Significant Equityholders, will include a legend on the certificates evidencing such securities indicating their restricted status.

Additional Common Stock issued as part of the Rights Offering and to the extent the Significant Equityholders exercise the Call Option, the Additional Common Stock issuable to the Significant Equityholders thereunder will be issued pursuant to the Registration Statement, provided that such Registration Statement is declared "effective" by the SEC, but may be subject to resale restrictions if held by an affiliate of the Reorganized Debtors.

### H.      Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a).

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### I.      Exhibits/Schedules.

All exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if fully set forth herein.

### J.      Notices.

All notices, requests, and demands hereunder to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Foamex International Inc., 1000 Columbia Avenue, Linwood, Pennsylvania 19061, attention: Gregory J. Christian, with a copy to (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, attention:  Alan W. Kornberg, Esq. and Brian S. Hermann, Esq., Tel.: (212) 373-3000, Fax:  (212) 757-3990, and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19801, attention:  Pauline K. Morgan, Esq. and Joseph M. Barry, Esq., Tel: (302) 571-6600, Fax: (302) 571-1253.

Doc #:NY7:279598.8

To the Ad Hoc Committee of Senior Secured Noteholders:  (i) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, attention:  Adam Harris Esq., Tel.: (212) 756-2000, Fax: (212) 593-5955, and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, attention:  John H. Knight, Esq., Tel.: (302) 651-7700, Fax: (302) 651-7701.

To the Creditors' Committee:  (i) Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey, 07068-1791, attention:  Kenneth A. Rosen, Esq., Tel.: (973) 597-2500, Fax: (973) 597-2400, and (ii) Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware, 19899, attention: Donald J. Detweiler, Tel.: (302) 661-7000, Fax: (302) 661-7360.

To the Significant Equityholders:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, attention James L. Bromley, Esq., Tel.: (212) 225-2000, Fax: (212) 225-3999, and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899-1347, attention: William H. Sudell, Jr., Esq., Tel: (302) 658-9200, Fax: (302) 658-3989.

The Agents for the DIP Lenders:  (i) Kaye Scholer LLP, 425 Park Avenue, New York, NY 10022-3598, attention:  Marc D. Rosenberg, Esq. and Albert M. Fenster, Esq., Tel.: (212) 836-8000, Fax: (212) 836-8689, (ii) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, attention:  Fredric L. Ragucci, Esq., Tel.: (212) 756-2000, Fax: (212) 593-5955, (iii) Buchanan Ingersoll & Rooney P.C., The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, Delaware 19801, attention:  Jami B. Nimeroff, Esq., Tel.: (302) 552-4200, Fax: (302) 522-4295, and (iv) Landis Rath & Cobb, LLP, 919 Market Street, Suite 600, Wilmington, Delaware 19899, attention:  Adam C. Landis, Esq., Tel: (302) 467-4400, Fax: (302) 467-4450.

The Agents for the Exit Lenders:  (i) Kaye Scholer LLP, 425 Park Avenue, New York, NY 10022-3598, attention:  Marc D. Rosenberg, Esq. and Albert M. Fenster, Esq., Tel.: (212) 836-8000, Fax: (212) 836-8689 and (ii) Cahill Gordon & Reindel, LLP, 80 Pine Street, New York, NY 10005, attention: Susanna M. Suh, Esq., Tel.: (212) 701-3686, Fax.: (212) 378-2611.

The Office of the United States Trustee: 844 King Street, Suite 2207, Wilmington, Delaware 19801, attention:  David L. Buchbinder, Esq., Tel.: (302) 573-6491, Fax: (302) 573-6497.

## K.    Plan Supplement.

Forms of the documents relating to the Exit Facilities, the Registration Rights Agreement, the Call Option Agreement, the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, the Other Amended and Restated Governing Documents, the FMXI Conversion Documents, a notice setting forth the identities, terms and nature of the compensation of the Reorganized Debtors' senior officers and directors and the employment contracts to be entered into with the Reorganized Debtors' senior officers, and such other documents and information as the

Debtors determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement, which will be filed with the Clerk of the Court no later than ten (10) days prior to the Confirmation Hearing; provided, however, that the Debtors may amend any of the Plan Supplement Documents through and including the Effective Date in a manner consistent with the Plan and with the prior written consent of each of the Significant Equityholders and the Exit Facilities Agent (which consent shall not be unreasonably withheld) and consent of any other non-Debtor third parties to the relevant document.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at Bankruptcy Services, LLC's website at Foamex's dedicated web page on www.bsillc.com.  Holders of Claims or Equity Interests may also obtain a copy of the Plan Supplement upon written request to the Debtors in accordance with Article X.J of the Plan.

### L.    Conflict.

The terms of this Plan shall govern in the event of any inconsistency with the summary of the Plan set forth in the Disclosure Statement.  The terms of the Confirmation Order shall govern in the event of any inconsistency with the Plan or the summary of the Plan set forth in the Disclosure Statement.

### M.    Setoff by the United States.

The valid setoff rights, if any, of the United States of America will be unaffected by this Plan or confirmation hereof.

## XI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except for those executory contracts and unexpired leases that are specified as rejected in this Article XI below, and other than executory contracts or unexpired leases that have expired or terminated pursuant to their own terms during the pendency of the Chapter 11 Cases or been assumed earlier in the Chapter 11 Cases, benefit plans, which are specifically dealt with in Article XII of the Plan, or insurance policies, which are specifically dealt with in Article VIII.N of the Plan, all of the executory contracts and unexpired leases that exist between the Debtors and any Person are specifically assumed as of and subject to the occurrence of the Effective Date pursuant to the Plan.  To the extent any such executory contracts or unexpired leases have been amended prior to the Confirmation Date, such contracts or leases shall be assumed as so amended.

The following executory contracts and unexpired leases are rejected:

(i)     executory contacts or unexpired leases that have been rejected by the Debtors before the Confirmation Date;

(ii)    executory contracts or unexpired leases that are the subject of a motion to reject pending on the Confirmation Date; and

(iii)   employment agreements that were terminated or rejected prior to the Confirmation Date or in connection with the Plan.

## B.     Cure.

Except as otherwise agreed to by the parties, on the Initial Distribution Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Debtors or the Reorganized Debtors' liability with respect thereto and (ii) the Initial Distribution Date.

## C.     Rejection Damage Claims.

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order authorizing such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 5 General Unsecured Claims.

## XII.

## BENEFIT PLANS

As, and subject to the occurrence, of the Effective Date, all employee compensation and benefit plans, policies and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans and workers' compensation programs, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts or plans that have previously been terminated or rejected, pursuant to

a Final Order, or specifically waived by the beneficiaries of such plans, contracts or programs.

The Debtors and the Reorganized Debtors, as the case may be, will continue to be the contributing sponsors of all pension plans which are defined as benefit pension plans by the Pension Benefit Guaranty Corporation (the "PBGC") under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461. The Confirmation Order shall provide that (i) such pension plans are subject to minimum funding requirements of ERISA and section 412 of the Internal Revenue Code, (ii) no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code, shall, or shall be construed to, discharge, release or relieve the Debtors or any other party, in any capacity, from any liability with respect to such pension plans under ERISA or under Internal Revenue Code section 412 and (iii) neither the PBGC nor such pension plans shall be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

## XIII.

## CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### A.    Conditions Precedent to Confirmation.

The Plan shall not be confirmed by the Court unless and until the following conditions have been satisfied in full or waived pursuant to Article XIII.C:

1.    The Court shall have entered an order finding that the Disclosure Statement, in form and substance reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors, contains adequate information pursuant to section 1125 of the Bankruptcy Code;

2.    The Plan shall be in form and substance materially consistent with the Equity Commitment Agreement and shall be reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors;

3.    The Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Significant Equityholders, the DIP Agents, the Exit Facilities Agent and the Debtors;

4.    All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors;

5.    The Debtors' existing commitments for the Exit Facilities shall not have expired and shall be in full force and effect; and

6.      The Equity Commitment Agreement shall not have terminated or expired pursuant to its terms.

**B.      <u>Conditions Precedent to Effectiveness</u>.**

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XIII.C:

1.      The Confirmation Order, in form and substance reasonably acceptable to the Significant Equityholders, the DIP Agents, the Exit Facilities Agent and the Debtors, shall have been entered, and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by the Plan and such Confirmation Order shall not have been modified or vacated on appeal;

2.      All undisputed statutory fees then due and payable to the United States Trustee shall have been paid in full;

3.      All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors and such documents shall be executed, delivered or filed, as the case may be;

4.      All actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors and shall remain in full force and effect;

5.      All amounts due under the DIP Revolving Credit Facility shall have been indefeasibly paid in full in Cash and the liens and security interests granted thereunder terminated;

6.      All amounts due under the DIP Term Loan Credit Facility shall have been indefeasibly paid in full in Cash and the liens and security interests granted thereunder terminated;

7.      The Exit Facilities shall have been entered into by the Debtors and the other parties thereto and all conditions to the initial borrowings under the Exit Facilities shall have been satisfied in accordance with the terms thereof (but for the occurrence of the Effective Date);

Doc #:NY7:279598.8

8. The Equity Commitment Agreement shall have been executed by the parties thereto, approved by the Court and shall not have expired or terminated by its terms;

9. The Rights Offering shall have been consummated in a manner that is reasonably acceptable to the Significant Equityholders, the Exit Facilities Agent and the Debtors;

10. The Put Option or the Call Option, as applicable, shall have been exercised, if necessary, as provided in the Plan and the Put Option Agreement; and

11. The Put Option Conditions shall have been satisfied or waived in accordance with the terms of the Equity Commitment Agreement.

## C.  **Waiver of Conditions.**

The Debtors may waive any or all of the conditions set forth in Article XIII.A and B (except for the condition set forth in sub-section B.1 above) at any time, with the prior written consent of the Significant Equityholders without leave or order of the Court and without any formal action.

## D.  **Effect of Failure of Conditions.**

In the event that the Effective Date does not occur on or prior to February 28, 2007, or such later date as may be agreed to by the Debtors, the Significant Equityholders and the Exit Facilities Agent, upon notification submitted by the Debtors to the Court:  (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## E.  **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

Doc #:NY7:279598.8

**F.**       **Revocation, Withdrawal, or Non-Consummation.**

      **1.**       **Right to Revoke or Withdraw.**

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date.

      **2.**       **Effect of Withdrawal, Revocation, or Non-Consummation.**

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, insurance policies or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

Doc #:NY7:279598.8

Dated: October 23, 2006

FOAMEX INTERNATIONAL INC.

By: /s/ Gregory J. Christian
      Name: Gregory J. Christian
      Title:  Executive Vice President,
             Chief Restructuring Officer
             and General Counsel

FMXI, INC.

By: /s/ Gregory J. Christian
      Name: Gregory J. Christian
      Title:  Vice President, Chief Restructuring
             Officer and Secretary

FOAMEX L.P.

**By:  FMXI, INC.**
**      Foamex L.P.'s Managing General Partner**

By: /s/ Gregory J. Christian
      Name:  Gregory J. Christian
      Title:   Vice President, Chief Restructuring
              Officer and Secretary

FOAMEX CAPITAL CORPORATION

By: /s/ Gregory J. Christian
      Name:  Gregory J. Christian
      Title    Vice President, Chief Restructuring
              Officer and Secretary

Doc #:NY7:279598.8

**FOAMEX CARPET CUSHION LLC**

By: /s/ Gregory J. Christian                        `
    Name:  Gregory J. Christian
    Title:   Vice President, Chief Restructuring
           Officer and Secretary


**FOAMEX ASIA, INC.**


By: /s/ Gregory J. Christian
    Name:  Gregory J. Christian
    Title:   Vice President, Chief Restructuring
           Officer and Secretary


**FOAMEX LATIN AMERICA, INC.**


By: /s/ Gregory J. Christian
    Name:  Gregory J. Christian
    Title:   Vice President, Chief Restructuring
           Officer and Secretary


**FOAMEX MEXICO, INC.**


By: /s/ Gregory J. Christian
    Name:  Gregory J. Christian
    Title:   Vice President, Chief Restructuring
           Officer and Secretary


**FOAMEX MEXICO II, INC.**


By: /s/ Gregory J. Christian
    Name:  Gregory J. Christian
    Title:   Vice President, Chief Restructuring
           Officer and Secretary

Doc #:NY7:279598.8

**PLAN EXHIBIT AND SCHEDULE LIST**

Exhibit A – Equity Commitment Agreement

Schedule A —  Unliquidated Claims

# **Exhibit A**

## EQUITY COMMITMENT AGREEMENT

October 13, 2006

Foamex International Inc.
1000 Columbia Avenue
Linwood, PA 19061
Attention: Raymond E. Mabus, Jr.
              Gregory J. Christian

        Re:      Equity Funding Commitment

Ladies and Gentlemen:

        We understand that Foamex International Inc. (the "Company," and together with its debtor affiliates, the "Debtors") proposes to file an amended plan of reorganization (the "First Amended Plan") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") incorporating the terms and conditions described in the term sheets annexed hereto as Exhibit A (the "Investment Term Sheet") and Exhibit B (the "Plan Term Sheet" and, together with the Investment Term Sheet, the "Term Sheets") and the Put Option Agreement annexed hereto as Exhibit C (the "Put Option Agreement"). The Term Sheets and the Put Option Agreement are hereby incorporated herein in their entirety as if set forth below in their entirety.

        Among other things, the First Amended Plan will provide for:

           (i)      an offering (the "Rights Offering") to the Company's existing common stockholders and preferred stockholders (collectively, the "Equityholders") of rights (the "Rights") to purchase additional shares of common stock (the "Additional Common Stock") of the Company as reorganized (the "Reorganized Company");

           (ii)     the purchase from the Company by the Significant Equityholders (as defined in the Investment Term Sheet) of the Call Option (as defined in the Investment Term Sheet) with respect to the Additional Common Stock; and

           (iii)    upon the exercise by the Significant Equityholders of the Call Option, or upon the exercise by the Company of the Put Option (as defined in the Investment Term Sheet), the sale to the Significant Equityholders of shares of Additional Common Stock, or preferred stock in the Reorganized Company (the "New Preferred Stock"), as the case may be, for an aggregate purchase price equal to the Rights Offering Amount (as defined in the Investment Term Sheet) less the aggregate amount received by the Company as a result of the exercise, if any, of Rights by the Significant Equityholders and the other Equityholders.

The Significant Equityholders are pleased to commit (the "Commitment"), subject to the terms and conditions set forth in this letter (the "Commitment Letter") and set forth in the Term Sheets and the Put Option Agreement, and on the basis of the representations and warranties set forth herein to (i) sell the Put Option to the Company on the terms and conditions substantially set forth in the Put Option Agreement and to fulfill their obligations under the Put Option Agreement and (ii) fulfill their obligations under the First Amended Plan as confirmed by the Bankruptcy Court to the extent such obligations are expressly set forth or contemplated in this Commitment Letter.

The Commitment is subject to, among other things, (i) the negotiation, execution and delivery of definitive documentation, including, without limitation, those documents to be included in the plan supplement to the First Amended Plan (collectively, the "Definitive Documents") in form and substance reasonably satisfactory to each of the Significant Equityholders; (ii) from the date of this Commitment Letter through the Effective Date (as defined in the Investment Term Sheet), there not having occurred any Material Adverse Change (as defined in the Investment Term Sheet); and (iii) the other terms and conditions set forth in the Term Sheets and the Put Option Agreement. The Definitive Documents and the First Amended Plan shall be in form and substance consistent with the Term Sheets and the Put Option Agreement and shall contain representations and warranties customarily found in agreements for similar investments or financings and shall be reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion.

