# Exhibit D

**BANC OF AMERICA
SECURITIES LLC
BANK OF AMERICA, N.A.**
9 West 57th Street
New York, New York 10019

**MORGAN STANLEY
SENIOR FUNDING, INC.**
1585 Broadway
New York, New York 10036

**BARCLAYS CAPITAL**
200 Park Avenue
New York, New York 10166

October 13, 2006

Foamex International Inc.
Foamex L.P.
1000 Columbia Avenue
Linwood, PA 19061-3997

Attention:   Governor Raymond E. Mabus, Chairman of the Board
Gregory J. Christian, EVP, Chief Restructuring Officer,
        Chief Administrative Officer and General Counsel
George L. Karpinski, SVP and Treasurer
CC:        Ronen Bojmel, Managing Director, Miller Buckfire & Co., LLC

**Commitment Letter
Senior Secured Credit Facilities
$175.0 Million Asset-Based Revolving Credit Facility
$425.0 Million First Lien Term Loan Facility
$190.0 Million Second Lien Term Loan Facility**

Ladies and Gentlemen:

You have advised Bank of America, N.A. ("***Bank of America***") and Banc of America Securities LLC ("***BAS***"), Morgan Stanley Senior Funding, Inc. ("***MSSF***") and Barclays Capital, the investment banking division of Barclays Bank PLC ("***Barclays***" and, together with Bank of America, BAS and MSSF, "*we*" or "*us*") that Foamex International Inc. ("***Parent***"), a Delaware corporation and a debtor-in-possession under Chapter 11 ("***Chapter 11***") of the U.S. Bankruptcy Code (the "***Bankruptcy Code***"), and its domestic subsidiaries that are also debtors-in-possession under Chapter 11, including Foamex L.P. (the "***Borrower***"), a Delaware limited partnership, are seeking emergence from Chapter 11 (the "***Emergence***"). The Emergence would follow shortly after confirmation of a Plan of Reorganization under Chapter 11 (the "***Plan of Reorganization***") by the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). Parent and its subsidiaries are collectively referred to herein as the "***Companies***."

In connection with the Emergence and pursuant to the Plan of Reorganization, the Borrower's debtor-in-possession senior secured revolving credit facility (the "***DIP Facility***") and certain other indebtedness of the Companies will be repaid and certain liabilities of the Companies will be paid (collectively, the "***Refinancing***"). You have advised us that you intend to finance the Refinancing, the costs and expenses related to the Transaction (as hereinafter defined)

and the ongoing working capital and other general corporate purposes of the Borrower and its subsidiaries following Emergence from the following sources (and that no financing other than the financing described herein will be required in connection with the Transaction):

(a) a $175.0 million senior secured asset-based revolving credit facility to the Borrower (the "*Revolving Credit Facility*");

(b) a $425.0 million senior secured first lien term loan facility to the Borrower (the "*First Lien Term Loan Facility*");

(c) a $190.0 million senior secured second lien term loan facility to the Borrower (the "*Second Lien Term Loan Facility*" and, together with the First Lien Term Loan Facility, the "*Term Loan Facilities*"); and

(d) the issuance of additional shares of common stock and/or Qualified Preferred Stock (as defined below) of Parent for cash proceeds in an aggregate amount of not less than $142.5 million after deduction for any net premiums or fees to be paid in cash in connection with the rights offering to the equity holders who will be parties to the equity commitment agreement to be executed in connection with the Plan of Reorganization, the net proceeds of which will be contributed in cash to the common equity of the Borrower (the "*Equity Financing*").

"*Qualified Preferred Stock*" means preferred stock that does not require any cash payments in respect thereof (whether as dividends or upon mandatory redemption or repurchase or otherwise) at any time prior to the repayment in full and termination of the Facilities. The Revolving Credit Facility, the First Lien Term Loan Facility and the Second Lien Term Loan Facility are collectively referred to herein as the "*Facilities*." The Emergence pursuant to the Plan of Reorganization (including the Refinancing), the entering into and initial funding of the Facilities, the Equity Financing and all related transactions are collectively referred to herein as the "*Transaction*."

1.     **Commitments**. In connection with the foregoing, (a) Bank of America, MSSF and Barclays are each pleased to advise you of their commitments, severally and not jointly, to provide the amount of each of the Facilities set forth opposite their names in the table set forth below this paragraph, Bank of America is pleased to advise you of its willingness to act as the sole and exclusive administrative agent (in such capacity, the "*Administrative Agent*") for each of the Facilities and MSSF and Barclays are pleased to advise you of their willingness to act as co-syndication agents for the Term Loan Facilities (in such capacity, the "*Co-Syndication Agents*" and, together with the Administrative Agent, the "*Agents*"), all upon and subject to the terms and conditions set forth in this letter and in the summaries of terms attached as Annexes I and II hereto (collectively, the "*Summaries of Terms*"), and (b) BAS, MSSF and Barclays (the "*Lead Arrangers*") are pleased to advise you of their willingness, in the roles set forth in the next succeeding sentence, to form a syndicate of banks, financial institutions and other lenders (collectively, the "*Lenders*") for each of the Facilities, including Bank of America and, with respect to the Term Loan Facilities, MSSF and Barclays. In connection with the syndication of the Facilities, (i) BAS shall act as the sole and exclusive lead arranger and sole and exclusive book running manager with respect to the Revolving Credit Facility and as the co-lead arranger and sole and exclusive book running manager with respect to the Term Loan Facilities, with "first posi-

2

tion" placement on all marketing materials, (ii) MSSF shall act as co-lead arranger with "second position" placement and league table credit for the First Lien Term Loan Facility and as co-lead arranger with "third position" placement for the Second Lien Term Loan Facility, and (ii) Barclays shall act as co-lead arranger with "third position" placement for the First Lien Term Loan Facility and as co-lead arranger with "second position" placement and league table credit for the Second Lien Term Loan Facility. All capitalized terms used and not otherwise defined herein shall have the same meanings as specified therefor in the Summaries of Terms. The date of the initial funding under the Facilities is referred to herein as the "**Closing Date.**"

| Commitments | Revolving Credit Facility | First Lien Term Loan Facility | Second Lien Term Loan Facility |
|---|---|---|---|
| **Bank of America** | $175.0 million | $255.0 million | $114.0 million |
| **MSSF** | — | $85.0 million | $38.0 million |
| **Barclays** | — | $85.0 million | $38.0 million |

2.   <u>**Syndication**</u>. The Lead Arrangers intend to commence syndication of each of the Facilities promptly after your acceptance of the terms of this Commitment Letter and the Fee Letter (as defined below) and to seek to complete such syndication prior to the Closing Date. You agree to use commercially reasonable efforts to assist the Lead Arrangers in achieving such syndication in a manner that is reasonably satisfactory to the Lead Arrangers. Such assistance shall include (a) your providing and causing your advisors to provide the Lead Arrangers and the Lenders upon request with all information reasonably deemed necessary by the Lead Arrangers to complete such syndication, including, but not limited to, information and evaluations prepared by the Companies and their advisors, or their behalf, relating to the Transaction, (b) your assistance in the preparation of Information Memoranda to be used in connection with the syndication of each of the Facilities, (c) your using your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arrangers benefit materially from the existing lending relationships of the Companies and (d) your otherwise using your commercially reasonable efforts to assist the Lead Arrangers in their syndication efforts, including by making the officers and advisors of the Loan Parties available from time to time to attend and make presentations regarding the business and prospects of the Loan Parties at one or more meetings of prospective Lenders.

