**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES AND REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (PJW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Brian S. Hermann
Justin G. Brass
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
November 27, 2006

# TABLE OF CONTENTS

Page

I. INTRODUCTION.................................................................................2

    A.    Holders of Claims and Interests Entitled to Vote ........................5

    B.    Voting Procedures ........................................................................6

    C.    Confirmation Hearing...................................................................7

II. OVERVIEW OF THE PLAN................................................................8

III. OVERVIEW OF CHAPTER 11 .......................................................19

IV. COMPANY BACKGROUND...........................................................19

    A.    The Debtors ................................................................................19

    B.    The Debtors' Businesses.............................................................20

    C.    The Debtors' Prepetition Capital Structure ...............................21

V. EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11
    CASES .............................................................................................23

VI. THE CHAPTER 11 CASES.............................................................26

    A.    Significant "First Day" Motions.................................................26

    B.    DIP Credit Facilities ...................................................................26

    C.    Official Committee of Unsecured Creditors...............................27

    D.    Ad Hoc Committee of Senior Secured Noteholders..................27

    E.    Ad Hoc Shareholder Committee.................................................27

    F.    Changes in the Debtors' Senior Management ...........................28

    G.    The Debtors' Motion to Preserve Net Operating Losses...........29

    H.    Claims Process............................................................................32

    I.    Assumption/Rejection of Leases and Executory Contracts.......35

    J.    Reclamation Claims....................................................................37

    K.    KERP .........................................................................................38

    L.    Litigation with PMC, Inc...........................................................39

    M.    Incentive Plan for the Foamex's Salaried Employees ...............41

    N.    Senior Secured Note Premium Claim Litigation .......................41

VII. CHAPTER 11 PLAN PROCESS .....................................................49

    A.    History of the Second Amended Plan.........................................49

VIII. SUMMARY OF THE PLAN...........................................................51

    A.    Introduction.................................................................................51

    B.    Classification and Treatment of Administrative Claims, Claims and
             Equity Interests Under the Plan .................................................52

| | | |
|---|---|---|
| C. | Voting on Plan. ................................................................ | 63 |
| D. | Distributions. .................................................................. | 63 |
| E. | Objections to and Resolution of Claims. ........................ | 64 |
| F. | Estimation. ...................................................................... | 66 |
| G. | Administrative Claims of Indenture Trustees. ................ | 66 |
| H. | Cancelation and Surrender of Existing Securities and Agreements. ......... | 67 |
| I. | Nonconsensual Confirmation. ......................................... | 67 |
| J. | Provisions Regarding Corporate Governance and Management of the Reorganized Debtors.................................. | 67 |
| K. | Securities to be Issued Pursuant to the Plan .................. | 70 |
| L. | Powers of Officers ......................................................... | 72 |
| M. | Corporate Reorganization............................................... | 72 |
| N. | Substantive Consolidation .............................................. | 72 |
| O. | Provisions Regarding Means of Implementation, Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims .............................. | 74 |
| P. | Effect of Confirmation of the Plan ................................. | 77 |
| Q. | Retention of Jurisdiction................................................ | 83 |
| R. | Miscellaneous Provisions ............................................... | 84 |
| S. | Executory Contracts and Unexpired Leases .................... | 86 |
| T. | Benefit Plans .................................................................. | 87 |
| U. | Confirmation and Effectiveness of the Plan .................. | 88 |

**IX. FINANCIAL PROJECTIONS**................................................91

| | | |
|---|---|---|
| **X. CERTAIN RISK FACTORS TO BE CONSIDERED** ............................. | | 94 |
| A. | Projected Financial Information ..................................... | 94 |
| B. | Risks Related to the Debtors' Business and Operations............ | 95 |
| C. | Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness.......................... | 97 |
| D. | Certain Bankruptcy Law Considerations......................... | 98 |
| E. | Certain Risks Relating to the Post-Effective Date Common Stock........... | 98 |
| F. | Risks Relating to the Rights Offering.............................. | 102 |

| | | |
|---|---|---|
| **XI. CONFIRMATION PROCEDURE** ....................................................... | | 105 |
| A. | Solicitation of Votes ...................................................... | 105 |
| B. | The Confirmation Hearing.............................................. | 105 |
| C. | Confirmation.................................................................. | 107 |

**XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**.................................................................................109

| | | |
|---|---|---|
| A. | Liquidation Under Chapter 7 ......................................... | 109 |
| B. | Alternative Plan of Reorganization or Plan of Liquidation ................ | 109 |

**XIII. SECURITIES LAW MATTERS** ....................................................110

| | | |
|---|---|---|
| A. | General........................................................................... | 110 |

DB02:5624651.2                                                                                      064397.1001

      B.      Rule 144......................................................................................................110

      C.      Subsequent Transfers of Securities -- State Laws ...................................111

      D.      Registration Rights ...............................................................................111

**XIV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE**
**PLAN** ..................................................................................................112

      A.      Scope of This Summary........................................................................112

      B.      Consequences to the Debtors.................................................................113

      C.      Consequences to Equityholders.............................................................118

      D.      Consequences to Creditors ....................................................................119

      E.      Information Reporting; Backup Withholding Tax ..................................120

**XV. CONCLUSION** ......................................................................................121

**EXHIBITS** ..................................................................................................124

ALL CREDITORS AND SHAREHOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS SECOND AMENDED DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN OF REORGANIZATION IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. **THOSE THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE X BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS IN THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN THE LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER OF SALE FOR ANY SECURITIES. A REGISTRATION STATEMENT IN RESPECT OF THE ADDITIONAL COMMON STOCK PROPOSED TO BE OFFERED PURSUANT TO THE RIGHTS OFFERING AND THE CALL OPTION TO BE CREATED PURSUANT TO THE SECOND AMENDED PLAN IS BEING FILED WITH THE SEC.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE

INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

## I.

## INTRODUCTION

On September 19, 2005 (the "Petition Date"), Foamex International Inc. ("Foamex International"), Foamex L.P., Foamex Latin America, Inc. ("Foamex Latin America"), Foamex Asia, Inc. ("Foamex Asia"), FMXI, Inc. ("FMXI"), Foamex Carpet Cushion LLC ("Foamex Carpet Cushion"), Foamex Capital Corporation ("Foamex Capital"), Foamex Mexico, Inc. ("Foamex Mexico") and Foamex Mexico II, Inc. ("Foamex Mexico II") (each a "Debtor," and collectively, the "Debtors" or "Foamex")[1] filed their petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").[2]

On December 23, 2005, the Debtors filed their proposed joint plan of reorganization, dated December 23, 2005 (the "Original Plan"), which set forth the manner in which Claims against and Equity Interests in the Debtors would be treated. Concurrently with the Original Plan, the Debtors filed a disclosure statement (the

---

[1]    In addition to the Debtors, on or about the Petition Date, Foamex Canada Inc., a wholly-owned non-debtor subsidiary of Foamex L.P., sought and obtained an interim, and later, a final, order from the Ontario Superior Court of Justice recognizing the Chapter 11 Cases as "foreign proceedings" for purposes of Section 18.6 of the *Companies' Creditors Arrangement Act* (the "Recognition Order"). The Recognition Order provides for, among other things, (a) a limited duration stay of any enforcement action or proceeding with respect to Foamex Canada Inc. and its property on the terms described therein, which has been extended through January 15, 2007, and may be further extended by order of the Ontario Superior Court of Justice, and (b) authorization allowing Foamex Canada Inc. to guarantee the Debtors' obligations arising under the DIP Credit Facilities and to grant liens on its assets as security therefor.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

"Original Disclosure Statement") describing certain aspects of the Original Plan, the Debtors' business and related matters.

The Debtors' first amended plan and first amended disclosure statement were filed on October 23, 2006, and amend and supercede in all respects the Original Plan and Original Disclosure Statement, respectively. The Debtors filed their second amended plan (the "Plan") and this second amended disclosure statement (the "Disclosure Statement") on November 27, 2006. The Plan and this Disclosure Statement amend and supercede in all respects all previously filed versions. This Disclosure Statement describes certain aspects of the Plan, the Debtors' business and related matters.

After a careful review of Foamex's business and its prospects as a going concern, Foamex, in consultation with its legal and financial advisors, concluded that recoveries to Creditors and Equityholders would be maximized by Foamex's continued operation as a going concern under the terms of the Plan. In other words, Foamex is worth more to its Creditors and Equityholders as a going concern than upon liquidation.

To achieve such higher value, the Plan contemplates (among other things): (i) payment in full in Cash to holders of Allowed (a) Administrative Claims, (b) Priority Tax Claims, (c) DIP Financing Claims, (d) Other Priority Claims and (e) Other Secured Claims (or, at the Debtors' option, the reinstatement of such Allowed Other Secured Claim or the return of collateral securing such Allowed Other Secured Claim); (ii) if Class 3 votes to accept the Plan, then each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Base Claim plus Post-Petition Interest and such holder's pro rata share of the Senior Secured Note Premium Settlement Amount; (iii) if Class 3 votes to reject the Plan, then the Senior Secured Note Base Claim plus Post-Petition Interest shall be Allowed; however, the Senior Secured Note Premium Claim shall be Disputed; (iv) payment in full in Cash to Senior Subordinated Noteholders in an amount equal to their Senior Subordinated Notes Claims plus Post-Petition Interest; (v) payment in full in Cash to holders of Allowed General Unsecured Claims in an amount equal to their Allowed General Unsecured Claims plus Post-Petition Interest; (vi) that all Unliquidated Claims shall be determined and satisfied, to the extent required, in the ordinary course of business by the Reorganized Debtors, without the need for Court approval, including where applicable, through access to available insurance; (vii) allowing holders of Equity Interests in Surviving Debtor Subsidiaries to retain such interests; (viii) converting each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date into 100 shares of Additional Common Stock; and (ix) the continuation (subject to dilution) of the Existing Common Stock and Other Common Equity Interests in Foamex International.

In order to achieve the results contemplated by the Plan, the Debtors need to raise a significant amount of new money. As discussed in more detail below, the Debtors have secured commitments for both debt and equity financing on favorable terms and in amounts sufficient to fund the payments required under the Plan. Such funding includes (i) debt financing in the form of Exit Facilities with combined commitments of

-3-

up to $790 million and (ii) equity financing of $150 million in the form of a Rights Offering, along with a commitment from certain existing holders of equity interests in Foamex International or their designees that are reasonably acceptable to Foamex International to purchase New Preferred Stock or Additional Common Stock under the Plan should the Rights Offering raise less than $150 million. Continued access to such funding sources up to the Effective Date is critical to the success of the Plan. For a more detailed discussion of the Rights Offering and Equity Commitment Agreement see Article VIII.O.

This Disclosure Statement is submitted, pursuant to section 1125 of the Bankruptcy Code, to holders of Interests that are entitled to vote on the Plan in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2007, at _____, prevailing Eastern Time.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- An Order of the Court (excluding the exhibits thereto) dated November __, 2006 (the "Disclosure Statement Order"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

- Foamex's Financial Projections (Exhibit C);

- A copy of the Exit Facility Commitment Letter and related term sheets (Exhibit D); and

- A joint letter supporting confirmation of the Plan from the Ad Hoc Committee of Senior Secured Noteholders and the Senior Secured Notes Indenture Trustee (Exhibit E).

In addition, Foamex's Annual Report on Form 10-K for the fiscal year ended January 1, 2006 and Foamex's Quarterly Reports on Form 10-Q for the quarters of fiscal year 2006 ended on April 2, 2006, July 2, 2006 and October 1, 2006, respectively, are available for inspection online at www.foamex.com or Foamex's dedicated webpage on Bankruptcy Services, LLC's website at www.bsillc.com.

A Ballot for, among other things, the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims and Interests that are entitled to vote to accept or reject the Plan.

By order dated November __, 2006, after notice and a hearing, the Court signed the Disclosure Statement Order, determining that the Disclosure Statement

-4-

contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, for making any elections as provided thereon, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Interest that is entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

A.     **Holders of Claims and Interests Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 4 (Senior Subordinated Note Claims), 5 (General Unsecured Claims), 6 (Unliquidated Claims), 7 (Intercompany Claims), 8 (Equity Interests in Surviving Debtor Subsidiaries) and 11 (Other Common Equity Interests in Foamex International) under the Plan are unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Classes 1, 2, 4

-5-

through 8 and 11 are conclusively deemed to have accepted the Plan and therefore may not vote to accept or reject the Plan. Classes 3 (Senior Secured Note Claims), 9 (Existing Preferred Stock) and 10 (Existing Common Stock) under the Plan are Impaired. Holders of such Allowed Senior Secured Note Claims, Existing Preferred Stock and Existing Common Stock, as of the Record Date, are entitled to vote to accept or reject the Plan. ACCORDINGLY, BALLOTS TO ACCEPT OR REJECT THE PLAN ARE BEING PROVIDED TO HOLDERS OF SENIOR SECURED NOTE CLAIMS, EXISTING PREFERRED STOCK AND EXISTING COMMON STOCK IN CLASSES 3, 9 AND 10, RESPECTIVELY.

