## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )
                                          )          Chapter 11
Foamex International, Inc., *et al.*,      )
                                          )          Case No.  05-12685(KG)
                        Debtors.          )          Jointly Administered
_____          )

## MEMORANDUM OPINION [1]

The matter before the Court involves Debtors' Supplemental Objection to the Claim

of Gungor M. Solmaz and Diane M. Solmaz (the "Objection") (D.I. 2180), wherein Debtors

object to the claim of Gungor M. Solmaz and Diana M. Solmaz (the "Claimants") and

propose to reduce such claim (the "Claim") pursuant to Section 502(b)(6)[2] of the Bankruptcy

Code from $793,872.51 to $24,472.51.  Claimants oppose the Objection, arguing that the

Section 502(b)(6) limitation on a lessor's recovery does not apply to a portion of their claim.

For the reasons set forth below, the Objection will be granted in part, with the Claim amount

to be determined following completion of discovery and a hearing.

## I.  STATUS OF THE CASE

The debtors, Foamex International Inc., *et al.* (the "Debtors"), are leading

manufacturers of flexible polyurethane and advanced polymer foam products.  Debtors, who

conduct their businesses throughout the United States, Mexico, and Canada, filed their

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law pursuant to
Federal Rule of Bankruptcy Procedure 7052, made applicable to this matter by Federal Rule of Bankruptcy
Procedure 9014.

[2] "Section" will refer to sections of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

Chapter 11 petitions on September 19, 2005. The United States Trustee appointed the Official Committee of Unsecured Creditors on September 29, 2005.

Debtors filed their Joint Plan of Reorganization and Disclosure Statement on December 23, 2005 (the "Original Plan"). Debtors then filed their Second Amended Disclosure Statement and Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on November 27, 2006 (the "Second Plan"). Debtors brought about a remarkable improvement in business operations between the filing of the Original Plan and the Second Plan. As a result, Debtors' Second Plan provides for payment in full of all allowed claims and for Debtors' shareholders to retain their ownership interests, subject to any dilution of such interests which may result from a rights offering. The Court confirmed the Second Plan on February 1, 2007.

## II. JURISDICTION

This Court has jurisdiction over the matter *sub judice* pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), and it is a core proceeding under 28 U.S.C. §§ 157(b)(2), (A), (B), and (O). The relief requested by the parties is based upon Section 502(b) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3001, 3003, and 3007.

## III. FACTUAL BACKGROUND

On April 13, 1995, Debtors (through Foamex Fibers, Inc.) and Claimants entered into two leases (the "Leases") for certain nonresidential real property located in Newton, North Carolina. The Leases were for ten year terms, expiring in April, 2005 and were later

extended for an additional ten year period. The Leases provided space for manufacturing facilities and administrative offices (the "Premises"). The monthly rental amounts on the two extended Leases were $10,701.31 and $2,776.27, respectively.

The Leases provided an option to Debtors for early termination upon 180 days' prior written notice. Debtors sent written notice of termination of both Leases on April 29, 2005, with termination to occur on October 31, 2005. Debtors thereafter filed the Motion for an Order Authorizing the Debtors to Reject Executory Contracts and Unexpired Leases (D.I. 86) on September 28, 2005, which included Debtors request to reject the Leases. The Court granted the relief by Order, dated October 18, 2005, and the Leases were rejected effective September 30, 2005 (D.I. 198).

The Leases also included provisions relating to each party's maintenance and repair obligations. Article 7 of the Leases[3] provides:

> 7.1    _Lessee Repair Obligations_. Lessee shall, at its expenses, take good care of the Demised Premises, the fixtures and appurtenances therein and any of the Lessee's trade fixtures, furnishings, equipment, and personal property (collectively, "Lessee's Property"). Except as provided in Paragraph 7.2, Lessee shall be responsible for and shall promptly make all repairs, interior and exterior, structural and nonstructural, ordinary and extraordinary, in and to the demised Premises, Lessee, at its expense, shall be responsible for the repair, maintenance and replacement of all mechanical, electrical, sanitary, heating, ventilating, air-conditioning and other fixtures and equipment in the Demised Premises.