In consideration of the foregoing, and the representations and warranties set forth herein, and other good and valuable consideration, the value of which is hereby acknowledged, the Company and the Significant Equityholders agree as follows:

1.      The Significant Equityholders' Commitment.

Subject to Bankruptcy Court approval and to the terms and conditions set forth in the Put Option Agreement, and on the basis of the representations and warranties herein contained, in exchange for the Put Option Premium (as defined in the Investment Term Sheet) each of the Significant Equityholders agrees to sell to the Company and the Company agrees to purchase from the Significant Equityholders the Put Option.

2.      Representations and Warranties of the Company. The Company represents and warrants to, and agrees with, the Significant Equityholders as set forth below. Each representation, warranty and agreement set forth in this Section 2 is made as of the date hereof and as of the Effective Date:

(a)      Each of the Company and its Subsidiaries (as defined below) has been duly organized and is validly existing as a corporation or other form of entity in good standing under the laws of its state of organization, with the requisite power and authority to own its properties and conduct its business as currently conducted, subject to the restrictions that result solely from its status as a debtor-in-possession under chapter 11 of the Bankruptcy Code (including that in certain instances the Company's conduct of its

business requires Bankruptcy Court approval). Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or other form of entity for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent the failure to be so qualified or be in good standing has not had or could not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or results of operations of the Company and its Subsidiaries taken as a whole or on the ability of the Company or any of the other Debtors, as the case may be, to consummate the transactions contemplated by this Commitment Letter, the Term Sheets, the Put Option Agreement, the First Amended Plan or the Definitive Documents contemplated hereby and thereby. For the purposes of this Commitment Letter, a "Subsidiary" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies.

(b)      Subject to Bankruptcy Court approval and the filing with the Secretary of State of Delaware of an appropriate Certificate of Amendment of the Company's Restated Certificate of Incorporation, as amended (or Amended Restated Certificate of Incorporation, as amended) (the "Certificate of Amendment"), the Company has the requisite corporate power and authority to enter into, execute, deliver and perform its obligations under this Commitment Letter. Subject to Bankruptcy Court approval, the Company will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Commitment Letter, the Put Option Agreement, the First Amended Plan and the Definitive Documents contemplated hereby and thereby, including, without limitation, the issuance of the Call Option, the New Preferred Stock, the Rights and the Additional Common Stock.

(c)      This Commitment Letter has been duly and validly executed and delivered by the Company, and, subject to Bankruptcy Court approval and the filing of the Certificate of Amendment, constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms. Subject to Bankruptcy Court approval and the filing of the Certificate of Amendment each of the Definitive Documents will be duly authorized and validly executed and delivered by the Company and will constitute a valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

(d)      If and when issued in accordance with the terms of the Put Option Agreement, and subject to the filing of the Certificate of Amendment, the issuance of the New Preferred Stock will be duly and validly authorized and will be duly and validly issued, fully paid and non-assessable, and free and clear of all taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights.

(e)     If and when issued pursuant to the exercise of the Rights or in accordance with the terms of the Call Option, and subject to the filing of the Certificate of Amendment, the issuance of the Additional Common Stock will be duly and validly authorized and will be duly and validly issued, fully paid and non-assessable, and subject to the termination prior to such issuance of the Company's Shareholder Rights Plan dated August 5, 2004, as amended, free and clear of all taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights.

(f)     Except (i) for the Preferred Equity Interests and Other Common Equity Interests in Foamex International (each as described in the Plan Term Sheet) and (ii) for the transactions contemplated by this Commitment Letter, there are no outstanding subscription rights, options, warrants, convertible or exchangeable securities or other rights of any character whatsoever to which the Company is a party relating to issued or unissued capital stock of the Company, or any commitments of any character whatsoever relating to issued or unissued capital stock of the Company or pursuant to which the Company is or may become bound to issue or grant additional shares of its capital stock or related subscription rights, options, warrants, convertible or exchangeable securities or other rights, or to grant preemptive rights, which, in each instance, will be in effect immediately following the closing of the transactions contemplated hereby.

(g)     Subject to obtaining the Required Approvals (as defined herein) and the filing of the Certificate of Amendment, none of the distribution of the Rights, the sale, issuance and delivery of Additional Common Stock upon exercise of the Rights or the Call Option, the purchase of the Put Option by the Company and the issuance and delivery of New Preferred Stock upon the exercise of the Put Option, the execution and delivery by the Company (or, with respect to the First Amended Plan, the filing by the Debtors) of this Commitment Letter, the Put Option Agreement and the First Amended Plan, performance of and compliance by the Company and the other Debtors with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (including compliance by the Significant Equityholders with their obligations hereunder and thereunder) (i) will conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration, termination, modification or cancellation of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will result in any violation of the provisions of the Restated Certificate of Incorporation or By-laws of the Company, or any of the equivalent organizational documents of any of its Subsidiaries, as amended and restated in connection with consummation of the transactions contemplated herein and in the First Amended Plan, or (iii) will result in any violation of, or any termination or material impairment of any rights under, any statute, license, authorization, injunction, judgment, order, decree, rule or regulation of any court, governmental agency or body, or arbitration

or similar tribunal having jurisdiction over the Company or any of its Subsidiaries or any of their respective properties.

   (h)  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their respective properties is required for the distribution of the Rights, the sale, issuance and delivery of Additional Common Stock upon exercise of the Rights or the Call Option, the purchase of the Put Option by the Company and the issuance and delivery of New Preferred Stock upon the exercise of the Put Option, the execution and delivery by the Company (or, with respect to the First Amended Plan, the filing by the Debtors) of this Commitment Letter, the Put Option Agreement and the First Amended Plan, performance of and compliance by the Company and the other Debtors with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except (i) the entry of one or more orders, including the Confirmation Order by the Bankruptcy Court; (ii) the filing of any notifications required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and the expiration or termination of the waiting periods applicable under the HSR Act to the acquisition of Additional Common Stock by the Significant Equityholders and (iii) the filing and effectiveness of a registration statement by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "Securities Act") (collectively, the "Required Approvals").

   (i)  The audited consolidated financial statements of the Company as of and for the year ended January 1, 2006 attached hereto as Schedule A and the unaudited consolidated financial statements of the Company as of and for the six months ended July 2, 2006 attached hereto as Schedule B present fairly in all material respects, in each case together with the related notes, the financial position of the Company and its consolidated Subsidiaries at the dates indicated and the statements of operations, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries for the periods specified, except that the unaudited financial statements are subject to normal and recurring year-end adjustments that are not expected to be material in amount; such financial statements have been prepared in conformity with generally accepted accounting principles in the United States, except as otherwise noted in such financial statements or related notes, applied on a consistent basis throughout the periods involved and with past practices, and in conformity with the rules and regulations of the SEC. The Significant Equityholders acknowledge that the Company's financial statements described above do not reflect the terms of the First Amended Plan and the Term Sheets.

   (j)  Each of the Company and its Subsidiaries is in compliance in all material respects with all laws, statutes, ordinances, rules, regulations, orders, judgments and decrees of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their respective properties, and none of the Company or any of its Subsidiaries has received written notice of any alleged material violation of any of the foregoing. Each of the Company and its Subsidiaries holds all material licenses, franchises, permits, consents, registrations, certificates and other

governmental and regulatory permits, authorizations and approvals required for the operation of the business as presently conducted by it and for the ownership, lease or operation of its assets, subject to the restrictions that result solely from its status as a debtor-in-possession under chapter 11 of the Bankruptcy Code (including that in certain instances the Company's conduct of its business requires Bankruptcy Court approval).

(k)     All written information and other materials concerning the Debtors, the Reorganized Company and the First Amended Plan (the "Information") which has been, or is hereafter, prepared by, or on behalf of, the Company and delivered to the Significant Equityholders is, or when delivered will be, when considered as a whole, complete and correct in all material respects and does not, or will not when delivered, contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements have been made. To the extent that any such Information contains projections, such projections were prepared in good faith on the basis of (i) assumptions, methods and tests which are believed by the Company to be reasonable and (ii) information believed by the Debtors to have been accurate based upon the information available to the Debtors at the time such projections were furnished to the Significant Equityholders.

(l)     Each of the Company and its Subsidiaries has timely filed or caused to be filed all federal and other material tax returns and reports required to have been filed by it and has paid or caused to be paid all material taxes required to have been paid by it, except (i) taxes that are being contested in good faith by appropriate proceedings and for which the Company or the applicable Subsidiary has set aside on its books adequate reserves or (ii) taxes the liability for which will be satisfied pursuant to the First Amended Plan. No material tax liens have been filed and no material claims have been asserted in writing with respect to any such taxes, except for claims that will be satisfied pursuant to the First Amended Plan. None of the Company nor any of its Subsidiaries has participated in a "reportable transaction" within the meaning of Section 1.6011-4(b) of the Treasury Regulations promulgated under the Internal Revenue Code of 1986, as amended.

(m)     Legal Proceedings. Except as set forth on the litigation schedule prepared by the Company and attached hereto as Schedule C (the "Litigation Schedule"), there is no material suit, action, claim or legal, administrative, arbitration or other alternative dispute resolution, proceeding or investigation (a "Proceeding ") pending or, to the knowledge of the Company, threatened by, against or involving the Company or any of its Subsidiaries or any of their respective properties, or, to the knowledge of the Company, no circumstances reasonably likely to give rise to such Proceeding. Neither the Company nor any of its subsidiaries is subject to any material judgment, decree, injunction, rule or order of any governmental entity.

(n)     Environmental. Except as set forth on the environmental schedule prepared by the Company and attached hereto as Schedule D (the "Environmental Schedule"):

(i)    To the knowledge of the Company, there are no pending or threatened material Environmental, Health or Safety Claims against or affecting the Company or any of its Subsidiaries, and the Company is not aware of any facts or circumstances, including without limitation the current or former presence, Release or threatened Release of or exposure to any Hazardous Materials, which could reasonably be expected to form the basis for any such material Environmental, Health or Safety Claim.

(ii)    To the knowledge of the Company, no Premises is currently or was formerly used for the handling, storage, treatment, disposal, manufacture, processing or generation of Hazardous Materials and no Hazardous Materials currently are or formerly were present in, on, about or migrating to or from any Premises, except, in either case, (A) in material compliance with applicable Environmental, Health or Safety Laws and  (B) as would not reasonably be anticipated to result in material liabilities or obligations to the Company or its Subsidiaries, including requirements for notification, investigation or remediation, pursuant to Environmental, Health or Safety Laws.

(iii)    Each of the Company and its Subsidiaries holds all material Environmental Permits necessary to the conduct of its businesses.

(iv)    Each of the Company and its Subsidiaries has been and is in material compliance with all applicable Environmental Permits and Environmental, Health or Safety Laws.

(v)    No Premises is a current, or to the knowledge of the Company, a proposed Environmental Clean-up Site.

(vi)    To the knowledge of the Company, there are no underground storage tanks (active or abandoned), asbestos or asbestos-containing materials, or polychlorinated biphenyls located at any Premises in a condition that would reasonably be anticipated to result in material liabilities or obligations to the Company pursuant to Environmental, Health or Safety Laws.

(vii)    There have been no material environmental, health or safety investigations, studies, audits, tests, reviews or other analyses conducted by, or on behalf of, and which are in the possession of, the Company or any of its Subsidiaries with respect to any Premises that have not been delivered to the Significant Equityholders.

(viii)  As used herein:

(A)    "Environment" means any surface or subsurface water, groundwater, water vapor, surface or subsurface land, air (including indoor, workplace and ambient air), fish, wildlife, microorganisms and all other natural resources.

(B)  "Environmental, Health or Safety Claim" means any and all administrative or judicial actions, suits, orders, claims, liens, notices, notices of violations, investigations, complaints, requests for information, proceedings and other written communications, whether criminal or civil, pursuant to or relating to any applicable Environmental, Health or Safety Law by any person (including, but not limited to, any court, governmental agency or body, private person and citizens' group) based upon, alleging, asserting or claiming any actual or potential (i) violation of or liability under any Environmental, Health or Safety Law, (ii) violation of any Environmental Permit or (iii) liability for investigatory costs, cleanup costs, removal costs, remedial costs, response costs, natural resource damages, damage, property damage, personal injury, fines or penalties arising out of, based on, resulting from or related to the presence, Release or threatened Release of or exposure to any Hazardous Materials at any location, including, but not limited to, any Premises or any location other than any Premises to which Hazardous Materials or materials containing Hazardous Materials were sent for handling, storage, treatment or disposal.

(C)  "Environmental Clean-up Site" means any location that is listed or proposed for listing on the National Priorities List, the Comprehensive Environmental Response, Compensation and Liability Information System or on any similar state list of sites requiring investigation or cleanup.

(D)  "Environmental, Health or Safety Laws" means any and all applicable federal, state, local, municipal and foreign laws, rules, orders, regulations, statutes, ordinances, codes, common law doctrines, decrees and enforceable requirements of any court or governmental agency or body regulating, relating to, or imposing liability or standards of conduct concerning, any Hazardous Material or protection of the Environment or human or worker health and safety, as now or at any time hereafter in effect, including, without limitation, the Clean Water Act also known as the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. §§ 1251 et seq., the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 et seq., the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq., the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201 et seq., the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., the Superfund Amendment and Reauthorization Act of 1986 ("SARA"), Public Law 99-499, 100 Stat. 1613, the Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U. S. C. § § 11001 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq., the Occupational Safety and Health Act as amended ("OSHA"), 29 U.S.C. §§ 655 and 657, together, in each case, with any amendment thereto, and the regulations adopted and the publications promulgated thereunder and all substitutions thereof.

(E)  "Environmental Permit" means any federal, state, local, provincial, or foreign permits, licenses, approvals, consents or authorizations required by any court or governmental agency or body under or in connection with any Environmental, Health or Safety Law.

(F)     "Hazardous Materials" means any hazardous, toxic or deleterious chemicals, materials, substances or wastes in any amount or concentration, including without limitation petroleum, petroleum hydrocarbons or petroleum products, petroleum by-products, radioactive materials, asbestos or asbestos-containing materials, gasoline, diesel fuel, pesticides, radon, urea formaldehyde, lead or lead-containing materials, polychlorinated biphenyls, and any other chemicals, materials, substances or wastes which are defined as or included in the definition of "hazardous substances," "hazardous materials," "hazardous wastes," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "pollutants," "regulated substances, " "solid wastes" or "contaminants" or words of similar import, under any Environmental, Health or Safety Law.

(G)     "Premises" means any real property currently or formerly owned, leased or operated by the Company or any of its Subsidiaries, including, but not limited to, the Environment, buildings and structures thereat.

(H)     "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, or other release of any Hazardous Materials, including, without limitation, the migration of any Hazardous Materials, the abandonment or discard of barrels, containers, tanks or other receptacles containing or previously containing any Hazardous Materials, or any "release", "emission" or "discharge" as those terms are defined in any applicable Environmental, Health or Safety Laws.

3.     Representations and Warranties of the Significant Equityholders. Solely with respect to itself, each of the Significant Equityholders, severally and not jointly, represents and warrants to, and agrees with, the Company as set forth below. Each representation, warranty and agreement made in this Section 3 is made as of the date hereof and as of the Effective Date:

(a)     The Significant Equityholder has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of organization.