It is understood and agreed that BAS will manage and control all aspects of the syndication of the Facilities in consultation with you and the other Lead Arrangers, including decisions as to the selection of prospective Lenders and any titles offered to proposed Lenders, when commitments will be accepted and the final allocations of the commitments among the Lenders; *provided* that competitors, customers and vendors of the Borrower and their affiliates previously identified by the Borrower to the Lead Arrangers or as otherwise reasonably agreed by the Borrower and the Lead Arrangers will not be selected as prospective Lenders without the Borrower's consent. It is understood that no Lender participating in any Facility will receive compensation from you in order to obtain its commitment, except on the terms contained herein and in the Summaries of Terms. It is also understood and agreed that the amount and distribution of such fees among the Lenders will be at the discretion of BAS in good faith consultation with the other Lead Arrangers.

3

3. **Information Requirements**. You hereby represent, warrant and covenant that (a) all information, other than Projections (as defined below), that has been or is hereafter made available to any of the Lead Arrangers or any of the Lenders by any of the Companies or any of their representatives or advisors in connection with any aspect of the Transaction (the "*Information*") is and will be complete and correct in all material respects taken as a whole and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances in which they were made and (b) all financial projections concerning the Companies that have been or are hereafter made available to any of the Lead Arrangers or any of the Lenders by any of the Companies or their representatives or advisors (the "*Projections*") have been or will be prepared in good faith based upon reasonable assumptions at the time prepared. You agree to furnish us with such Information and Projections as we may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date so that the representation, warranty and covenant in the immediately preceding sentence is correct on the Closing Date. In issuing this commitment and in arranging and syndicating the Facilities, we are and will be using and relying on the Information and the Projections without independent verification thereof.

You hereby acknowledge that (a) we will make available Information and Projections (collectively, "*Borrower Materials*") to the proposed syndicate of Lenders by posting the Borrower Materials on IntraLinks or another similar electronic system (the "*Platform*") and (b) certain of the proposed Lenders may be "public-side" Lenders (*i.e.*, Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "*Public Lender*"). You hereby agree that (w) we will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and to include a reasonably detailed term sheet among such Borrower Materials and that all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," you shall be deemed to have authorized us and the proposed Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Companies or their securities for purposes of United States federal and state securities laws, it being understood that certain of such Borrower Materials may be subject to the confidentiality requirements of the definitive credit documentation; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform that is designated "Public Investor;" and (z) we shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform that is not designated "Public Investor."

4. **Fees and Indemnities**. You agree to pay the fees set forth in the Fee Letter dated as of the date hereof (the "*Fee Letter*") among the parties hereto. You also agree to reimburse us from time to time on demand for all reasonable out-of-pocket fees and expenses (including, but not limited to, the reasonable fees, disbursements and other charges of Cahill Gordon & Reindel LLP and Kaye Scholer LLP, as counsels to the Lead Arrangers and the Agents, and of one local counsel per jurisdiction to the Lenders retained by the Lead Arrangers and due diligence expenses) incurred in connection with the Facilities, the syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated hereby. We currently estimate in good faith that the fees and expenses of Cahill Gordon & Re-

4

indel LLP and Kaye Scholer LLP in connection with due diligence and the preparation and nego-
tiation of the loan documentation for the Facilities and the closing thereunder will be $900,000,
and we agree to advise you before such estimate is exceeded.

You also agree to indemnify and hold harmless Bank of America, BAS, MSSF,
Barclays, each other Lender and each of their affiliates and their officers, directors, employees,
agents, advisors and other representatives (each an *"Indemnified Party"*) from and against (and
will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages,
losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements
and other charges of counsel) that may be incurred by or asserted or awarded against any Indem-
nified Party, in each case arising out of or in connection with or by reason of (including, without
limitation, in connection with any investigation, litigation or proceeding or preparation of a de-
fense in connection therewith) (a) any aspect of the Transaction and any of the other transactions
contemplated thereby or (b) the Facilities, or any use made or proposed to be made with the pro-
ceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a fi-
nal, non-appealable judgment by a court of competent jurisdiction to have resulted from such
Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, liti-
gation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be
effective whether or not such investigation, litigation or proceeding is brought by you, your eq-
uity holders or creditors or an Indemnified Party, whether or not an Indemnified Party is other-
wise a party thereto and whether or not any aspect of the Transaction is consummated. You also
agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or
tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity
holders or creditors arising out of, related to or in connection with any aspect of the Transaction,
except to the extent of direct (as opposed to special, indirect, consequential or punitive) damages
determined in a final non-appealable judgment by a court of competent jurisdiction to have re-
sulted from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding
any other provision of this Commitment Letter, no Indemnified Party shall be liable for any
damages arising from the use by others of information or other materials obtained through elec-
tronic telecommunications or other information transmission systems, unless arising from the
Indemnified Party's gross negligence or willful misconduct with respect to the use of such elec-
tronic telecommunication or information transmission system, as determined in a final non-
appealable judgment by a court of competent jurisdiction.

5. **Conditions to Financing**. The commitments of Bank of America, MSSF
and Barclays in respect of the Facilities and the undertakings of BAS, MSSF and Barclays to
provide the services described herein are subject to the satisfaction of each of the conditions set
forth in Annex II hereto and each of the following conditions precedent in a manner reasonably
acceptable to the Lead Arrangers: (a) the negotiation, execution and delivery of definitive
documentation with respect to each of the Facilities reasonably satisfactory to the Lead Arrang-
ers, the Lenders under such Facility and you; (b) on and after the date hereof and prior to the 90th
day following the Closing Date, there shall be no competing offering, placement or arrangement
of any debt financing by or on behalf of any of the Companies (other than the Facilities pursuant
to this Commitment Letter); (c) no change, occurrence or development shall have occurred since
July 2, 2006 that could reasonably be expected to have a material adverse effect on the business,
results of operations or financial condition of the Borrower and its subsidiaries, taken as a whole;
(d) the corporate credit/family ratings of the Borrower and the ratings of each of the First Lien

5

Term Loan Facility and the Second Lien Term Loan Facility from Moody's Investor Service Inc. ("**Moody's**") and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**") shall have been obtained at least 30 days prior to the Closing Date, and such corporate credit/family ratings at all times from issuance through the Closing Date shall be B2 (stable) or higher from Moody's and B (stable) or higher from S&P; and (e) the satisfaction of all other conditions and requirements described herein and in the Summaries of Terms.

6.    **Confidentiality**. This Commitment Letter and the Fee Letter and the contents hereof and thereof are confidential and, except for the disclosure hereof or thereof on a confidential basis to your directors, officers, employees, accountants, attorneys and other professional advisors retained in connection with the Transaction, may not be disclosed in whole or in part to any person or entity without our prior written consent, except (x) as may be compelled in a judicial or administrative proceeding or otherwise required by law or the Bankruptcy Court and (y) that you may disclose, on a confidential basis, (i) this Commitment Letter (including the Summaries of Terms but not the Fee Letter) to representatives of each of the classes of claims of the Companies, (ii) this Commitment Letter and the Fee Letter (with the "market flex" provisions redacted) to the advisors for each of the classes of claims of the Companies; *provided* that such advisors shall have executed a Confidentiality Confirmation (as defined below), (iii) this Commitment Letter and the Fee Letter (with the fees redacted) to S&P and Moody's in connection with obtaining ratings for the Facilities, (iv) this Commitment Letter and the Fee Letter (with the "market flex" provisions redacted) to the U.S. Trustee in the Chapter 11 proceeding of the Borrower and certain of its affiliates, (v) this Commitment Letter and the Fee Letter to Imperial Capital and Cleary Gottlieb Steen & Hamilton LLP, as advisors for members of the ad hoc equity committee in connection with the Equity Financing; *provided* that such advisors shall have executed a Confidentiality Confirmation, and (vi) with the prior approval of BAS (not to be unreasonably withheld), this Commitment Letter and the Fee Letter to holders of 5% or more of Parent's common stock and other representatives of such ad hoc equity committee. Subject to the foregoing, you agree to take such reasonable actions as shall be necessary to prevent the Fee Letter from becoming publicly available, including without limitation, the filing of a motion pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 seeking an order of the Bankruptcy Court authorizing the Companies to file the Fee Letter under seal. "**Confidentiality Confirmation**" means a letter executed and delivered to BAS by the applicable advisor in which the advisor agrees (a) not to disclose the specific terms of the Fee Letter to any of the members of the committee for which the advisor is providing services or to any of such committee's other advisors who have not executed and delivered a Confidentiality Confirmation to BAS or to any other person outside such advisor's firm (*provided, however*, that the advisor may advise the members and other advisors of such committee as to the reasonableness of the Fee Letter in light of market conditions and its appropriateness in light of the Transaction so long as the specific terms thereof are not disclosed), and (b) to abide by the terms of the existing confidentiality agreement between such advisor (or, in the case of counsel, such advisor's client) and Parent with respect to both the Commitment Letter and (to the extent consistent with clause (a) above) the Fee Letter.