The Bankruptcy Code defines "acceptance" of a plan by (i) a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan and (ii) a class of interests as acceptance by holders of such interests in that class that hold at least two-thirds in amount that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article XI below.

In the event that Class 3, 9 or 10 votes to reject the Plan, section 1129(b) permits the Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more Impaired Classes of Claims or Equity Interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article XI.C below.

For a summary of the treatment of each Class of Claims and Interests, see Article II below.

### B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim or Interest in more than one Class, you will receive separate Ballots that must be used for each separate Class. Please vote and return your Ballot(s).

If you received a Ballot from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution promptly so that it can be forwarded to the Debtors' voting tabulation agent, Bankruptcy Services, LLC. If you received a Ballot(s) from the Debtors, please vote and return your Ballot(s) directly to the following address:

Bankruptcy Services, LLC
Attn: Foamex Balloting
757 Third Avenue, 3rd Floor
New York, NY 10017
Tel.: (646) 282-2500

DO NOT RETURN YOUR SENIOR SECURED NOTES OR ANY
EQUITY SECURITIES THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED OR TO EXERCISE ANY ELECTIONS PROVIDED
ON SUCH BALLOT, YOUR BALLOT(S) INDICATING ACCEPTANCE OR
REJECTION OF THE PLAN OR THE EXERCISE OF ANY ELECTIONS MUST BE
ACTUALLY RECEIVED NO LATER THAN 4:00 P.M., PREVAILING EASTERN
TIME, ON _____, 2007.

Pursuant to the Disclosure Statement Order, the Court set November __,
2006, the date of the entry of the Disclosure Statement Order, as the record date (the
"Voting Record Date") for voting on the Plan. Accordingly, only holders of record as of
_____, 2006 that are otherwise entitled to vote under the Plan will receive a Ballot
and may vote on the Plan. **IMPORTANT:** THE VOTING RECORD DATE MAY
DIFFER FROM THE SEPARATE RECORD DATE ESTABLISHED FOR
PARTICIPATION IN THE RIGHTS OFFERING THAT WILL TAKE PLACE
PURSUANT TO, AND IN CONNECTION WITH, THE PLAN. THE RECORD DATE
ESTABLISHED FOR THE RIGHTS OFFERING, AND NOT THE VOTING RECORD
DATE, WILL DETERMINE THOSE HOLDERS OF THE EXISTING COMMON
STOCK AND EXISTING PREFERRED STOCK THAT ARE ELIGIBLE TO
PARTICIPATE IN THE RIGHTS OFFERING. For a summary of the Rights Offering,
see Article VII.A.4.

If you are a holder of a Claim or Interest entitled to vote on the Plan and
did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you
have any questions concerning the Disclosure Statement, the Plan or the procedures for
voting on the Plan, please call Bankruptcy Services, LLC at (646) 282-2500 from 9 a.m.
to 6 p.m., prevailing Eastern Time, Monday through Friday.

### C.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Court has scheduled
a hearing to consider confirmation of the Plan for _____, 2007 at _____
prevailing Eastern Time before the Honorable Peter J. Walsh, United States Bankruptcy
Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the
"Confirmation Hearing"). The Court has directed that objections, if any, to confirmation
of the Plan be served and filed so that they are received on or before _____, 2007 at
4:00 P.M., prevailing Eastern Time, in the manner described below in Article XI.B. The
Confirmation Hearing may be adjourned from time to time by the Court without further
notice except for the announcement of the adjournment date made at the Confirmation
Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM
TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES
OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST
INTERESTS OF THE DEBTORS, THEIR CREDITORS AND EQUITYHOLDERS.
THE DEBTORS URGE THOSE ENTITLED TO VOTE TO ACCEPT THE PLAN.

IN ADDITION, THE AD HOC COMMITTEE OF SENIOR SECURED
NOTEHOLDERS AND THE SENIOR SECURED NOTES INDENTURE TRUSTEE
SUPPORT CONFIRMATION OF THE PLAN AND RECOMMEND THAT THE
SENIOR SECURED NOTEHOLDERS IN CLASS 3 VOTE TO ACCEPT THE PLAN.

## II.

### OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of
Claims and Equity Interests under the Plan and the estimated distributions to be received
by the holders of Allowed Claims[3] and Equity Interests thereunder. This table is only a
summary of the classification and treatment of Claims and Equity Interests under the
Plan. Reference should be made to the entire Disclosure Statement and the Plan for a
complete description of the classification and treatment of Claims and Equity Interests.

### SUMMARY OF CLASSIFICATION AND TREATMENT
### OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Claims | Unimpaired; except with respect to Administrative Claims that are Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon, which treatment shall be reasonably acceptable to the Significant Equityholders; provided, however, that | $332,645 | 100% |

---

[3]    The estimated allowed amount of Allowed Claims excludes Post-Petition Interest unless otherwise
noted.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. | | |
| -- | Priority Tax Claims | Unimpaired; except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, or the Court has previously ordered otherwise, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim plus Post-Petition Interest on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, deferred Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim plus Post-Petition Interest, plus interest on such aggregate amount over such period at the same rate as | $1,659,565 | 100% |

-9-

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | such Post-Petition Interest. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business, without Post-Petition Interest, in accordance with the terms thereof. | | |
| -- | DIP Financing Claims | Unimpaired; except to the extent that the holders of the DIP Financing Claims and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, the holders of the DIP Financing Claims, or their designees, shall receive payment in full in Cash of all DIP Financing Claims in full and final satisfaction thereof other than the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms survive the termination of the DIP Credit Facilities. | $130,313,400[4] | 100% |
| 1 | Other Priority Claims | Unimpaired; except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of | $394,786 | 100% |

---

[4]     The amount of the DIP Financing Claims will fluctuate until the Effective Date, particularly with respect to interest and fees as well as the principal amount of the DIP Revolving Credit Facility.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim plus Post-Petition Interest on or as soon as practicable after the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim. All Allowed Other Priority Claims which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof. | | |
| 2 | Other Secured Claims | Unimpaired; except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders, at the sole option of the Debtors, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an | $1,011,940[5] | 100% |

---

[5] This amount includes the mechanic's lien claim filed by Commercial Roofing Systems, Inc. ("Commercial Roofing") in the amount of $178,473.95. Inclusion of such amount herein is without prejudice to any party-in-interest's, including the Debtors' and/or Reorganized Debtors', right to object to Commercial Roofing's claim at any time on any grounds.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim plus Post-Petition Interest in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable. | | |
| 3 | Senior Secured Note Claims | Impaired; if Class 3 votes to accept the Plan, then, as part of the proposed settlement among the Debtors, the Significant Equityholders, the Ad Hoc Committee of Senior Secured | Deemed allowed in the amount of $315,139,583.33 plus Post-Petition Interest and the Senior Secured | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Noteholders and the Senior Secured Notes Indenture Trustee described in Article VI.N below, and pursuant to Bankruptcy Rule 9019, (i) the Senior Secured Note Premium Claim shall no longer be Disputed and instead shall be Allowed in an amount equal to the Senior Secured Note Premium Settlement Amount and (ii) the Debtors shall take all steps necessary to dismiss, with prejudice, the Senior Secured Note Premium Claim Litigation. If Class 3 votes to accept the Plan, on the Initial Distribution Date, in full and final satisfaction and settlement of the Senior Secured Note Claims, each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Base Claim plus Post-Petition Interest and such holder's pro rata share of the Senior Secured Note Premium Settlement Amount.<br><br>If Class 3 votes to reject the Plan, then the Senior Secured | Note Settlement Amount.[6] | |

---

[6]     This amount assumes Class 3 votes to accept the Plan. In the event that Class 3 votes to reject the Plan, then the amounts of Post-Petition Interest and the Senior Secured Note Premium Claim that are Allowed may vary.

-13-

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Note Base Claim plus Post-Petition Interest shall be deemed Allowed. If Class 3 votes to reject the Plan, on the Initial Distribution Date, in full and final satisfaction of the Senior Secured Note Base Claim, each holder of an Allowed Senior Secured Note Base Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Base Claim plus Post-Petition Interest. | | |
| | | If Class 3 votes to reject the Plan, the Senior Secured Note Premium Claim shall be Disputed. On the Initial Distribution Date, the Debtors shall establish the Senior Secured Note Claims Reserve, which shall initially be funded with Cash or the Senior Secured Notes Letter of Credit in an amount to be determined by the Court at or prior to the Confirmation Hearing. | | |
| | | If Class 3 votes to reject the Plan, on the date on which the Senior Secured Note Premium Claim is Allowed by Final Order, or as soon as practicable thereafter, the full Allowed amount of the Senior Secured Note Premium Claim shall be | | |

-14-

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | paid in full in Cash with the Cash deposited in the Senior Secured Note Claim Reserve or from proceeds of the Senior Secured Notes Letter of Credit, as applicable.  If the amount of Cash on deposit in the Senior Secured Note Claim Reserve or the proceeds of the Senior Secured Notes Letter of Credit is insufficient to make the required payments, then the Reorganized Debtors will pay Cash to the Senior Secured Note Indenture Trustee in an amount necessary to satisfy any such shortfall.  Any residual amount remaining in the Senior Secured Note Claims Reserve after payment of the Allowed amount, if any, of the Senior Secured Note Premium Claim and any other required payments to be made by such Final Order or under the escrow agreement shall be returned to the Reorganized Debtors, and any unused portion of the Senior Secured Notes Letter of Credit shall not be drawn and the Senior Secured Notes Letter of Credit shall be canceled.<br><br>If Class 3 votes to reject the Plan and if the Senior Secured Note Premium Claim is disallowed by Final Order, then the amount remaining in the Senior Secured Note Claim Reserve after making any payments required to be made | | |

-15-

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | by such Final Order or under the escrow agreement shall be returned to the Reorganized Debtors, and the Senior Secured Notes Letter of Credit shall be canceled, as applicable, as soon as practicable following such disallowance. | | |
| 4 | Senior Subordinated Note Claims | Unimpaired; on the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Senior Subordinated Note Claim shall receive Cash in an amount equal to such holders' Allowed Senior Subordinated Note Claim plus Post-Petition Interest.[7] | $208,150,130.55[8] | 100% |
| 5 | General Unsecured Claims | Unimpaired; on the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, in full and final satisfaction of such Claim, each holder of an Allowed General Unsecured Claim will receive Cash in an amount equal to such holder's Allowed General Unsecured Claim plus Post-Petition | $13,007,468[9] | 100% |

---

[7]   The Debtors and the 2005 Indenture Trustee dispute the method for calculating Post-Petition Interest on the 2005 Senior Subordinated Notes Claims.

[8]   As per the proof of claim filed by the Senior Subordinated Note Claims Indenture Trustee, the Allowed amount of Senior Subordinated Note Claims includes accrued and unpaid interest through the Petition Date but not Post-Petition Interest.

[9]   Amount does not include six Disputed Claims totaling $5,779,590.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Interest. To the extent that insurance is available to satisfy an Allowed General Unsecured Claim, such Allowed General Unsecured Claim shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, without the need for Court approval, at such time as such claim becomes liquidated and the insurance proceeds and the insurance therefor becomes available. | | |
| 6 | Unliquidated Claims | Unimpaired; all Unliquidated Claims shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, without the need for Court approval, including, where applicable, through access to available insurance. Holders of Unliquidated Claims that are liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors shall be entitled to (and shall receive payment of) interest on such Claims solely to the extent provided for under applicable non-bankruptcy law. | N/A | 100% |
| 7 | Intercompany Claims | Unimpaired; all Intercompany Claims will remain outstanding and shall not be discharged by this Plan or the Confirmation Order, but shall instead be | $5,000,000[10] | 100% |

---

[10]  As of October 29, 2006.

DB02:5624651.2                    064397.1001

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | liquidated, determined and satisfied in accordance, and in a manner consistent, with the Debtors' historical practices as if the Chapter 11 Cases had not been commenced. | | |
| 8 | Equity Interests in Surviving Debtor Subsidiaries | Unimpaired; the holders of Equity Interests in Surviving Debtor Subsidiaries shall retain such Equity Interests. | N/A | 100% |
| 9 | Existing Preferred Stock | Impaired; on the Initial Distribution Date, each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date shall be converted into 100 shares of Additional Common Stock. | N/A | 100% |
| 10 | Existing Common Stock | Impaired; Existing Common Stock in Foamex International shall remain outstanding after the Effective Date (and become common stock of Reorganized Foamex International on the Effective Date), subject to dilution as a result of the issuance of any Additional Common Stock. | N/A | 100% |
| 11 | Other Common Equity Interests in Foamex International | Unimpaired; each holder of Other Common Equity Interests in Foamex International shall retain such Equity Interests. | N/A | 100% |

# III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equityholders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth, among other things, the treatment of, and means for satisfying, claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor that are impaired by the plan are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to satisfy the requirements of section 1125 of the Bankruptcy Code.