---

[3] The Leases appear to be identical and, of importance to the pending matter, the provisions at issue are identical.

3

> 7.2    <u>Lessor Repair Obligations</u>.  Lessor agrees, at its sole cost
> and expenses, to make any and all repairs in and to the Demised
> Premises only to the extent that, in Lessee's reasonable
> judgment, the cost of any individual repair would exceed
> $5,000.00.  Lessor agrees, at its sole cost and expenses, to
> remedy and correct any violation of Governmental Laws arising
> out of or relating to the construction of the improvements or the
> environmental condition of the Demised Premises on the date
> hereof.  Neither Lessee's acceptance of the Demised Premises
> nor Lessee's entry into possession thereof, nor payments of any
> monthly installments of Rent, nor Lessee's performance of any
> of the other provisions or conditions hereof, shall relieve Lessor
> of such responsibility.

Article 7.1 required Debtors, at their own expense, to maintain the Premises.  This included the obligation to ". . . . promptly make all repairs, interior and exterior, structural and nonstructural, ordinary and extraordinary. . . ."  Debtors were also responsible for ". . . . the repair, maintenance and replacement of all mechanical, electrical, sanitary, heating, ventilating, air-conditioning and other fixtures and equipment in the Demised Premises."  Debtors' duties were subject to the limitations contained in Article 7.2 of the Leases.  That clause required Claimants, as lessors, at their expense, ". . . . to make any and all repairs in and to the Demised Premises only to the extent that, in [Debtors'] reasonable judgment, the cost of any individual repair would exceed $5,000.00."

Claimants filed a proof of claim in this case on December 1, 2005, for a general unsecured claim in the amount of $793,872.51, consisting of: (a) $13,477.58 of unpaid rent; (b) $10,994.93 of unpaid taxes; and (c) $769,400.00 of repair obligations.  The alleged repair obligations are itemized in engineering reports attached to Claimants' proof of claim and are

associated with the costs to restore the Premises to the condition they would be in had the Debtors complied with their maintenance and repair obligations under the Lease.

On March 10, 2006, the Debtors filed the Objection and on January 11, 2007, they filed a Supplemental Objection. Debtors objected to the Claim and sought to reduce the claim by $769,400 and allow Claimants a general unsecured claim in the amount of $24,472.51, consisting of the unpaid rent and unpaid taxes components of the Claim. Debtors also request that the Claim be capped pursuant to Section 502(b)(6) at an amount no greater than one year of rent reserved under the Leases.[4]

The Objection was sustained by the April 11, 2006 Omnibus Order, which was subsequently vacated with respect to the Claim due to an alleged service issue. Briefing and argument on the applicability of the Section 502(b)(6) cap has been completed and the matter is ripe for decision.

## IV. DISCUSSION

The facts germane to the issue before the Court at this time are essentially not in dispute[5] and, therefore, only a legal issue must be decided, viz., should the Court limit the Claim which included repairs to the Premises at the statutory cap for lease termination damages?

---

[4] An issue also remains to be decided at a later date, viz., if the $5,000 cap on repairs under Section 7.2 of the Leases is aggregate or per repair. The issue is not presently before the Court.

[5] The parties have submitted only the legal issue of the applicability of the Section 502(b)(6) cap for decision by the Court at this time. The amount of alleged damages under the repair and maintenance provisions of the Leases will be decided following an evidentiary hearing presently scheduled for July 18, 2007.