(b)     The Significant Equityholder has the requisite power and authority to enter into, execute and deliver this Commitment Letter and the Put Option Agreement and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Commitment Letter and the Put Option Agreement.

(c)     This Commitment Letter and the Put Option Agreement have been duly and validly executed and delivered by the Significant Equityholder, and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)     Any New Preferred Stock that may be acquired by the Significant Equityholder is solely for its own account, for investment and not with a view toward

resale or other distribution within the meaning of the Securities Act; provided, however, that the disposition of the Significant Equityholder's respective property will at all times be under its control. Any New Preferred Stock will not be offered for sale, sold or otherwise transferred by the Significant Equityholder except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)     The Significant Equityholder has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in any New Preferred Stock that may be acquired by it. The Significant Equityholder is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act. The Significant Equityholder understands and is able to bear any economic risks associated with such investment.

(f)     The Significant Equityholder acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and to obtain additional information that it has requested to verify the accuracy of the information contained herein. Notwithstanding the foregoing, nothing contained herein will operate to modify or limit in any respect the representations and warranties of the Company or to relieve it from any obligations to the Significant Equityholder for breach thereof or the making of misleading statements or the omission of material facts in connection with the transactions contemplated herein.

(g)     Subject to obtaining the Required Approvals, compliance by the Significant Equityholder with its obligations hereunder, the Put Option Agreement and any Call Option will not, other than such conflicts, violations or defaults that would not have an adverse effect on the ability of the Significant Equityholder to consummate the transactions contemplated hereunder, (i) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration, termination, modification or cancellation of, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Significant Equityholder is a party or by which the Significant Equityholder is bound or to which any of the property or assets of the Significant Equityholder are subject, (ii) result in any violation of the provisions of the organizational documents of the Significant Equityholder or (iii) result in any violation of any statute, license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Significant Equityholder or any of its respective properties.

(h)     No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Significant Equityholder or any of its properties is required for the compliance by the Significant Equityholder with all of the provisions hereof and of the Put Option Agreement or the consummation of the transactions contemplated herein or therein, except the Required Approvals or other consent, approval, authorization, order,

registration or qualification that would not have an adverse effect on the Significant Equityholder's ability to consummate the transactions contemplated hereunder.

(i)    The Significant Equityholder has available to it the funds required to fulfill in full its obligations hereunder and under the Put Option Agreement.

4.    <u>Fees and Expenses.</u>  Upon approval of this Commitment Letter by the Bankruptcy Court, and so long as this Commitment Letter shall continue to be in full force and effect and has not been terminated or otherwise expired by its terms, and the Significant Equityholders are not otherwise in breach of any material obligation hereunder and under the Commitment Letter, the Company shall be obligated to pay the reasonable, documented, out-of-pocket fees and expenses incurred since June 8, 2006 through the earlier of such termination or expiration date and the Effective Date, for the Professionals (as defined below) in connection with the negotiation, preparation, execution and delivery of the Commitment Letter and any and all Definitive Documents, including, without limitation, any such reasonable fees and expenses incurred in connection with litigation, contested matters, adversary proceedings, or negotiations necessitated by such proceedings, in each case, relating to the Commitment Letter or the First Amended Plan, subject to (i) an aggregate monthly cap of $125,000 for reasonable legal fees and expenses (with the excess in any given month capable of being carried forward and applied in a subsequent month(s)), and (ii) the terms of the engagement letter to be executed by the Company, the Significant Equityholders and Imperial Capital, LLC (such fees and expenses, the "<u>Expenses</u>"); <u>provided</u>, <u>however</u>, that any Expenses that remain unpaid as of the earlier of such termination or expiration date and the Effective Date, as the case may be, shall be paid by the Company no later than thirty (30) days after such termination or expiration date or the Effective Date, as applicable.

All invoices for which reimbursement is sought from the Company shall be sent via email and regular mail to the Company, the Company's counsel, the U.S. Trustee and counsel for the Official Committee of Unsecured Creditors appointed in the Company's chapter 11 cases. The parties shall have ten (10) calendar days from the delivery of such invoices to object to the reasonableness of the amounts requested. If no objections are raised during the objection period, the Company shall make such payments without the need for filing any application with the Bankruptcy Court. If an objection is raised and cannot be resolved consensually, the parties shall submit such dispute to the Bankruptcy Court for final resolution.

5.    <u>Indemnification.</u>  The Company agrees to indemnify and hold harmless the Significant Equityholders and their respective affiliates, and each of their respective directors, officers, partners, members, employees, agents, counsel, financial advisors and assignees (including affiliates of such assignees), in their capacities as such (each an "<u>Indemnified Party</u>"), from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject from third party claims (including claims by other stockholders), insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from this

Foamex International Inc.
October 13, 2006
Page 12

Commitment Letter, the First Amended Plan or the Definitive Documents, and the
Company agrees to reimburse (on an as-incurred monthly basis) each Indemnified Party
for any reasonable legal or other reasonable expenses incurred in connection with
investigating, defending or participating in any such loss, claim, damage, liability or
action or other proceeding (whether or not such Indemnified Party is a party to any action
or proceeding out of which indemnified expenses arise), but excluding therefrom all
expenses, losses, claims, damages and liabilities of the Significant Equityholders that are
finally judicially determined (not subject to appeal) to have resulted solely from (i) the
gross negligence or willful misconduct of such Indemnified Party or (ii) statements or
omissions in a registration statement, disclosure statement or prospectus or any
amendment or supplement thereto made in reliance upon or in conformity with the
information relating to the Significant Equityholders furnished to the Company in writing
by or on behalf of the Significant Equityholders expressly for use in a registration
statement, disclosure statement or prospectus or any amendment or supplement thereto.
In the event of any litigation or dispute involving this Commitment Letter, the First
Amended Plan and/or the Definitive Documents, subject to the foregoing, the Significant
Equityholders shall not be responsible or liable to the Company for any special, indirect,
consequential, incidental or punitive damages. The obligations of the Company under
this paragraph (the "Indemnification Obligations") shall remain effective whether or not
any of the transactions contemplated in this Commitment Letter are consummated, any
Definitive Documents are executed and notwithstanding any termination of this
Commitment Letter and shall be binding upon the Reorganized Company in the event
that any plan of reorganization of the Company is consummated.

Except in the case of fraud, and subject to the foregoing Indemnification
Obligations, the Significant Equityholders' rights to payment of the Put Option Premium
(to the extent due and payable in accordance with the Investment Term Sheet and the Put
Option Agreement) and any accrued and unpaid Expenses (subject to the limitations set
forth herein) shall constitute the sole and liquidated damages available to the Significant
Equityholders in the event the transactions contemplated herein are not consummated.

6.      Additional Covenants of the Company. The Company agrees with
the Significant Equityholders:

(a)      To file a motion seeking Bankruptcy Court approval of this
Commitment Letter (including payment of the Expenses and the Put Option Premium and
the Indemnification Obligations) as soon as practicable but in no event more than three
(3) business days after execution of the Commitment Letter by the Significant
Equityholders and the Company. Any motion, pleading, proposed order, press release,
public statement or other document that relates or refers to the Commitment, the
Commitment Letter or the First Amended Plan shall be provided to counsel to the
Significant Equityholders in draft form for review prior to its being made public or its
being filed with the Bankruptcy Court. No such materials may be made public or be filed
with the Bankruptcy Court without the consent of each of the Significant Equityholders
(through their counsel), which consent shall not be unreasonably withheld or delayed.

(b)     Other than with respect to a Competing Transaction, the Company (i) will use reasonable best efforts to obtain, and to cause the other Debtors to obtain, the entry of the Confirmation Order by the Bankruptcy Court, the terms of which shall be consistent in all material respects with this Commitment Letter and the First Amended Plan; (ii) will use reasonable best efforts to adopt, and to cause the other Debtors to adopt, the First Amended Plan; (iii) will not, and will cause the other Debtors not to, amend or modify the First Amended Plan in any material respect that would adversely affect the Significant Equityholders without their prior written consent. In addition, the Company will provide to the Significant Equityholders and their counsel with a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court, and the Company will not, and will cause the other Debtors not to, file the Confirmation Order with the Bankruptcy Court unless the Significant Equityholders have approved the form of such order, such approval not to be unreasonably withheld or delayed.

(c)     To use reasonable best efforts to effectuate the Rights Offering as provided herein upon the terms and conditions set forth in the Investment Term Sheet.

(d)     Other than after the Company has sent the Significant Equityholders a Competing Transaction Acceptance Notice in accordance with the Investment Term Sheet, not to file any pleading or take any other action in the Bankruptcy Court that is inconsistent with the terms of this Commitment Letter, the First Amended Plan, the Confirmation Order or the consummation of the transactions contemplated hereby or thereby without providing prior written notice to the Significant Equityholders no later than five (5) business days before filing any such pleading or taking such action.

(e)     To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications that are necessary or advisable under the HSR Act so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase, if any, of the Additional Common Stock by the Significant Equityholders hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement. The Company shall pay the filing fees required by the HSR Act.

(f)     To file with the Secretary of State of Delaware the Certificate of Amendment as contemplated herein on or prior to the Effective Date.

(g)     The Company shall provide to the Significant Equityholders and their advisors and representatives reasonable access during normal business hours to all books, records, documents, properties and personnel of the Company. In addition, the Company shall promptly provide written notification to counsel to the Significant Equityholders of any claim or litigation, arbitration or administrative proceeding that is threatened or filed against the Company from the date hereof until the earlier of the (i) Effective Date and (ii) termination or expiration of this Commitment Letter. The

Company shall promptly provide written notice to counsel to the Significant Equityholders of any change in any of the information contained in the representations or warranties, including without limitation related schedules, made by the Company herein and shall promptly furnish any information that a Significant Equityholder may reasonably request in relation to such changes.

       7.    <u>Additional Covenants of the Significant Equityholders.</u>  Solely with respect to itself, each Significant Equityholder agrees, severally and not jointly, with the Company:

       (a)    To use reasonable best efforts, upon confirmation of the First Amended Plan, to fulfill its obligations under the First Amended Plan (solely to the extent expressly set forth or contemplated in this Commitment Letter) and otherwise to consummate the transactions contemplated by this Commitment Letter, the Put Option Agreement and the First Amended Plan.

       (b)    Not to file any pleading or take any other action in the Bankruptcy Court that is inconsistent with the terms of this Commitment Letter, the Put Option Agreement, the First Amended Plan, the Confirmation Order or the consummation of the transactions contemplated hereby or thereby other than with respect to any pleadings or actions related to the Senior Secured Notes (as defined in the Plan Term Sheet) by Goldman, Sachs & Co., in its capacity as a holder of Senior Secured Notes.

       (c)    To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications that are necessary or advisable under the HSR Act so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase, if any, of the Additional Common Stock by the Significant Equityholders hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement; the parties understanding that this shall not require a Significant Equityholder to take any actions under the HSR Act prior to the Rights Offering Commencement Date (as defined in the Investment Term Sheet).

       8.    <u>Acknowledgements and Agreements of the Debtors.</u>
Notwithstanding anything herein to the contrary, the Debtors acknowledge and agree that (a) the transactions contemplated hereby are arm's-length commercial transactions between the Debtors, on the one hand, and the Significant Equityholders, on the other, (b) in connection therewith and with the processes leading to such transactions, each Significant Equityholder is acting solely as a principal and not the agent or fiduciary of the Debtors or their estates, (c) no Significant Equityholder has assumed an advisory or fiduciary responsibility in favor of the Debtors or their estates with respect to such transactions or the processes leading thereto (irrespective of whether such Significant Equityholder has advised or is currently advising the Debtors on other matters) and (d) the Debtors have consulted their own legal and financial advisors to the extent they deemed appropriate. The Debtors agree that they will not claim that any Significant

Equityholder has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Debtors or their estates, in connection with such transactions or the processes leading thereto.

9.     Survival of Representations and Warranties.  All representations and warranties made in this Commitment Letter will survive the execution and delivery of this Commitment Letter but will terminate and be of no further force or effect after the Effective Date.

10.     Obligations of Significant Equityholders.  Notwithstanding anything else to the contrary set forth in this Commitment Letter (including the Term Sheets), the Put Option Agreement, the Definitive Documents, or the First Amended Plan, the obligations of the Significant Equityholders under this Commitment Letter (including the Term Sheets), the Put Option Agreement, the Definitive Documents, the First Amended Plan or in respect of the transactions contemplated by any of the foregoing, shall be several, not joint and several.

11.     Termination.  This Commitment Letter shall terminate upon the occurrence of any of the Termination Events (as defined in the Investment Term Sheet) in accordance with the terms set forth in Investment Term Sheet, unless such Termination Event is waived as set forth in the Investment Term Sheet.

12.     Miscellaneous.  This Commitment Letter, including the attached Term Sheets and Put Option Agreement, (a) supersedes, if accepted and approved by the Bankruptcy Court, all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the Significant Equityholders and the Debtors with respect hereto and thereto; (b) shall be governed, except to the extent that the Bankruptcy Code is applicable, by the laws of the State of New York, without giving effect to the conflict of laws provisions thereof; (c) shall not be assignable by the Company without the prior written consent of each of the Significant Equityholders (and any purported assignment without such consent shall be null and void); (d) shall not be assignable by the Significant Equityholders except to their designees as may be reasonably acceptable to the Company, (e) is intended to be solely for the benefit of the parties hereto and the Indemnified Parties and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Parties; and (f) may not be amended or waived except by an instrument in writing signed by the Company and each of the Significant Equityholders.

13.     Effectiveness.  Notwithstanding anything herein to the contrary, the obligations of the Debtors hereunder, under the Put Option Agreement and under the Term Sheets are subject to the approval of the Bankruptcy Court.  The failure to include any provision of the Term Sheets or the Put Option Agreement in this Commitment Letter shall not affect the enforceability of such provision.  The terms and conditions set forth in the Term Sheets and the Put Option Agreement are incorporated in their entirety as if set forth in this Commitment Letter.

14.     <u>Counterparts.</u>  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

15.     <u>Headings.</u>  The headings in this Commitment Letter are for reference purposes only and will not in any way affect the meaning or interpretation of this Commitment Letter.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the Term Sheets by returning to us executed counterparts hereof not later than 5:00 p.m., New York City time, on Monday, October 16, 2006.

Very truly yours,

D. E. SHAW LAMINAR PORTFOLIOS, L.L.C.

By: _____
     Name:
     Title:

SUNRISE PARTNERS LIMITED PARTNERSHIP

By: _____
     Name:
     Title:

GOLDMAN, SACHS & CO.

By: _____
     Name:
     Title:

PAR IV MASTER FUND, LTD.