You acknowledge that we or our affiliates may be providing financing or other services to parties whose interests may conflict with yours. However, be assured that, consistent with our longstanding policy to hold in confidence the affairs of our customers, we will not furnish confidential information obtained from you to any of our other customers and will treat con-

6

fidential information relating to the Companies with the same degree of care as we treat our own confidential information. By the same token, we will not make available to you confidential information that we have obtained or may obtain from any other customer. In connection with the services and transactions contemplated hereby, you agree that we are permitted to access, use and share with any of our bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives, any information concerning the Companies that is or may come into the possession of us or any of such affiliates.

In connection with all aspects of each transaction contemplated by this letter, you acknowledge and agree that: (i) the Facilities and any related arranging or other services described in this letter is an arm's-length commercial transaction between you and your affiliates, on the one hand, and Bank of America, BAS, MSSF and Barclays, on the other hand, and you are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated by this letter; (ii) in connection with each transaction contemplated hereby and the process leading to such transaction, each of Bank of America, BAS, MSSF and Barclays is and has been acting solely as a principal and is not acting as an agent or fiduciary, for you or any of your affiliates, stockholders, creditors or employees or any other party; (iii) none of Bank of America, BAS, MSSF or Barclays has assumed or will assume an advisory or fiduciary responsibility in your or your affiliates' favor with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether Bank of America, BAS, MSSF or Barclays has advised or is currently advising you or your affiliates on other matters) and none of Bank of America, BAS, MSSF or Barclays has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this letter; (iv) Bank of America, BAS, MSSF and Barclays and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and your affiliates and Bank of America, BAS, MSSF and Barclays have no obligation to disclose any of such interests by virtue of any fiduciary or advisory relationship; and (v) Bank of America, BAS, MSSF and Barclays have not provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate. You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against Bank of America, BAS, MSSF and Barclays with respect to any breach or alleged breach of fiduciary duty.

Bank of America, BAS, MSSF and Barclays hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*Act*"), each of them is required to obtain, verify and record information that identifies you, which information includes your name and address and other information that will allow Bank of America, BAS, MSSF, Barclays and the other Lenders to identify you in accordance with the Act.

7.    **Survival of Obligations.** The provisions of numbered paragraphs 4 and 6 shall remain in full force and effect regardless of whether any definitive documentation for the Facilities shall be executed and delivered and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of Bank of America, BAS, MSSF or Barclays hereunder. The provisions of numbered paragraph 2 shall remain in full force and effect until completion of a successful syndication of the Facilities. For purposes only of this Section 7, a

7

"successful syndication" shall mean the Agents and their affiliates holding commitments and loans in respect of the Revolving Credit Facility, First Lien Term Loan Facility and Second Lien Term Loan Facility in aggregate principal amounts of not more than $50.0 million, $15.0 million and $15.0 million, respectively.

8. **Miscellaneous.** This Commitment Letter and the Fee Letter may be executed in multiple counterparts and by different parties hereto in separate counterparts, all of which, taken together, shall constitute an original. Delivery of an executed counterpart of a signature page to this Commitment Letter or the Fee Letter by telecopier or electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

This Commitment Letter and the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York. Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including, without limitation, the Summaries of Terms), the Fee Letter, the Transaction and the other transactions contemplated hereby and thereby or the actions of Bank of America, BAS, MSSF and Barclays in the negotiation, performance or enforcement hereof. Each of the parties hereto hereby irrevocably submits to the jurisdiction of any New York State court or Federal court sitting in the Borough of Manhattan in New York City and, prior to Emergence, the Bankruptcy Court in respect of any suit, action or proceeding arising out of or relating to the provisions of this Commitment Letter (including, without limitation, the Summaries of Terms), the Fee Letter, the Transaction and the other transactions contemplated hereby and thereby and irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. Each of the parties hereto waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceedings brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

This Commitment Letter (including the Summaries of Terms) and the Fee Letter embody the entire agreement and understanding among the parties hereto with respect to the Facilities and supersede all prior agreements and understandings relating to the subject matter hereof, including (i) the commitment letter and the fee letter, each dated August 14, 2005 among the Borrower, Bank of America and BAS and (ii) upon effectiveness of the Facilities, the commitments under the DIP Facility. No person has been authorized by Bank of America, BAS, MSSF or Barclays to make any oral or written statements that are inconsistent with this Commitment Letter.

This Commitment Letter is not assignable by you without our prior written consent, is not assignable by Bank of America, BAS, MSSF or Barclays without your prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties. Notwithstanding the foregoing, you agree that Bank of America, BAS, MSSF and Barclays may each perform their obligations hereunder through one or more affiliates without your consent, *provided* that such affiliates shall agree to be bound by the confidentiality obligations of Bank of America, BAS, MSSF and Barclays hereunder. Each of MSSF and Barclays agrees that it will not assign, sell a participation in or otherwise trade any of its commitments or loans hereunder or under the loan documentation for the Facilities other than as part of the general syndica-

8

tion coordinated by BAS, and each of Bank of America, MSSF and Barclays agrees that the commitments and loans in respect of the Term Loan Facilities will be syndicated on a pro rata basis among Bank of America, MSSF and Barclays based on their respective commitments hereunder; provided that this provision shall not limit the ability of Bank of America, MSSF and Barclays to assign their commitments or loans to any of their respective affiliates that agrees to be bound by this provision.

All commitments and undertakings of Bank of America, BAS, MSSF and Barclays under this Commitment Letter with respect to the Facilities will expire at 5:00 p.m. (New York City time) on October 13, 2006 unless you execute this Commitment Letter as provided below and the Fee Letter as provided therein to accept such commitments and return them to us prior to that time. Further, we shall have the right to terminate the commitments and agreements set forth herein on and after November 30, 2006 unless, prior to such date, you shall have delivered to us a copy of an order (the "*Approval Order*") in respect of the voluntary case commenced by the Borrower under Chapter 11 (the "*Bankruptcy Case*") that has been entered by the Bankruptcy Court and become effective, in form and substance reasonably satisfactory to us, authorizing the Companies to pay the fees and expenses set forth in the Commitment Letter and the Fee Letter and otherwise authorizing the Companies to accept, and incur their obligations under, the Commitment Letter and the Fee Letter, which Approval Order shall specifically provide that our right to receive all amounts due and owing to us, including the fees as outlined herein and in the Fee Letter and reimbursement of all reasonable out-of-pocket costs and expenses incurred in connection with the financing outlined herein and as set forth herein and in the Fee Letter, shall be entitled to priority as administrative expense claims under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code, whether or not the Facilities are consummated. If you satisfy the conditions set forth in this paragraph, we agree to hold our commitment, as outlined herein, available for you until (A) the earliest of (i) the consummation of the transactions contemplated hereby, (ii) the consummation of any Chapter 11 plan of reorganization other than the Plan of Reorganization, (iii) the completion of the Emergence without the funding of the Facilities, (iv) the dismissal or conversion to proceedings under Chapter 7 of the Bankruptcy Code of the Bankruptcy Case or the appointment in the Bankruptcy Cases of a trustee or examiner with expanded powers and (v) 5:00 p.m., New York City time, on February 28, 2007 and (B) such later date as we shall, in our sole discretion, otherwise agree. Notwithstanding the foregoing, if the Approval Order shall at any time cease to be in full force and effect or shall be reversed, modified (in a material and adverse manner with respect to the Lead Arrangers or the financing contemplated hereby) or stayed, we may, in our sole discretion, terminate our commitments or agreements hereunder, in each case without further obligation hereunder.