# IV.

## COMPANY BACKGROUND

### A.    The Debtors

Headquartered in Linwood, Pennsylvania, Foamex International is a public holding company that, as of the date hereof, along with its subsidiaries, had annual net sales of approximately $1.3 billion in 2005, employed approximately 4,100 people and maintained two administrative offices and 32 domestic and 9 international

manufacturing facilities located throughout the United States, Canada and Mexico.[11] Foamex International's domestic operations are conducted through Foamex L.P., a Delaware limited partnership, in which Foamex International owns a 98.284% limited partnership interest. FMXI, a Delaware corporation and a wholly-owned, non-operating subsidiary of Foamex International, is a 1.716% owner and the managing general partner of Foamex L.P.

The other Debtors – Foamex Latin America, Foamex Asia, Foamex Carpet Cushion, Foamex Capital, Foamex Mexico and Foamex Mexico II – are all Delaware companies and subsidiaries of Foamex L.P. Foamex Latin America is a holding company and the parent of Foamex Mexico, itself an intermediate holding company and the ultimate parent of various nondebtor intermediate holding and operating companies and subsidiaries through which the Debtors conduct business in Mexico. Foamex Asia is the 70% owner of Foamex Asia Co., Ltd., which is a joint venture through which Foamex conducts business in China, Malaysia, Singapore and Thailand. Foamex Carpet Cushion is an inactive corporation through which the Debtors previously conducted their carpet underlay business. Foamex Capital is a financing corporation and is the co-issuer and co-obligor of the Senior Secured Notes and the Senior Subordinated Notes. Foamex Mexico II is presently dormant.

## B. The Debtors' Businesses

The Debtors' operations consist of the following business lines or "strategic business units" ("SBUs"): foam products, automotive products, technical products and carpet cushion products.

The Debtors' foam products group, their largest SBU based on net sales, serves various comfort, industrial and consumer products markets with a mixture of specialty and commodity products. The Debtors' foam products are used primarily in various bedding and furniture items, including quilting rolls, toppers, cores and border rolls for mattresses, upholstered seating products, mattress overlay pads, leisure furniture, futons and pillows. The Debtors' bedding and furniture products are sold directly to manufacturers as well as through distributors.

The Debtors' automotive products group, their second largest SBU, is one of the largest suppliers of polyurethane foam products to the North American automotive industry. The automotive products group produces, among other things, foam rolls, flame and adhesive laminated composites, thermoformable foams, acoustical foams, basic foam products, energy absorbing foams and molded seat cushions. The Debtors'

---

[11] Since the Petition Date, the Debtors have closed several carpet cushion and foam warehouses, a fiber operation, a foam pouring operation and five foam fabrication facilities, including three facilities in connection with the discontinuation of certain business lines within their Consumer Products Group within the United States. The products for the remaining business lines will be manufactured at certain of the Debtors' other Foam Products facilities. In addition, the Debtors have closed two manufacturing facilities located in Canada, one of which is a foam pouring operation. The Debtors continue to examine their current manufacturing and warehousing operations and it is possible that additional closures may be implemented in the future.

-20-

automotive foam products are sold through a range of tiers in the automotive industry's supply chain. The Debtors primarily supply Tier 1 system integrators that in turn supply original equipment manufacturers, or so-called "OEMs" (e.g., General Motors, Ford and Daimler Chrysler).

The Debtors' technical products group produces innovative specialty foam materials and solutions for use in the automotive, consumer, electronic, industrial and medical fields. Its products are found in various consumer and business products, including sponges, band-aids, cleaning brushes and laser and inkjet printers.

The Debtors' carpet cushion segment is primarily a by-product business utilizing the scrap foam generated by the foam manufacturing operations and outside sources to create carpet underlay. This scrap by-product is re-bonded to form rebond carpet underlay, which accounts for approximately 90% of the revenue of this SBU. The Debtors' carpet cushion products are sold through various wholesalers, "big box" home centers, retail buying groups and chains and independent retailers and contractors.

## C. The Debtors' Prepetition Capital Structure

### 1. Secured Financing

Prior to the Petition Date, the Debtors had a relatively complex capital structure including three primary layers of secured debt consisting of a bank revolving credit and term loan A facility, a term loan B facility and second-lien bond indebtedness. Specifically, Foamex L.P. was a borrower under a $190 million revolving credit facility (as amended, the "Prepetition Bank Facility") with Bank of America, N.A., as administrative agent and a lender, and certain other lenders party thereto and a term loan A (the "Prepetition Term Loan A") in the approximate principal amount of $33 million with Bank of America, N.A., as administrative agent and a lender, and other lenders party thereto, and an $80 million principal amount term loan B (the "Prepetition Term Loan B," and together with the Prepetition Term Loan A, collectively, the "Prepetition Term Loans") with Silver Point Finance, LLC, as administrative agent and a lender, and the other lenders party thereto. The Debtors' obligations under each facility were guaranteed by each of the Debtors that was not a primary obligor and by Foamex Canada Inc., a Canadian wholly-owned subsidiary of Foamex L.P., and were secured by a first priority lien on, and security interest in, substantially all of the assets of Foamex L.P. and the guarantors.[12]

In addition to the Prepetition Bank Facility and the Prepetition Term Loans, pursuant to an indenture (the "Senior Secured Notes Indenture"), dated as of March 25, 2002, Foamex L.P. and Foamex Capital issued $300 million (original principal

---

[12] The obligations under the Prepetition Bank Facility and the Prepetition Term Loans ranked pari passu in right of payment; however, pursuant to an intercreditor agreement between the administrative agent for the Prepetition Bank Facility and the Prepetition Term Loan A, on the one hand, and the Prepetition Term Loan B administrative agent, on the other, the lenders under the Prepetition Bank Facility and the Prepetition Term Loan A had prior rights in and to the Debtors' collateral that secured the obligations under the Prepetition Bank Facility and the Prepetition Term Loan A.

amount) of 10 3/4% Senior Secured Notes due April 1, 2009 (the "Senior Secured Notes"). Payment of the Senior Secured Notes was guaranteed by each of the other Debtors except Foamex International and FMXI. The Senior Secured Notes were secured by second liens on substantially the same collateral that secured the obligations under the Prepetition Bank Facility and the Prepetition Term Loans.

In addition to the three primary layers of secured debt described above, as of the Petition Date, the Debtors had approximately $7.0 million of other secured debt, including, inter alia, two industrial revenue bonds ("IRBs") with face amounts of $1.0 million and $6.0 million, respectively. The IRBs were both secured by letters of credit and liens on the facilities constructed with the funds. The issuer of the $1.0 million IRB was the Delaware County (PA) Industrial Development Authority. The proceeds of that bond issuance were originally used to construct an approximately 50,000 square foot foam bun room addition at the Debtors' Eddystone, Pennsylvania facility. The $1.0 million IRB matured on October 1, 2005 and was repaid in full. The issuer of the $6.0 million IRB was the county of Dona Ana, New Mexico. The proceeds of that bond issuance were used to fund the original construction of the Debtors' Santa Teresa, New Mexico facility, consisting of approximately 84,800 square feet of manufacturing and warehousing space and an additional 5,000 square feet of office space, and the equipment initially used at the facility. The $6.0 million IRB matures in November 2013 and, pursuant to the Plan, will be reinstated and paid according to its terms.

## 2. Unsecured Financings

On the Petition Date, the Debtors also had outstanding two tranches of subordinated bonds. Specifically, pursuant to an indenture, dated as of June 12, 1997 (the "2007 Senior Subordinated Notes Indenture"), Foamex L.P. and Foamex Capital issued $150 million (original principal amount) of 9 7/8% Senior Subordinated Notes due June 15, 2007 (the "2007 Senior Subordinated Notes"). Separately, pursuant to an indenture, dated as of December 23, 1997 (the "2005 Senior Subordinated Notes Indenture," and, together with the 2007 Senior Subordinated Notes Indenture, collectively, the "Senior Subordinated Notes Indentures"), Foamex L.P. and Foamex Capital issued $98 million (original principal amount) of 13 1/2% Senior Subordinated Notes that matured on August 15, 2005 (the "2005 Senior Subordinated Notes," and, together with the 2007 Senior Subordinated Notes, collectively, the "Senior Subordinated Notes").[13] The 2007 Senior Subordinated Notes and the 2005 Senior Subordinated Notes are unsecured obligations of Foamex L.P. and Foamex Capital (as well as the Debtors that have guaranteed the obligations thereunder as set forth in the Senior Subordinated Notes Indentures) and are subordinated in right of payment to the Debtors' secured debt, but rank pari passu in right of payment with each other and with the Debtors' other unsecured obligations.

---

[13] As a result of the Debtors' prior repurchases of 2005 Senior Subordinated Notes, the principal amount outstanding at maturity was $51.6 million.

-22-

In addition to the foregoing bank and bond indebtedness, the Debtors also had approximately $90,000,000 in ordinary course trade debt that was unpaid as of the Petition Date.

### 3. Equity Interests in Foamex International

On the Petition Date, Foamex International had 50,000,000 shares of Existing Common Stock authorized for issuance of which 24,509,728 shares were outstanding, with an additional 3,489,000 shares issued and held in treasury. In addition, pursuant to various stock option plans, on the Petition Date, there were outstanding options to purchase an additional 3,663,174 shares of Existing Common Stock. As of the Petition Date, there were approximately 129 record holders of the Existing Common Stock. Prior to the Petition Date, the Existing Common Stock was publicly held and traded on the Nasdaq National Market ("NASDAQ") under the ticker symbol "FMXI."[14] In addition, as of the Petition Date, Foamex International had 5,000,000 shares of Existing Preferred Stock authorized for issuance of which 15,000 Series B shares were outstanding.[15]

## V.

## EVENTS LEADING TO COMMENCEMENT
## OF THE CHAPTER 11 CASES

Beginning in the second half of 2002, the Debtors experienced a dramatic decline in their operating performance. Contributing to the deterioration in the Debtors' operating performance was a confluence of events, including a significant increase in the prices of the Debtors' primary raw materials and the severe downturn in the U.S. automotive industry. These factors are discussed in greater detail below.

The Debtors' bank and bond indebtedness – totaling more than $763 million in principal amount – significantly impaired the Debtors' operating performance in several key respects. First and foremost, the Debtors' need to service their heavy debt load limited their ability during the three years preceding the Petition Date to make much needed capital investments and improvements. The lack of capital investment, in turn, hampered the Debtors' ability to remain cost-competitive which, in consequence, resulted in a reduction in unit volume, particularly in the highly competitive bedding and furniture markets where the Debtors manufacture commodity-type products.

---

[14] Subsequent to the Debtors' Chapter 11 filings, on or about September 28, 2005, NASDAQ delisted the Existing Common Stock. The Existing Common Stock now trades over the counter under the ticker symbol "FMXIQ."

[15] On the Petition Date, all of Foamex International's issued and outstanding Series B Preferred Stock was held by the Bank of Nova Scotia. According to Bank of Nova Scotia's 13-D filing with the SEC on April 20, 2006, the Bank of Nova Scotia sold all of its Existing Preferred Stock in a block trade to D. E. Shaw Laminar Portfolios, L.L.C. ("D. E. Shaw"). According to D. E. Shaw's separate 13-D filing with the SEC on April 20, 2006, D. E. Shaw is the owner of all of the issued and outstanding shares of the Existing Preferred Stock.

Additionally, prior to the Petition Date, the Debtors' customers grew concerned about the Debtors' financial condition. Because of their concerns, a few of the Debtors' significant customers took steps to source a portion of their business elsewhere and/or suspend placing new orders with the Debtors.

Compounding the Debtors' decrease in volume was the dramatic increase over the same period in the prices of the chemicals that comprise the vast majority of the Debtors' raw material requirements – specifically, polyol, TDI and MDI. At least four primary factors contributed to these price increases: first, worldwide demand for MDI had increased dramatically which caused it to be in short supply. Second, a reduction in domestic capacity of propylene oxide, a major chemical component of polyol, resulted in a significant decrease in the supply of polyol. Third, given the Debtors' financial distress, many of the Debtors' major chemical suppliers placed strict credit limits on the Debtors' purchases which, in turn, compromised the Debtors' ability to leverage their purchasing scale to obtain more attractive pricing through volume discounts and the like. Lastly, the primary urethane chemicals used to create polyol, MDI and TDI – propylene, toluene and benzene – are each oil-based derivatives. The cost of these raw materials generally tracks the price of oil and energy costs and, consequently, the cost of these chemicals rose dramatically in the year prior to the Petition Date.