## A.  Legislative History

In order to understand the parties' arguments, the Court must describe the distinction between Section 502(b)(6) of the Bankruptcy Code and its predecessor, section 63(a)(9) of the Bankruptcy Act.  The relevant difference[6] which the parties address and courts have grappled to explain is but one short phrase that appears in the Act and was not carried forward in the Code.  Section 63(a)(9) of the Bankruptcy Act provided:

> the claim of a landlord for damages or injury resulting from the rejection of an unexpired lease of real estate *or for damages or indemnity under a covenant contained in such lease* shall in no event be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year next exceeding the date of the surrender of the premises to the landlord or the date of re-entry of the landlord, whichever first occurs, whether before or after bankruptcy, plus an amount equal to the unpaid rent accrued, without acceleration, up to date.  *(Emphasis added)*.

The words in emphasis do not appear in Section 502(b)(6).  Claimants argue that the omitted phrase is evidence of Congressional intent to exclude covenants, such as repair and maintenance requirements, from the limitation on a lessor's damages recovery.  If Claimants are correct, the repair and maintenance covenants in the Leases are not subject to a cap under Section 502(b)(6).  Debtors argue to the contrary.  There is persuasive case law supporting both positions.

---

[6]  Another difference between the two sections is that while the Bankruptcy Act section uses "rejection," Section 502(b)(6) uses "termination."  The difference is not germane here and the parties have not argued otherwise.

## B. <u>Debtors' Argument</u>

At issue is the scope of the damages cap under Section 502(b)(6), which sets a limit

on the amount of damages arising from termination of a lease recoverable by the lessor of

real property.[7]  Debtors concede that there is no controlling precedent on this issue in this

Circuit or District.   However, Debtors argue that case law coupled with legislative history

support a ruling by this Court that the Section 502(b)(6) cap applies to the Claim without

regard to the type of damages involved.   Debtors urge this Court to adopt the reasoning

followed in decisions from other jurisdictions which theorize that the rejection of a lease

constitutes a breach of the lease and all of the lease covenants, including those for repair and

maintenance, and such breach allows a  lessor to file a claim for all damages, which  then

triggers the Section 502(b)(6) cap.   Debtors rely heavily on *Kuske v. McSheridan* (*In re

McSheridan*), 184 B.R. 91 (9th Cir. B.A.P. 1995); *In re Mr. Gatti's, Inc.*, 162 B.R. 1004

---

[7]  Section 502(b) states in relevant part:

Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

\*    \*    \*

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>> (I) the date of the filing of the petition; and
>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b).

(Bankr.W.D.Tex. 1994); and *In re New Valley Corp.*, 2000 U.S. Dist. LEXIS 12663 (D.N.J. Aug. 31, 2000).

In *McSheridan*, the Bankruptcy Appellate Panel ("BAP") for the Ninth Circuit held that damages to the leasehold which resulted from the debtors' breach of repair and maintenance covenants in the lease prior to the rejection of the lease were subject to the Section 502(b)(6) cap. The BAP premised its conclusion on its analysis of the predecessor to Section 502(b)(6), section 63(a)(9) of the Bankruptcy Act, and found that:

> Section 63(a)(9) of the Bankruptcy Act referred to the landlord's claim for damages or injury resulting from rejection, and the Bankruptcy Act provided and the Code still provides that rejection equals breach. Congress clearly intended that a landlord's claim for any damages resulting from the rejection of the lease by the debtor, including any and all damages for breach of any covenants within the lease, was to be computed and allowed within the limits of former Section 63(a)(9).

*McSheridan* 184 B.R. at 101 (citations omitted).

The BAP also concluded that "[t]he distinction between past obligations under the lease and damages 'caused' by the termination is incorrect because all damages due to non-performance are encompassed by the 'statute'."