_____
Name:
Title:

SIGMA CAPITAL ASSOCIATES, LLC

_____
Name:
Title:

Agreed and accepted on this
   __ day of October, 2006:

FOAMEX INTERNATIONAL INC. (ON BEHALF OF ITSELF AND THE OTHER DEBTORS)

By: _____
     Name:
     Title:

**EXHIBIT A**

**Investment Term Sheet**

**Exhibit A**

**Term Sheet for Potential Investment**

This Term Sheet (the "Investment Term Sheet") is part of a commitment letter, dated October 13, 2006 (the "Commitment Letter"), addressed to Foamex International Inc. by the Significant Equityholders (as defined below) and is subject to the terms and conditions of the Commitment Letter. Capitalized terms used herein shall have the meanings set forth in the Commitment Letter unless otherwise defined herein.

| | |
|---|---|
| **ISSUER:** | Foamex International Inc. (the "Company") |
| **SIGNIFICANT EQUITYHOLDERS:** | D. E. Shaw Laminar Portfolios, L.L.C., Par IV Master Fund, Ltd., Sunrise Partners Limited Partnership, Sigma Capital Associates, LLC and Goldman, Sachs & Co., or their respective designees that are reasonably acceptable to the Company (collectively, the "Significant Equityholders"). |
| **PREFERRED STOCK PUT OPTION:** | The Significant Equityholders and the Company will enter into a put option agreement (the "Put Option Agreement") by which each of the Significant Equityholders will sell, and the Company will purchase, a put option (the "Put Option") under which the Company may require the Significant Equityholders to purchase New Preferred Stock (as defined below) in the Reorganized Company (as defined below) in the event that not all of the shares of Additional Common Stock (as defined below) are subscribed and paid for in full by the Equityholders (as defined below) pursuant to the Rights Offering (as described below) (after taking into account the Rights (as defined below), if any, exercised by the Significant Equityholders). If the Company exercises the Put Option, and subject to the satisfaction of the Put Option Conditions (as defined below), the Company will sell the New Preferred Stock to each of the Significant Equityholders under the Put Option, on a pro rata basis in accordance with each Significant Equityholder's pro rata share of the Significant Equityholders Common Stock or on such other basis as may be agreed among the Significant Equityholders, communicated in writing and reasonably acceptable to the Company, for an aggregate purchase price equal to the Rights Offering Amount (as defined below) less the aggregate amount received by the Company as a result of the exercise, if any, of Rights by the Significant Equityholders and the other Equityholders. The terms and conditions of the Put Option shall be more fully set out in the Put Option Agreement. If issued, the New Preferred Stock shall be issued on the Effective Date (as defined below). |

As consideration for the Put Option, the Company will pay the Significant Equityholders an aggregate amount of up to $9.5 million in immediately available funds (the "Put Option Premium"), to be allocated among the Significant Equityholders in accordance with the terms of the Put Option Agreement and payable in the following manner: (i) $2.0 million shall be paid no later than three (3) business days after the Bankruptcy Court (as defined below) enters an order approving the Approval Motion (as defined below); (ii) $2.5 million shall be paid on the date that the Bankruptcy Court enters an order approving a Competing Transaction (as defined below); (iii) $5.5 million shall be paid upon the occurrence of a Termination Event set forth in subsections (g), (h), (i), (j), (m) or (n) of the section captioned "Termination Events" below; and (iv) $7.5 million shall be paid on the Effective Date if the Commitment Letter (including this Investment Term Sheet) is not otherwise terminated earlier and remains in full force and effect.

The Put Option shall expire on the earlier of (i) the Effective Date and (ii) February 28, 2007 (the "Put Option Expiration Date"), unless terminated or extended as provided herein.

**EQUITY RIGHTS OFFERING:**

A rights offering (the "Rights Offering") shall be made in conjunction with and pursuant to the First Amended Plan (as defined below) to generate gross proceeds equal to the Rights Offering Amount (as defined below).

Pursuant to the First Amended Plan, (i) each Common Equityholder shall be offered the Right (as defined below) to purchase up to 2.56 shares of Additional Common Stock for each share of Existing Common Stock owned by such holder on the Record Date, in exchange for a cash payment equal to $2.25 per share of Additional Common Stock (the "Additional Common Stock Purchase Price") and (ii) each Preferred Equityholder shall be offered the Right to purchase up to 255.78 shares of Additional Common Stock for each share of Existing Preferred Stock owned by such holder on the Record Date, in exchange for a cash payment equal to the Additional Common Stock Purchase Price.

Each Equityholder will receive such number of Rights that, if exercised by such holder, would allow such holder to maintain its equity ownership percentage in the Company as of the Record Date, subject to dilution as a result of (a) the issuance of any shares of common stock or options to purchase Additional Common Stock under the Management Incentive Plan and the issuance of any shares of common stock under the Key Employee Retention Plan (each as defined in the Plan Term Sheet), and (b) the exercise of any employee stock options outstanding on and as of the Effective Date.

The Rights shall not be independently transferable, but shall trade

together with the Existing Common Stock or Existing Preferred Stock, as the case may be, through the Record Date.

A rights agent will be appointed by the Company to facilitate the Rights Offering following consultation with the Significant Equityholders.

Fractional shares shall not be issued and no compensation shall be paid in respect of fractional shares.

Unexercised Rights will expire without compensation at the Expiration Time.

Shares of Additional Common Stock issued in connection with the Rights Offering and as a result of the exercise, if any, by the Significant Equityholders of the Call Option (as defined below) shall be issued on the Effective Date and the First Amended Plan shall expressly require that the Rights Offering close prior to the Effective Date.

**SEC REGISTRATION:**

The Company shall file a registration statement (the "Offering Registration Statement") with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), registering the offering of the Additional Common Stock underlying the Rights.

**USES OF PROCEEDS:**

The Reorganized Company shall utilize the proceeds from the sale of Additional Common Stock and the New Preferred Stock, if any, (a) first, to pay the expenses of the Rights Offering and to pay the balance of the Put Option Premium that becomes due and payable on the Effective Date and (b) second, the net proceeds remaining will be contributed by the Company to Foamex, L.P., its operating subsidiary, to fund required payments under the First Amended Plan and to fund Foamex L.P.'s working capital requirements on the Effective Date.

**COVENANTS:**

The definitive documents with respect to the transactions contemplated by this Investment Term Sheet, including, without limitation, the documents to be included in the plan supplement to be filed in connection with the First Amended Plan (the "Definitive Documents"), shall be entered into pursuant to the First Amended Plan and shall provide for affirmative and negative covenants customarily found in agreements for similar investments or financings, as well as other covenants reasonably satisfactory to the Significant Equityholders, in their individual reasonable discretion, including, without limitation, a covenant that the parties agree to treat the Call Option and the Put Option as options for U.S. federal income tax purposes.

The Amended and Restated Certificate of Incorporation of the Reorganized Company shall include provisions with respect to any "Business Combination" (as defined in the Company's current Restated Certificate of Incorporation) with or into any "Related

3

Person" (as so defined) requiring that the consideration received by the other shareholders in connection with such Business Combination (as so defined) is at "fair value" as determined by the "independent director(s)" (who shall have authority, but not the obligation, to engage independent counsel and independent bankers at the Company's expense, subject to a budget which shall be reasonably acceptable to the Reorganized Company's board of directors, as a whole for purposes of such determination).

**REPRESENTATIONS AND WARRANTIES:** The Definitive Documents shall contain representations and warranties customarily found in agreements for similar investments or financings and shall be reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion.

**REGISTRATION RIGHTS:** Pursuant to the First Amended Plan, on the Effective Date the Reorganized Company shall enter into a registration rights agreement with each of the Significant Equityholders (the "Registration Rights Participants") in form and substance reasonably satisfactory to the parties thereto which will provide:

(A) such Registration Rights Participants with two demand registration rights and unlimited piggy-back registration rights (provided that (i) no demand shall qualify as such unless made by the holders of at least 25% of the aggregate number of outstanding shares of Additional Common Stock, and unless at least 25% of such aggregate number of outstanding shares shall be included to be sold in each registration statement and (ii) no such piggyback registration rights shall be applicable with respect to any filing by the Reorganized Company of a registration statement on Forms S-4 or S-8, or any successor forms thereto) with respect to any Additional Common Stock held by such Registration Rights Participants (including Additional Common Stock issuable upon exercise of the Call Option by such Registration Rights Participants) on customary and reasonable terms; and

(B) that (i) at such time as the Reorganized Company is eligible to effect a registration on Form S-3 (or any successor form), within sixty (60) days after the request of any Registration Rights Participant or group thereof which holds at least 25% of the aggregate number of outstanding shares of Additional Common Stock, the Reorganized Company shall prepare and file, and shall use its reasonable best efforts to have declared effective as soon as practicable thereafter, a registration statement under the Securities Act for the offering on a continuous basis pursuant to Rule 415 of the Securities Act, of any shares of Additional Common Stock held by the Registration Rights Participants (the "Shelf Registration"); and (ii) the Reorganized Company shall keep the Shelf Registration effective for a period ending on the earlier of (a) the date that is the two-year anniversary of the date upon which such registration statement is declared effective

4

by the SEC, (b) the date such Additional Common Stock has been disposed of pursuant to an effective registration statement, (c) the date such Additional Common Stock has been disposed of (1) pursuant to and in accordance with SEC Rule 144 (or any similar provision then in force) under the Securities Act or (2) pursuant to another exemption from the registration requirements of the Securities Act pursuant to which the Additional Common Stock is thereafter freely transferable without restriction under the Securities Act, and (d) the date such Additional Common Stock ceases to be outstanding.

The Reorganized Company shall pay all fees and expenses for any demand registration (including, without limitation, the reasonable fees and expenses of one special counsel for the Registration Rights Participants). The managing underwriter of any public offering effected pursuant to a demand registration will be selected by the Reorganized Company. The selling stockholders shall pay for their respective internal costs and expenses related to any piggyback registration in which they participate. The Registration Rights Agreement shall be reasonably satisfactory to the Significant Equityholders in their sole discretion.

**EXPENSES:**    Upon approval of the Commitment Letter by the Bankruptcy Court, and so long as such Commitment Letter shall continue to be in full force and effect and has not been terminated or otherwise expired by its terms, and the Significant Equityholders are not otherwise in breach of any material obligation hereunder and under the Commitment Letter, the Company shall be obligated to pay the reasonable, documented, out-of-pocket fees and expenses incurred since June 8, 2006 through the earlier of such termination or expiration date and the Effective Date, for the Professionals (as defined below) in connection with the negotiation, preparation, execution and delivery of the Commitment Letter and any and all Definitive Documents, including, without limitation, any such reasonable fees and expenses incurred in connection with litigation, contested matters, adversary proceedings, or negotiations necessitated by such proceedings, in each case, relating to the Commitment Letter or the First Amended Plan, subject to (i) an aggregate monthly cap of $125,000 for reasonable legal fees and expenses (with the excess in any given month capable of being carried forward and applied in a subsequent month(s)), and (ii) the terms of the engagement letter to be executed by the Company, the Significant Equityholders and Imperial Capital, LLC (such fees and expenses, the "Expenses"); provided, however, that any Expenses that remain unpaid as of the earlier of such termination or expiration date and the Effective Date, as the case may be, shall be paid by the Company no later than thirty (30) days after such termination or expiration date or the Effective Date, as applicable.

All invoices for which reimbursement is sought from the Company shall be sent via email and regular mail to the Company, the Company's counsel, the U.S. Trustee and counsel for the Official Committee of Unsecured Creditors appointed in the Company's chapter 11 cases. The parties shall have ten (10) calendar days from the delivery of such invoices to object to the reasonableness of the amounts requested. If no objections are raised during the objection period, the Company shall make such payments without the need for filing any application with the Bankruptcy Court. If an objection is raised and cannot be resolved consensually, the parties shall submit such dispute to the Bankruptcy Court for final resolution.

**CONDITIONS PRECEDENT TO PUT OPTION OBLIGATIONS:**

The obligations of the Significant Equityholders under the Put Option shall be subject to satisfaction of each of the following conditions precedent (collectively, the "Put Option Conditions"):

(a)    the Offering Registration Statement shall have become effective and no stop order suspending its effectiveness or any notice objecting to its use shall have been issued and no proceeding for such purpose shall have been threatened or instituted by the SEC or any state securities commission or authority and all of the Rights shall have been issued;

(b)    the Expiration Time of the Rights Offering shall have passed;

(c)    the First Amended Plan shall provide that the Company shall sell, and each of the Significant Equityholders shall purchase, on or prior to the Effective Date, pursuant to and in connection with the First Amended Plan, on a pro rata basis in accordance with each Significant Equityholder's pro rata share of the Significant Equityholders Common Stock, or on such other basis as may be agreed among the Significant Equityholders, communicated in writing and reasonably acceptable to the Company, for an aggregate purchase price equal to $2.0 million (the "Call Option Premium"), an option (the "Call Option") to purchase on the Effective Date, on a pro rata basis in accordance with each Significant Equityholder's pro rata share of the Significant Equityholders Common Stock, or on such other basis as may be agreed among the Significant Equityholders, communicated in writing and reasonably acceptable to the Company, shares of the Additional Common Stock at a per share price equal to the Additional Common Stock Purchase Price for each Right that is not subscribed and paid for in full by the Equityholders as of the Expiration Time, up to a maximum aggregate purchase price equal to the Rights Offering Amount less the aggregate amount received by the Company as a result of the exercise, if any, of the Rights by Equityholders; provided, however, that if a Termination Event

6

occurs or the Company agrees to enter into a Competing Transaction, the Call Option Premium shall not be payable;

(d)    the Definitive Documents shall provide for the following: (i) the Rights Offering shall expire at least seven (7) business days prior to the projected Effective Date of the First Amended Plan (the "Projected Effective Date," which date shall be determined jointly by the Debtors and the Significant Equityholders); (ii) within two (2) business day after the expiration of the Rights Offering the Company shall send the Significant Equityholders and their counsel a written notice setting forth the total proceeds received through the Rights Offering and any shortfall between the Rights Offering Amount and such proceeds received; (iii) the Significant Equityholders may exercise the Call Option no later than three (3) business days after receipt of the notice set forth in (ii) above; and (iv) (a) if the Significant Equityholders exercise the Call Option, settlement of the Call Option shall take place on the Effective Date and the Put Option shall expire without any further action by any Party (unless the Significant Equityholders default in the settlement of the Call Option) or (b) if the Significant Equityholders do not exercise the Call Option, the Call Option shall expire without any further action by any Party, and the Company shall have one (1) business day from the date of expiration of the Call Option to exercise the Put Option, which if exercised, shall settle on the Effective Date.

(e)    the First Amended Plan shall be in form and substance materially consistent with the Plan Term Sheet and shall be reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion;

(f)    an order confirming the First Amended Plan (the "Confirmation Order"), in form and substance reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion, shall have been entered and shall not have been stayed or modified or vacated on appeal;

(g)    from the date of the Commitment Letter through the Effective Date, there shall not have been a Material Adverse Change (as defined below);

(h)    appropriate legal documentation in connection with the Rights Offering shall have been executed and delivered, in form and substance reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion, and the satisfaction of the conditions precedent contained therein shall have been satisfied or waived in accordance therewith;

(i)    a corporate charter, bylaws and other governance documents of the Reorganized Company shall have been adopted as part of

the First Amended Plan, in form and substance consistent with the Plan Term Sheet and this Investment Term Sheet and in forms reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion;

(j)     all necessary governmental, regulatory and third-party approvals, waivers and/or consents in connection with the Rights Offering and the First Amended Plan shall have been obtained and remain in full force and effect, and there shall exist no pending claim, action, suit, investigation, litigation or proceeding in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the transactions contemplated by this Investment Term Sheet;

(k)     no Termination Event (as defined below) shall have occurred (excluding a Termination Event that has been waived as provided for herein);

(l)     to the extent not already paid, the Put Option Premium shall have been paid;

(m)    all of the Company's representations and warranties set forth in the Commitment Letter shall have been true and correct as of the date of execution of the Commitment Letter and shall be true and correct as of the Effective Date as if then made (in each case, without giving effect to any materiality or similar qualifier therein), unless the failure of such representations and warranties to be true and correct, individually or in the aggregate, has not resulted in there being a Material Adverse Change after the execution of the Commitment Letter; and

(n)     the Exit Facility (as defined in the Plan Term Sheet), shall be in full force and effect; in addition, the lenders under the Exit Facility shall be prepared to fund under the Exit Facility on or after the Effective Date immediately following the Reorganized Company's receipt of the proceeds from the Rights Offering, including, if applicable, any proceeds from the Company's exercise of the Put Option or the Significant Equityholders' exercise of the Call Option.