[The remainder of this page intentionally left blank.]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

BANK OF AMERICA, N.A.

By: _____
Name:
Title:

BANC OF AMERICA SECURITIES LLC

By: _____
Name:
Title:

MORGAN STANLEY SENIOR
FUNDING, INC.

By: _____
Name:
Title:

BARCLAYS BANK PLC

By: _____
Name:
Title:

10

**FOAMEX INTERNATIONAL INC.**

By: _____
Name:
Title:

**FOAMEX L.P.**

By:     FMXI, Inc., its Managing General Partner

By: _____
Name:
Title:

11

## SUMMARY OF TERMS AND CONDITIONS
## TERMS APPLICABLE TO EACH OF THE FACILITIES

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this Annex is attached.

This Annex I sets forth the terms applicable to all of the Facilities, and Addenda A, B, C and D hereto sets forth terms specifically applicable to each Facility.

**Borrower:** FOAMEX L.P., a Delaware limited partnership (the "***Borrower***").

**Guarantors:** The Facilities will be unconditionally guaranteed, jointly and severally, by Foamex International Inc., a Delaware corporation ("***Parent***"), Foamex Canada Inc., and each of Parent's other existing and future direct and indirect U.S. subsidiaries (other than any existing subsidiaries to be eliminated pursuant to the Plan of Reorganization) (the "***Guarantors***"). All guarantees will be guarantees of payment and not of collection. The Borrower and the Guarantors are collectively referred to herein as the "***Loan Parties***."

**Administrative and Collateral Agent:** Bank of America, N.A. ("***Bank of America***") will act as sole and exclusive administrative and collateral agent for each of the Facilities (in each such capacity, the "***Administrative Agent***").

**Lenders:** For each of the Facilities, Bank of America and, with respect to the Term Loan Facilities, MSSF and Barclays, and other banks and financial institutions selected by the Lead Arrangers in consultation with the Borrower.

**Facilities:** The Facilities will consist of the following:

(i)    a $175.0 million senior secured asset-based revolving credit facility to the Borrower (the "***Revolving Credit Facility***"), with the specific terms set forth in Addendum A hereto;

(ii)    a $425.0 million senior secured first lien term loan facility to the Borrower (the "***First Lien Term Loan Facility***"), with the specific terms set forth in Addendum B hereto; and

(iii)    a $190.0 million (or such lesser amount as the Borrower may elect) senior secured second lien term loan facility to the Borrower (the "***Second Lien Term Loan Facility***"), with the specific terms set forth in Addendum C hereto.

**Interest Rates:**  The interest rates per annum applicable to the Facilities will be, at the option of the Borrower, (i) LIBOR plus the Applicable Margin or (ii) the Alternate Base Rate (to be defined as the higher of (x) the Bank of America prime rate and (y) the Federal Funds rate plus 0.50%) plus the Applicable Margin.

The Borrower may select interest periods of one, two, three or six months (and, if agreed to by all relevant Lenders, nine or twelve months) for LIBOR advances. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

During the continuance of any Event of Default under any Facility, at the election of the majority lenders under such Facility, the Applicable Margin on all obligations owing under such Facility shall increase by 2% per annum.

Interest will be calculated on the basis of actual number of days elapsed in a 360-day year, except that, in the case of the First Lien Term Loan Facility and the Second Lien Term Loan Facility, interest on loans bearing interest by reference to the prime rate will be calculated on the basis of actual number of days elapsed in a 365/366 day year.

**Security:**  The Loan Parties shall grant the Administrative Agent for each of the Facilities valid and perfected liens and security interests in all of the following (collectively, the "*Collateral*"):

(a)  all accounts receivable, certain assets related to the foregoing and all proceeds of the foregoing (the "*ABL Collateral*"); and

(b)  all present and future shares of capital stock of (or other ownership or profit interests in) each Loan Party's present and future direct U.S. subsidiaries and Foamex Canada Inc. and 65% of the voting stock of each other first-tier foreign subsidiary of a Loan Party (in each case, other than any existing subsidiaries to be eliminated pursuant to the Plan of Reorganization); all present and future intercompany debt owed to any Loan Party; and all of the present and future property of the Loan Parties, including, but not limited to, equipment, inventory, real property, fixtures, investment property, contract rights, intellectual property, other general intangibles, commercial tort claims, letter of credit rights, insurance proceeds and instruments; and all proceeds of the foregoing, but excluding the ABL Collateral (the "*Term Loan Collateral*").

All the above-contemplated pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, and shall be supported by landlord and mortgagee waivers, ware-

housemen and bailee letters, third party consents, intercreditor agreements and other agreements, reasonably satisfactory to the Administrative Agent, subject to exceptions for third-party documents that cannot be obtained after use by the Loan Parties of commercially reasonable efforts, and none of the Collateral shall be subject to any other pledges, security interests or mortgages, subject to exceptions to be agreed upon, including, without limitations, existing liens securing industrial revenue bonds and capital leases. Notwithstanding the foregoing, assets will be excluded from the Collateral in circumstances where the Administrative Agent reasonably determines the cost of obtaining a security interest in such assets is excessive in relation to the value afforded thereby, or if the granting of a security interest in such asset would be prohibited by enforceable anti-assignment provisions of any contract or by applicable law.

The obligations of the Loan Parties under (i) the Revolving Credit Facility and (ii) any interest rate or currency hedging agreements and any treasury management agreements with a Lender under the Revolving Credit Facility, the Administrative Agent or any affiliate of any such Lender or the Administrative Agent will be secured by first priority security interests in the ABL Collateral and third priority security interests in the Term Loan Collateral. The order of payment of such obligations will be subject to "waterfall" provisions to be set forth in the loan documentation for the Revolving Credit Facility.

The obligations of the Loan Parties under First Lien Term Loan Facility will be secured by first priority security interests in the Term Loan Collateral and second priority security interests in the ABL Collateral.

The obligations of the Loan Parties under Second Lien Term Loan Facility will be secured by second priority security interests in the Term Loan Collateral and third priority security interests in the ABL Collateral.

An intercreditor agreement in form and substance reasonably satisfactory to the Lead Arrangers and the Borrower shall have been entered into by the Administrative Agent for each of the Facilities.

**Representations and Warranties:**

Applicable to Parent and its subsidiaries and, with respect to each Facility, customary for transactions of such type, and others reasonably deemed appropriate by the Lead Arrangers (subject to materiality qualifications and other exceptions to be agreed), including, without limitation: (i) corporate status, corporate power and

authority; (ii) due authorization, execution, delivery and enforceability of the loan documentation; (iii) no violation of law, contracts or organizational documents; (iv) no material litigation or investigations; (v) accuracy and completeness of financial statements and other information; (vi) no material adverse change and no internal control event; (vii) no required governmental or third party approvals or consents; (viii) use of proceeds; (ix) compliance with laws (including PATRIOT ACT and margin regulations); (x) valid title to property and assets; (xi) status under Investment Company Act; (xii) ERISA matters; (xiii) environmental matters; (xiv) validity, priority and perfection of security interests; (xv) solvency; (xvi) tax status and payment of taxes; (xvii) labor matters; and (xviii) Emergence matters.