Collectively, these factors contributed to chemical price increases of more than 20% from the first to the fourth quarter of 2004, and a further increase of more than 10% in the first quarter of 2005. Although the Debtors were able to pass a portion of these cost increases on to their customers, given the highly competitive environment in which they operate, the Debtors concluded at the time that they could not pass along all such increases, particularly in certain SBUs, and, as a consequence, the Debtors saw their gross margins and operating income erode dramatically.

Finally, the problems facing the North American automotive industry together with certain product-related factors, such as the move away from SUVs in the first half of 2005, negatively impacted the Debtors' automotive business, which is their second largest revenue source. In the months leading up to the Petition Date, several Tier 1 automotive suppliers sought bankruptcy protection and others scaled back their production. In addition, many OEMs were facing their own financial difficulties.

In view of these external factors, and cognizant of the need to restructure their balance sheet, prior to the Petition Date, the Debtors initiated steps to rationalize their business by refocusing on their core competencies. Along those lines, in 2002 and 2003, the Debtors attempted to sell their carpet cushion and automotive businesses. However, based on the results of those sale processes, the Debtors decided not to proceed with either sale because the prices offered would not have allowed the Debtors to deleverage their balance sheet. In April 2005, the Debtors sold their rubber and felt carpet cushion business to Leggett & Platt, Incorporated for approximately $38.7 million. In addition, in May 2005, the Debtors combined the management of their technical and foam products SBUs to increase productivity and efficiency, enhance their market focus and improve integration and communication among their sales, marketing and manufacturing teams. Finally, in the two years prior to the Petition Date, the Debtors

-24-

ceased operating in over ten locations, closed four offices, significantly reduced SG&A spending and implemented various strategies designed to further reduce overhead expenses.

Although the Debtors benefited from these restructuring initiatives prior to the Petition Date, they proved to be insufficient. To assist the Debtors in their restructuring efforts, in May 2005, the Debtors retained Miller Buckfire & Co., LLC ("Miller Buckfire"), as their investment banker and financial advisor, to evaluate strategic alternatives designed to strengthen the Debtors' balance sheet. Almost immediately upon being engaged, Miller Buckfire worked with the Debtors to devise various restructuring alternatives that could be implemented in, or outside of, chapter 11. As part of this process, Miller Buckfire solicited various financing and restructuring proposals from the Debtors' existing stakeholders as well as from third-party financing sources and equity sponsors. The results of this process demonstrated at the time that, to provide the Debtors with sufficient liquidity to operate effectively for the long-term, any restructuring would likely require a significant reduction in Foamex's indebtedness – something that, under the circumstances, could only be achieved by means of a chapter 11 case. In view of all of these factors, on August 15, 2005, Foamex L.P. did not pay the $51.6 million principal payment due upon the maturity of the 2005 Senior Subordinated Notes and the accrued and unpaid interest.

Despite defaulting on their 2005 Senior Subordinated Notes, as part of their overall restructuring efforts, the Debtors announced on August 15, 2005, amendments to both their Prepetition Bank Facility and the Prepetition Term Loans to provide for waivers to September 30, 2005, in respect of the default resulting from the failure to repay the 2005 Senior Subordinated Notes at maturity and the interest due thereon as well as certain other covenant defaults. Such amendments also provided additional liquidity under the Prepetition Bank Facility to allow the Debtors to continue their restructuring efforts. In addition, the Debtors announced at such time that the administrative agents under the Prepetition Bank Facility and Prepetition Term Loans had committed to provide the Debtors with debtor-in-possession and chapter 11 exit financing.

After the Debtors' August 15th announcement, the Debtors and their professionals continued to negotiate with their key creditors, including an informal committee of holders of Senior Secured Notes representing at the time a majority in principal amount of the outstanding Senior Secured Notes (as constituted from time to time, the "Ad Hoc Committee of Senior Secured Noteholders") and their respective professionals concerning the terms of a consensual restructuring. Those negotiations culminated in the Debtors' agreement in principle with members of the Ad Hoc Committee of Senior Secured Noteholders on the key terms of a proposed reorganization plan. That agreement in principle was memorialized in a term sheet that was filed as part of an 8-K filing on September 22, 2005; the term sheet ultimately was embodied in the Original Plan.

As described in detail in Article VII below, significant improvements in the Debtors' business postpetition beginning in the fourth quarter of 2005 have led the Debtors to abandon the Original Plan in favor of the current Plan.

## VI.

## THE CHAPTER 11 CASES

### A. Significant "First Day" Motions

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Court entered several orders authorizing the Debtors to pay various prepetition claims. These orders were designed to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the chapter 11 filings. The Court entered orders authorizing the Debtors, among other things, to (i) pay prepetition compensation, benefits and reimbursable employee expenses; (ii) continue certain workers' compensation programs and insurance policies; (iii) continue certain customer practices and programs; (iv) pay certain prepetition freight and customs brokers' claims and amounts due in respect of the Debtors' foreign operations; (v) pay prepetition claims of certain critical vendors,[16] and (vi) obtain postpetition financing, repay certain prepetition secured debt, and grant first priority liens, super-priority administrative expense status and adequate protection to the Debtors' postpetition lenders.

In addition, the Debtors filed several applications seeking orders authorizing the Debtors' retention of professional advisors. Specifically, the Debtors filed applications to retain (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young, Conaway, Stargatt & Taylor, LLP, as co-counsel, (ii) Miller Buckfire, as financial advisor, (iii) KPMG LLP, as auditors and accountants, and (iv) certain ordinary course professionals. The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

### B. DIP Credit Facilities

To provide the Debtors with the cash and liquidity necessary to continue operating and to maintain normal vendor relations postpetition, on September 19, 2005, the Debtors sought Court approval of a $240 million debtor-in-possession revolving credit facility (including a $40 million sub-limit for letters of credit) in the form of a Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified, the "DIP Revolving Credit Facility"), dated as of September 22, 2005, with Bank of America, N.A., as administrative agent (the "DIP Revolving Credit Agent"), and the lenders party thereto (the "DIP Revolving Credit Lenders"). In addition, the Debtors sought Court approval of an $80 million debtor-in-possession term loan (as amended, restated, supplemented or otherwise modified, the "DIP Term Credit Facility,"

---

[16] During the Chapter 11 Cases, the Debtors have paid approximately $32,477,673 to 24 critical vendors. The primary recipients of these critical vendor payments have been the Debtors' chemical and fabric suppliers.

and together with the DIP Revolving Credit Facility, collectively, the "DIP Credit Facilities"), dated as of September 22, 2005, with Silver Point Finance, LLC, as administrative agent (the "DIP Term Credit Agent," and together with the DIP Revolving Credit Agent, collectively, the "DIP Agents"), and the lenders party thereto (the "DIP Term Loan Lenders," and together with the DIP Revolving Credit Lenders, collectively, the "DIP Lenders"). A portion of the proceeds from the DIP Credit Facilities were used to repay the Debtors' Prepetition Bank Facility and Prepetition Term Loans. The remainder of the proceeds have been able to fund the Debtors' working capital requirements during their Chapter 11 Cases.

On September 21, 2005, the Court approved the DIP Credit Facilities on an interim basis and on October 17, 2005, the Court approved the DIP Credit Facilities on a final basis. On October 18, 2005, the Court entered a final order (the "DIP Financing Order") approving the DIP Credit Facilities.

### C. Official Committee of Unsecured Creditors

On September 29, 2005, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "Creditors' Committee"). The Creditors' Committee is currently comprised of The Bank of New York, as indenture trustee for the Senior Subordinated Notes, the Pension Benefit Guaranty Corporation, Shell Chemicals L.P., Newcastle Partners, LP and Donovan Williams.

The Creditors' Committee has, with Court approval, employed and retained (i) Lowenstein Sandler PC and Greenberg Traurig, LLP, as its co-counsel, and (ii) Jefferies & Company, Inc., as its financial advisor.

### D. Ad Hoc Committee of Senior Secured Noteholders

Prior to the Petition Date, an Ad Hoc Committee of Senior Secured Noteholders was formed by certain large holders of the Debtors' Senior Secured Notes that together represented a majority of the outstanding amount of such securities. Subsequent to the Petition Date, U.S. Bank National Association, as indenture trustee under the Senior Secured Notes Indenture, joined the Ad Hoc Committee of Senior Secured Noteholders. The Ad Hoc Committee of Senior Secured Noteholders has employed and retained (i) Schulte Roth & Zabel LLP and Richards Layton & Finger, P.A., as its co-counsel and (ii) Houlihan Lokey Howard & Zukin Capital, as its financial advisor.

### E. Ad Hoc Shareholder Committee

By letter dated April 25, 2006, D. E. Shaw requested the U.S. Trustee to appoint an official equity committee in the Chapter 11 Cases. The U.S. Trustee denied D. E. Shaw's request on May 3, 2006. On May 9, 2006, D. E. Shaw moved the Court for the appointment of an official equity committee.

Subsequent to D. E. Shaw filing its motion seeking the appointment of an official equity committee, D. E. Shaw and certain other large shareholders of Foamex International formed an ad hoc shareholder committee (the "Ad Hoc Shareholder Committee"). The members of the Ad Hoc Shareholder Committee are D. E. Shaw, Sigma Capital Management, LLC, Par IV Capital Management LLC ("Par IV Capital") and Paloma International L.P. Goldman, Sachs & Co. is an observer to the Ad Hoc Shareholder Committee. The Ad Hoc Shareholder Committee has selected Cleary Gottlieb Steen & Hamilton LLP and Skadden, Arps, Slate, Meagher & Flom LLP, as bankruptcy and special tax counsel, respectively, and Imperial Capital, LLC, as financial advisor.

On August 21, 2006, D.E. Shaw withdrew, without prejudice, its motion seeking the appointment of an official shareholders committee. On October 13, 2006, members of the Ad Hoc Shareholder Committee (or their designees) and Goldman, Sachs & Co. entered into the Equity Commitment Agreement in connection with the proposed Rights Offering. See Article VIII for a more detailed discussion of the Equity Commitment Agreement and Rights Offering.

### F.    Changes in the Debtors' Senior Management

Beginning in April 2006, the Debtors' senior management went through a series of changes. On April 7, 2006, Mr. K. Douglas Ralph, Executive Vice President and Chief Financial Officer ("CFO") of Foamex International, resigned from the Debtors. To date, the Debtors have not hired a replacement CFO.

On June 7, 2006, Mr. Thomas E. Chorman resigned his positions as Foamex International and Foamex L.P.'s President and Chief Executive Officer ("CEO"), and as a board member of Foamex International. In the face of Mr. Chorman's resignation, the board of directors of Foamex International named Mr. Raymond E. Mabus, Jr., Foamex International's Chairman, as Foamex International's President and CEO on at least an interim basis. Mr. Mabus has served in the positions of President and CEO since Mr. Chorman's resignation. Under the Plan, if confirmed, Mr. Mabus will serve as Chairman and CEO of Reorganized Foamex International.

Mr. Mabus is a man of great distinction who has served on Foamex International's board of directors since 2000 and as its Chairman since early 2004. Prior to that, Mr. Mabus was the governor of Mississippi from 1988 to 1992 and the U.S. ambassador to the Kingdom of Saudi Arabia from 1994 to 1996. After leaving public service in 1996, Mr. Mabus joined the board of directors of an employee training service called Strategic Partnerships, now operating as the Global Resources Division ("Global Resources Division") of Frontline Group Ltd. Mr. Mabus was president of Global Resources Division from October 1998 through February 2002.

In addition to Mr. Mabus's appointment as Foamex's President and CEO, Mr. Gregory J. Christian was appointed Foamex International's Chief Administrative Officer ("CAO"). In addition to his multiple other roles as Foamex International and Foamex L.P.'s Executive Vice President, General Counsel and Chief Restructuring

-28-

Officer ("CRO"), as CAO Mr. Christian has assumed responsibility for the Debtors' information technology, procurement and manufacturing technology. Mr. Christian was also elected to Foamex International's board of directors to fill the vacancy left by Mr. Chorman.

### G. The Debtors' Motion to Preserve Net Operating Losses

At the time when the voluntary petitions were filed, the Debtors believed that, although they expected to emerge from chapter 11 with substantial net operating losses ("NOLs") for Federal income tax purposes as of January 1, 2006, as a result of the anticipated reorganization to be implemented in the Chapter 11 Cases, the Debtors would recognize an amount of cancelation of indebtedness income ("COD Income") that would exceed the amount of such NOLs. The application of section 108 of the Internal Revenue Code (the "Tax Code") would reduce the Debtors' NOLs by the amount of such COD Income, with the result that there would not be any NOLs to be carried forward to offset future income. By the second quarter of 2006, however, the Debtors' financial performance had so improved, that it began to appear as though there may be no COD Income so that the NOLs would not be reduced by COD Income. The NOLs may therefore constitute a valuable asset of the Debtors' estates that could be used to reduce their future federal income tax liability. For a more detailed description of the NOLs and federal income tax consequences of the Plan, see Article XIV below.