Debtors also place great weight on *Mr. Gatti's*, another case in which a debtor breached a repair and maintenance lease covenant. The court ruled that the damages which resulted from breaches of the covenants were limited by Section 502(b)(6) because a different result would drastically change established bankruptcy law. The court based its decision upon the holdings of numerous cases and legislative history. The court quoted the

legislative history at length:

The relevant legislative history provides as follows:

> Paragraph (7) *derived from current law, limits the damages*
> *allowable to a landlord of the debtor*.  The history of this
> provision is set out at length in *Oldden v. Tonto Realty Co.*, 143
> F.2d 916 (2nd Cir.1944).  It is designed to compensate the
> landlord for his loss while not permitting a claim so large (based
> on a long-term lease) as to prevent other general unsecured
> creditors from recovering a dividend from the estate . . . .
> *"Moreover, [landlord's] allowed claim is for his total damages*
> *as limited by this paragraph . . . ."*  H.R. 95-595 to accompany
> H.R. 8200, 95th Cong. 1st Sess. (1977) pp. 353-355 (*emphasis*
> *added*).

*Mr. Gatti's*, 162 B.R. at 1009, n.4.

Similarly, in *New Valley Corp.* which involved deferred maintenance payments under

a lease, the district court relied on *McSheridan* and *Mr. Gatti's* in holding that Section

502(b)(6) includes maintenance provisions in its limitation on landlord recoveries.   In

addition, the court suggested that there was no significance in the conversion from the

Bankruptcy Act, section 63(a)(9).

> Moreover, nothing in the legislative history suggests that
> Congress intended to effectuate a change in this area.  In fact,
> the legislative history states that the current law, Section
> 502(b)(6) derives from the precursor Section 63(a)(9) of the act.

*New Valley*, 2000 U.S. Dist. LEXIS 12663 at *29.

Finally, Debtors have asked the Court to consider *First Bank National Association v.*

*Federal Deposit Insurance Corporation*, 79 F.3d 362 (3d Cir. 1996).  *First Bank* was not a

bankruptcy case but dealt with damages related to a disaffirmed lease under the Financial

9

Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").  In *First Bank*,

the Third Circuit addressed "a narrow issue: under what circumstances, if any, is the FDIC

required to pay the cost of lease-mandated structural repairs and modifications to a building

when it acts as a receiver for a failed lessee - thrift and disaffirms its lease under FIRREA

Enforcement Act of 1989, 12 U.S.C. § 1811, et seq.?"  *Id.* at 364.  In its decision, the Third

Circuit used Section 502(b)(6) to interpret the applicable FIRREA provision, on the basis that

the provision "like much of FIRREA, was modeled after the Bankruptcy Code, in this

instance, 11 U.S.C. § 502(b)(6), the provision dealing with a trustee's obligations if it

terminates a lease." *Id.* at 366 n.4.

It is helpful to explore the significant facts of *First Bank*.  First Bank National

Association ("FBNA") leased property to Meritor Savings Bank ("Meritor"), which was

placed into receivership with The Federal Deposit Insurance Corporation ("FDIC") as

receiver.  FBNA sued FDIC for Meritor's breach of the lease, including Meritor's failure to

make repairs and upgrades to the property. FIRREA, in relevant part provides:

> (A) In general, if the conservation receiver disaffirms or
> repudiates a lease under which the insured depository institution
> was lessee, the conservator or receiver shall not be liable for any
> damages (other than damages determined pursuant to
> subparagraph (B)) for the disaffirmance or repudiation of such
> lease.
>
> *       *       *       *

Subparagraph (B) governs payments of rent, and provides:

> (B) Payments of rent

10

> Notwithstanding subparagraph (A), the lessor under a
> lease to which such subparagraph applies shall-
>> (i) be entitled to the contractual rent accruing
>> before the later of the date-
> (I) the notice of disaffirmance or repudiation is mailed;
> (II) the disaffirmance or repudiation becomes effective,
> unless the lessor is in default or breach of the terms of
> the lease;
>> (ii) have no claim for damages under any
>> acceleration
> clause or other penalty provision in the lease; and
>> (iii) have a claim for any unpaid rent, subject to all
>> appropriate offsets and defenses, due as of the date of the
>> appointment which shall be paid in accordance with this
>> subsection and subsection (i) of this section.