The foregoing Put Option Conditions can be waived or modified only upon the written consent of each of the Significant Equityholders and the Company; provided, however, that if one or more of the Significant Equityholders (each a "Waiving Significant Equityholder") so consent in writing, then the agreement set forth herein and in the Commitment Letter shall continue to be in full force and effect as between the Company and each Waiving Significant Equityholder; provided further such consent shall state that the Waiving Significant Equityholders assume the funding obligation of each Significant Equityholder that is not a Waiving

8

Significant Equityholder such that the total amount of proceeds generated from the exercise of the Put Option or the Call Option, as applicable, shall be equal to the Rights Offering Amount less the amount of proceeds generated by the exercise of Rights under the Rights Offering.

**TERMINATION EVENTS:**

"Termination Event," wherever used herein, means any of the following events (whatever the reason for such Termination Event and whether it will be voluntary or involuntary; provided, however, that such event is not the result of action (or inaction) on the part of any of the Significant Equityholders):

(a) within three (3) business days of the Company and the Significant Equityholders executing the Commitment Letter, the Company has not filed a motion (the "Approval Motion") seeking Bankruptcy Court approval of the Commitment Letter and the Company's payment of the Expenses and the Put Option Premium;

(b) the Company has not filed the First Amended Plan and accompanying disclosure statement (in form and substance reasonably acceptable to the Significant Equityholders in their individual reasonable discretion, the "Disclosure Statement") on or before November 10, 2006;

(c) the Company has not filed the Offering Registration Statement with the SEC on or before November 10, 2006;

(d) the Bankruptcy Court has not entered an order granting the relief sought in the Approval Motion (including the approval of the Company's payment of the Expenses and the Put Option Premium as valid and binding obligations entitled to administrative expense priority) on or before November 30, 2006;

(e) the Company does not obtain Bankruptcy Court approval of the Disclosure Statement on or before December 15, 2006;

(f) the Bankruptcy Court does not confirm the First Amended Plan on or before February 2, 2007;

(g) the Effective Date of the First Amended Plan does not occur on or before February 28, 2007;

(h) a trustee, responsible officer, or an examiner with powers beyond the duty to investigate and report, as set forth in 11 U.S.C. § 1106(a)(3) and (4), shall have been appointed under 11 U.S.C. §§ 1104 or 105;

(i) the chapter 11 cases shall have been converted to cases under chapter 7 of the Bankruptcy Code;

(j) the Company shall have breached any material provision of the Commitment Letter, this Investment Term Sheet or the Definitive Documents, written notice of such breach shall have

9

been given by the Significant Equityholders and such breach shall not have been cured within two (2) business days of the Company's receipt of such notice;

(k)     the failure or non-occurrence by the date specified of any Put Option Condition or any condition precedent in the Commitment Letter;

(l)     the Bankruptcy Court shall have entered an order approving a Competing Transaction;

(m)     the First Amended Plan is modified to provide for any terms that are adverse to the Significant Equityholders (solely in their capacity as Significant Equityholders and not as Equityholders) or materially inconsistent with the terms set forth in the Commitment Letter, this Investment Term Sheet or the Plan Term Sheet; and

(n)     after filing the First Amended Plan, the Company (i) submits or supports a plan of reorganization or liquidation that is adverse to the Significant Equityholders (solely in their capacity as Significant Equityholders and not as Equityholders) or materially inconsistent with the terms and provisions of the Commitment Letter, this Investment Term Sheet or the Plan Term Sheet or (ii) moves to withdraw or withdraws the First Amended Plan.

The foregoing Termination Events are intended solely for the benefit of the Significant Equityholders, and can be waived or modified only upon the consent of each of the Significant Equityholders, provided, however, that if one or more of the Significant Equityholders shall agree in writing to be a Waiving Significant Equityholder with respect to such Termination Event then the agreement set forth herein and in the Commitment Letter shall continue to be in full force and effect as between the Company and each Waiving Significant Equityholder; provided further such consent shall state that the Waiving Significant Equityholders assume the funding obligation of each Significant Equityholder that is not a Waiving Significant Equityholder such that the total amount of proceeds generated from the exercise of the Put Option or the Call Option, as applicable, shall be equal to the Rights Offering Amount less the amount of proceeds generated by the exercise of Rights under the Rights Offering.

Other than with respect to the Waiving Significant Equityholders, all provisions of the Commitment Letter and this Investment Term Sheet shall terminate automatically without any act of any Significant Equityholders upon the occurrence of any of the Termination Events, provided, however, that each Significant Equityholder shall be entitled to receive or retain any portion of the Put Option Premium (provided such Significant Equityholders are not otherwise in breach

of any material obligation hereunder and under the Commitment Letter) paid or payable as of the date of termination, <u>unless</u> such Termination Event is caused by such Significant Equityholder.

Notwithstanding anything to the contrary herein or in the Commitment Letter, during the time period between the Company's acceptance of a Competing Transaction and the Bankruptcy Court's entry of an order approving such Competing Transaction, the Commitment Letter and this Investment Term Sheet shall not terminate <u>except</u> upon the occurrence of a Termination Event set forth in subsection (g), (h) or (i) of the section captioned "Termination Events" above.

**COMPETING TRANSACTIONS:** Notwithstanding anything to the contrary herein, within three (3) business days of the Company's receipt of an offer or proposal to enter into a Competing Transaction, the Company shall deliver a detailed notice setting forth the terms and conditions of the Competing Transaction to the legal and financial advisors to the Significant Equityholders. Prior to the Company's acceptance of such Competing Transaction, the Company shall deliver a second notice to the legal and financial advisors to the Significant Equityholders setting forth the Company's intent to accept such Competing Transaction and the terms and conditions of such Competing Transaction and the Significant Equityholders shall then have three (3) business days from their advisors' receipt of such notice to make an offer (the "<u>Significant Equityholders Revised Offer</u>") revising the transactions contemplated herein. Upon receipt of a Significant Equityholders Revised Offer, the Board of Directors of the Company (in consultation with its financial advisors and outside legal counsel) shall evaluate the Competing Transaction and the Significant Equityholders Revised Offer, if any, and choose the one that in its sole business judgment constitutes the higher or best offer or is otherwise more favorable to the Company and its creditors and stockholders. If after such evaluation, the board determines to pursue the Competing Transaction (or if the Significant Equityholders fail to make a Significant Equityholders Revised Offer), the Company shall send a written notice (the "<u>Competing Transaction Acceptance Notice</u>") of its determination to the Significant Equityholders no later than one (1) day after making such determination.

**DAMAGES:** Except in the case of fraud, the Significant Equityholders' rights to payment of the Put Option Premium (to the extent due and payable) and any accrued and unpaid Expenses (subject to the limitations set forth herein) shall constitute the sole and liquidated damages available to the Significant Equityholders in the event the transactions contemplated herein and in the Commitment Letter are not consummated; <u>provided</u>, <u>however,</u> that nothing herein shall be construed to limit any indemnity obligations that the Company has as

set forth in the Commitment Letter.

**GOVERNING LAW:** All documentation in connection with the transactions contemplated by this Investment Term Sheet shall be governed by the laws of the State of New York.

**AMENDMENT:** No material amendment of the Commitment Letter, this Investment Term Sheet or the First Amended Plan shall be effective without the prior written consent of each of the Significant Equityholders.

**DEFINITIONS:** "Additional Common Stock" means the common stock in Reorganized Foamex International to be issued on the Effective Date to (i) Equityholders under the First Amended Plan in connection with Rights that are exercised as part of the Rights Offering, and (ii) Significant Equityholders under the First Amended Plan in connection with the Call Option, if exercised. For the avoidance of doubt, the Additional Common Stock that will be outstanding on or after the Effective Date will be in addition to, and will be fungible with, the Existing Common Stock on the Effective Date (except as limited by applicable securities law).

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court of competent jurisdiction.

"Common Equityholder" means a holder of Existing Common Stock as of the Record Date.

"Competing Transaction" means an offer with respect to (i) an equity financing or sale (to the extent any such proposal, offer or bid, relates to the acquisition of 25% or more of the Reorganized Company's common stock), (ii) a financing or refinancing of all or substantially all of the Company's or its subsidiaries' debt (other than the Exit Facility or a similar substitute exit financing facility), or (iii) a sale of all or substantially all of the Company's business or assets; provided that the Significant Equityholders are not in breach of any of material obligation under the Commitment Letter.

"Effective Date" means the date that all conditions to the effectiveness of the First Amended Plan have been satisfied or waived as provided herein, which conditions shall be reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion.

"Equityholder" means a holder, as of the Record Date, of Existing Common Stock or Existing Preferred Stock.

"Existing Common Stock" means the outstanding common stock in the Company immediately prior to the Effective Date.

"Existing Preferred Stock" means the outstanding preferred stock in the Company immediately prior to the Effective Date.

"Expiration Time" means 5:00 p.m. on the date that the Rights

12

Offering expires.

"First Amended Plan" shall have the meaning ascribed to it in the Plan Term Sheet attached as Exhibit B to the Commitment Letter.

"Material Adverse Change" means any material adverse change, or any development that could reasonably be expected to result in a material adverse change, individually or when taken together with any other such changes or developments, in the financial condition, business, results of operations, assets and liabilities of the Company and its subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, it being understood that a material adverse change resulting from a general economic downturn or other event that does not affect the Company disproportionately to other companies (or their subsidiaries or divisions) in the foam industry shall not be deemed to be a Material Adverse Change.

"New Preferred Stock" means preferred stock in the Reorganized Company on terms and conditions specified in an exhibit to the Put Option Agreement. Such New Preferred Stock shall be structured to qualify as "plain vanilla preferred stock" for U.S. federal income tax purposes under Section 1504(a)(4) of the United States Tax Code.

"Preferred Equityholder" means a holder of Existing Preferred Stock as of the Record Date.

"Professionals" means (i) Cleary Gottlieb Steen & Hamilton LLP and Skadden, Arps, Slate, Meagher & Flom LLP, as legal advisors to the Significant Equityholders, (ii) Imperial Capital LLC, as the financial advisor to the Significant Equityholders, (iii) Morris, Nichols, Arsht & Tunnell LLP, as local counsel to the Significant Equityholders, and (iv) BDO Siedman, LLP and Nexant, Inc., as additional advisors to the Significant Equityholders.

"Record Date" means a date that is three (3) business days prior to the Rights Offering Commencement Date, whereby the rights are granted to Equityholders of record on such date.

"Reorganized Company" means the Company after the Effective Date.

"Right" means the right to purchase Additional Common Stock pursuant to the Rights Offering as contemplated herein.

"Rights Offering Amount" means an amount equal to $150.0 million; provided, however, that in no event shall the Company's cash on its consolidated balance sheet as of the Effective Date (after giving effect to the payments and other transactions contemplated by the First Amended Plan) exceed $7.5 million on and as of the second business day after the Effective Date.

"Rights Offering Commencement Date" means a date, after the SEC declares the Offering Registration Statement effective on which the Rights Offering shall commence and the Rights shall become exercisable, which date shall be selected by the Company and shall be reasonably acceptable to the Significant Equityholders in their individual reasonable discretion.

"SEC" means the United States Securities and Exchange Commission.

"Significant Equityholders Common Stock" means the aggregate amount of Existing Common Stock (assuming the conversion of the Existing Preferred Stock) owned by each of the Significant Equityholders, when taken together, on the Record Date.

**EXHIBIT B**

**Plan Term Sheet**

**Exhibit B**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.**

**SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**FOAMEX INTERNATIONAL INC.**

**TERM SHEET FOR PROPOSED CHAPTER 11 PLAN OF REORGANIZATION**

This term sheet (the "Plan Term Sheet"), which is part of a commitment letter, dated October 13, 2006 (the "Commitment Letter"), addressed to Foamex International Inc. ("Foamex International") by the Significant Equityholders (as defined in the Investment Term Sheet) and is subject to the terms and conditions of the Commitment Letter, describes the principal terms of a proposed restructuring of Foamex International, together with its affiliates and subsidiaries that are debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") (collectively, the "Debtors," or the "Company"). Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Investment Term Sheet that is attached as Exhibit A to the Commitment Letter.

| | |
|---|---|
| **PLAN PROPONENT:** | The Debtors |
| **PLAN OF REORGANIZATION:** | The Debtors shall file a plan of reorganization (the "First Amended Plan") and related disclosure statement (the "Disclosure Statement") that incorporate, and are consistent with, the terms of the Commitment Letter, the Investment Term Sheet and this Plan Term Sheet. |
| | The First Amended Plan and the Disclosure Statement shall be in form and substance reasonably acceptable to the Significant Equityholders in their individual reasonable discretion and may not be amended to adversely affect the Significant Equityholders. |
| | The First Amended Plan shall address, among other things, the Debtors' (i) obligations under the DIP Financing Facilities among Foamex, as borrower, the lenders party thereto (the "DIP Lenders"), including Bank of America, N.A., as agent, and Silver Point Finance, LLC, as agent (as amended, collectively, the "DIP Facility"); (ii) obligations under the Indenture, dated as of March 25, 2002, among Foamex and U.S. Bank National Association, as trustee, relating to the issuance of the Series A and Series B 10-3/4% Senior Secured Notes of Foamex due 2009 (the "Senior Secured Notes"); (iii) obligations under the Indenture, dated as of June 12, |

1997, between Foamex and the Bank of New York, as trustee, relating to the issuance of the 9-7/8% Senior Subordinated Notes due 2007 (the "2007 Senior Subordinated Notes"); (iv) obligations under the Indenture, dated as of December 23, 1997, between Foamex and the Bank of New York, as trustee, relating to the issuance of the 13-1/2% Senior Subordinated Notes due 2005 (the "2005 Senior Subordinated Notes," and together with the 2007 Senior Subordinated Notes, collectively, the "Senior Subordinated Notes"); (v) other obligations; and (vi) equity securities including options, warrants and rights related thereto.

**PLAN FUNDING:**  Foamex International shall effectuate a Rights Offering for Additional Common Stock pursuant to the First Amended Plan as contemplated by the Investment Term Sheet.

In addition, the Reorganized Company shall enter into an exit facility(ies) upon terms substantially similar to those contained in the draft commitment letter and the fee letter delivered to the Significant Equityholders (as executed, the "Exit Facility Commitment Letter") and their legal and financial advisors prior to the Significant Equityholders and Foamex International's execution of the Commitment Letter in connection with this Plan Term Sheet (the "Exit Facility").

The First Amended Plan will be funded with cash from operations, borrowings under the Exit Facility and the proceeds of the Rights Offering for Additional Common Stock or the exercise of the Put Option or the Call Option, as the case may be.

**DEFINITIVE DOCUMENTS:**  The transactions described in this Plan Term Sheet are subject in all respects to, among other things, definitive documentation, including the First Amended Plan and the documents to be included in the plan supplement to the First Amended Plan and the Disclosure Statement, all of which shall be in form and substance reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion.