**Affirmative Covenants:** Applicable to Parent and its subsidiaries (or the Loan Parties and the Mexican subsidiaries, such applicability to be generally consistent with the DIP Facility) and, with respect to each Facility, customary for transactions of such type, and others reasonably deemed appropriate by the Lead Arrangers (subject to materiality qualifications and other exceptions to be agreed), including, without limitation, the following: (i) compliance with laws and regulations (including, without limitation, ERISA and environmental laws); (ii) payment of taxes and other obligations; (iii) maintenance of appropriate and adequate insurance; (iv) preservation of corporate existence, rights (charter and statutory), franchises, permits, licenses and approvals; (v) visitation and inspection rights; (vi) keeping of proper books in accordance with generally accepted accounting principles; (vii) maintenance of properties; (viii) performance of leases, related documents and other material agreements; (ix) further assurances on collateral matters; (x) additional guarantors and additional collateral; and (xi) customary financial and other reporting requirements (including, without limitation, audited annual financial statements and quarterly unaudited financial statements, notices of defaults, compliance certificates, annual business plans and forecasts, notices of material litigation and other material events, reports to shareholders and other creditors).

**Negative Covenants:** Applicable to the Loan Parties and the Mexican subsidiaries and, in case of clause (ix), other subsidiaries and, with respect to each Facility, customary for transactions of such type, and others reasonably deemed appropriate by the Lead Arrangers (subject to materiality qualifications and other exceptions to be agreed), including, without limitation, the following restrictions on:

(i) liens;

Annex I-4

(ii) debt, guarantees or other contingent obligations (with carve-outs permitting (1) unsecured guarantees supporting indebtedness and other obligations of foreign subsidiaries in an aggregate amount not to exceed $50.0 million at any one time outstanding, (2) capital leases in an aggregate principal amount not to exceed $10.0 million in any year and $25.0 million at any one time outstanding, (3) insurance premium financing and (4) indebtedness to fund the acquisition of the property in Orange, California previously identified to the Lead Arrangers (which indebtedness under this clause (4) may be secured by a mortgage on such property);

(iii) mergers and consolidations;

(iv) sales, transfers and other dispositions of property and assets (other than sales of inventory and licenses of intellectual property in the ordinary course of business);

(v) loans, acquisitions, joint ventures and other investments (with carve-outs permitting existing investments and (1) up to $20.0 million of additional investments in the existing Asian joint venture and (2) additional investments, loans, advances or trade receivables with or in foreign subsidiaries and joint ventures (other than the existing Asian joint venture) in an amount not to exceed $10.0 million minus the amount of existing trade receivables from foreign subsidiaries (other than any Loan Party) and joint ventures (currently $4.0 million);

(vi) dividends and other distributions to, and redemptions and re-purchases from, equity holders (with a carve-out permitting up to $2.5 million of dividends and distributions per year to fund administrative costs of the Borrower's immediate parent company);

(vii) granting negative pledges;

(viii) transactions with affiliates;

(ix) changes in the nature of business;

(x) amending organizational documents, or amending or otherwise modifying certain material agreements and prepayments of certain debt, including, in the case of the First Lien Term Loan Facility, any prepayment of the Second Lien Term Loan Facility;

(xi) changes in fiscal year;

(xii) maintenance of Parent as a passive holding company; and

DB02:5559019.1

064397.1001

(xiii) with respect to the Revolving Credit Facility and the First Lien Term Loan Facility only, Capital Expenditures (subject to a $25.0 million per year limit, with the ability to carry forward unused amounts for up to one year);

in each of the foregoing cases, with such additional exceptions (if applicable) as may be agreed upon in the loan documentation. *"Capital Expenditures"* will be defined in a manner consistent with GAAP; *provided* that up to an amount to be agreed may be excluded from Capital Expenditures for expenditures on and after January 1, 2009 in connection with the acquisition of the property in Orange, California previously identified to the Lead Arrangers.

**Events of Default:** With respect to each Facility, customary for transactions of such type, and others reasonably deemed appropriate by the Lead Arrangers (subject to materiality qualifications (where applicable) and other exceptions to be agreed), including, without limitation, (i) nonpayment of principal, interest, fees or other amounts (with grace periods to be agreed for amounts other than principal), (ii) any representation or warranty proving to have been inaccurate in any material respect when made or confirmed; (iii) failure to perform or observe covenants set forth in the loan documentation, where customary and appropriate, for specified periods of time to be agreed after notice or knowledge of such failure; (iv) cross-defaults to other indebtedness of the Loan Parties and the Mexican subsidiaries in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings) by the Loan Parties and the Mexican subsidiaries; (vi) monetary judgment defaults against the Loan Parties and the Mexican subsidiaries in an amount to be agreed and material non-monetary judgment defaults; (vii) actual or asserted (by a Loan Party) impairment of loan documentation or security; (viii) Change of Control (to be defined); and (ix) customary ERISA defaults.

**Assignments and Participations:** Each Lender under a Facility will be permitted to make assignments in minimum amounts of $5.0 million in the case of assignments under the Revolving Credit Facility and $1.0 million in the case of assignments under the First Lien Term Loan Facility and the Second Lien Term Loan Facility to other entities approved by the Administrative Agent under such Facility and, so long as no Event of Default under such Facility has occurred and is continuing, the Borrower, which approval shall not be unreasonably withheld or delayed; *provided* that neither the approval of the Borrower nor the Administrative Agent shall be required in connection with any assignment under a Facility to another Lender under such Facility or any affiliate of such Lender. Each Lender under a Facility

will also have the right, without consent of the Borrower or the Administrative Agent, to assign (i) as security all or part of its rights under the loan documentation to any Federal Reserve Bank and (ii) all or part of its rights or obligations under a Facility to any of its affiliates. Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate and maturity date. An assignment fee will be charged to the assignor or assignee with respect to each assignment.

**Waivers and Amendments:** Amendments and waivers of the provisions of the loan documentation for any Facility will require the approval of Lenders holding advances and commitments representing more than 50% of the aggregate advances and commitments under such Facility, except that the consent of all of the Lenders under such Facility be required with respect to, among other things, (i) increases in commitment amounts, (ii) reductions of principal, interest, or fees, (iii) extensions of scheduled maturities or times for payment, (iv) releases of all or substantially all of the collateral or the guarantees, (v) any subordination of such Facility to any other indebtedness or, other than pursuant to the Intercreditor Agreement, any subordination of the liens securing such Facility to any other liens and (vi) changes that impose any restriction on the ability of any Lender to assign any of its rights or obligations. Liens in favor of the Administrative Agent on Collateral shall automatically be released in connection with any permitted asset sale. In addition, with the consent of only the Administrative Agent under each Facility, the liens in favor of the Administrative Agent on Collateral with a value not in excess of $500,000 singly or $2.0 million in the aggregate during the term of the Facilities may be released.

**Indemnification:** The Borrower will indemnify and hold harmless the Agents, the Lead Arrangers, each Lender and each of their affiliates and their officers, directors, employees, agents and advisors from and against all losses, liabilities, claims, damages or expenses (*"Losses"*) arising out of or relating to the Transaction, the Facilities, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees and settlement costs, except to the extent such Losses arise from the gross negligence or willful misconduct of an indemnified person, as determined in a final non-appealable judgment by a court of competent jurisdiction.