In light of increased trading activity in the Existing Common Stock from February 2006 through April 2006, Foamex took steps to preserve the utilization of the NOLs after conclusion of the Chapter 11 Cases and to prevent an ownership change within the meaning of section 382(g)(1) of the Tax Code from occurring prior to the consummation of its Chapter 11 plan of reorganization. Because an ownership change occurring prior to the consummation of the chapter 11 plan would result in the imposition of more onerous annual limitations on the usage of the NOLs to offset future taxable income, on April 20, 2006, Foamex filed a motion in the Bankruptcy Court requesting an order establishing notification and hearing procedures for trading in the Existing Common Stock. Following negotiations with certain significant equityholders, the Court entered a consensual order establishing the notification and hearing procedures on May 3, 2006 (the "Trading Order"). Specifically, the Trading Order provides that any person or entity that beneficially owns or will own shares of Existing Common Stock representing 4.5% of Foamex International's outstanding shares at the time the Trading Order was entered (a "4.5% Equityholder") must comply with certain procedures in order to provide the Debtors with an opportunity to challenge any transfer of stock that would jeopardize the value of the Debtors' NOLs. In general, and subject to certain exceptions set forth in the Trading Order, the procedure can be summarized as follows:

(a) Any person or entity who currently is or becomes a 4.5% Equityholder[17] shall file with the Court, and serve upon the Debtors and counsel to the

---

[17] A "4.5% Equityholder" is any person or entity that beneficially owns at least 1,102,938 shares of Foamex International's common stock, representing 4.5% of the 24,509,728 shares outstanding at the time the Trading Order was entered.

-29-

Debtors, a notice of such status, substantially in the form attached to the Trading Order as Exhibit A, on or before the later of (i) thirty (30) days after the Debtors provide notice of the Trading Order or (ii) ten (10) days after becoming a 4.5% Equityholder.

(b)     Prior to effectuating any transfer of equity securities (including any sale, transfer, assignment, pledge, hypothecation, option to acquire stock[18], or other disposition or encumbrance) that would result in an increase in the amount of equity securities of Foamex International beneficially owned by a 4.5% Equityholder or would result in a person or entity becoming a 4.5% Equityholder, such 4.5% Equityholder shall file with the Court, and serve on the Debtors and counsel to the Debtors, advance written notice, substantially in the form attached to the Trading Order as Exhibit B, of the intended transfer of equity securities.

(c)     Prior to effectuating any transfer of equity securities (including any sale, transfer, assignment, pledge, hypothecation, option to acquire stock, or other disposition or encumbrance) that would result in a decrease in the amount of common stock of Foamex International beneficially owned by a 4.5% Equityholder or would result in a person or entity ceasing to be a 4.5% Equityholder, such 4.5% Equityholder shall file with the Court, and serve on the Debtors and counsel to the Debtors, advance written notice, substantially in the form attached to the Trading Order as Exhibit C, of the intended transfer of equity securities.

(d)     The Debtors shall have twenty (20) days after receipt of a Notice of Proposed Transfer to file with the Court and serve on such 4.5% Equityholder an objection to any proposed transfer of equity securities described in the Notice of Proposed Transfer on the grounds that such transfer may adversely affect the Debtors' ability to utilize their NOLs; provided, however, that, to the extent practicable, the Debtors will use reasonable best efforts to file objections, or confirm to the 4.5% Equityholder that the Debtors have no objection, before the expiration of the twenty (20) day period. If the Debtors file an objection, the Debtors shall request that such objection be heard by the Court on shortened notice (no more than ten (10) days after the date of such objection), and such transaction will not be effective unless approved by a final and nonappealable order of the Court. If the Debtors do not object within such twenty (20) day period, such transaction may proceed in an amount not to exceed the amount set forth in the Notice of Proposed Transfer. Any transaction for which a Notice of Proposed Transfer is filed is void *ab initio* unless either (1) express permission for such transaction is granted by the Debtors; (2) the twenty (20) day period referred to above expires without an objection from the Debtors; or (3) such transaction is approved by a final and nonappealable order of the Court.

For a complete description of these notification and hearing procedures, reference should be made to the Trading Order on file with the Court (docket no.1029).

---

[18]     For purposes of the Trading Order, an "option" to acquire stock includes any contingent purchase, warrant, convertible debt, Series B convertible preferred stock, put, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

Shortly after entry of the Trading Order, Morgan Stanley & Co. Incorporated ("Morgan Stanley"), through its counsel, advised counsel to Foamex that Morgan Stanley owned 1,400,004 shares of Existing Common Stock, representing at the time approximately 5.7% of the Existing Common Stock. Foamex and its advisers concluded that the acquisition by Morgan Stanley of stock representing 5% or more of the total equity value would likely cause Morgan Stanley to be an additional 5% shareholder and thus constitute an additional owner shift for purposes of section 382 which would result in an ownership change under section 382 of the Tax Code. Accordingly, Foamex took steps, consistent with the Trading Order, to have the Court determine that Morgan Stanley's acquisition of the shares that caused it to become a 5% shareholder was void *ab initio*. With the cooperation and consent of Morgan Stanley, Foamex submitted and obtained the Court's approval of a Stipulation and Order (the "MS Stipulation").

The MS Stipulation provides that each purchase by Morgan Stanley of shares of Existing Common Stock that increased its holdings above 1,270,004 shares of Existing Common Stock (approximately 4.9% of Foamex International's then Existing Common Stock) shall be void *ab initio*. Any shares with respect to which the purchases were void *ab initio* (the "Excess Shares") shall be treated as having been held at all times by Morgan Stanley in trust for the benefit of a qualified charitable organization selected by Foamex International. The MS Stipulation required that Morgan Stanley sell the Excess Shares; Morgan Stanley was permitted to retain the proceeds of such sale only to the extent of its actual cost for such shares, and must pay any additional proceeds to the charitable organization selected by Foamex International. Counsel for Morgan Stanley notified counsel for Foamex International that the Excess Shares were in fact sold on May 15, 2006, for a price in excess of Morgan Stanley's cost; the excess proceeds have been remitted to the charitable organization selected by Foamex International.

Also, subsequent to the entry of the Trading Order, Par IV Capital filed a Schedule 13-G with the SEC for the period ending on May 1, 2006, on which it reported beneficially owning, for SEC reporting purposes, greater than 5 percent of the Existing Common Stock. After discussions between Par IV Capital and Foamex International's counsel revealed that Par IV Capital should not be treated as a 5% shareholder for tax purposes, on May 23, 2006, Par IV Capital, and certain entities affiliated with Par IV Capital (collectively, the "Par IV Entities") and Foamex International entered into a stipulation (the "Par IV Stipulation") that memorialized the earlier discussions between each party's counsel. According to the Par IV Stipulation, shortly after the Trading Order became effective, Par IV Capital notified Foamex that two funds, Par IV Master Fund, Ltd. ("Par IV Fund") and Sunrise Partners Limited Partnership ("Sunrise"), for which Par IV Capital acts as an investment advisor, each separately own 884,750 shares of Existing Common Stock (approximately 3.4% of the Existing Common Stock then outstanding) in separate accounts, both of which are managed by Par IV Capital. As part of the Par IV Stipulation, the Par IV Entities represented and warranted that of the 1,769,500 shares of Existing Common Stock referred to in the Schedule 13-G, 884,750 shares are beneficially owned by the Par IV Fund and 884,750 are beneficially owned by Sunrise. The Par IV Entities further represented that: (1) since the filing date of the Schedule 13-G, none of the Par IV Entities has acquired any shares of Existing Common Stock or Existing

-31-

Preferred Stock, and the ownership reflected on the Schedule 13-G for the period ending on May 1, 2006, represented each Par IV Entity's highest ownership level in the three-year period preceding the filing date of the Schedule 13-G; and (2) to the knowledge of the Par IV Entities, no "person," as that term is defined in the Trading Order, who owns a 5 percent or greater interest in any of the Par IV Entities, owns Foamex common stock or Existing Preferred Stock.

Foamex believes that neither the purchases of its Existing Common Stock by Morgan Stanley nor those reported by Par IV Capital resulted in an ownership change for purposes of section 382 of the Tax Code. However, to avoid any dispute over the effect of Morgan Stanley and/or the Par IV Entities' purchases of Existing Common Stock on reorganized Foamex International's ability to utilize its NOLs, Foamex International has requested a ruling from the IRS confirming that its belief is correct. See Article XIV for a more detailed discussion of the Debtors' NOLs.

### H.    Claims Process

#### 1.    Last Date to File Proofs of Claim

On October 18, 2005, the Court entered an order (the "Bar Date Order") requiring any person or entity holding or asserting a Claim (other than an Administrative Claim) against the Debtors to file a written proof of claim with Foamex International Inc., et al., Claims Processing, c/o Bankruptcy Services, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, on or before December 8, 2005, and for Governmental Units holding a Claim against the Debtors to file such Claim on or before 4:00 p.m., prevailing Eastern Time on March 20, 2006. The Bar Date Order further provides that, pursuant to Bankruptcy Rule 3003(c)(2), any entity that is required to file a proof of claim in these Chapter 11 Cases pursuant to the Bankruptcy Code, the Bankruptcy Rules or the Bar Date Order with respect to a particular claim against the Debtors, but that fails to do so by the applicable Bar Date, shall not be treated as a creditor with respect to such Claim for the purposes of voting upon, or receiving distributions under, any plan or plans of reorganization filed in these Chapter 11 Cases. Approximately 1,330 claims were filed against the Debtors in the aggregate amount of $4,970,510,219.14, many of which are duplicative or are otherwise objectionable.

Since the Bar Date, the Debtors have engaged in a continuous process of assessing the proofs of claim filed against them and where appropriate, objecting to Claims that the Debtors believe should not be Allowed at all or, at most, not in the amount(s) or classification as filed. Thus far the Debtors have filed nine omnibus objections to proofs of claim:

- On January 13, 2006, the Debtors filed their *First Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "First Omnibus Objection"). On February 13, 2006, the Court entered an order granting the First Omnibus Objection expunging over $1.5 million in Claims against the estates.

-32-

- On March 3, 2006, the Debtors filed their *Second Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Second Omnibus Objection"). On April 12, 2006, the Court entered an order granting the Second Omnibus Objection reducing the amount of Claims against the estates by over $2.9 million.

- On March 10, 2006, the Debtors filed their *Third Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Third Omnibus Objection"). On April 12, 2006, the Court entered an order granting the Third Omnibus Objection reducing the amount of Claims against the estates by over $3.5 million.

- On July 7, 2006, the Debtors filed their *Fourth Omnibus Objection to Claims Pursuant to Section 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Fourth Omnibus Objection"). On August 8, 2006, the Court entered an order granting the Fourth Omnibus Objection reducing the amount of Claims against the estates by over $2 million in Claims.

- On July 7, 2006, the Debtors filed their *Fifth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Fifth Omnibus Objection"). On August 8, 2006, the Court entered an order granting the Fifth Omnibus Objection reducing the amount of Claims against the estates by over $2 million.

- On August 23, 2006, the Debtors filed their *Sixth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Sixth Omnibus Objection"). On October 5, 2006, the Court entered an order granting the Sixth Omnibus Objection reducing the amount of Claims against the estates by over $14 million.

- On August 23, 2006, the Debtors filed their *Seventh Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Seventh Omnibus Objection"). On October 5, 2006 the Court entered an order granting the Seventh Omnibus Objection reducing the amount of Claims against the estates by over $352 million.

- On September 19, 2006, the Debtors filed their *Eighth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Eighth Omnibus Objection"). On October 19, 2006, the Court entered

-33-

an order granting the Eighth Omnibus Objection reducing the amount of Claims against the estates by over $1 million

- On September 19, 2006, the Debtors filed their *Ninth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Ninth Omnibus Objection"). On October 19, 2006, the Court entered an order granting the Ninth Omnibus Objection reducing the amount of Claims against the estates by over $3 million.

- On November 21, 2006, the Debtors filed their *Tenth Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Tenth Omnibus Objection"). A hearing on the Tenth Omnibus Objection is scheduled for December 21, 2006.

- On November 21, 2006, the Debtors filed their *Eleventh Omnibus Objection to Claims Pursuant to Sections 105 and 502(b) of the Bankruptcy Code and Rules 3001, 3003 and 3007 of the Federal Rules of Bankruptcy Procedure* (the "Eleventh Omnibus Objection"). A hearing on the Eleventh Omnibus Objection is scheduled for December 21, 2006.

In addition to the foregoing objections, on March 3, 2006, the Debtors filed their initial "Notice of Claims Previously Satisfied" (the "First Notice of Satisfaction") seeking to reduce and allow or expunge approximately 340 filed and scheduled Claims which the Debtors believe were satisfied after the Petition Date by payments authorized pursuant to certain "first day" orders of the Court. The First Notice of Satisfaction resulted in Claims reductions in excess of $31 million.