12 U.S.C. Section 1821(e)(4).

FBNA argued that repairs and upgrades were independent of the lease termination and therefore such costs were recoverable. The Third Circuit disagreed and found that FIRREA Section 1821(e)(4) capped all damages. The Third Circuit relied upon *McSheridan* for the point that breaches of covenants are termination damages. *Id.* at 367. Therefore, according to Debtors, the *First Bank* decision, which applied bankruptcy law, is persuasive if not controlling precedent and supports their position.

In summary, Debtors argue that the limitation on lease termination damages includes covenants for maintenance and repair. Therefore, if Debtors are correct, Claimants alleged damages for any breaches by Debtors of their maintenance and repair obligations are subject to the Section 502(b)(6) cap.

## C. **Claimants' Argument**

Claimants, on the other hand, argue that Section 502(b)(6) is inapplicable because the Claim is for obligations which arose prior to termination, i.e., maintenance and repair obligations together with taxes and rent accruing before termination. Claimants therefore argue that: "Because the repair and maintenance damages sought by the Claim are unrelated to, and independent of, the termination of the Leases, the damages are not capped by Section 502(b)(6) and should be allowed in their full amount." (Reply to Supplemental Objection at 2-3) (D.I. 2227).

Claimants contend that the plain language of Section 502(b)(6) limits the cap to claims resulting from termination of a lease, and damages unrelated to termination are allowed in full. *In re Bob's Sea Ray Boats*, 143 B.R. at 229, 231-32 (Bankr.D.N.D. 1992) (allowed claim for damages for failure to maintain premises); *In re Atlantic Container Corp.*, 133 B.R. 980, 987-88 (Bankr.D.Ill. 1991) (allowed damages resulting from physical neglect and damage to the property ); *In re Best Prod., Inc.*, 229 B.R. 673, 679 (Bankr.E.D.Va.1998) (landlord was entitled to claim for deferred maintenance damages).

Claimants also point out that even though it is unnecessary to refer to the legislative history, a reading of the statute gives effect to the legislative purpose behind the provision, i.e. to compensate a landlord for the loss suffered upon termination of a lease, while not permitting large claims for breaches of long-term leases. The damages claimed here, Claimants argue, arise from breaches of certain covenants of the Leases that arose prior to

termination and are not future, speculative damages which Congress sought to limit. "Congress intended to compensate landlords for their actual damages while placing a limit on large future, speculative damages which would displace other creditors' claims." *In re Vause*, 886 F.2d 794, 801-802 (6th Cir. 1989).

A thoughtful analysis contrary to the *McSheridan* holding and in support of Claimants' argument is *Best Products*. The *Best Products* court refused to follow *McSheridan*, reasoning that *McSheridan* rested ". . . . upon a somewhat tortured analysis of the relevant code sections . . . ." and did not find support in the legislative history of Section 502(b)(6) or its predecessor, Bankruptcy Act section 603(a)(9).[8] *Best Prod.*, 229 B.R. at 677-78.

In *Best Products*, a landlord sought allowance of a claim for deferred maintenance in addition to a claim for future rent. The debtor, as here, objected to the claim arguing that under *McSheridan* and *Mr. Gatti's*, deferred maintenance charges were damages resulting from the rejection of the lease and thus subject to the statutory cap. In rejecting the debtor's claim objection, the *Best Products* court provided an exhaustive analysis of the legislative history of both Section 502(b)(6) and its predecessor under the Bankruptcy Act, section 63(a)(9) and concluded that *McSheridan* was decided incorrectly. The court determined that it was "unable to find anything in the legislative history of the Bankruptcy Act or current code that overtly suggests Congress intended to do more than change common law rules of

---

[8] The court did not explain why it believed the analysis was "tortured".

law so as to allow landlords to receive a limited portion of future rents in bankruptcy." *Best*

*Prod.* 229 B.R., 673, 678.  The *Best Products* court further observed:[9]

> Most of the cases found by this Court do not follow the
> restrictive rationale of *Mr. Gatti's* and *McSheridan*.  Rather, the
> weight of authority and reported opinions where landlords have
> actually claimed damages for such items as maintenance and
> repairs is that these damages do *not* result "from the termination
> of a lease of real property" and are therefore not subject to the
> cap of § 502(b)(6)(A) [footnote omitted].