**TREATMENT OF CLAIMS AND INTERESTS:**

**Administrative Expense Claims**  The allowed administrative expense claims against Foamex shall be unimpaired. Except with respect to administrative expense claims that are professional fee claims, each holder of an allowed administrative expense claim shall receive (a) cash in an amount equal to the amount of such allowed administrative expense claim on the later of the initial

2

distribution date under the First Amended Plan and the date such administrative expense claim becomes an allowed administrative expense claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon; provided, however, that allowed administrative expense claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

**Priority Tax Claims**
The allowed priority tax claims shall be unimpaired. Except to the extent that a holder of an allowed priority tax claim agrees to a different treatment, each holder of an allowed priority tax claim shall receive, at the sole option of the Reorganized Debtors, (a) cash in an amount equal to such allowed priority tax claim plus Post-Petition Interest on the later of the initial distribution date under the First Amended Plan and the date such priority tax claim becomes an allowed priority tax claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of such allowed priority tax claim, deferred cash payments in an aggregate amount equal to such allowed priority tax claim (plus Post-Petition Interest) plus interest on such aggregate amount over such period at the same rate as such Post-Petition Interest. All allowed priority tax claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**DIP Financing Claims**
The allowed claims under the DIP Facility shall be unimpaired. Except to the extent that the holders of claims under the DIP Facility and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Substantial Equityholders, the holders of the DIP financing claims, or their designees, shall receive payment in full in cash of all DIP financing claims in full and final satisfaction thereof other than the obligations under the indemnity and other provisions of the DIP credit facilities that by their terms shall survive the termination of the DIP credit facilities and confirmation of the First Amended Plan.

**Other Priority Claims**
The allowed other priority claims shall be unimpaired. Except to the extent that a holder of an allowed other priority claim and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Significant Equityholders, each holder of an allowed other priority claim

3

|                              | shall receive, in full and final satisfaction of such claim, payment in full in cash in an amount equal to such allowed other priority claim plus Post-Petition Interest on or as soon as practicable after the later of the initial distribution date under the First Amended Plan and the date when such other priority claim becomes an allowed other priority claim, _provided, however_, that other priority claims that arise in the Debtors' ordinary course of business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
|------------------------------|---|
| **Other Secured Claims**     | Allowed other secured claims (including outstanding industrial revenue bonds) shall be unimpaired. Except to the extent that a holder of an allowed other secured claim and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Substantial Equityholders, at the sole option of the Debtors, in full and final satisfaction of such claim, (i) each allowed other secured claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an allowed other secured claim to demand or to receive payment of such allowed other secured claim prior to the stated maturity of such allowed other secured claim from and after the occurrence of a default, (ii) each holder of an allowed other secured claim shall receive cash in an amount equal to such allowed other secured claim plus Post-Petition Interest, in full and complete satisfaction of such allowed other secured claim on the later of the initial distribution date under the First Amended Plan and the date such other secured claim becomes an allowed other secured claim, or as soon thereafter as is practicable, or (iii) each holder of an allowed other secured claim shall receive the collateral securing its allowed other secured claim plus Post-Petition Interest in full and complete satisfaction of such allowed other secured claim on the later of the initial distribution date under the First Amended Plan and the date such other secured claim becomes an allowed other secured claim, or as soon thereafter as is practicable. |
| **Senior Secured Note Claims** | Allowed Senior Secured Note claims shall be unimpaired. With respect to the Senior Secured Notes, the Company and the Significant Equityholders (other than Goldman, Sachs & Co.) agree that the First Amended Plan shall provide that the Senior Secured Note claims shall be allowed in the aggregate amount of $312,452,083.33 plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties. |

Each holder of an allowed Senior Secured Note claim shall be paid in full in cash on the initial distribution date under the First Amended Plan, or as soon thereafter as is practicable.

**Senior Subordinated Note Claims**

Allowed Senior Subordinated Note claims shall be unimpaired. The Senior Subordinated Note claims shall be allowed in the aggregate amount of $208,150,130.55. Each holder of an allowed Senior Subordinated Note claim shall paid in full in cash on the initial distribution date under the First Amended Plan, together with Post-Petition Interest, or as soon thereafter as is practicable.

**General Unsecured Claims**

Allowed general unsecured claims shall be unimpaired. Each holder of an allowed general unsecured claim (which shall not include Unliquidated Claims) shall be paid in full in cash on the later of the initial distribution date, or as soon thereafter as is practicable under the First Amended Plan and the date such general unsecured claim is allowed plus Post-Petition Interest. To the extent insurance is available to satisfy an allowed general unsecured claim, such allowed general unsecured claim shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, without need for Court approval, at such time as such claim becomes liquidated and proceeds of the insurance therefor become available. The Debtors shall not establish any disputed claims reserve for payment of general unsecured claims.

**Unliquidated Claims**

Holders of Unliquidated Claims shall not be impaired. All Unliquidated Claims, solely to the extent and on the basis set forth in a timely and validly filed proof of claim, shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, without need for Court approval, including, where applicable, through access to available insurance. The Debtors shall not establish any disputed claims reserve for payment of Unliquidated Claims.

**Existing Preferred Stock**

The Existing Preferred Stock in Foamex International shall be impaired. Each share of preferred stock in Foamex International to the extent still outstanding shall be converted into 100 shares of Additional Common Stock on the Effective Date and shall receive the treatment accorded to the holders of Existing Common Stock under the First Amended Plan.

**Existing Common Stock**

The Existing Common Stock in Foamex International shall be impaired.

Existing Common Stock in Foamex International shall remain outstanding after the Effective Date, subject to dilution as a result of the issuance, if any, of additional shares of common stock pursuant to the (a) Rights Offering, including shares

5

issued to the Significant Equityholders under the Call Option, if exercised, (b) the Management Incentive Plan, (c) the Key Employee Retention Plan and (d) the exercise of any employee stock options outstanding on and as of the Effective Date.

The Company and the Reorganized Company will use its reasonable best efforts to maintain one or more market makers for its common stock, who will facilitate trading of the common stock on the OTC Bulletin Board (the "pink sheets").

**Other Common Equity Interests in Foamex International**

The allowed other common equity interests in Foamex International, including options, warrants and rights related to the Debtor's equity interests, shall be unimpaired and shall remain outstanding after the Effective Date.

**Intercompany Claims**

Intercompany claims shall be unimpaired and shall be reinstated upon the Effective Date.

**Other Equity Interests in Surviving Debtor Subsidiaries**

Except as otherwise provided for in the First Amended Plan, all other equity interests in the subsidiaries of Foamex International and Foamex L.P. shall be unimpaired.

**SEC REGISTRATION:**

The Rights Offering shall be offered pursuant to the Offering Registration Statement, filed with the SEC, in connection with and pursuant to the First Amended Plan.

**CONDITIONS TO CONFIRMATION & EFFECTIVE DATE:**

The First Amended Plan shall contain various conditions precedent to confirmation and to the Effective Date that must be satisfied or waived, which conditions shall include and be consistent with the conditions set forth in the Investment Term Sheet.

Such conditions to the Effective Date shall include, without limitation, the following:

(a)     the First Amended Plan shall be in form and substance consistent with the Commitment Letter, the Investment Term Sheet and this Plan Term Sheet, and shall be reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion;

(b)     an order confirming the First Amended Plan, in form and substance reasonably satisfactory to the Significant Equityholders in their individual reasonable discretion, shall have been entered and shall not have been stayed or modified or vacated on appeal; and

(c)     the Effective Date of the First Amended Plan shall have occurred on or before February 28, 2007.

**BOARD**

The Significant Equityholders shall have the right to nominate

6

| | |
|---|---|
| **REPRESENTATION:** | four (4) members of the Reorganized Company's board of directors. In addition to the Significant Equityholders' four (4) nominees, there shall be one (1) independent director. The Reorganized Company's chief executive officer and its general counsel shall also serve on the board of directors (the "Board of Directors"); provided that if stock in the Reorganized Company is listed on a national securities exchange, the number of directors and/or composition of the Board of Directors may be revised as required under the applicable rules of the relevant stock exchange. |
| | Subject to the Reorganized Company's by-laws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date. |
| **REORGANIZED DEBTORS' SENIOR MANAGEMENT:** | The officers of the Reorganized Company shall be substantially the same as the officers of the Debtors on the date of the Commitment Letter. Raymond E. Mabus shall be retained as the Chief Executive Officer and President of Reorganized Foamex International. |
| | The Reorganized Debtors' officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law, as the case may be. |
| **MANAGEMENT INCENTIVE PLAN:** | The First Amended Plan shall provide for a management incentive plan (the "Management Incentive Plan"), which shall include, among other things, an allocation of up to 10% of the fully diluted common stock outstanding on the Effective Date to be distributed as determined by the Reorganized Company's board of directors. |
| **DEREGISTRATION:** | Foamex International and the Reorganized Company shall take all necessary steps to qualify to cease filing public reports with the SEC as soon as legally practicable following the Effective Date. |
| **POST-EFFECTIVE DATE GOVERNANCE:** | The First Amended Plan shall provide that (i) the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Commitment Letter and the First Amended Plan; and (ii) on and as of the Effective Date, the Rights Agreement between Foamex International Inc. and Mellon Investor Services LLC, dated as of August 5, 2004, and amended thereafter, shall be |

7

terminated.

| | |
|---|---|
| **MINORITY SHAREHOLDER PROTECTIONS:** | The Amended and Restated Certificate of Incorporation of the Reorganized Company shall include provisions with respect to any "Business Combination" (as defined in the Company's current Restated Certificate of Incorporation) with or into any "Related Person" (as so defined) requiring that the consideration received by the other shareholders in connection with such Business Combination (as so defined) is at "fair value" as determined by the "unrelated director(s)" (who shall have authority, but not the obligation, to engage independent counsel and independent bankers at the Company's expense, subject to a budget which shall be reasonably acceptable to the Reorganized Company's board of directors, as a whole for purposes of such determination). |
| **ADDITIONAL PROVISIONS:** | The First Amended Plan shall contain other provisions customarily found in other similar plans of reorganization, as are reasonably acceptable to the Significant Equityholders in their individual reasonable discretion. |
| **DEFINITIONS:** | |
| **Post-Petition Interest** | "Postpetition Interest" means with respect to: |

(a) the Senior Secured Note Claims, accrued and unpaid interest (including interest on interest that is due and owing and unpaid, compounded semi-annually on the semi-annual interest payment dates) pursuant to the Senior Secured Notes Indenture from the Petition Date through the Effective Date at the applicable contractual rate;

(b) the 2005 Senior Subordinated Note Claims, accrued and unpaid interest pursuant to the 2005 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the applicable contractual rate;

(c) the 2007 Senior Subordinated Note Claims, accrued and unpaid interest (including interest on interest that is due and owing and unpaid, compounded semi-annually on the semi-annual interest payment dates) pursuant to the 2007 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the applicable contractual rate;

(d) other secured claims, interest accruing on such claims from the Petition Date through the Effective Date at the rate set forth in the contract or other applicable document giving rise to such claims (to the extent lawful) or, if the applicable instrument does not specify a rate of interest, at the federal judgment rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date;

(e) priority tax claims, (i) with respect to federal taxes, at a fixed annual rate equal to the federal statutory rate as provided in 26 U.S.C. § 6621; and (ii) with respect to state and local taxes, at the prime lending rate of interest as in effect for the period to which the priority tax claim pertains; and

(f) general unsecured claims, interest, accruing from the Petition Date through the Effective Date at the federal judgment rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date; provided, however, that the First Amended Plan shall provide procedures under which holders of allowed unsecured claims may seek payment of interest at an otherwise legally required rate.

For the avoidance of doubt, except as required under applicable non-bankruptcy law, Post-Petition Interest will not be paid on the following allowed claims: administrative expense claims, cure claims, fee claims or Unliquidated Claims.

"Unliquidated Claim" means a timely and validly filed proof of claim, disputed by the Debtors, asserting an unliquidated or contingent unsecured claim (which claim numbers shall be set forth in a schedule attached to the First Amended Plan) against one of the Debtors, solely to the extent and on the basis set forth in the proof of claim, and to the extent such claim has not been disallowed and remains unliquidated, disputed and/or contingent on and as of the Effective Date unless such claim has been disallowed by the Bankruptcy Court.

"Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

## EXHIBIT C

### Put Option Agreement

EXHIBIT C

## PUT OPTION AGREEMENT

THIS PUT OPTION AGREEMENT (this "Agreement") is made and entered into as of the [ ] day of _____, 2006, by and between Foamex International Inc., a Delaware corporation (the "Company"), and each of the parties set forth on the signature page hereto (collectively, the "Significant Equityholders").

WHEREAS, the Company and the Significant Equityholders have entered into an equity commitment agreement, dated October 13, 2006 (the "Commitment Agreement"), which has attached thereto as Exhibit A, the Investment Term Sheet, and as Exhibit B, the First Amended Plan Term Sheet;

WHEREAS, the Company has filed the First Amended Plan with the Bankruptcy Court (as defined in the Investment Term Sheet) incorporating the terms and conditions of the Investment Term Sheet and the Plan Term Sheet;

WHEREAS, as set forth in the Investment Term Sheet, the Company plans to distribute to holders of its common stock, par value $0.01 per share (the "Common Stock") and preferred stock, rights to purchase shares of Common Stock upon its emergence from chapter 11 of the United States Bankruptcy Code (the "Rights");

WHEREAS, in connection with the consummation of the First Amended Plan, the proceeds of the Rights Offering (as defined in the Investment Term Sheet), estimated to be approximately $150.0 million (the "Rights Offering Amount"), will be used to provide funding for the Company's required payments under or in connection with the First Amended Plan;

WHEREAS, in the event that the aggregate gross proceeds received by the Company as a result of the exercise, if any, of Rights does not raise all of the Rights Offering Amount, the funds comprising the shortfall will be raised by the Company either pursuant to (i) the Significant Equityholders' exercise of the Call Option (as defined in the Investment Term Sheet) to be provided for pursuant to the First Amended Plan, subject to the terms and conditions of the Call Option, or (ii) the Company's exercise of the Put Option (as defined below), subject to the terms and conditions thereof, as contemplated by the Investment Term Sheet and the First Amended Plan; and

WHEREAS, each of the Significant Equityholders desires to sell to the Company pursuant to the Put Option, and the Company desires to purchase from each of the Significant Equityholders, its Pro Rata Share (as defined below) of the right to put shares of Series C Preferred Stock of the Company having the terms set forth in the term sheet attached hereto as Annex A (the "Preferred Stock"), with an aggregate purchase price and stated value equal to the difference between the Rights Offering Amount and the aggregate gross proceeds actually received by the Company as a result of the exercise, if any, of Rights (the "Put Amount").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Company and each Significant Equityholder agrees, severally and not jointly, as follows:

## ARTICLE I
## OPTION TO REQUIRE PURCHASE

1.1    Grant of Option. (a) Each Significant Equityholder hereby grants to the Company an option (the "Put Option") to require such Significant Equityholder to purchase its Pro Rata Share of shares of the Preferred Stock. The aggregate purchase price and aggregate stated value of Preferred Stock to be issued pursuant to exercise of the Put Option shall be equal to the Put Amount (such shares of the Preferred Stock, the "Shares"). Such purchase shall be upon and subject to the terms, covenants and conditions set forth herein.

(b) Upon the exercise of the Put Option by the Company, the Company agrees to sell, and each of the Significant Equityholders agrees to purchase, upon and subject to the terms, covenants and conditions set forth herein, its Pro Rata Share of the Shares.