**Governing Law:** New York.

**Expenses:** The Borrower will reimburse the Agents and the Lead Arrangers from time to time on demand for all reasonable out-of-pocket fees and expenses (including, but not limited to, the reasonable fees,

disbursements and other charges of Cahill Gordon & Reindel LLP and Kaye Scholer LLP, as counsels to the Lead Arrangers and the Agents, and of one local counsel per jurisdiction to the Lenders retained by the Lead Arrangers and due diligence expenses) incurred in connection with the Facilities, the syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated hereby, as well as the administration and enforcement of the loan documentation. The Borrower will also pay the expenses of each Lender in connection with the enforcement of any of the loan documentation related to the Facilities.

**Cost and Yield Protection:** Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**Miscellaneous:** Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction.

DB02:5559019.1

064397.1001

## SUMMARY OF TERMS AND CONDITIONS
## $175.0 MILLION SENIOR SECURED
## ASSET-BASED REVOLVING CREDIT FACILITY

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter or the Annexes or other Addenda thereto.

The Revolving Credit Facility will have the terms specified in this Addendum in addition to the terms applicable to all of the Facilities specified in Annex I to which this Addendum is attached.

| | |
|---|---|
| **Sole Lead Arranger and Sole Book Manager:** | Banc of America Securities LLC ("***BAS***") will act as sole and exclusive lead arranger and sole and exclusive book running manager for the Revolving Credit Facility (in each such capacity, the "***Lead Arranger***"). |
| **Purpose:** | Subject to satisfaction of the condition in paragraph (vi) in Annex II, up to $60 million of the Revolving Credit Facility (increased by any amount of OID or upfront fees pursuant to Section 2 of the Fee Letter) may be used on the Closing Date (i) to finance in part the Refinancing and (ii) to pay fees and expenses incurred in connection with the Transaction. On and after the Closing Date, the Revolving Credit Facility may be used for working capital and other general corporate purposes of the Borrower and its subsidiaries. |
| **Maturity:** | Five years after the Closing Date. |
| **Applicable Margin:** | The Applicable Margin for the Revolving Credit Facility will be 1.50% per annum in the case of LIBOR advances; *provided* that after the first three months after the Closing Date, the Applicable Margin will be adjusted (ranging from 1.75% to 1.25% in the case of LIBOR advances) based on a metric to be determined. The Applicable Margin for Alternate Base Rate advances will be 150 basis points lower than the Applicable Margin for LIBOR advances but in any event not less than 0. |
| **Commitment Fees:** | From and after the Closing Date, the Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.25% on the average daily unused commitments under the Revolving Credit Facility, payable quarterly in arrears. |
| **Non-Ratable Loans:** | The Revolving Credit Facility will permit up to $25.0 million of loans under the Revolving Credit Facility to be provided by Bank of America or one of its affiliates on a non-ratable basis, in a man- |

ner and on conditions substantially similar to those in the DIP Facility.

**Letters of Credit:** The Revolving Credit Facility will have a sublimit of $45.0 million for the issuance of standby, commercial and documentary letters of credit ("***Letters of Credit***") to be issued by Bank of America, certain Lenders to be agreed upon by the Borrower and the Administrative Agent or one of their respective affiliates (in such capacity, the "***Issuing Bank***").

The Borrower shall pay a commission on the undrawn face amount of each Letter of Credit at a *per annum* rate equal to the Applicable Margin then in effect with respect to LIBOR advances under the Revolving Credit Facility. Such commission shall be shared ratably among the Lenders under the Revolving Credit Facility and shall be payable quarterly in arrears.

In addition to letter of credit commissions, a fronting fee equal to 12.5 basis points on the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Bank for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Bank for its own account.

**Fee Basis:** All fees will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

**Scheduled Amortization:** None.

**Excess Availability/ Borrowing Base:** No loan will be made under the Revolving Credit Facility and no Letter of Credit will be issued if after giving effect thereto Excess Availability would be less than zero.

"***Excess Availability***" means (i) the lesser of (x) the total commitments under the Revolving Credit Facility and (y) the Borrowing Base *minus* (ii) the aggregate amount of loans and Letters of Credit outstanding under the Revolving Credit Facility *minus* (iii) applicable reserves.

"***Borrowing Base***" means an amount equal to 85% of eligible accounts receivable in which the Administrative Agent has a perfected first priority security interest for the benefit of the Lenders under the Revolving Credit Facility.

Definitions of eligibility and reserve levels and categories will be substantially similar to those in the DIP Facility, except that ac-

Addendum A-2

counts receivable backed by letters of credit reasonably acceptable to the Administrative Agent shall be eligible.

**Mandatory Prepayments:** Loans under the Revolving Credit Facility shall be prepaid and/or Letters of Credit cash collateralized at any time that Excess Availability is less than zero in an amount sufficient to cause Excess Availability to equal zero.

See also "Cash Management" below.

**Optional Prepayments:** The Revolving Credit Facility may be prepaid at any time in whole or in part without premium or penalty, except that any prepayment of LIBOR advances other than at the end of the applicable interest periods therefor shall be made with reimbursement for any funding losses and redeployment costs of the Lenders resulting therefrom.

**Commitment Reductions:** The unutilized portion of the commitments under the Revolving Credit Facility may, upon three business days' notice, be permanently reduced or terminated by the Borrower without premium or penalty, in minimum amounts to be agreed.

**Cash Management:** The Loan Parties shall maintain a concentration account with the Administrative Agent throughout the term of the Revolving Credit Facility. All collections and proceeds from the ABL Collateral will be deposited either directly into such account or into an account at an institution for which the Administrative Agent has in place a control agreement reasonably satisfactory to it. The Loan Parties shall establish cash management provisions reasonably acceptable to the Administrative Agent. At such time as (i) a default or event of default exists under the Revolving Credit Facility or (ii) Excess Availability is less than $20.0 million, all collections and proceeds from the ABL Collateral will be applied on a daily basis, on the business day of receipt of funds by the Administrative Agent (if received prior to a time to be agreed, otherwise, such application shall be on the business day following receipt), to prepay loans under the Revolving Credit Facility and/or cash collateralize Letters of Credit.

**Affirmative Covenants:** In addition to those specified in Annex I, periodic commercial financial examinations (field audit) and monthly borrowing base reporting; *provided* borrowing base reporting shall be weekly at any time (i) a default or an event of default exists or (ii) Excess Availability is less than $20.0 million.

**Financial Covenants:** To be applicable only if Excess Availability is less than $20.0 million.

- Maintenance of a minimum Fixed Charge Coverage Ratio (as described below) of 1.00:1.00, measured on a rolling four quarter basis

The Fixed Charge Coverage Ratio will be defined as the ratio of (x) EBITDA (as defined in the loan documentation) less the sum of (i) unfinanced capital expenditures and (ii) income taxes paid in cash to (y) the sum of (i) cash interest expense and (ii) scheduled payments of principal of debt, all calculated on a consolidated basis in accordance with GAAP.

The financial covenant will be calculated on a consolidated basis for the Borrower and its subsidiaries and on a pro forma basis for the Transaction and acquisitions and dispositions outside the ordinary course of business.

**Waivers and Amendments:** In addition to those specified in Annex I, the consent of all Lenders under the Revolving Credit Facility will be required with respect to any increases in the advance rates in the calculation of the Borrowing Base.

**Counsel to the Administrative Agent and the Lead Arranger for the Revolving Credit Facility:** Kaye Scholer LLP.

## SUMMARY OF TERMS AND CONDITIONS
## $425.0 MILLION SENIOR SECURED
## FIRST LIEN TERM LOAN FACILITY

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter or the Annexes or other Addenda thereto.