On June 20, 2006, the Debtors filed a "Second Notice of Claims Previously Satisfied" (the "Second Notice of Satisfaction") seeking to reduce and allow or expunge approximately 100 filed and scheduled Claims which the Debtors believe were satisfied after the Petition Date by payments authorized pursuant to certain "first day" orders of the Court. The Second Notice of Satisfaction resulted in Claims reductions in excess of $1.85 million.

The Debtors have substantially completed their Claims reconciliation process and believe, based on the results of such process, that the Claims amount will be further reduced significantly for, among others, the following reasons: (i) certain creditors filed duplicative Claims against each of the Debtors that, under the substantive consolidation provisions in the Plan, will be deemed to be only a single Claim and (ii) the Debtors anticipate that certain significant claims will be withdrawn prior to the effective date of the Plan. According to the Debtors' estimates, there should remain approximately

$13 million[19] of Allowed General Unsecured Claims that will be due and payable on the Effective Date.

## I. Assumption/Rejection of Leases and Executory Contracts

Pursuant to the Bankruptcy Code, the Debtors have (a) 60 days after the Petition Date to assume or reject unexpired leases of nonresidential real property unless such time period is extended by the Court for cause and (b) until confirmation of the Plan to assume or reject executory contracts and other unexpired leases. The Debtors recently filed a motion to extend their October 16, 2006 deadline to assume or reject unexpired leases of nonresidential real property in the Chapter 11 Cases through February 17, 2007 (the "365 Motion"). On November 21, 2006, the Court entered an order granting the 365 Motion. The Debtors reserve the right to seek one or more further extensions should they determine it is necessary to do so.

As described more fully below, the Debtors have already assumed a number of critical executory contracts and the cure amounts associated with such assumptions either have been paid or will have been paid prior to the Confirmation Hearing. In connection with the assumption of unexpired leases and the Debtors' remaining executory contracts, the Debtors have already reconciled the cure amounts payable in respect of such assumptions with the counterparties to such leases and contracts and shall send the counterparty to such contract or lease a "cure" notice indicating the Debtors' estimate of the "cure" amount required to be paid pursuant to section 365(b) of the Bankruptcy Code upon the assumption of such contract or lease. Counter-parties will be given an opportunity to object to such amounts pursuant to the procedures set forth in such cure notice. All cure amounts shall be paid on the Initial Distribution Date or as otherwise provided for in the Plan. Because the Debtors believe that they have already reconciled such cure amounts with the counterparties to the contracts and leases to be assumed, the Debtors do not anticipate disputes over cure amounts and, as a result of such cure amount reconciliations, the Debtors estimate that the aggregate cure amount to be paid in connection with such assumptions will be approximately $2.8 million.

### 1. Rejected Leases and Executory Contracts

The Debtors have already obtained Court approval to reject eleven nonresidential real property leases, eight equipment leases, one employment agreement and twenty-three executory contracts. The Debtors expect to reject only a handful of remaining contracts and leases, and anticipate doing so, if at all, at, or prior to, the Confirmation Hearing.

### 2. Assumed Executory Contracts

The Debtors have already obtained Court approval to assume ten executory contracts, six of which are critical supply contracts that will help ensure that

---

[19] Amount excludes approximately $3.7 million of General Unsecured Claims that are Disputed Claims.

the Debtors and the Reorganized Debtors will have a sufficient supply of raw materials on terms more favorable than those in existence on the Petition Date.

Specifically, on October 17, 2005, the Debtors obtained Court approval to assume (i) that certain sales contract for scrap foam between Maverick, Inc. and Foamex L.P., dated January 1, 2005 (as amended, the "Maverick Contract"), (ii) that certain sales contract for blended and scrap foam between Advanced Foam Recycling, Ltd. and Foamex L.P., dated July 1, 2005 (as amended, the "Advanced Foam Contract") and (iii) that certain sales contract for various forms of MDI isocyanate between Huntsman International LLC and Foamex L.P., dated September 28, 2004 (as amended, the "Huntsman Contract"). The Maverick Contract, the Advanced Foam Contract and the Huntsman Contract are each important supply contracts, the assumption of which has resulted in, among other things, cost savings and a significant increase in the Debtors' supply of scrap foam and MDI.

In addition, on December 19, 2005, the Court entered an order approving the assumption of that certain sales contract for polyol and TDI between Foamex L.P. and Bayer Material Science LLC, dated August 19, 2005 (as amended, the "Bayer Contract"). The Bayer Contract is an important supply contract, the assumption of which will result in, among other things, a significant increase in the Debtors' availability of polyol and TDI, a return to normal credit terms and an expanded credit limit.

On August 8, 2006, the Debtors obtained Court approval to assume an executory contract with Lyondell Chemical Company ("Lyondell"), as amended by that certain amendment (the "Lyondell Contract Amendment") executed by Foamex L.P. and Lyondell on July 25, 2006 (as amended, the "Lyondell Contract"), pursuant to which Foamex L.P. agrees to buy, and Lyondell agrees to sell, certain quantities of TDI. The Lyondell Contract, similar to the Bayer Contract discussed above, is an important supply contract and its assumption provides the Debtors with additional assurance that their TDI demands will be satisfied.

On October 5, 2006, the Court entered an order approving the assumption of an executory contract for polyol between Foamex L.P. and Shell Chemical LP d/b/a Shell Chemical Company ("Shell"), dated March 30, 2001 (as amended, the "Shell Contract"), pursuant to which Foamex L.P. agrees to buy, and Shell agrees to sell, certain quantities of polyol. Similar to the Bayer Contract and Lyondell Contract described above, the Shell Contract is another important supply contract and its assumption provides the Debtors with further assurance that their polyol demands will be satisfied.

The Debtors have also assumed certain customer agreements. On October 17, 2005, the Debtors obtained Court approval to assume that certain supply contract for polyurethane foam between Anatomic Concepts, Inc. and Foamex L.P., dated September 28, 2001 (as amended, the "Anatomic Contract"). The Anatomic Contract is an important supply contract with one of the Debtors' significant polyurethane foam customers, the assumption of which has resulted in, among other things, an extension of the term of the agreement.

On March 14, 2006, the Court entered an order approving the assumption of an important supply agreement, as amended by the February 21, 2006 amendment, for lamination and foam rolls between Johnson Controls, Inc. ("JCI") and Foamex L.P. (as amended, the "JCI Contract"). JCI is an important customer of the Debtors' automotive SBU and the changes in the contract are expected to benefit both parties.

Finally, on August 8, 2006, the Debtors obtained Court approval to assume all of their pre-petition insurance policies and related agreements (collectively, the "Insurance Agreements") entered into between the Debtors and/or their predecessors Crain Industries, Inc. and its related entities and ACE American Insurance Company and certain of its affiliates (collectively, "ACE") with respect to, among other things, workers' compensation, automobile, employer and general liability.

The Insurance Agreements are critical to the Debtors' operations because, as a matter of state law (at least with respect to the Debtor's workers' compensation insurance), the Debtors are required to obtain and maintain the types of insurance ACE provides. Another important benefit of assumption of the Insurance Agreements is that, after the order approving assumption was entered, ACE released $1,323,068.67 to the Debtors, which represents adjustments to the pledged cash collateral provided by the Debtors to ACE. As a result of the assumption, ACE also agreed to adjust certain premiums paid to ACE by the Debtors and to reduce the amount of required letters of credit posted by the Debtors to collateralize their obligations under the Insurance Agreements.

The Debtors continue to assess their raw material sourcing needs and general business requirements and will make any appropriate motions with respect to their remaining leases and executory contracts within the time period established by the Bankruptcy Code or such other time as may be set by the Court. The Plan provides that except for unexpired leases and executory contracts that are the subject of a motion(s) to reject that is pending on or decided prior to the Confirmation Date, the Debtors will assume all of their executory contracts and unexpired leases effective as of, and subject to the occurrence of, the Effective Date.

### J.     Reclamation Claims

Section 546(c) of the Bankruptcy Code recognizes the statutory and common law rights of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor received such goods while insolvent and the seller demands in writing reclamation of such goods (i) before ten (10) days after receipt of such goods by the debtor, or (ii) if such ten (10) day period expires after the commencement of the bankruptcy case, before twenty (20) days after receipt of such goods by the debtor. Section 546(c) further permits the bankruptcy court to deny reclamation to a seller with such a right that has made a valid demand if the court (i) grants the claim of such seller priority under section 503(b) of the Bankruptcy Code, or (ii) secures such claim with a lien.

-37-

The Debtors have received nineteen (19) reclamation demands seeking the return of at least $20,856,115.20 worth of goods. Six of these reclamation demands failed to specify an exact amount of the alleged reclamation claim. The Debtors have satisfied certain of these alleged reclamation claims through the payment of "cure" amounts associated with contracts that have been assumed or through payments to critical vendors. The Debtors' satisfied their largest reclamation claim – that of Dow Chemical Company in the amount of $16,324,185.79 – through a critical vendor agreement with Dow Chemical Company. Certain other reclamation claims may be similarly satisfied prior to or in connection with confirmation of the Plan.

Any reclamation claims that remain unsatisfied prior to the Confirmation Hearing will be treated as Administrative Claims under the Plan.

### K.    KERP

On October 28, 2005, the Debtors filed a motion (the "KERP Motion") with the Court seeking approval of their Key Employee Retention Plan (the "KERP") and the continuation of their Severance Plan, as slightly modified. On November 17, 2005, the Court entered an order approving the KERP and Severance Plan. The KERP and Severance Plan are intended to assist the Debtors in retaining and incentivizing their senior management and other key employees (the "Key Employees") to work through certain key dates and to file, confirm and implement a successful plan of reorganization for the Debtors. Under the KERP, and as set forth in greater detail in the KERP Motion, the Debtors' divided their Key Employees into three groups. Group 1 consisted of 65 non-executive and three executive employees. The retention distributions to the Key Employees in Group 1 are to be made in Cash and are formula driven based upon a percentage of the Key Employee's base salary ranging from 15% to 40%. Group 2 consists of six executives and Group 3 consisted of the Debtors' three senior executives. The amounts of the retention distributions to be made to the Key Employees in Groups 2 and 3 were determined on a discretionary basis and range from 50% to 125% of the particular Key Employee's base salary. The Key Employees in Groups 2 and 3 will receive their KERP distributions in Cash, provided, however, that at the sole option of the board of directors of Reorganized Foamex International (which determination shall be made within forty-five (45) days of the Effective Date), up to 25% (for Group 2) and 50% (for Group 3) of such distributions may be made in the form of Common Stock. For purposes of determining the number of shares of Common Stock, if any, to be distributed to Key Employees in Groups 2 and 3, the Common Stock will be valued at the price per share equal to the price per share at the closing of the over the counter market on the Effective Date.[20]

---

[20]   The KERP Motion provides the Board of Directors with the option to pay a portion of the KERP distribution "in the form of common stock in the reorganized Company at a price per share that reflects the value of the equity to be distributed to the Debtors' creditors on the Effective Date of the Debtors' plan." Because the Debtors no longer will be issuing equity to creditors, the Debtors will be seeking, as part of the Confirmation Order, a modification to the KERP that would provide for the issuance of

-38-

Payment of the KERP amounts described above are made in installments at intervals during the Chapter 11 Cases and, with respect to Groups 2 and 3, after the Effective Date.[21] Specifically, pursuant to the KERP, the Key Employees in Group 1 shall receive a Cash distribution equal to: (i) 25% of their KERP award on the earlier of the filing of a plan of reorganization and December 15, 2005 (which amount was paid); (ii) 25% of their KERP award on the earlier of the confirmation of a plan of reorganization and March 15, 2006 (which amount was paid); and (iii) 50% of their KERP award on the effective date of a plan of reorganization. Key Employees in Group 2 are entitled to receive a Cash distribution equal to 25% of their KERP award on each of: (i) February 1, 2006 (which amount was paid); (ii) the effective date of a plan of reorganization; and (iii) the 6 month anniversary of the effective date of a plan of reorganization. In addition, on the 1 year anniversary of the effective date of a plan of reorganization, Key Employees in Group 2 are entitled to receive 25% of their KERP award in Cash or, at the sole option of the board of directors of Reorganized Foamex International, in common stock in reorganized Foamex International. Finally, Key Employees in Group 3 are entitled to receive a Cash distribution equal to 25% of their KERP award on each of (i) February 1, 2006 (which amount was paid); and (ii) the effective date of a plan of reorganization. In addition, on each of the 6 month and 1 year anniversaries of the effective date of a plan of reorganization, the Key Employees in Group 3 shall be entitled to receive 25% of their KERP award in Cash or, at the sole option of the board of directors of Reorganized Foamex International, in common stock in reorganized Foamex International. Pursuant to the KERP, the board of directors of Reorganized Foamex International shall have 45 days following the Effective Date to determine whether the 25% payable to Group 2 at the 1 year anniversary of the Effective Date and the 25% payable to Group 3 on each of the 6 month and 1 year anniversaries of the Effective Date shall be payable in Cash or common stock.