*Best Products*, 229 B.R. at 678.

> In *Atlantic Container*, the court addressed the issue as follows:

> Whether the Landlords' pre-petition claims for physical damage
> to the Premises and for repair and maintenance expenses
> constitute claims for "future rent" or "lease termination
> damages," which are subject to a cap or ceiling under §
> 502(b)(6) of the Bankruptcy Code;

*Atl. Container*, 33 B.R. at 984.

The chapter 7 trustee argued that (1) the damages arose only on termination of the leases and

Congress specifically intended to limit the claims for damages from breaches of non-

monetary lease covenants through Section 502(b)(6); or (2) alternatively, the cost of repairs

could be considered "future rent" and therefore subject to the limitation on termination

damage under Section 502(b)(6).  *Id.* at 985.  The court held that (1) the phrase "damages

resulting from the termination of a lease" limits only damages which the lessor "would have

---

[9]  In addition to the cases previously cited, the court cited the following cases which reached the same result: *In re Farley, Inc.*, 146 B.R. 739, 746 (Bankr.N.D.Ill. 1992); *In re Q-Masters, Inc.*, 135 B.R. 157, 161 (Bankr.S.D.Fla. 1991); and *Heck's Inc. v. Cowron & Co.*, (*In re Heck's*), 123 B.R. 544, 546 (Bankr.S.D.W.Va. 1991).

14

avoided but for the lease termination," and that damages to the premises caused by debtor's failure to repair and maintain the premises were unrelated to termination of the lease; and (2) the primary purpose for the § 502(b)(6) cap is to limit claims for prospective damages arising from termination of a lease. The court therefore ruled that the landlord's claim for its expenses in repairing the premises which resulted from debtor's breach of the lease covenants was not subject to the Section 502(b)(6) cap.

## V.  DECISION

### A.  Section 502(b)(6) - "Rent Reserved"

It appears that the parties are not disputing whether or not the repair and maintenance requirements under the Leases constitute rent.[10]  Clearly, were they "rent" the obligations would be included as "rent reserved" within the Section 502(b)(6) cap. The Court is satisfied that the obligations at issue are not rent.

In *In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339 (Bankr.D.Del. 1998), this Court addressed the measure of "rent reserved" under Section 502(b)(6) and, specifically, which charges are allowed under Section 502(b)(6). In his analysis, then Chief Judge Walsh looked at the three-part test "known as the *McSheridan* test" (*Id*. at 349) to determine if attorneys' fees charges constituted "rent reserved" under Section 502(b)(6). The elements of the *McSheridan* test are:

---

[10]  The Court has a duty "to make an independent determination of what constitutes 'rent reserved' because labels alone may be misleading." *McSheridan*, 184 B.R. 91, 99.

15

> 1)    The charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;
>
> 2)    The charge must be related to the value of the property or the lease thereon; and
>
> 3)    [T]he charge must be properly classifiable as rent because it is fixed, regular or periodic charge.

*McSheridan*, 184 B.R. 91, 99.

Here, it is beyond cavil that Claimants' maintenance and repair damages do not satisfy the *McSheridan* test, and therefore the damages are not "rent reserved" and accordingly are not subject to the statutory cap as rent pursuant to Section 502(b)(6).  The application of the *McSheridan* factors permits no other conclusion.

First, the maintenance and repair covenants are not designated as "rent" or "additional rent."  They are designated as tenants' (Debtors') lease obligations, however, which would satisfy the *McSheridan* test for classification as rent.