(c) As used herein, the "Pro Rata Share" of a Significant Equityholder shall be either (i) the percentage of the number of Rights to be received by all Significant Equityholders that are to be received by such Significant Equityholder or (ii) such other percentage as may be agreed among the Significant Equityholders, which percentage shall be communicated in writing to the Company by the Significant Equityholders in accordance with Section 4.2 hereof and be reasonably acceptable to the Company.

1.2.    Term and Exercise Period. The Company may only exercise the Put Option during the time between the expiration of the Call Option if it has not been exercised and one business day prior to the earlier of the Effective Date (as defined in the Investment Term Sheet) and February 28, 2007 (the "Exercise Period"). If the Company shall not have exercised the Put Option during the Exercise Period, the Put Option shall automatically terminate without any further action by either the Company or the Significant Equityholders, and, subject to Section 3.2(c) hereof, neither the Company nor any of the Significant Equityholders shall have any further rights, duties or obligations hereunder.

1.3    Procedure to Exercise Option. (a) To exercise the Put Option during the Exercise Period, the Company shall deliver a written notice in accordance with Section 4.2 hereof in the form attached hereto as Annex B (an "Exercise Notice") to each Significant Equityholder, which Exercise Notice shall state that the Company is thereby exercising the Put Option and shall state that the date for the closing of the exercise of the Put Option (the "Closing Date") shall be the Effective Date.

(b) Upon exercise of the Put Option, this Agreement shall become a contract for the sale of the Shares upon all of the terms, covenants and conditions as herein set forth, with the names to be listed on each certificate evidencing the Shares to be those set forth in Annex C hereto, as applicable, unless a Significant Equityholder shall have transmitted a notice to the Company in accordance with Section 4.2 hereof specifying different information to be used in respect of the certificates relating to it.

(c) If the Put Option is exercised, on the Closing Date, the Company shall deliver the Shares to the Significant Equityholders against payment by the respective Significant

Equityholders of the purchase price for their respective Shares by wire transfer of immediately available funds to the account designated by the Company in the Exercise Notice.

ARTICLE II
PUT OPTION PREMIUM

2.1     Put Option Premium. The Company will pay, by wire transfer of immediately available funds to the accounts designated by the Significant Equityholders in accordance with Section 4.2 hereof, the following amounts to the Significant Equityholders (such amounts, collectively, the "Put Option Premium"):

(a) $2.0 million shall be paid no later than three (3) business days after the Bankruptcy Court (as defined in the Investment Term Sheet) enters an order approving the Approval Motion (as defined in the Investment Term Sheet);

(b) $2.5 million shall be paid on the date that the Bankruptcy Court enters an order approving a Competing Transaction;

(c) $5.5 million shall be paid upon the occurrence of any of the Termination Events set forth in subsections (g), (h), (i), (j), (m) or (n) of the section captioned "Termination Events" in the Investment Term Sheet; and

(d) $7.5 million shall be paid on the Effective Date if the Commitment Letter (including the Investment Term Sheet) is not otherwise terminated earlier and remains in full force and effect.

Each payment shall be made to the respective accounts of the Significant Equityholders in the same proportion as their Pro Rata Shares.

ARTICLE III
CONDITIONS PRECEDENT TO THE SIGNIFICANT EQUITYHOLDERS' OBLIGATIONS

3.1     Conditions to the Significant Equityholders' Obligations. (a) The Significant Equityholders' obligations hereunder are subject to satisfaction or waiver of the Put Option Conditions (as defined in the Investment Term Sheet).

(a)     The Put Option Conditions may be waived or modified only upon the written consent of each of the Significant Equityholders and the Company; provided, however, that if one or more of the Significant Equityholders (each a "Waiving Significant Equityholder") so consent in writing, then this Agreement shall continue to be in full force and effect as between the Company and each Waiving Significant Equityholder; provided further such consent shall state that the Waiving Significant Equityholders assume the funding obligation of each Significant Equityholder that is not a Waiving Significant Equityholder such that the total amount of proceeds generated from the exercise of the Put Option or the Call Option, as applicable, shall be equal to the Rights Offering Amount less the amount of proceeds generated by the exercise of Rights under the Rights Offering.

-3-

3.2 <u>Termination</u>. (a) This Agreement shall terminate automatically without any act of any Significant Equityholders upon the occurrence of any of the Termination Events (as defined in the Rights Offering Term Sheet).

(b) The Termination Events are intended solely for the benefit of the Significant Equityholders, and can be waived or modified only upon the consent of each of the Significant Equityholders, <u>provided</u>, <u>however</u>, that if one or more of the Significant Equityholders shall agree in writing to be a Waiving Significant Equityholder with respect to such Termination Event then this Agreement shall continue to be in full force and effect as between the Company and each Waiving Significant Equityholder; <u>provided further</u> such consent shall state that the Waiving Significant Equityholders assume the funding obligation of each Significant Equityholder that is not a Waiving Significant Equityholder such that the total amount of proceeds generated from the exercise of the Put Option or the Call Option, as applicable, shall be equal to the Rights Offering Amount less the amount of proceeds generated by the exercise of Rights under the Rights Offering.

(c) Notwithstanding any other provision of this Agreement to the contrary, each Significant Equityholder shall be entitled to retain or receive any portion of the Put Option Premium (provided such Significant Equityholder is not otherwise in breach of any of its material obligations under the Commitment Letter) paid or payable as of the date of termination, unless such Termination Event is caused by such Significant Equityholder.

(d) Notwithstanding any other provision of this Agreement to the contrary, upon the Significant Equityholders' exercise of the Call Option and purchase of Additional Common Stock pursuant to the Call Option, this Agreement shall terminate automatically, and any exercise of the Put Option shall be cancelled automatically, without any further action by either the Company or any Significant Equityholder, and, subject to Section 3.2(c) hereof, neither the Company nor any of the Significant Equityholders shall have any further rights, duties or obligations hereunder, including, for the avoidance of doubt, any obligation on the part of the Company to issue, or the Significant Equityholders to acquire, New Preferred Stock.

ARTICLE IV
<u>MISCELLANEOUS</u>

4.1 <u>Captions</u>. The captions, headings and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions hereof.

4.2 <u>Notices</u>. Any notice, request, demand, instruction or other document to be given or served hereunder or under any document or instrument executed pursuant thereto shall be in writing and shall be delivered personally by a receipt requested therefor, by electronic mail (with a return receipt obtained), by facsimile transmission (with a delivery confirmation obtained) or sent by a recognized overnight courier service or by the United States registered or certified mail, return receipt requested, postage prepaid and addressed to the parties at their respective addresses set forth below, and the same shall be effective (a) upon receipt or refusal if delivered personally or by facsimile transmission; (b) one (1) business day after depositing with such an overnight courier service or (c) two (2) business days after deposit in the mails if mailed. A party may change its address for receipt of notices by service of a notice of change in accordance herewith.

-4-

All notices by facsimile transmission shall be subsequently confirmed by U.S. certified or registered mail.

If to each Significant Equityholder:

[D. E. Shaw & Co., L.P. ]
120 West 45th Street, 39th Floor
New York, New York 10036
Attention: Seth Charnow
Facsimile No.: _____
Telephone No.:_____
E-mail: _____

[Goldman, Sachs & Co.]
One New York Plaza, 50th Floor
New York, NY 10004
Attention: Richard Katz
Facsimile No.: _____
Telephone No.:_____
E-mail: _____

[Par IV Master Fund, Ltd.]
50 Tice Blvd. 3rd Floor
Woodcliff Lake, NJ 07677
Attention: Robert B. Burke
Facsimile No.: _____
Telephone No.:_____
E-mail: _____

[Sunrise Partners Limited Partnership]
Two American Lane
Greenwich, CT 06836-2571
Attention: Doug Ambrose
Facsimile No.: _____
Telephone No.:_____
E-mail: _____

[Sigma Capital Management, LLC]
540 Madison Avenue
New York, NY 10022
Attention: John Reilly
Facsimile No.: _____
Telephone No.:_____
E-mail: _____

With a copy to:
                            _____

                            _____

                            _____

Attention: _____

Facsimile No.: _____

Telephone No.: _____

E-mail: _____

If to the Company:
          Foamex International Inc.
          1000 Columbia Avenue
          Linwood, Pennsylvania 19061
          Attention: Gregory Christian, Executive Vice
                  President
          Facsimile No.: (610) 859-2948
          Telephone No.: (610) 859-3000
          E-mail: _____

With a copy to:
          Paul, Weiss, Rifkind, Wharton & Garrison LLP
          1285 Avenue of the Americas
          New York, New York 10019
          Attention: Judith R. Thoyer, Esq.
          Facsimile No.: (212) 492-0002
          Telephone No.: (212) 373-3002
          E-mail: jthoyer@paulweiss.com

4.4    GOVERNING LAW. **THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICT OF LAW PRINCIPLES, SHALL GOVERN THE INTERPRETATION OF THIS AGREEMENT.**

4.5    Entirety and Amendments. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the transactions contemplated herein, and may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

4.6    Multiple Counterparts. This Agreement may be executed in counterparts, each of which shall be an original but all of which together shall constitute one agreement, binding on all of the parties hereto notwithstanding that all of the parties hereto are not signatories to the same counterpart. For purposes of this Agreement, each of the parties hereto agrees that a facsimile copy of the signature of the person executing this Agreement on either party's behalf shall be effective as an original signature and legally binding and effective as an execution counterpart hereof.

4.7    Parties Bound. The Company shall not have the right to assign this Agreement, without the prior written consent of the Significant Equityholders. None of the Significant Equityholders shall have the right to assign this Agreement without the prior written consent of the Company, except the Significant Equityholders may assign this agreement to such designees as may be reasonably acceptable to the Company. This Agreement will be binding upon and inure to the benefit of the Company and the Significant Equityholders and their respective

successors (including, with respect to the Company, the Reorganized Company (as defined in the Investment Term Sheet)) and permitted assigns, and no other party will be conferred any rights by virtue of this Agreement or be entitled to enforce any of the provisions hereof.

      4.8    <u>Further Acts</u>. In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by the Company and the Significant Equityholders, the Company and the Significant Equityholders agree to perform, execute and/or deliver or cause to be performed, executed and/or delivered at the Closing or after the Closing any and all such further acts, deeds and assurances as may be necessary to consummate the transactions contemplated hereby.

      4.9    <u>Business Days</u>. All references to "business days" contained herein are references to days on which banks are not required or authorized to close in New York City.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Put Option Agreement as of the date first above written.

**COMPANY:**

FOAMEX INTERNATIONAL INC.

By:_____
    Name:
    Title:

**SIGNIFICANT EQUITYHOLDERS:**

D.E. SHAW LAMINAR PORTFOLIOS, L.L.C.

By:_____
    Name:
    Title:

PAR IV MASTER FUND, LTD.

By:_____
    Name:
    Title:

SUNRISE PARTNERS LIMITED PARTNERSHIP

By:_____
    Name:
    Title:

SIGMA CAPITAL ASSOCIATES, LLC

By:_____
    Name:
    Title:

GOLDMAN, SACHS & CO.

By:_____
    Name:
    Title:

## ANNEX A

## SERIES C PREFERRED STOCK TERM SHEET

The following sets forth the terms of the Preferred Stock; terms not defined herein shall have the meanings ascribed to them in the Put Option Agreement:

| Terms of the Investment | |
|---|---|
| **The Company** | The Reorganized Company (the "Company"). |
| **Significant Equityholders** | D.E. Shaw Laminar Portfolios, L.L.C., Par IV Master Fund Ltd., Sunrise Partners Limited Partnership, Sigma Capital Associates, LLC and Goldman, Sachs & Co., or their respective designees that are reasonably acceptable to the Company. |
| **Price Per Share** | The price per share will be the Put Amount divided by the aggregate number of Preferred Shares to be issued (the "Purchase Price"). |
| **Preferred Shares Designation** | Series C Preferred Stock (the "Preferred Shares"). |
| **Ranking** | The Preferred Shares will rank senior to all equity capital of the Company, whether now or hereafter outstanding. |
| **Dividends** | The holders of Preferred Shares will be entitled to receive, when, as and if declared by the Board of Directors, as described below, quarterly dividends in respect of each Preferred Share equal to the rate per annum of __%[1] (the "Dividend Rate") of the Liquidation Preference (as defined below). Dividends on Preferred Shares will be cumulative from the date of issuance and accrued and unpaid dividends will compound quarterly. |
| **Liquidation Preference** | Upon a liquidation (but excluding mergers or similar transactions) with respect to the Company, the holders of Preferred Shares will be entitled to receive, in cash, in preference to payment on Junior Securities, an amount with respect to each Preferred Share equal to the sum of (i) the Purchase Price (as appropriately adjusted for stock splits, recapitalizations and similar events) plus (ii) all accrued and unpaid dividends (as appropriately adjusted for stock splits, recapitalizations and similar events, the "Liquidation Preference"). |

---

[1]    To be determined according to the following formula: LIBOR Swap as of the "Effective Date," as defined in Exhibit A to the Equity Commitment Agreement + 2nd Lien Spread + 200bps. "LIBOR Swap" shall be equal to the rate on the seven-year interest rate swap quoted [10] business days prior to the Effective Date by three nationally recognized fixed income derivative broker-dealers acceptable to the Company for 3-month LIBOR. "2nd Lien Spread" means the interest margin for the second lien term loan that is part of the Exit Facility (as defined in the Plan Term Sheet).

9

| | |
|---|---|
| **Redemption at the Option of the Company** | Subject to compliance with the Company's debt, the Preferred Shares will be redeemable at the option of the Company, in whole or in part, at the redemption prices set forth below (expressed as percentages of the Dividend Rate), if redeemed during the twelve-month period beginning on the dates indicated below: |
| | **Anniversary** |
| | of Issuance |
| | Fourth                100 % + (50% of Dividend Rate) |
| | Fifth                   100 % + (33% of Dividend Rate) |
| | Sixth                  100 % + (16% of Dividend Rate) |
| | Seventh and thereafter   100% |
| | Redeemed Preferred Shares will be cancelled and will cease to be outstanding. |
| **Mandatory Redemption** | None. |
| **Change of Control** | Upon a Change of Control (to be defined), each holder of Preferred Shares shall have the right to require the Company to purchase each outstanding share of its Preferred Stock at a price equal to 101% of the Liquidation Preference thereof on the date of such purchase; provided that the Company shall not so repurchase such shares if prohibited by any provision of any of the Company's debt. Failure to repurchase shares will result in a Voting Rights Triggering Event. |
| **Voting Rights** | None, unless a Voting Rights Triggering Event exists. |
| **Voting Rights Triggering Event** | Failure to comply with any covenant contained in any instrument governing the Preferred Shares or any agreement pursuant to which the Preferred Shares was issued (including the certificate of designation and the Definitive Documents) shall result in the holders of a majority of the outstanding Preferred Shares being entitled to elect 2 directors to the Board of Directors. In order to effectuate the foregoing, at the request of the holders of a majority of the outstanding Preferred Shares, the size of the Board of Directors will be increased by 2 and the Company and the Board of Directors shall take such other actions to cause such election to occur. Upon the Company coming into compliance with all such covenants, the size of t he Board of Directors shall be decreased by 2 and the directors elected pursuant to this clause shall cease to be directors. For the avoidance of doubt, (i) the total number of directors who may be elected pursuant to this provision and in office at any time shall not exceed 2 and (ii) the voting right described in this paragraph shall be the sole remedy for breaches of any covenant in any instrument governing the Preferred Shares or any agreement pursuant to which the Preferred Shares was issued (including the certificate of designation and the Definitive Documents). |
| **Registration Rights** | None. |
| **Holder Approval** | Without the consent or affirmative vote of the holders of at least 67% of the outstanding Preferred Shares voting separately as a class, the Company shall not (a) authorize, create or issue or |

10

| | |
|---|---|
| | increase the authorized amount of any (i) equity securities of the Company ranking senior or *pari passu* to the Preferred Shares or (ii) any class or series of capital stock or any security convertible or exercisable for any class or series of capital stock that is redeemable mandatorily or at the option of the holder thereof; (b) amend, alter or repeal any provision of the certificate of incorporation or bylaws of the Company if such amendment or alteration alters or changes the powers, preferences or rights of the Preferred Shares so as to affect them adversely; (c) declare, pay or set aside for payment, any dividend on any Junior Securities (as defined below) without the prior consent of the holders of the Preferred Shares or redeem, repurchase or otherwise acquire any Junior Securities (other than the repurchase of common stock held by employees, officers or directors of the Company or any of its subsidiaries in accordance with arrangements approved by the Board of Directors up to an amount to be agreed); or (d) authorize or take any other action if such action alters or changes any of the rights of the Preferred Shares in any respect or otherwise would be inconsistent with the certificate of designation for the Preferred Shares. |
| **Junior Securities** | "Junior Securities" shall mean the Series A Preferred Stock of the Company, if issued at a future date, and the common stock of the Company and any other securities ranking junior to the Preferred Shares or securities convertible into, or exchangeable for, any such securities. |

11

## ANNEX B

## FORM OF EXERCISE NOTICE

## Form of Put Option Exercise Notice

[Date]

TO:

D.E. Shaw Laminar Portfolios, L.L.C.
[_____]

Par IV Master Fund, Ltd.
[_____]

Sunrise Partners Limited Partnership
[_____]

Sigma Capital Associates, LLC
[_____]

Goldman, Sachs & Co.
[_____]

Reference is made to the Put Option Agreement, dated as of _____, 2006 (the "Put Option Agreement"), by and among the aforementioned parties (collectively, the "Significant Equityholders") and Foamex International Inc. (the "Company"). Capitalized terms used but not otherwise defined herein have the meanings specified in the Put Option Agreement.