The First Lien Term Loan Facility will have the terms specified in this Addendum in addition to the terms applicable to all of the Facilities specified in Annex I to which this Addendum is attached.

| | |
|---|---|
| **Lead Arrangers and Sole Book Manager:** | Banc of America Securities LLC ("*BAS*"), Morgan Stanley Senior Funding, Inc. ("*MSSF*") and Barclays Capital, the investment banking division of Barclays Bank PLC ("*Barclays*") will act as co-lead arrangers and BAS will act as sole and exclusive book running manager, in each case, for the First Lien Term Loan Facility (in each such capacity, the "*Lead Arrangers*"). |
| **Purpose:** | All of the proceeds of the First Lien Term Loan Facility shall be used on the Closing Date (i) to finance in part the Refinancing and (ii) to pay fees and expenses incurred in connection with the Transaction. |
| **Maturity:** | Six years after the Closing Date. |
| **Applicable Margin:** | The Applicable Margin for the First Lien Term Loan Facility will be (a) 2.75% per annum, in the case of LIBOR advances, and (b) 1.75% per annum, in the case of Alternate Base Rate advances. |
| **Scheduled Amortization:** | The First Lien Term Loan Facility will be subject to quarterly amortization of principal equal to 0.25% of the original aggregate principal amount of the First Lien Term Loan Facility for the first 5-3/4 years, with the balance payable at final maturity. |
| **Mandatory Prepayments:** | In addition to the amortization set forth above, (a) an amount equal to 100% of all net cash proceeds from sales of property and assets of any of the Loan Parties or the Mexican subsidiaries (including sales or issuances of equity interests of subsidiaries of the Borrower but excluding sales of inventory in the ordinary course of business and other exceptions to be agreed in the loan documentation), subject to provisions to be agreed for reinvestment of up to $10.0 million of such net cash proceeds and up to an additional $5.0 million of such net cash proceeds per year; (b) an amount equal to 100% of all net cash casualty and condemnation proceeds, |

subject to provisions to be agreed for reinvestment; (c) an amount equal to 100% of all net cash proceeds from the issuance or incurrence after the Closing Date of additional debt of any of the Loan Parties or the Mexican subsidiaries (other than debt permitted under the loan documentation), and (d) 50% of Excess Cash Flow (to be defined in the loan documentation) of the Borrower and its subsidiaries, such percentage subject to leverage-based stepdown to be determined (subject to a dollar-for-dollar reduction of such prepayment from Excess Cash Flow for optional prepayments of the First Lien Term Loan Facility during the applicable fiscal year), shall be applied to the prepayment of the First Lien Term Loan Facility. Any reinvestment of net cash proceeds pursuant to clauses (a) and (b) above will not be included in the calculation of Capital Expenditures. Each such prepayment of the First Lien Term Loan Facility shall be applied to the next four scheduled amortization payments of the First Lien Term Loan Facility in direct order of maturity and, thereafter, to the remaining scheduled amortization payments on a pro rata basis.

**Optional Prepayments:**      The First Lien Term Loan Facility may be prepaid at any time in whole or in part without premium or penalty, except that any prepayment of LIBOR advances other than at the end of the applicable interest periods therefor shall be made with reimbursement for any funding losses and redeployment costs of the Lenders resulting therefrom. Each such prepayment of the First Lien Term Loan Facility shall be applied to the next four scheduled amortization payments of the First Lien Term Loan Facility in direct order of maturity and, thereafter, to the remaining scheduled amortization payments on a pro rata basis.

**Interest Rate Protection:**      The Borrower shall obtain, within 90 days following the Closing Date, interest rate protection in form and with parties reasonably acceptable to the Administrative Agent or the Lead Arrangers for a notional amount equal to 40% of the aggregate principal amount of the First Lien Term Loan Facility and the Second Lien Term Loan Facility for a period of two years and otherwise on terms to be agreed in the loan documentation.

**Financial Covenants:**      Limited to the following (each measured on a rolling four quarter basis):

- Maintenance of a minimum Interest Coverage Ratio (EBITDA (as defined in the loan documentation)/cash interest expense), with an initial level of 1.50:1.00

- Maintenance of a maximum Leverage Ratio (total debt/EBITDA), with an initial level of 5.25:1.00

Addendum B-2

The financial covenants will be calculated on a consolidated basis for the Borrower and its subsidiaries and on a pro forma basis for the Transaction and acquisitions and dispositions outside the ordinary course of business. The financial covenants will be tested beginning with the fiscal quarter ending on or about March 31, 2007. The initial covenant levels set forth above will adjust over the term of the First Lien Term Loan Facility in a manner to be agreed.

**Counsel to the Agents and the Lead Arrangers for the First Lien Term Loan Facility:**    Cahill Gordon & Reindel LLP.

## SUMMARY OF TERMS AND CONDITIONS
## $190.0 MILLION SENIOR SECURED
## SECOND LIEN TERM LOAN FACILITY

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter or the Annexes or other Addenda thereto.

The Second Lien Term Loan Facility will have the terms specified in this Addendum in addition to the terms applicable to all of the Facilities specified in Annex I to which this Addendum is attached.

| | |
|---|---|
| **Lead Arrangers and Sole Book Manager:** | Banc of America Securities LLC ("*BAS*"), Barclays Capital, the investment banking divisions of Barclays Bank PLC ("*Barclays*") and Morgan Stanley Senior Funding, Inc. ("*MSSF*") will act as co-lead arrangers and BAS will act as sole and exclusive book running manager, in each case, for the Second Lien Term Loan Facility (in each such capacity, the "*Lead Arrangers*"). |
| **Purpose:** | All of the proceeds of the Second Lien Term Loan Facility shall be used on the Closing Date (i) to finance in part the Refinancing and (ii) to pay fees and expenses incurred in connection with the Transaction. |
| **Maturity:** | Seven years after the Closing Date. |
| **Applicable Margin:** | The Applicable Margin for the Second Lien Term Loan Facility will be (a) 5.75% per annum, in the case of LIBOR advances, and (b) 4.75% per annum, in the case of Alternate Base Rate advances. |
| **Scheduled Amortization:** | None. |
| **Mandatory Prepayments:** | (a) An amount equal to 100% of all net cash proceeds from sales of property and assets of any of the Loan Parties or the Mexican subsidiaries (including sales or issuances of equity interests of subsidiaries of the Borrower but excluding sales of inventory in the ordinary course of business and other exceptions to be agreed in the loan documentation), subject to provisions to be agreed for reinvestment of up to $10.0 million of such net cash proceeds and up to an additional $5.0 million of such net cash proceeds per year; (b) an amount equal to 100% of all net cash casualty and condemnation proceeds, subject to provisions to be agreed for reinvestment; (c) an amount equal to 100% of all net cash proceeds from the issuance or incurrence after the Closing Date of additional debt of any of the Loan Parties or the Mexican subsidiaries (other than debt permitted under the loan documentation), and (d) 50% of Ex- |

cess Cash Flow (to be defined in the loan documentation) of the Borrower and its subsidiaries, such percentage subject to leverage-based stepdown to be determined (subject to a dollar-for-dollar reduction of such prepayment from Excess Cash Flow for optional prepayments of the Term Loan Facilities during the applicable fiscal year), shall be applied to the prepayment of the Second Lien Term Loan Facility; *provided* that the foregoing amounts applied to the prepayment of the First Lien Term Loan Facility shall reduce the prepayment requirement with respect to the Second Lien Term Loan Facility on a dollar-for-dollar basis. Any reinvestment of net cash proceeds pursuant to clauses (a) and (b) above will not be included in the calculation of Capital Expenditures.

**Optional Prepayments:** The Second Lien Term Loan Facility may be prepaid at any time in whole or in part without premium or penalty, except that any prepayment of LIBOR advances other than at the end of the applicable interest periods therefor shall be made with reimbursement for any funding losses and redeployment costs of the Lenders resulting therefrom, and except as set forth below under "Prepayment Premium."