## L.    Litigation with PMC, Inc.

In July 2001, Foamex L.P. purchased certain assets, but did not assume any liabilities, related to the manufacture and sale of a variety of polyurethane products from a group of sellers, including General Foam Corporation ("GFC"). PMC, Inc. ("PMC"), the parent of GFC, served as guarantor under the asset purchase agreement memorializing the sale. The guarantee, for the benefit of Foamex, covered the performance of all terms, conditions, covenants and indemnities required to be performed by the sellers (including GFC) under the agreement.

Foamex L.P. is a party to certain disputes relating to a fire at a nightclub in Warwick, Rhode Island in February 2003. The fire destroyed the nightclub killing 100 persons and injuring over 100 others. Foamex L.P. and several of its affiliates are named as defendants, along with more than 50 other defendants, in certain litigations concerning

---

common stock under the KERP at a per share value that reflects the value of Reorganized Foamex International's Common Stock on the Effective Date.

[21]    Two of the three executives in Group 3 are no longer employed by the Debtors. Accordingly, under the KERP, the post-Effective Date distributions to those two executives are forfeited.

the fire. The ensuing litigation comprising numerous cases has been consolidated in a single case, Gray v. Derderian, Case No. 04-312L (the "Rhode Island Litigation"), before the United States District Court for the District of Rhode Island. Plaintiffs have also filed proofs of claim in these Chapter 11 Cases. Such proofs of claim are included in the Class of Unliquidated Claims. Foamex L.P. and certain of its affiliates are named in the Rhode Island Litigation solely as an alleged successor to GFC, itself a defendant in the Rhode Island Litigation. In addition to other foam manufacturing defendants in the Rhode Island Litigation, GFC is alleged to have manufactured and sold polyurethane foam to a foam fabricator in Rhode Island. The foam fabricator is alleged to have then sold the foam at issue to the nightclub. The foam was among other building materials alleged to have caught fire when pyrotechnics were set off inside the nightclub.

The Rhode Island Litigation is in its early stages and is presently stayed as against Foamex L.P. and its affiliates that are named as defendants due to the automatic stay. Foamex L.P. believes that there are multiple defenses to (i) the plaintiff's claims against GFC, and (ii) the successor liability claim against Foamex L.P. Foamex L.P. also intends, upon the lifting of the automatic stay, to continue vigorously defending itself in the Rhode Island Litigation. Foamex L.P. also believes that, if GFC is held liable for monetary damages in the Rhode Island Litigation, GFC is unable to satisfy that obligation and Foamex L.P. and/or any of its affiliates is found to have liability as a successor to GFC, there is likely to be adequate insurance available to cover such liability. However, there can be no assurance that the defenses available to GFC or to Foamex L.P. and its affiliates as an alleged successor will prevail. In addition, there can be no assurance that, if GFC is held liable for monetary damages in the Rhode Island Litigation, GFC will be able to satisfy that obligation through its insurance or assets or that the liability insurance available to Foamex L.P. will be sufficient to cover potential liability to Foamex L.P. and/or its affiliates, if any one or more of them were to be found to be a successor to GFC.

Foamex L.P. has incurred fees and costs in defense of the Rhode Island Litigation and neither GFC nor PMC had honored Foamex L.P.'s demand for reimbursement of fees and costs, as was agreed to under the asset purchase agreement. Therefore, in November 2005, Foamex L.P. filed an adversary proceeding (the "PMC Litigation") in the bankruptcy case against PMC alleging, among other claims, that PMC breached its obligations under the asset purchase agreement by failing to reimburse Foamex L.P. for its costs related to the defense of the Rhode Island Litigation.

On October 4, 2006, the parties to the PMC Litigation agreed, subject to certain conditions, to a settlement of the PMC Litigation. On October 19, 2006, the Court entered an order approving the settlement of the PMC Litigation. The settlement resolves the PMC Litigation in its entirety and will result in the recovery of the vast majority of Foamex L.P.'s costs and fees expended thus far in defending the Rhode Island Litigation and up to an aggregate of $2.5 million in future costs and fees, but does not settle any disputes as to any PMC obligations under the indemnity for the underlying liability, which is subject to the same $2.5 million indemnity cap. In view of the Court's approval of the settlement, the Debtors dismissed the complaint concerning the PMC Litigation, without prejudice.

-40-

**M. Incentive Plan for the Foamex's Salaried Employees**

On October 10, 2006, Foamex filed a motion (the "<u>Incentive Plan Motion</u>") with the Court seeking approval of an incentive plan for their salaried employees (the "<u>Incentive Plan</u>"). In designing the proposed Incentive Plan, the Debtors borrowed heavily from the basic incentive plan structure that had been in place in prior years, with some modifications suggested by the Debtors' compensation consultants, Bright Tree Consulting. The cost of the Incentive Plan will be approximately $5.9 million if the Debtors achieve 100% of the target performance goal for 2006 ($151 million of EBITDA) and as much as approximately $11.7 million if the Debtors achieve 110% of their target performance goal. On October 30, 2006, the Court entered an order approving the Incentive Plan Motion, as modified therein.

**N. Senior Secured Note Premium Claim Litigation**

**1. Background and Filing of Senior Secured Note Premium Complaint**

On November 3, 2006, the Debtors filed a complaint (the "<u>Senior Secured Note Premium Claim Complaint</u>") commencing an adversary proceeding against the Senior Secured Notes Indenture Trustee in the Bankruptcy Court (Adv. Pro. No. 06-50913) seeking, among other things, a declaration that no call premium, prepayment fee or penalty or change of control premium is payable under the Senior Secured Notes Indenture on account of the treatment of the Senior Secured Note Claims under the Plan (the "<u>Senior Secured Note Premium Claim Litigation</u>").

Subsequent to the filing of the Plan and Disclosure Statement, on October 23, 2006,[22] counsel for the Ad Hoc Committee of Senior Secured Noteholders advised the Debtors' representatives of the Ad Hoc Committee of Senior Secured Noteholders' demands for payment of a prepayment premium in the amount of as much as $16,125,000 or, in the alternative, a change of control premium in the amount of $3,000,000. The Debtors believe that no premium of any type is payable and commenced the Senior Secured Note Premium Claim Litigation to obtain a Bankruptcy Court order declaring that such amounts are not payable.

**2. Legal and Factual Bases Underlying the Senior Secured Note Premium Complaint**

**(a) The Senior Secured Notes Indenture Fails to Provide for Payment of any Call or Prepayment Premium.**

The Debtors assert in the Senior Secured Note Premium Claim Litigation that no call premium, prepayment fee or penalty is or will become due under the express terms of the Senior Secured Notes Indenture as a result of the treatment afforded the

---

[22] The Ad Hoc Committee contends that such demand had been made as early as February 2006 in connection with negotiations relating to the Original Plan and at various times thereafter.

Senior Secured Note Claims under the Plan. The only two references to any call premiums or prepayment fees or penalties appear in sections 3.07 and 6.02 of the Senior Secured Notes Indenture. Section 3.07, which is entitled "Optional Redemption," provides, among other things, that Foamex may *redeem* the Senior Secured Notes at any time after April 1, 2006; provided, however, if a redemption occurs during specified periods, Foamex is required to pay the holders of the Senior Secured Notes a premium as follows:

> On and after April 1, 2006:  105.375%
>
> On and after April 1, 2007:  102.688%
>
> On and after April 1, 2008:  100.000%

Section 6.02 of the Senior Secured Notes Indenture deals with acceleration. The first paragraph of section 6.02 states that a bankruptcy filing automatically accelerates the Senior Secured Notes. The Debtors submit that the Senior Secured Notes Indenture does not require or contemplate payment of any call premiums or prepayment fees or penalties upon an acceleration resulting from a bankruptcy filing. The third paragraph of section 6.02 of the Senior Secured Notes Indenture provides for the payment of a premium upon acceleration only in certain limited circumstances as follows[23]:

> If an Event of Default occurs on or after April 1, 2006 by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Issuers with the intention of avoiding payment of the premium that the Issuers would have had to pay if the Issuers then had elected to redeem the [Senior Secured] Notes pursuant to Section 3.07 hereof, then, upon acceleration of the [Senior Secured] Notes, an equivalent premium shall also become and be immediately due and payable, to the extent permitted by law, anything in this Indenture or in the [Senior Secured] Notes to the contrary notwithstanding. If an Event of Default occurs prior to April 1, 2006 by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Issuers *with the intention of avoiding the prohibition on redemption of the [Senior Secured] Notes prior to such date,* then upon acceleration of the [Senior Secured] Notes, an additional premium shall also become and be immediately due and payable in an amount for each of the years beginning in April of the years set forth below, as set forth below . . . .

---

[23] Capitalized terms used and not defined in this paragraph shall have the meanings ascribed to them in the Senior Secured Notes Indenture.

-42-

Thus, according to the Senior Secured Note Premium Complaint, the premium provided for in the third paragraph of section 6.02 of the Senior Secured Notes Indenture is not payable here, because these chapter 11 cases – which triggered an Event of Default that caused an automatic acceleration of the Senior Secured Notes – were not commenced with the willful intention of avoiding the prohibition on redemption of the Senior Secured Notes, the only circumstance where acceleration would require payment of the premium. No other provision of the Senior Secured Notes Indenture entitles the holders of the Senior Secured Notes to a call or prepayment premium or penalty in the event of an acceleration of the indebtedness.

Therefore, once the Senior Secured Notes were accelerated by the commencement of the Debtors' chapter 11 cases, any subsequent repayment under a plan of reorganization is not subject to the "optional redemption premium" provided for in section 3.07 of the Senior Secured Notes Indenture.

The Ad Hoc Committee of Senior Secured Noteholders disputes the Debtors' contention that no call or prepayment premium will become due and payable under the Senior Secured Notes Indenture. Specifically, the Ad Hoc Committee of Senior Secured Noteholders alleges that because the Debtors are solvent and have the option of reinstating the Senior Secured Notes, pursuant to section 1124(2) of the Bankruptcy Code, by choosing not to do so, the Debtors are effectively prepaying the Senior Secured Notes voluntarily. As a result of this alleged "voluntary" or "optional" prepayment, absent a settlement of the dispute, the Ad Hoc Committee of Senior Secured Noteholders would assert that the Senior Secured Noteholders are entitled under the Plan to a call premium equal to either (a) 5.375%, or $16,125,000, if the Senior Secured Note Base Claim is paid on or before March 31, 2007, or (b) 2.688%, or $8,064,000, if the Senior Secured Note Base Claim is paid on or after April 1, 2006.

The Debtors contend that neither their solvency nor section 1124(2) of the Bankruptcy Code has any factual or legal relevance to the parties' dispute. However, even putting that aside, if the Ad Hoc Committee of Senior Secured Noteholders is correct, and the Debtors could reinstate the Senior Secured Notes under section 1124(2), then the Debtors believe that, at a minimum, they would not be required to pay default interest on the principal amount of the Senior Secured Notes to be reinstated ($300,000,000). Assuming that the Debtors emerge from chapter 11 on February 25, 2007, that would mean that, if the Senior Secured Notes Indenture Trustee were to prevail in the Senior Secured Note Premium Litigation, the amount awarded to it would be reduced by the amount of default interest it would otherwise have been entitled to during the period from the Petition Date through February 25, 2007, or approximately $4,250,000. Assuming no default interest for that period, the most the Senior Secured Notes Indenture Trustee could recover in the Senior Secured Note Premium Litigation on account of any call or prepayment premium would be $11,875,000.

(b) **The Amount of any Call or Prepayment Premium is not Reasonable Under Section 506(b)**

-43-

Section 506(b) of the Bankruptcy Code provides, in relevant part: "To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any *reasonable* fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b) (emphasis added).

Thus, in the alternative, the Debtors submit that, if a call or prepayment premium is determined to be payable under the Senior Secured Notes Indenture, the amounts specified therein are not reasonable under section 506(b) of the Bankruptcy Code. The Ad Hoc Committee of Senior Secured Noteholders believes that the call premium amount specified in the Senior Secured Notes Indenture is reasonable and would be allowed under section 506(b) of the Bankruptcy Code.

### (c)    The Change of Control Premium Claim

In the alternative, if no call or prepayment premium is Allowed, then the Ad Hoc Committee of Senior Secured Noteholders has asserted that the Senior Secured Noteholders are entitled to a change of control premium equal to 1% of the original principal amount of the Senior Secured Notes, or $3,000,000.