Second, the maintenance and repair obligations are related to the use of the Premises, not the value of the property.  A review of a number of cases leads the Court to conclude that general maintenance and repair obligations are use related.  Such cases [11] include *Farley,*

---

[11]    The *McSheridan* court cited each of these cases and, as well, discussed a decision by Judge Augustus Hand in *In re United Cigar Stores Co. of America*, 86 F.2d 629 (2d Cir. 1936), cert. denied 300 U.S. 679 (1937), in which Judge Hand found that the costs of repair and maintenance were rent because the lease referred to them as "additional rent." Judge Hand speculated that the additional tenant obligations were in the nature of rent because "regular" rent would have been larger in the absence of the tenant's additional obligations. *Id.* at 633. The *McSheridan* panel noted that the *United Cigar Stores* interpretation was overstated since,

> "[S]uch a determination could conceivably apply to every covenant in the lease and would nullify the provisions of § 502(b)(6)(A), which was meant to cap the damages, not to encourage allowance of the entire damage claim.

(continued...)

16

*Inc.*, 146 B.R. 739, 746 (Bankr.N.D.Ill. 1992) ("rent reserved" did not include general maintenance); *In re Goldblatt Bros., Inc.*, 66 B.R. 337, 339 (Bankr.N.D.Ill. 1986) (lessee's obligation to make all repairs and improvements not included as "rent reserved" because not required for the use of the leasehold). Accordingly, the Court is convinced that under the second prong of *McSheridan*, the repair and maintenance charges are not rent under Section 502(b)(6).

Most convincing that the repair and maintenance charges are not "rent reserved" is that, in the language of *McSheridan*, the lease obligations are not "a fixed, regular or periodic charge." *McSheridan*, 184 B.R. at 100. The repair and maintenance obligations were not time related but required performance "promptly," meaning as they arose. Here again, *McSheridan* leads to the necessary conclusion that the obligations were not rent. For illustrative purposes, unlike charges for common area maintenance found in many leases which are assessed on a regular, periodic schedule, the maintenance and repair obligations of Debtors to Claimants were episodic, not fixed, regular or periodic.

The application of the *McSheridan* factors for determining whether or not a tenant's lease obligation is "rent" for purposes of Section 502(b)(6) leads to only one conclusion: the maintenance and repair obligations are not rent. All three of the factors must be present for

---

[11](...continued)
> We prefer to view this case as one where the repair costs were so fixed and regular as to be considered additional rent."

*McSheridan*, 184 B.R. at 99.

the Court to deem an obligation to be "rent" and only one of the requirements is met in this

case.

## B.  **Lease Rejection**

Having determined that Debtors' maintenance and repair obligations are not rent, the

Court must still consider the effect of the lease rejection on the obligations, which is what

the BAP did in *McSheridan*.  The *McSheridan* BAP concluded:

> Section 365(d)(3) provides for the performance under the lease
> by the Trustee until the lease is assumed or rejected.  Section
> 365(g) provides that rejection constitutes breach of the lease.
> Section 502(g) provides that a "claim arising from the rejection,
> under section 365 of this title . . . shall be allowed under
> Subsection (a), (b) or (c) of this section" as a prepetition claim.
> Section 502(b)(6) further provides that a claim of a lessor for
> damages resulting from the termination of the lease of real
> property shall be subject to the statutory cap.
>
> Reading these provisions as a whole, therefore, rejection of the
> lease results in the breach of each and every provision of the
> lease, including covenants, and § 502(b)(6) is intended to limit
> the lessor's damages resulting from that rejection.  The damages
> are those resulting from nonperformance of the Debtor's
> obligations under the lease. . . . The distinction between past
> obligations under the lease and damages "caused" by the
> termination is incorrect because all damages due to
> nonperformance are encompassed by the statute.
>
> Even courts which do not accept that rejection of the lease
> equates with termination would limit all of the landlord's
> damage claims pursuant to § 502(b)(6) because that is the
> section dealing with claims by a lessor against the estate in
> bankruptcy.