The Company hereby notifies the Significant Equityholders that it is exercising the Put Option with respect to the New Preferred Stock pursuant to Section 1.3 of the Put Option Agreement. The Closing Date shall be the Effective Date.

Payment of the purchase price for the Shares shall be made to the following account: **[account details]**.

Very truly yours,

FOAMEX INTERNATIONAL INC.

By: _____
    Name:
    Title:

12

## ANNEX C

### DETAILS FOR PREFERRED SHARE CERTIFICATES

[D.E. Shaw Laminar Portfolios, L.L.C.]

[Par IV Master Fund, Ltd.]

[Sunrise Partners Limited Partnership]

[Sigma Capital Associates, LLC]

[Goldman, Sachs & Co.]

13

# Schedule A

Schedule of Unliquidated Claims (as of October 23, 2006)

# SCHEDULE A

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 73800 | 4011 BUILDING LLC<br>ATTN: JEAN MCGEE<br>PO BOX 2979<br>PHOENIX, AZ 85062 |
| 120400 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 120500 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 120600 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 120700 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 120800 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 120900 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 121000 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 121100 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVE<br>NEW YORK, NY 10022 |
| 121200 | BANK OF AMERICA, NA, ET AL<br>C/O KAYE SCHOLER LLP<br>ALBERT FENSTER & MARC ROSENBERG, ESQS<br>425 PARK AVEE<br>NEW YORK, NY 10022 |
| 95100 | BIECHELE, DANIEL<br>C/O PETER N HILL, ESQ<br>WOLFF, HILL, MCFARLIN & HERRON, PA<br>1851 W COLONIAL DR<br>ORLANDO, FL 32804 |
| 95200 | BIECHELE, DANIEL<br>C/O PETER N HILL, ESQ<br>WOLFF, HILL, MCFARLIN & HERRON, PA<br>1851 W COLONIAL DR<br>ORLANDO, FL 32804 |
| 95000 | BIECHELE, DANIEL<br>C/O PETER N HILL, ESQ<br>WOLFF, HILL, MCFARLIN & HERRON, PA<br>1851 W COLONIAL DR<br>ORLANDO, FL 32804 |

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 82200 | BNY FINANCIAL CORP N/K/A GMACC FIN<br>C/O CRAIG M GENO & JEFFREY K TYREE<br>HARRIS& GENO, PLLC<br>PO BOX 3380<br>RIDGELAND, MS 39158-3380 |
| 93400 | BRENDA GOGUEN<br>ATTN: EVA MARIE MANCUSO<br>HAMEL, WAXLER, ALLEN & COLLINS<br>387 ATWELLS AVE<br>PROVIDENCE, RI 02909 |
| 101000 | BUTLER, MICHAEL<br>56 MOONACHIE RD<br>HACKENSACK, NJ 07601 |
| 93100 | CARPET PADDING SHRINKAGE (NORDSTORM)<br>C/O DAVID G JOHANSEN, DIV VP<br>& COUNSEL, NORDSTROM<br>1700 SEVENTH AVE, STE 1000<br>SEATTLE, WA 98101-4407 |
| 53100 | CHINOOK GROUP<br>C/O GILBERTSON DAVIS EMERSON LLP<br>ATTN: JOHN L DAVIS,ESQ<br>20 QUEEN ST WEST, STE 2020<br>TORONTO, ON M5H 3R3<br>CANADA |
| 82700 | CITY OF PHILA/DIANE STANLEY/KENDRA HOGAN<br>C/O SEGAL WOLFE BERK ET AL<br>17010 BANJAMIN FRANKLIN PKWY<br>PHILADELPHIA, PA 19103 |
| 86400 | CONTINENTAL CASUALTY CO<br>C/O CARROLL, MCNULTY & KULL, LLC<br>ATTN: CHRISTOPHER R CARROLL, ESQ<br>570 LEXINGTON AVE 10TH FL<br>NEW YORK, NY 10022-6837 |
| 119000 | DOUGLAS COUNTY, NEBRASKA<br>JULIE HANEY - TREASURER<br>909 CIVIC CTR<br>1819 FARNAM ST<br>OMAHA, NB 68183 |
| 95700 | ENGINEERED FOAM PRODUCTS CANADA LTD<br>C/O LAWSON MCGRENERE LLP<br>SUITE 700, 120 ADELAIDE ST WEST<br>TORONTO, ON M5H 1T1<br>CANADA |
| 78400 | EST OF MATTHEW J BY JOHN PICKETT<br>C/O CHARLES N REDIHAN, JR<br>KIERNAN PLUNKETT & REDIHAN<br>91 FRIENDSHIP STT<br>PROVIDENCE, RI 02903 |
| 80500 | ESTATE OF CHRISTOPHER G ARRUBA, ET AL<br>JOHN N CALVINO LAW ASSOCS<br>ATTN: STEVEN A MINICUCCI ESQ RI<br>373 ELMWOOD AVE<br>PROVIDENCE, RI 02907 |
| 80100 | ESTATE OF JEFFREY WOOD MARTIN, ET AL<br>HAMEL WAXLER ALLEN & COLLINS<br>ATTN: EVA MARIE MANCUSO<br>387 ATWELLS AVE<br>PROVIDENCE, RI 02909 |
| 80300 | ESTATE OF JUDE B HENAULT, ET AL<br>THE REARDON LAW FIRM PC<br>ATTN: ROBERT I REARDON, JR ESQ<br>160 HEMPSTEAD ST<br>NEW LONDON, CT 06320 |
| 80400 | ESTATE OF JUDE B HENAULT, ET AL<br>THE REARDON LAW FIRM PC<br>ATTN: ROBERT I REARDON JR ESQ<br>160 HEMPSTEAD ST<br>NEW LONDON, CT 06320 |

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 103800 | ESTATE OF JUDE B HENAULT, ET AL<br>ATTN:ROBERT I REARDON JR, ESQ<br>THE REARDON LAW FIRM, PC<br>160 HEMPSTEAD ST<br>NEW LONDON, CT 06320 |
| 75600 | ESTATE OF KEVIN ANDERSON, ET AL<br>ATTN: MAX WISTOW, ESQ<br>61 WEYBOSSET ST<br>PROVIDENCE, RI 02903 |
| 80600 | ESTATE OF MATTHEW J BY JOHN PICKETT<br>KIERNAN PLUNKETT & REDIHAN<br>ATTN: CHARLES N REDIHAN JR<br>91 FRIENDSHIP ST<br>PROVIDENCE, RI 02903 |
| 79800 | ESTATE OF MATTHEW P DARBY, ET AL<br>BREGGIA BOWEN & GRANDE<br>ATTN:STEPHEN E BREGGIA, ESQ<br>395 SMITH ST<br>PROVIDENCE, RI 02908 |
| 103900 | ESTATE OF TAMMY MATTERA-HOUSA<br>ATTN: MICHAEL A ST PIERRE, ESQ<br>REVENS REVENS & ST PIERRE<br>946 CENTERVILLE RD<br>WARWICK, RI 02886 |
| 15300 | FRANK GELALIA<br>2310 LAKE SIDE DR<br>ORLANDO, FL 32803 |
| 78300 | GAUVIN, GINA M<br>C/O CHARLES N REDIHAN, JR<br>KIERNAN, PLUNKETT & REDIHAN<br>91 FRIENDSHIP ST<br>PROVIDENCE, RI 02903 |
| 80700 | GINA M GAUVIN, ET AL<br>KIERNAN PLUNKETT & REDIHAN<br>ATTN: CHARLES N REDIHAN JR<br>91 FRIENDSHIP ST<br>PROVIDENCE, RI 02903 |
| 126000 | HARRIS COUNTY/CITY OF HOUSTON<br>LINEBARGER GOGGAN BLAIR ET AL<br>ATTN: JOHN P DILLMAN<br>PO BOX 3064<br>HOUSTON, TX 77253-3064 |
| 95400 | HEWLETT-PACKARD CARIBE LIMITED<br>HEWLETT PACKARD COET AL<br>C/O ANNE M KENNELLY, CORP CNSL<br>3000 HANOVER ST, MAIL STOP 1050<br>PALO ALTO, CA 94304-1112 |
| 125800 | HOUSTON ISD<br>LINEBARGER GOGGAN BLAIR ET AL<br>ATTN: JOHN P DILLMAN<br>PO BOX 3064<br>HOUSTON, TX 77253-3064 |
| 26200 | JOHN A AITKEN<br>833 WESTBROOK DR<br>NEWTON, NC 28658 |
| 104200 | KOLASA, KATRINA<br>PO BOX 791<br>BALTIC, CT 06330 |
| 83800 | MAX WISTOW ESQ<br>61 WEYBOSSET ST<br>PROVIDENCE, RI 02903 |
| 87400 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 87500 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 87600 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 87700 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 87800 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 87900 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE STT, 31ST FL<br>NEW YORK, NY 10270 |
| 88000 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 88100 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 88200 | NAT'L UNION FIRE INS CO, ET AL<br>AIG LAW DEPT - BANKRUPTCY<br>ATTN: MICHELLE A LEVITT, ESQ<br>70 PINE ST, 31ST FL<br>NEW YORK, NY 10270 |
| 126600 | NEW MEXICO ENVIRONMENT DEPARTMENT<br>ATTN: LESLIE BARNHART<br>PO BOX 26110<br>SANTA FE, NM 87502 |
| 92900 | OOO "PKF" FLINT<br>C/O JERROD S KULBACK, ES.<br>ARCHER & GREINER, PC<br>ONE CENTENNIAL SQ<br>HADDONFIELD, NJ 08033 |
| 65800 | PATRICK T JONES, ESQ<br>COOLEY MANION JONES LLP<br>21 CUSTOM HOUSE ST<br>BOSTON, MA 02110 |
| 90100 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 90300 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEOBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 90400 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHEIF COUNSEL, STE 340<br>ATTN: BEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 90600 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 90700 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 90900 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>WASHINGTON, DC 20005-4026 |
| 91000 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 91300 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 91500 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 91600 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 92300 | PENSION BENEFIT GUARANTY CORP<br>ATTN: DEBORAH J. BISCO, ATTY<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 91800 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST<br>WASHINGTON, DC 20005-4026 |
| 91900 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO<br>1200 K ST<br>WASHINGTON, DC 20005-4026 |
| 92100 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO, ATTY<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 92200 | PENSION BENEFIT GUARANTY CORP<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>ATTN: DEBORAH J BISCO<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 92400 | PENSION BENEFIT GUARANTY CORP<br>ATTN: DEBORAH J BISCO, ATTY<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 92500 | PENSION BENEFIT GUARANTY CORP<br>ATTN: DEBORAH J BISCO, ATTY<br>OFFICE OF THE CHIEF, COUNSEL, STE 340<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 92600 | PENSION BENEFIT GUARANTY CORP<br>ATTN: DEBORAH J BISCO, ATTY<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 92700 | PENSION BENEFIT GUARANTY CORP<br>ATTN: DEBORAH J BISCO, ATTY<br>OFFICE OF THE CHIEF COUNSEL, STE 340<br>1200 K ST, NW<br>WASHINGTON, DC 20005-4026 |
| 86300 | PUBLIC UTILITY SERVICE CORP<br>734 SPRINGDALE DR<br>EXTON, PA 19341 |
| 82800 | RUSSELL BRAMLEY ESQ<br>875 CENTERVILLE RD<br>BLDG 2, UNIT 4B6<br>WARWICK, RI 02886 |
| 119500 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 119600 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 119700 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 119800 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 119900 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 120000 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 120100 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 120200 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 120300 | SILVER POINT FINANCE, LLC<br>TWO GREENWICH PLAZA<br>1ST FL<br>GREENWICH, CT 06830 |
| 76000 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 76100 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 76200 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |

| CLAIM NUMBER | CLAIMANT NAME & ADDRESS |
|---|---|
| 76300 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL STT<br>NEW YORK, NY 10005-2858 |
| 76400 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 76500 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 76600 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 76700 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 76800 | STANLEY BURG<br>DEUTSCHE BANK TRUST CO AMERICA<br>TRUST & SECURITIES SERVICES<br>MS NYC60-2720, 60 WALL ST<br>NEW YORK, NY 10005-2858 |
| 96500 | STEPHEN C TRAVIS<br>6206 NIGHTINGALE ST<br>MORRISTOWN, TN 37814 |
| 46100 | SUSAN AND MICHAEL J BAGNATO<br>C/O CATHERINE BERLIN, ESQ<br>ALTREUTER HABERMEHL<br>617 MAIN ST<br>BUFFALO, NY 14203 |
| 3100 | TN DEPT OF ENVIRONMENT AND CONSERVATION<br>C/O TN ATTY GENERAL, BANKRUPTCY DIV<br>PO BOX 20207<br>NASHVILLE, TN 37202-0207 |
| 123400 | U.S. CUSTOMS AND BORDER PROTECTION<br>6650 TELECOM DRIVE<br>P.O. BOX 68911<br>INDIANAPOLIS, IN 46268 |
| 123600 | UNITED STATES ON BEHALF OF E.P.A.<br>KARL FINGERHOOD, ESQ.<br>US DOJ, PO BOX 7611<br>WASHINGTON, DC 20044 |
| 25400 | WALKER, LARRY<br>264 ARLINGTON ST<br>FOREST CITY, NC 28043 |
| 69400 | WILLIAMS, JOYCE A<br>301 W 10TH ST<br>AUBURN, IN 46706-2145 |