**Prepayment Premium:** Any mandatory or optional prepayment of the Second Lien Term Loan Facility on or prior to the second anniversary of the Closing Date shall be accompanied by a premium equal to (i) 2% in the case of any prepayment on or prior to the first anniversary of the Closing Date and (ii) 1% in the case of any prepayment after the first anniversary, but on or prior to the second anniversary, of the Closing Date.

**Interest Rate Protection:** The Borrower shall obtain, within 90 days following the Closing Date, interest rate protection in form and with parties reasonably acceptable to the Administrative Agent or the Lead Arrangers for a notional amount equal to 40% of the aggregate principal amount of the First Lien Term Loan Facility and the Second Lien Term Loan Facility for a period of two years and otherwise on terms to be agreed in the loan documentation.

**Financial Covenants:** Limited to the following:

- Maintenance of a maximum Leverage Ratio (total debt/EBITDA (as defined in the loan documentation)), with an initial level of 5.75:1.00 measured on a rolling four quarter basis

The financial covenant will be calculated on a consolidated basis for the Borrower and its subsidiaries and on a pro forma basis for the Transaction and acquisitions and dispositions outside the ordi-

Addendum C-2

nary course of business. The financial covenant will be tested beginning with the fiscal quarter ending on or about March 31, 2007. The initial covenant level set forth above will adjust over the term of the Second Lien Term Loan Facility in a manner to be agreed.

**Events of Default:**  As set forth in Annex I, except that defaults under the Revolving Credit Facility or the First Lien Term Loan Facility will not be an Event of Default under the Second Lien Term Loan Facility unless such default under the Revolving Credit Facility or the First Lien Term Loan Facility (i) is a payment default or (ii) results in the acceleration of the obligations under the Revolving Credit Facility or the First Lien Term Loan Facility, as the case may be.

**Counsel to the Agents and the Lead Arrangers for the Second Lien Term Loan Facility:**  Cahill Gordon & Reindel LLP.

## CONDITIONS PRECEDENT

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this Annex II is attached.

The closing and the initial extension of credit under the Facilities will be subject to satisfaction of, with respect to each Facility, conditions customary for transactions of such type, and others reasonably deemed appropriate by the Lead Arrangers, including the following conditions precedent:

(i) The Disclosure Statement and the Plan of Reorganization and the terms and provisions of the restructuring of the debt (or any new debt), Qualified Preferred Stock, capitalization and ownership of the Companies shall be in form and substance reasonably satisfactory to the Lead Arrangers and the Agents.

(ii) The confirmation order of the Bankruptcy Court with respect to the Plan of Reorganization (i) shall be in form and substance reasonably satisfactory to the Lead Arrangers and shall authorize the Facilities and all of the transactions contemplated hereby, and (ii) shall be in full force and effect and shall not be subject to any stay, appeal, modification or reversal, unless consented to by the Agents, such consent not to be unreasonably withheld. The Plan of Reorganization shall have become effective (and all conditions precedent thereto (other than that related to the effectiveness of the Facilities) as set forth therein shall have been satisfied without waiver unless consented to by the Agents, such consent not to be unreasonably withheld), and the Plan of Reorganization and the funding of the Facilities shall be consummated substantially simultaneously.

(iii) The Equity Financing shall have been or shall be concurrently consummated. Any debtor-in-possession financing (including the DIP Facility) shall have been or shall be concurrently repaid in full in cash, all commitments relating to the foregoing shall have been or shall be concurrently terminated and all liens or security interests related thereto shall have been or shall be concurrently terminated, released or transferred, in each case, on terms reasonably satisfactory to the Lead Arrangers, and no pre-petition indebtedness, debtor-in-possession financing or other claims against the debtors shall remain outstanding as an obligation of the debtors, except as contemplated by the Plan of Reorganization. After giving effect to the Transaction, the Loan Parties and Mexican subsidiaries shall have outstanding no indebtedness or preferred stock other than the Facilities, existing intercompany indebtedness, Qualified Preferred Stock issued in the Equity Financing and up to $7.5 million of other debt specified to remain outstanding pursuant to the Plan of Reorganization.

(iv) No litigation shall be pending with respect to the Facilities or the definitive documentation in respect of the Facilities. There shall not exist any judgment, order, injunction or other restraint prohibiting the consummation of the transactions contemplated hereby.

064397.1001

(v)     The Agents and Lead Arrangers shall have received (a) unaudited consolidated balance sheets and statements of operations and cash flows of the Borrower and its consolidated subsidiaries as of the end of and for each fiscal quarter ending after July 2, 2006 and at least 45 days prior to the Closing Date (which shall have been reviewed by the independent accountants in accordance with SAS 100) and (b) unaudited consolidated balance sheets and statements of operations and cash flows of the Borrower and its consolidated subsidiaries as of the end of and for each fiscal month ending after September 1, 2006 and at least 45 days prior to the Closing Date. The ratio of (x) total consolidated debt of the Loan Parties and the Mexican subsidiaries on the Closing Date after giving effect to the Transaction to (y) EBITDA for the latest twelve month period preceding the Closing Date for which monthly financial statements have been delivered pursuant to the foregoing (the "*Closing Total Leverage Ratio*") shall not be greater than 4.50x. For purposes of the Closing Total Leverage Ratio, "*EBITDA*" means, for any period, (i) net income, plus (ii) without duplication, (a) income tax expense, (b) depreciation and amortization expense, (c) interest expense, (d) the aggregate amount of all other non-cash charges reducing net income for such period (other than non-cash charges to accrue a reserve for future cash charges, except for those items referred to in clause (e) below), (e) non-recurring reorganization, restructuring and bankruptcy-related expenses reasonably satisfactory to the Administrative Agent and (f) losses on dispositions of capital assets, minus (iii) without duplication, (a) the aggregate amount of all non-cash items increasing net income for such period, other than the accrual of revenue or recording of receivables in the ordinary course of business and (b) gains on dispositions of capital assets, all calculated on a consolidated basis for the Loan Parties and the Mexican subsidiaries in accordance with generally accepted accounting principles, as adjusted (x) for the Transaction as if it had occurred at the beginning of the calculation period in a manner consistent with Regulation S-X under the Securities Exchange Act of 1934 and (y) for such other adjustments as are reasonably satisfactory to the Lead Arrangers.

(vi)    On the Closing Date, after giving effect to the Transaction, there shall be at least $80.0 million Excess Availability under the Revolving Credit Facility, which amount shall be reduced on a dollar-for-dollar basis by the amount of any OID or additional upfront fees imposed pursuant to Section 2 of the Fee Letter; *provided* that such amount shall not be reduced to less than $75.0 million.

(vii)   The Administrative Agent under each of the Facilities shall have valid and perfected security interests in the Collateral as required by, and with the priorities set forth in, the Summaries of Terms. The Administrative Agent shall have received a Certificate naming it as an additional insured or loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Borrower and its subsidiaries forming part of the Collateral.

(viii)  The Borrower shall have complied with the terms of the Fee Letter to be complied with on or before such date. All accrued expenses of the Agents and the Lead Arrangers (including the fees and expenses of counsels for the Agents and the Lead Arrangers named in the Summaries of Terms and one local counsel per jurisdiction for

the Administrative Agent) required to be paid and for which invoices have been received at least one business day prior to the Closing Date shall have been paid.

(ix)     All of the representations and warranties in the loan documentation shall be true and correct in all material respects (except that representations and warranties that are qualified by materiality shall be true and correct in all respects) and no default or Event of Default shall have occurred and be continuing.

(x)     The Administrative Agents shall have received a borrowing notice, customary legal opinions, corporate documents and certificates (including a solvency certificate from the chief financial officer of each of Parent and the Borrower), all in form and substance reasonably satisfactory to the Administrative Agents. The Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.

DB02:5559019.1