Pursuant to section 4.15 of the Senior Secured Notes Indenture, "[u]pon the occurrence of a Change of Control, the Issuers will make an offer . . . to each Holder to repurchase all or any part . . . of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest." The Senior Secured Notes Indenture defines Change of Control as the occurrence of any of the following[24]:

> (1)    the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of Foamex and its Restricted Subsidiaries, taken as a whole, to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than a Principal or a Related Party of a Principal (as defined below);
>
> (2)    the adoption of a plan relating to the liquidation or dissolution of Foamex;
>
> (3)    the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above), other than the Principals and their Related Parties and disregarding

---

[24]    Capitalized terms used and not defined in this paragraph shall have the meanings ascribed to them in the Senior Secured Notes Indenture.

any holding companies or similar entities whose principal asset is Voting Stock of Foamex, becomes the Beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of Foamex, measured by voting power rather than number of shares;

(4)     the first day on which a majority of the members of the Board of Directors of Foamex are not Continuing Members, *provided* that notwithstanding the foregoing, so long as Foamex is a Subsidiary of Foamex International, this provision shall be deemed to be complied with for so long as the majority of the members of the Board of Directors of Foamex International are Continuing Members; or

(5)     for so long as the Senior Subordinated Notes are outstanding, a change of control under the indentures governing the Senior Subordinated Notes.

The Debtors do not believe that any such change of control has occurred; nor do they believe that the transactions contemplated under the Plan give rise to any such change of control. As a result, the Debtors do not believe that any change of control premium is or would be payable under the Senior Secured Notes Indenture. The Ad Hoc Committee of Senior Secured Noteholders believes that the execution by the Debtors and the Significant Equityholders of the Equity Commitment Agreement has, or, alternatively, the consummation of the Rights Offering will, trigger a change of control for purposes of the Senior Secured Notes Indenture.

## (d)     The Bar Date Order Precludes Recovery of Either a Call or Prepayment Premium or a Change of Control Premium

Finally, the Debtors assert that the Bar Date Order precludes the Senior Secured Indenture Trustee and the Senior Secured Noteholders from recovering either a call or prepayment premium, fee or penalty or a change of control premium.

On or about December 8, 2005, the Trustee timely filed a proof of claim in each Debtor's chapter 11 case (claim nos. 865-873, collectively, the "Trustee POCs"), asserting a secured claim against each Debtor for money loaned in the amount of $312,452,083.33 (comprised of principal in the amount of $300,000,000 and prepetition interest in the amount of $12,452,083.33), and postpetition interest at the default rate accrued from the Petition Date through December 8, 2005, in the amount of $7,854,872.24. The Trustee POCs also expressly reserved unliquidated claims for "[i]nstallment interest payments due on the [Senior Secured] Notes [that] continue to accrue post-petition at the default rate under the Indenture," together with "Trustee administration fees and expenses" and attorneys fees and expenses accruing postpetition.

-45-

The Trustee POCs do not make reference to a claim for the payment of any premiums, whether characterized as a call or prepayment premium, fee or penalty or a change of control or other premium and, as a result, according to the Debtors, any such claim must be disallowed by virtue of the Bar Date Order. The Ad Hoc Committee of Senior Secured Noteholders disputes whether the Bar Date Order precludes recovery of any premiums, arguing instead that the Trustee POCs reference the Senior Secured Notes Indenture, the terms of which are known to the Debtors. Nevertheless, subsequent to the filing of the Senior Secured Note Premium Complaint, on November 13, 2006, the Senior Secured Notes Indenture Trustee amended its proofs of claim, among other things, to make express mention for the first time of a premium claim. The Debtors do not believe that such an amendment is lawful and, absent an affirmative vote on the Plan from Class 3 and the resulting settlement of the Senior Secured Note Premium Claim described below and contained in the Plan, will object to or otherwise challenge the amended proofs of claim. The Senior Secured Notes Indenture Trustee believes that the amended proof of claim relates back to the original filing date of the Trustee POCs or, alternatively, that the Court would permit such amendment and the prosecution of the Senior Secured Note Premium Claim.

### 3. Proposed Settlement of the Senior Secured Note Premium Claim Litigation.

The Senior Secured Note Premium Claim Litigation is in its initial stages. The Debtors anticipate that many of the issues are capable of being resolved through summary judgment. Thus far, no such motions have been filed and the Senior Secured Notes Indenture Trustee has yet to answer the Senior Secured Note Premium Complaint.

Since the filing of the Senior Secured Note Premium Claim Complaint, representatives of the Debtors, the Significant Equityholders and the Ad Hoc Committee of Senior Secured Noteholders, including a steering committee comprised of Senior Secured Noteholders (the "Steering Committee"), have engaged in extensive settlement discussions to try and resolve the Senior Secured Notes Premium Claim Litigation. To avoid the uncertainty, delay and potentially significant costs[25] attendant to further litigation, on November 22, 2007, the parties to the negotiations reached a proposed settlement that, if approved as part of the Plan, would resolve all of the outstanding issues related to the Senior Secured Note Claims. The proposed settlement is supported by the Ad Hoc Committee of Senior Secured Noteholders and the Senior Secured Notes Indenture Trustee as well as the Significant Equityholders.

Pursuant to the proposed settlement, if Class 3 votes to accept the Plan then:

---

[25] The Debtors are obligated to pay the Senior Secured Notes Indenture Trustee's reasonable fees and expenses in connection with the Senior Secured Note Premium Claim Litigation to the extent specified in the Senior Secured Notes Indenture.

- the Senior Secured Note Base Claim plus Post-Petition Interest shall be Allowed;

- the Senior Secured Note Premium Claim shall be Allowed in an amount equal to $7,500,000;

- the Debtors shall take all steps necessary to dismiss, with prejudice, the Senior Secured Note Premium Claim Litigation;

- on the Initial Distribution Date, in full and final satisfaction and settlement of the Senior Secured Note Base Claim and the Senior Secured Note Premium Claim, each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Base Claim plus Post-Petition Interest and such holder's pro rata share of the Senior Secured Note Premium



The Debtors ultimately determined that it was not in their best interests nor those of these estates to proceed immediately toward approval of a plan that would embody the "agreement in principle." Fundamentally, the Debtors' significantly improved operating performance over the six months immediately preceding April 2006 suggested that the recoveries negotiated as part of the "agreement in principle" might no longer be supportable. The Debtors' generated EBITDA far in excess of the Debtors' projections for the fourth quarter of 2005 and the first quarter of 2006. In view of the Debtors' improved operating performance, the Debtors thought it prudent to pause to re-evaluate their business plan and projections and to decide, after that re-evaluation, whether the recoveries negotiated as part of the "agreement in principle" continued to be supportable.

### 3. Retention of Alvarez & Marsal as the Debtors' Business Operations Consultant

To assist the Debtors in their development of a revised business plan and projections, the Debtors retained Alvarez & Marsal Business Consulting, LLC ("Alvarez & Marsal"). In addition to assisting in developing a revised business plan, Alvarez & Marsal was tasked with assessing and analyzing the Debtors' business operations, identifying material operational improvement opportunities, and quantifying the benefits that could be generated from implementing those improvement opportunities. Alvarez & Marsal completed its business assessment toward the end of May 2006, and, together with Miller Buckfire and the Debtors' senior management, presented a revised business plan and projections for 2006 and beyond to the Debtors' board of directors in early June 2006.[26] The revised business plan and projections underlie the Plan.

### 4. First Amended Plan

Armed with a revised business plan and projections that for the first time imply recoveries for the Debtors' Equityholders, the Debtors immediately embarked on a process to obtain financing to repay valid claims in full or otherwise leave them unimpaired and to maximize recoveries for their existing Equityholders. With the assistance of Miller Buckfire, the Debtors sent requests for debt financing proposals upon their emergence from chapter 11 to 19 commercial and investment banks and also commenced discussions with the Significant Equityholders about investing additional equity into Foamex through a Rights Offering. The combination of the debt and equity financing would be used to repay Allowed Creditor Claims in full or otherwise leave them unimpaired and to fund the Reorganized Debtors' working capital requirements upon their emergence from chapter 11. Ultimately, the Debtors concluded, in the exercise of their business judgment, and in consultation with Miller Buckfire and Paul Weiss, that the Exit Facilities and the Rights Offering provided the Debtors with the best means of maximizing value for their Creditors and Equityholders.

---

[26] Pursuant to the Court order approving their retention, Alvarez & Marsal's findings were also shared with the Creditors' Committee and the Ad Hoc Committee of Senior Secured Noteholders.

On October 13, 2006, Foamex International entered into the Equity Commitment Agreement to conduct a $150 million Rights Offering to holders of Existing Common Stock and Existing Preferred Stock. Subject to the terms of the Equity Commitment Agreement, several Equityholders – D. E. Shaw, Goldman, Sachs & Co., Sigma Capital Associates, LLC, Par IV Master Fund, Ltd. and Sunrise Partners Limited Partnership (collectively the "Significant Equityholders") – have committed to fund any shortfall between $150 million and the actual proceeds from the Rights Offering through their commitment to purchase, as applicable, New Preferred Stock or Additional Common Stock on the Effective Date pursuant to the Plan.

Separately, on October 13, 2006, Foamex L.P. entered into a commitment with a group of lenders led by Bank of America, N.A. and Banc of America Securities LLC for up to $790 million of exit financing, of which it expects to draw approximately $635 million immediately upon its emergence from chapter 11.[27] Once consummated, the combination of the new equity investment and the exit financing would allow the Debtors to satisfy all Allowed Claims in full and allow holders of Existing Common Stock to retain their ownership interests, subject to any dilution that may occur in connection with the Rights Offering or otherwise.

### 5. The Plan

On November 27, 2007, the Debtors filed the Plan. The Plan reflects changes to the First Amended Plan, including the change in the treatment of Class 3 based upon the proposed settlement of the Senior Secured Note Premium Claim Litigation described in Article VI.N above.

### VIII.

### SUMMARY OF THE PLAN

### A. Introduction

The Debtors believe that confirmation of the Plan is critical to their continued survival and that the Plan provides the best opportunity for maximum recoveries for their creditors and shareholders. As a legal matter, the Debtors' creditors cannot receive more than the full recoveries provided for under the Plan and the Debtors believe, and will demonstrate to the Court, that their shareholders will receive at least as much, and likely far more, in value under the Plan than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT**

---

[27] The Debtors also filed a motion with the Bankruptcy Court seeking approval of the commitments described above, the commencement of the rights offering, the Company's payment of certain premiums, fees and expenses in connection therewith and modification of the DIP Credit Facilities to

| Class 10 | Existing Common Stock | Impaired |
| Class 11 | Other Common Equity Interests in Foamex International | Unimpaired |

For purposes of computing distributions under the Plan, Allowed Claims do not include Post-Petition Interest unless otherwise specified in the Plan.

### 1. Unclassified — Administrative Claims

Administrative Claims are any rights to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, any Substantial Contribution Claims, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all valid and existing reclamation claims, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code, but excluding any Senior Secured Notes Adequate Protection Payments.

Except with respect to Administrative Claims that are Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to

payment on or before the Administrative Claims Bar Date or forever be barred from doing so and from receiving payment thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute notice of the Administrative Claims Bar Date. The Reorganized Debtors shall have until the Claims Objection Deadline (or such longer period as may be allowed by order of the Court) to review and object to all Administrative Claims.

      **(a)**    <u>Fee Claims</u>. Fee Claims means an Administrative Claim under sections 330(a), 331 or 503 of the Bankruptcy Code for compensation of a professional or other person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Confirmation Date, including the reasonable non-legal expenses of the individual members of the Creditors' Committee incurred in the discharge of their duties as members of the Creditors' Committee, but excluding any Substantial Contribution Claims, Senior Secured Notes Adequate Protection Payments (which shall be paid in accordance with the DIP Order) and fees and expenses to be paid under the Exit Facility Commitment Letter and the Equity Commitment Agreement (which fees and expenses shall be paid in accordance with the terms of the Exit Facility Commitment Letter and the Equity Commitment Agreement, as applicable). All requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Confirmation Date shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Creditors' Committee, counsel to the Significant Equityholders and the Exit Facilities Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Confirmation Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and their counsel and the requesting party no later than thirty (30) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

      **(b)**    <u>Substantial Contribution Claims</u>. All requests for compensation or reimbursement of Substantial Contribution Claims shall be filed and served on the Reorganized Debtors and their counsel, the United States Trustee, counsel to the Significant Equityholders, counsel to the Exit Facilities Agent and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Effective Date. Unless Financing Claims and the Debtors agree to a different treatment, which shall be reasonably acceptable to the Significant Equityholders and the Exit Facilities Agent, the holders of the DIP Financing Claims, or their designee(s), shall receive payment in full in Cash of all DIP Financing Claims in full and final satisfaction thereof other than the obligations under the indemnity and other provisions of the DIP Credit Facilities that by their terms survive the termination of the DIP Credit Facilities.

      **4.**    **Class 1 — Other Priority Claims**

      Other Priority Claims are Claims that are entitled to priority pursuant to section 507(a) of the Bankruptcy Code – other than Administrative Claims and Priority Tax Claims. Such claims may include (i) unsecured Claims for accrued employee