*McSheridan*, 184 B.R. at 101-02 (citations omitted).

*McSheridan* held that the bankruptcy court did not commit error by limiting the landlord's total damage claim by the damages cap provision of Section 502(b)(6)(A).  The *McSheridan* court concluded as follows:

> For non-rental charges in the Triple-Net lease to be "rent reserved" pursuant to § 502(b)(6)(A), they must meet the aforementioned three-part test.  Furthermore, the provisions of § 502(b)(6)(A) encompasses [*sic*] damages arising from breach of any and all lease covenants upon termination of the lease.

*Id.* at 102.  The ruling of *McSheridan* was that a landlord is entitled to a single claim for all lease termination damages which are measured by Section 502(b)(6).  The single claim includes both pre-petition and post-petition damages resulting from breaches of the lease.

In reaching its decision, the Court has made a comprehensive review of the legislative history and the cases the parties cited in support of their respective positions.  There are well-reasoned decisions on both sides of the argument and no controlling decision in this Circuit.  On balance, however, the Court is satisfied that *McSheridan* is the better view, particularly when the Third Circuit's decision in *First Bank* adopted the reasoning of *McSheridan* and did so applying bankruptcy law[12].  *McSheridan* convincingly and firmly concluded that "rejection of the lease results in the breach of all of the lease provisions, including covenants, and Section 502(b)(6) is intended to limit the lessor's damages resulting from the rejection." *McSheridan*, 184 B.R. at 101.  *McSheridan* is clear in its holding that lessor's are entitled to one claim and that claim is limited by Section 502(b)(6).  Furthermore, the single, capped

---

[12]  The Court reads *First Bank* as the Third Circuit's implicit, if not explicit, approval of the *McSheridan* rationale and holding.

claim governs "all time intervals," meaning prepetition and postpetition breaches of the lease

and any resulting damages.  *Id.* at 99-101.

The Ninth Circuit BAP based its conclusion on essentially two grounds which this

Court adopts.  First, the court premised its holding on the basis that:

> Such an interpretation fulfills the purpose of "discharg[ing] the debtor from liability to future suits based upon the lease 'and giving' a new and more certain remedy for a limited amount, in lieu of an old remedy inefficient and uncertain in its result."[13]

*Id.* at 101.  Second, the court looked to the legislative history and Sections 365(d)(3), 365(g),

502(g) and 502(b)(6), and read them "as a whole" to support its ruling.  Thus, the court

concluded:

> [T]he provisions of § 502(b)(6)(A) encompasses damages arising from breach of any and all lease covenants upon termination of the lease.

*Id.* at 102.

## VI.  CONCLUSION

The Court finds that Claimants' damages from the failure, if any, by Debtors to

perform the maintenance and repair obligations under the Leases are limited by the statutory

cap.  Section 502(b)(6) was enacted to curtail exorbitant future damage claims by landlords

on long-term leases that threaten to consume a debtor's bankruptcy estate to the detriment

of other creditors.

---

[13] The material within the quotation marks is from *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 453 (1937).

Accordingly, Debtors' Supplemental Objection to the Claim of Gungor M. Solmaz and Diana M. Solmaz is sustained, in part. Claimants will be allowed an unsecured claim in the amount of $13,477.58 for unpaid rent and $10,994.93 for unpaid taxes. The Court will determine, following an evidentiary hearing, if Claimants will also be allowed an unsecured claim, and in what amount, for any breach of the repair and maintenance provisions of the Leases, subject to the provisions of the Leases and the Section 502(b)(6) cap. An appropriate order follows.

DATE: May 16, 2007
       Wilmington, Delaware

KEVIN GROSS, U.S.B.J.